UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

STEVEN HORNE,                          )
RONALD BROWN                           )
                                       )
        Plaintiffs                     )
v.                                     )
                                       )
CITY OF BOSTON,                        )        C.A. No. 04-10718-RGS
SERGEANT ERIC BULMAN, and              )
SERGEANT JOHN DAVIN,                   )
                                       )
        Defendants                     )
_____)

## DEFENDANTS' CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, PURSUANT TO LOCAL RULE 56.1

        Defendants Eric Bulman and John Davin hereby submit in support of their

Motion for Summary Judgment the following material facts of record, as to which no

genuine dispute exists for trial, pursuant to L.R.D.Mass. 56.1:

The Parties and Youth Violence Strike Force Commanders

        1.      The Boston Police Department is a paramilitary organization

headed by a Police Commissioner appointed by the Mayor of the City of Boston. An

appointed Command Staff comprised of Superintendents and Deputy Superintendents

serve at the will of the Commissioner. The remaining sworn officers hold rank according

to the civil service exam system, and are members of collective bargaining units. Union

contracts govern a number of the terms and conditions of employment of sworn

personnel.

2.      The Police Commissioner has the "Cognizance and control of the government, administration, disposition and discipline of the department, and of the police force."  St. 1962, c. 322, § 1.

3.      The BPD is headquartered at One Schroeder Plaza, Boston, Massachusetts and is comprised of eleven police districts, each located in a neighborhood of the City of Boston; investigatory divisions (Homicide, Drug Control, Major Case, Community Disorders) with centralized commands based at headquarters and officers assigned to the police districts; specialized units based both at headquarters (Internal Affairs; Crime Lab) and at external locations (Sexual Assault, Family Justice Center, Anti-Corruption).

4.      Steven Horne is a police officer, hired in March 1996 by the City of Boston Police Department (hereafter, "BPD").  In August 1999, he was transferred into the Youth Violence Strike Force (hereafter, "YVSF") to the day unit division of the YVSF.  In May 2001, Horne was transferred out of the YVSF and into the District C-6 station.  (Exhibit 1, Horne deposition, 9 - 17; Exhibit 2, personnel orders).

5.      Ronald Brown is a former Boston Police Officer, hired in June 1997.  (Exhibit 3, Brown deposition, 16).  His employment with the BPD was terminated after he was convicted of felony offenses stemming from an off duty incident where he assaulted one or more persons with his firearm.   (Exhibit 4, certified copy of conviction). In August 1999, Brown was transferred into the YVSF, day unit division.  (Ex. 3, 45).  In May 2001, Brown was transferred out of the YVSF and into the District B-2 station. (Ex. 2).

6.      Eric Bulman is a Sergeant Detective with the BPD.  In August 1999, he was a Sergeant assigned to the YVSF day unit and the plaintiffs were among those under his supervision.  In April 2000, Bulman was promoted to Sergeant Detective

2

and reassigned to supervise the YVSF detectives, night division.  (Exhibit 5, Bulman deposition, 50; Ex. 2).

7.      John Davin is a Lieutenant with the BPD.  In April 2000 he was assigned to the YVSF as a Sergeant, and succeeded Bulman as the supervisor of the day warrant apprehension unit.  Davin then became the plaintiffs' supervisor, and except for the occasional times when his officers assisted the detectives, Bulman had no further responsibility for the plaintiffs or other officers on the day shift  (Exhibit 6, Davin deposition, 46 - 50).  He was in this position when plaintiffs were transferred out of the YVSF.  (Ex. 2 ).

8.      In August 1999, when the plaintiffs transferred into the YVSF, the commander of the day division was Lieutenant Gary French.  French transferred out of the YVSF in May 2000.  (Ex. 2).

9.      Lieutenant Kevin Foley was the commander of the night division and had been in that position since 1998.  In May 2000, the day and night command positions were consolidated, and Foley replaced French as the commander of the YVSF.  Foley was the commander of the unit in April 2001 when the plaintiffs were transferred out of the YVSF.  (Exhibit 7, Foley deposition, 66 – 70;  80 – 82;  98 – 102;  Ex. 2).

## Plaintiffs' Transfer Into The YVSF In August 1999

10.      Vacancies within BPD divisions and units are sometimes "posted," that is, a notice is circulated Department wide inviting interested officers to apply for vacancies as they occur.  (Exhibit 8, French, 30-45).

11.      No set practice governs the assignments of officers to units.  The Police Commissioner has the inherent right to deploy officers within the ranks of the Department.  However, in many instances commanders may interview and recommend officers for assignment to their units.  Typically, those recommendations are forwarded

up the chain of command to the Police Commissioner's office.  (Ex. 7,  96-105; Exhibit 9, Dowd deposition, 126; 290; Ex. 8, 30-45).

12.     Assignment to the YVSF is attractive to many officers, as the personnel assigned to it do not answer 911 calls, and enjoy more discretion in performing their functions (such as tracking fugitives, and gang interdiction work) (Ex. 8,  48-53). The YVSF does not, however, provide as many opportunities to perform detail work or overtime as do districts, and thus is less attractive to some officers because it is not as lucrative as district assignments can be.  (Ex. 8, 56;  Ex. 7,  111-113)

13.     In the summer of 1999, a notice issued announcing vacancies within the Youth Violence Strike Force.  Both plaintiffs interviewed with Lieutenant French (who was then the commander of the unit) for positions within the YVSF in the summer months of 1999.  (Ex. 3, 38; Ex. 1, 13 -14, Ex. 8, 31-33).

14.     French told plaintiffs that the mission of the YVSF is to gather information in neighborhoods plagued with gun and drug activity, in order to minimize criminal activity among youth.  Most of the unit's work focused on the Dorchester, Mattapan and Roxbury neighborhoods, and gang intervention was a significant responsibility of the unit.  Ex. 1,  13 -15;  Ex. 3,  41-42).

15.     French described looking for officers who were "relatively easygoing but aggressive on the street, aggressive in the sense of searching out information, searching out community contacts, searching out informants.  I was looking for officers that weren't problematic, didn't have a history of internal affairs complaints … didn't have a reputation of being overly aggressive, … that were progressive in the sense of how they wanted to do policing, … that were familiar with the neighborhoods, … that had some experience … that would fit in with the group, fit in with the other [officers]."  (Ex. 8,  31)

4

16.    French does not recall the specifics of his interviews with the plaintiffs, but recalls that Brown's brother, Greg Brown, had been working with the YVSF for a long time and was one of the best officers in the Boston Police Department. (Ex. 8, 36-37).

17.    After interviewing the applicants, French gave a list of ten or so officers to his commander; he believes that Horne and Brown were among the officers he recommended for transfer into the unit. (Ex. 8, 40-45)

18.    In addition to the plaintiffs, three other officers were transferred into the YVSF in August 1999:    Adolfo Brito (Cape Verdean male), Joseph McCarthy (white male) and Mariso Langer (Hispanic male). (Ex. 2 ).

19.    Upon reporting to the YVSF, plaintiffs were given an orientation during which they were addressed by French, community activists, and clergy leaders. The new officers were told that they were to get close to the youth in the neighborhoods to find out what was going on;  the goal of the unit was to minimize gang activity by their presence in the neighborhoods and by identifying those who were causing problems in the community. (Ex. 1, 18 - 32; Ex. 3, 58-59; Ex. 8, , 118-120).

20.    The day shift, to which plaintiffs and the three other new officers were assigned, focused on youth who were engaged in gang or violent crime activities and warrant apprehension work. Some officers assigned to the day shift focused both on warrant apprehension, and on intervention work with youth in the public schools (Ex. 1, 27 – 28).    With regard to outstanding warrants, the unit had a practice of prioritizing the most serious offenders.   When he was the commander of the unit, Foley made it a point to prioritize wanted murderers. (Ex. 7, 367 - 374).    Plaintiffs had had some experience in tracking and serving felony warrants when they worked in the districts – Brown had "served quite a few warrants" when assigned to District C-11 (Ex. 3, 73).   \

**Bulman's Supervision of Plaintiffs**

21.    Brown and Horne believe that, from the beginning of their transfer into the YVSF, Bulman favored white officers over minority officers.  (Complaint)

22.    Horne reports that Bulman told the new officers during orientation that "you guys must prove yourselves, you're going to have to prove yourselves to be in this unit, just to make sure you do what you need to do, basically.  He just kept reiterating, basically, you guys need to really prove yourself, basically pointing at us; I was like, okay."  (Ex. 1, 30).

23.    Brown also heard Bulman say that they had to prove themselves, and while he first believed this was general advice from Bulman, he came to believe Bulman's comments were a reflection of his feeling that he did not want black officers on the day shift.  Brown bases his opinions on the fact that Bulman's statements to him during the first meetings were "demeaning, it was body language, his body language was harsh and hard, it wasn't the type of language that you would say, … somebody that was new in the unit, you come in friendly … his body language was more of a hard type, you know, no smiles, just up and go."  (Ex.3, 115-124)

24.    Horne also claims that Bulman told him on two occasions that he (and Officer Brito) had taken the place of Officers Frank McLaughlin and Greg Long (both of whom are white).  Horne does not recall when he heard Bulman make this statement; it could have been "a few weeks in or maybe, it could have been a year or so" after he joined the YVSF.  (Ex. 1, 55 – 57).

25.    Brown also claims to have heard this statement.  (Ex. 3, 118 – 122).

26.    Bulman assigned Horne, Brown and Brito to work as a team, and Officers Langer and McCarthy were assigned to work together.  The two teams were

given one file each to work on, files Horne describes as "minimal, you know, minor warrants of individuals to go seek out … [were given ] like one or two files [to investigate]," (Ex. 1, 31- 32; 38 – 40).  Brown's recollection is that they were not given any files at all to work on, but instead were left to sit at the YVSF base while other officers went to work.  (Ex. 3, 126)

       27.    Horne and Brown felt that they were not given adequate training on how to do their jobs in the YVSF:  "The reason why we hadn't started immediately working on [warrant apprehensions] … [was] because we didn't know what to do … he just handed [the file] to us …"   Lieutenant French  "let us know … the next room is where you can find all the information, but still, like I said, we didn't know what to do." (Ex. 1, 39 – 42).  Horne and Brown felt that Bulman gave more hands – on attention to the white officers, and was neglectful of their training needs.   (Ex. 1, 47,  Ex. 3, 125- 126)

       28.    Brown had informed French during his interview that "I was interested in the intervention and prevention of youth violence, and [French] indicated that's what he's looking for, people to work … with schools, and I was interested, I guess I was excited, .. that that's what he did…"  (Ex. 3, 42).  Brown reports that for approximately the first two months of his assignment to the YVSF, "I think we spent, well, I spent a lot of time working with the school officers doing anticrime and school assignments before I started doing any kind of apprehension, because we were not introduced to it, may I say, although there were officers performing warrant apprehensions, but we were not introduced to it."  (Ex. 3, 45 – 46).

       29.    Usually, three officers are assigned to work together as a squad in a cruiser.   Horne and Brown report that the YVSF squads were segregated by race, that is, that white officers rode together and black officers rode together.  Foley, French,

7

Bulman and Davin report that officers are permitted to select who they want to work with in squads. (Ex. 7 (Foley), 421: "My policy was that people could ride with whomever they requested to ride with. Because if they were riding together with people they wanted to work with, their productivity would be greater." Ex. 8 (French), 87 – 88: "A lot of times if officers sort of click together, we would let them work together. If there was a conflict … we would let them work with who they wanted to work with. So it was pretty much a self-selection process."

### Bulman's Critiques of Plaintiffs

30.     According to Brown, Bulman again told him that he would have to prove himself to remain in the unit shortly after an incident in which Brown and Officer Brito attempted to serve a warrant on a suspect who was the target of another squad. Bulman made "negative," "non supervision type statements" to Brown (the details of which he could not recall); Brown assumes because the other squad complained. (Ex. 3, 126 – 138).

31.     Bulman also criticized Brown and Horne for being secretive in regard to the apprehension of another suspect who again, was a target of a different YVSF squad. Bulman chastised the plaintiffs for failing to inform the other squad of information leading to the suspect's arrest. Plaintiffs explained that the information came to them when the other squad was on a day off, that they had entered the information into the YVSF database, and that "if you [Bulman] read the Lotus Notes database that you trained us to use and put information in as an intelligence tool, you would have known that the information was there … we had also informed [the other squad]." (Ex. 3, 181 – 184).

32.     Bulman also questioned plaintiffs' judgment in conducting off duty arrests, and in utilizing questionable tactics (such as when plaintiffs obtained a key

8

to an apartment maintained by a suspect's girlfriend, and entering the apartment to check her voice mail). Bulman "advised them that this was not a good practice." (Ex. 5, 193-194).

33.     On another occasion, plaintiffs sought to arrest a suspect, working with Lieutenant Foley, but Foley called off the operation after speaking to Bulman. Although plaintiffs were informed that the operation had been cancelled due to safety concerns, Brown believes that the real reason was that Bulman wanted white officers to receive the credit for the apprehension. (Ex. 5, 188 – 193).

34.     Bulman shared his observations of the plaintiffs' reluctance to share information.   Although the unit had a number of information databases in which officers, including plaintiffs, entered information, "some of the subtleties of intelligence information wasn't [sic] being provided."    …   "If there is a question relating to the basis of knowledge on the intelligence report, the supervisor would go to the officer and ask him where did you get this?  How reliable is it?  A lot of the intelligence report is just raw information or street sources, or it could be a confidential informant who is carded and has credibility. … Those are the types of things supervisors and investigators were interested in knowing." (Ex. 8, 122 – 126).

35.     Bulman told French that plaintiffs had a source who was providing information about a fugitive who was a priority for the unit, as the fugitive had shot people in Georgia and had also shot at a Brookline police officer:  "The flavor of the conversation that I had with Eric [Bulman] was the fact that Brown and Horne wouldn't share that information not only with Eric but with other members of the unit.  And we had a full court press on to arrest this guy and there was a high level of frustration in the unit regarding that." (Ex. 8, 92).

36.     Brown testified that this case was "hush hush."  He created a handwritten report of the intelligence that he had gathered over a four month period, which he "more than likely" provided to Bulman or the investigating FBI agent.  He testified that he collected information suggesting the whereabouts of the fugitive but gave this to Bulman "[in] bits and pieces that we suspected, but we had no proof …"   and gave little information to the FBI agent assigned to the case because "Bulman kind of told us, … be careful what you say to [the agent], watch out what you say to him. … So I would pass most of the information to Sergeant Bulman ... and no so much to [the agent] because the sergeant asked us not to say too much to him, although I guess it was his case."  (Brown, 330 - 334).

37.     Bulman reports that the FBI agent came to him in frustration after failing to get the identification of the source information Brown claimed to have in this case.  Bulman asked Brown to tell him who his source was, and only obtained the information from Brown "after a lot of teeth pulling."  (Ex. 5, 194-195).

38.     French shared Bulman's disapproval of off duty arrests, although he concedes that there is no rule that prohibits them and, that if an officer comes upon a felony in progress while off duty, it may be appropriate to intervene. However, he believes it to be "poor judgment" to continue investigations when off duty:

> … you shouldn't be tracking a dangerous felon off duty, if that answers your question.  And if you happen to cross a dangerous felon when you're off duty, the very idea that he's a dangerous felon – and most of these guys like we discussed earlier are involved in violent crimes, homicides, et cetera – your best bet common sense dictates and this is one of the things we try when we bring an officer on to the unit is to ensure that they have a lot of common sense.  Common sense would dictate you call the local police department.  You don't do anything until they arrive and you contact the department, your supervisor…the issue is continuing an investigation … into one fugitive while they are off duty without anyone in the unit being aware that they are tracking

that person.  That was the issue that was brought to my attention."
(Ex. 8, 72 – 76).

39.    French asked Bulman to speak to the plaintiffs about their concerns about the plaintiffs' practices.  (Ex. 8, 88 – 89).

40.    French did not seek to transfer plaintiffs, despite these concerns, because he believed that with experience they would improve:  "they were relatively new in the unit.  I think they may have worked for me for eight or nine months.  … there is a learning curve coming into the unit."    If French had remained the commander and plaintiffs had not improved, "I probably would have asked [Bulman] where they wanted to go…" and recommended they be transferred.  (Ex. 8, 97 – 98).

41.    French agrees that Bulman recommended the plaintiffs for commendations, both individually and as part of the YVSF unit, on occasion.  Asked if these recommendations for commendation were consistent with Bulman's criticisms, French testified "It can be.  These were individual situations or operations that took place that involved Horne and Brown where they did exceptional work.  And it's tempered by the concerns that Eric raised to me when I was a unit commander there."  (Ex. 8, 253-254).

42.    In August 1999, Bulman was assigned to investigate a civilian complaint of verbal abuse brought against Brown.  Bulman concluded that that the charges against Brown were false, and recommended that the case be carried as "Unfounded."  (Exhibit 10,  IAD report recommendation).

43.    Bulman never instituted discipline against either plaintiff while he was their supervisor:  "…I felt that writing anything down about what they did was a higher level of discipline and something that could be turned over to Internal Affairs, be on their record, and that wasn't my intention to try to hurt them.  I was just trying to

make sure they understood why we do things a certain way, for their safety and for the procedures that we had in place to safeguard everybody, both the officers and the suspects." (Ex. 5, 197-198).

### Dorchester High School Meeting And Its Aftermath

44.     In or around February 2000, a spate of violence erupted in Dorchester High School.  On a Saturday during this time period, Lieutenant French held a brainstorming session with some on-duty members of the YVSF.  Horne was present for this meeting.  Brown was not present.  (Ex. 3,  203;  Ex. 1, 96 – 99).

45.     The focus of the meeting was to devise strategies to respond to the school related violence.  Lieutenant French informed the group that they were being "redirected" to the schools, and some of the officers present objected.    (Ex. 1, 98 – 100).

46.     One white officer asked "what the fuck" the officers assigned to the public schools were doing.  Both school police officers are black.  (Ex. 1, 99).

47.     Another white officer said that he "wouldn't even send my dog to Dorchester High because it was so bad." (Ex. 1, 100)

48.     Horne was upset with the comments, and informed French after the meeting that he thought the comments were inappropriate.  Horne also spoke with other officers on the day shift, and ultimately Horne, Brown and others (including Dave Singletary, Vance Mills, and Neva Grice) met with Bulman to discuss their concerns. (Ex. 1, 101 – 102; Ex. 3, 209)

49.     Bulman told French about his meeting with the officers.  Bulman recalls being told by the group that other comments had been made by white officers that the black officers took offense to: for example, comments related to the condition of the houses they went into (that they were "nasty" and "full of roaches,") and comments about

the students at the public schools (that they were "animals," and that "only rapists and murderers" attended the schools).  (Ex. 5, 108 – 121).

50.     French immediately convened further meetings with the YVSF officers to discuss their concerns about the issues raised at the Dorchester High School meeting.  In addition, French informed his supervisor, Deputy Superintendent Thomas Dowd, that these issues had been raised and that, in French's opinion, the Department's command staff needed to be informed.  (Ex. 8, 170 – 173).

51.     Within a week or two of the issues coming to light, a meeting of a number of YVSF officers was held at Boston Police headquarters, ("Headquarters meetings") which were moderated by Joan Sweeney, a management consultant who provided training to the BPD.  (Ex. 8, 173).   Neither plaintiff attended these meetings, although they were aware that they occurred.  (Ex. 3, 218).

52.     Within a number of weeks from the Dorchester High School meeting, Lieutenant French convened a unit wide off-site meeting, held at the VFW Post on American Legion Highway.  At this meeting, French invited all officers in the unit to engage in a dialogue about the issues and concerns that had come to a head and a discussion ensued.  Both plaintiffs attended this meeting.  (Ex. 3, 223 – 240; Ex. 1, 109 – 118).

53.     Among the issues discussed at the VFW Meeting were:

- Minority officers' perceptions that some white officers were overly aggressive or hostile in their interaction with minority youth;

- The comment by an officer that he wouldn't send his dog to Dorchester High School;

- A white officer had worn a T-shirt reflecting the Abner Diallo shooting, which was taken as an offense by a minority officer;

- Use of the word "nigger" by a white officer in the presence of a black officer;

- Tensions within the unit breaking down along racial lines;

- Officers being segregated by race in partner/car assignments;

- The "wanted" poster consisting only of black suspects;

- Some officers (mostly whites) wanting only to make arrests, and neglecting the intervention/prevention work the unit had traditionally engaged in.

(Ex. 3, 224; 230 – 246;  Ex. 1, 112 – 118).

54.    Horne did not say anything at this meeting.  He recalls that the meeting started in the morning and ended in the late afternoon, but he does not recall any white officer speaking, nor does he recall discussion of anything other than the Diallo T-shirt and the warrant board.   (Ex. 1, 115 – 117).

55.    Brown was also present at the VFW Meeting.  He recalls that at the meeting, "people expressed their concerns about a lot of different things, a lot of racial tension … they expressed ways to, … trying to prevent further hostility and tensions from occurring if they could."  (Ex. 3,  231).

56.    Brown recalls discussion about the officer wearing the Diallo T-shirt, and "I don't know if he did it directly at that meeting … but I heard that he had … apologized for [wearing] it."  (Ex. 3 235).

57.    Brown also recalls discussion about officers who were in the YVSF who shouldn't be, officers who were in the unit because of political connections ("dimes"), "officers [who] are really not totally street experienced with the community … a lot of them can't identify drugs if they saw it…"  (Ex. 3, 234).

58.    Brown recalls that the commanders at the meeting "made certain statements that they were trying to provide certain amount of sensitivity training to

14

officers, …and were trying to voice more of a camaraderie within [the] unit, that we all kind of learn to get along…"  (Ex. 3, 237)

59.     The Dorchester High School event was discussed, and Brown recalls the officer who made the "dog" comment "gave his little speech about … the apology, pretty much apologized, that [he] may have been misinterpreted as to what he said, … and he had apologized to Officer Horne about it."  (Ex. 3,  240).

60.     Brown felt that, had he wanted to, he had an opportunity to express his concerns at the VFW Post meeting.   He did not raise any issues at that meeting. (Ex. 3, 238-239; 257).

61.     Shortly after the VFW Post meeting, Deputy Superintendent Dowd met with sergeants in the unit to review the roster of officers assigned to the YVSF.  A number of officers were identified for transfer out of the unit based on the commanders' conclusions that these officers were not contributing to the overall success of the unit or because the officers had indicated a lack of interest in remaining in the unit.   (Ex. 9, 54 – 56;  Ex. 7,  406 – 414).

62.     In total, nine police officers were transferred out of the YVSF in the March 1, 2000 transfer.  Of the nine, one was black, one Asian, one Hispanic; the remainder were white males.  Plaintiffs were not transferred at this time.  (Ex. 2;  Ex. 7, 402 – 414).

63.     In May 2000, Lieutenant Kevin Foley replaced Lieutenant Gary French as commander of the YVSF.  Foley had been assigned to the unit immediately prior to being named its commander, but had served on nights; he did not have overall command of the unit prior to May 2000.  Nevertheless, Foley was familiar with the issues that had arisen within the unit in February – March, and had been present at the VFW Hall meeting.  (Ex. 7, 424).

64.     Shortly after taking command, Foley designed a unit wide meeting intended as a follow up to the meetings that had been held previously.  In addition to the YVSF personnel, members of the clergy and community (including representatives from the Nation of Islam and the NAACP) were present.   (Ex. 7, 426 – 431).

65.     The plaintiffs did not speak at this meeting.  (Ex. 1,  158-159; Ex. 3, 259).

66.     Horne believed that the meeting was intended to resolve the tensions within the YVSF.  (Ex. 1, 162)

67.     Foley also held meetings with the white and black officers assigned to the unit, and addressed the issues that had been brought up during the early months of 2000.  He informed the officers that he would not tolerate racial divisions, and invited them to share any concerns that they had with him.   (Ex. 7,  435 – 438).

68.     Brown reports that after the series of meetings, "… things started to try to come together.  I think that Lieutenant Foley probably became a little instrumental … to try and do things together as a unit, … to get that camaraderie going to settle some of this hostility.  … at least it was an attempt to get things, a solution to the problem…"  (Ex. 3, 261)

**Events Subsequent To The Unit Meetings**

69.     Horne believes that white officers in the YVSF resented them for raising issues that portrayed the YVSF as a racist unit.  He does not know who these officers might be.  (Ex. 1, 163 – 164).

70.     Horne and Brown stopped to assist three white officers who were questioning a black man on Washington Street.  The three white officers told Horne and Brown that they "could handle it.  Back off.  This is ours."  Horne and the white officers ended up exchanging profanities.  Horne believes this incident was an instance of racial

harassment, and informed Foley of it.  He does not recall Foley's response.  (Ex. 1, 168 – 171).

71.    Horne also complained to Foley that the "wanted" board did not contain white suspects.  (Ex. 1, 172).  Foley had revised the board to contain only murder suspects, and "… if you look at the murder warrants that are outstanding, for whatever reason the majority of them are black individuals.  So that's what would be out there. … It was not … intentional …"   (Ex. 7, 441 – 442).

72.    Brown also reports that on occasion, he believes both prior and subsequent to the unit meetings, detectives would hold up pictures of wanted suspects and ask, "does anyone know this monkey?"  This occurred in the presence of Sergeant Bulman.  Brown expressed his concern to Bulman that this term was racially offensive, and believes that Bulman spoke to the detectives who used the term, because Brown never heard it again.  (Ex. 3, 245 – 246).

73.    Brown claims that on one occasion, white officers directed profanity to the crying child of a suspect when executing an arrest warrant.  He does not recall when this happened, and he did not bring it to the attention of any supervisor.  (Ex. 3, 65 – 70).

74.    Brown alleges that, some time between January and March 2001, while tracking a fugitive felon on Homestead Street in Roxbury, a white officer checked CORI (criminal offender record information) with regard to a black woman who Bailey thought was providing a false name.  Brown found this to be racially harassing.  He complained to Lieutenant Foley, who stated he would speak to the officer involved.  (Ex. 3, 75 – 80).

75.    Brown complains that in Dorchester, while looking for a white suspect, Sergeant Davin agreed with the suspect's family members that the suspect could

turn himself in the following day. Brown felt this was an unfair concession that would not be afforded to a black suspect. (Ex. 3, 154-158).

76.    Some time between November 2000 and March 2001, Brown reported to Sergeant Davin that white officers had assaulted a black male at the YVSF base. Brown told Davin that the assault was a result of his, Davin's, insistence that the YVSF officers gather information from minority youth. Brown does not recall what Davin said in response to this information. (Ex. 3, 140 – 148).

### Davin's Supervision Of The Plaintiffs

77.    Davin became the plaintiffs' direct supervisor in April 2000. As far as he knew, the racial tensions exposed during the Dorchester High School meeting had been dealt with prior to his arriving in the YVSF, and he testified that no complaints were brought to him after assuming the command of the YVSF. (Ex. 6, 64-71).

78.    Bulman and Davin spoke about each officer on the squad when Davin took over. Davin has no recollection of speaking of the plaintiffs specifically, or with regard to the racial tensions that had been addressed in the unit; Davin understood that the issues had been resolved. (Ex. 6, 69 – 72).

79.    Although Davin believed that the plaintiffs were good police officers, he had concerns about their reluctance to share information, particularly with regard to executing warrants in the field:

> A:    To me as a supervisor, I would want to have a level of probable cause that the person lives there. Is his car registered there? Is his license back to that address? Does he pay the utility bills there? Have you seen him coming and going from the address day and night? Have other family members told you he lives there? Have informants told you he lives there? There's a whole list [of questions]. But what puts you going into this house other than a phone call that I'm going to change the address [on the warrant] because I think he lives there?

> Q:    And how do you get that information from the officer?

18

A:     I ask them.

Q:     And your memory is there were three occasions where [Horne and Brown]  were with you in the field and they wouldn't tell you how they got the address?

A:     It's not always that they wouldn't tell me.  It's when we got to the house – … as you pull up as a supervisor, you come out with the immediate questions with the guys, okay, this is what got us here, boom, boom, boom, so I can make my decision on whether to go through the door or not.
…

Q:     And what was your concern about how [Horne and Brown] responded?

A:     Sometimes their response would be, "an informant got us here," and I'd have to pry further, "Well, is it a carded informant?" "Is it not a carded informant?"  "Well, it's not a carded informant, but it's a source."  "Well, that source got us here."

And then what would happen, instead of just getting the bang, bang probable cause that got us here, I'd have to ask more and more and more questions to pull out more and more information to hit the level that we're at to go into the house if we in fact can get into the house.  (Ex. 6,   200 – 210).

80.     Davin also reported that Brown "in my opinion, was tactically lacking in training whether he came up there too soon as a police officer and hadn't learned just basic patrol procedures relative to standing in front of doors – I mean we all make mistakes along the way, but it was my opinion that Ron made more mistakes than most of us."   (Ex. 6, 140-141).

81.     In January 2001, the supervisors of the YVSF met with the BPD command staff (including Police Commissioner Evans and a number of Superintendents) to conduct a personnel review (the "Personnel Analysis Meeting," or "PAM").  Every police officer (i.e., non-supervisory personnel) was reviewed.  (Ex. 7, 323).

82.     PAM was designed to be:

"[an] early warning mechanism to review all personnel in the department, not as a disciplinary tool, but a management tool to assess each officer and perhaps red flag any problems that we foresee in the future with these officers … It was done department wide … The procedure or process was that the team, which involved the commissioner, the chief, and the superintendent, chief in charge of Internal Affairs, would visit districts throughout the city, and they would bring with them an assessment, … of all the personnel they're assigned … they would review every individual assigned to that district or unit. … every officer under that particular command would be reviewed, and then there would be a discussion on each officer, usually involving the district or unit commander and the specific supervisor that supervised that individual on a day-to-day basis." (Ex. 7, 315-316).

83.    Davin reported on the officers assigned to him, including the plaintiffs.  Davin reported that Horne was "an excellent fugitive officer, did a great job at finding where the bad guy was, but I felt at times that he withheld information from me relative to the case, how they came about finding the guy or where they ended up or things of that nature."  (Ex. 6, 140-142)

84.    Davin spoke about each officer assigned to him at the PAM:  "I was asked to go through my list of officers and give my opinion, good and bad, of how I felt their work ethic was and what they needed to work on, and that's what I did for every officer on the day shift." (Ex. 6, 150).

85.    Davin met with both Brown and Horne after the PAM, and told them what he had reported to the command staff.  Davin told Horne that he believed he "was an excellent fugitive investigator, but … I felt sometimes he withholds information."  (Ex. 6, 167)

86.    Davin stated to Brown that "I thought he was a good fugitive investigator, [but] that he lacked, in my opinion, the tactical skills, basic skills involved in serving a warrant."  (Ex. 6,  173-174 )

20

87.     Another officer recently transferred into the unit and assigned to work with the plaintiffs had asked Davin to remove him from their car.   This officer told Davin that the plaintiffs "do fucked up shit, and it's going to jeopardize my career if I ride with them."  (Ex. 6,  182 – 185).

88.     Specifically, the officer complained that plaintiffs, after being informed to stay clear of a "very low profile … ongoing" homicide investigation where issuance of an arrest warrant was imminent, went to the house where the suspect was believed to be hiding and "were showing photos to prostitutes up around … Blue Hill Ave., … that he [the suspect] may have stayed there, to see if they could ID the suspect out of the photo array."   (Ex. 6, 185)

89.     Davin told Lieutenant Foley about the officer's request, as well as about his (Davin's) critique of plaintiffs' work performance.  (Ex. 6, 160 – 162).

90.     Like Bulman, Davin recommended that commendations be issued to plaintiffs for meritorious work.  (Ex. 6, 237 – 250).

91.     Brown believes that Davin's critique of their work performance was racially motivated, in part because Brown does not believe any other officers were subjected to PAM review.  (Ex. 3, 273).

92.     Horne also believes that the PAM assessment was unfair, because Davin spoke more to Brown's secretiveness than to Horne's.    (Ex. 1, 187 – 189).

## Transfer Out Of The YVSF

93.     Lieutenant Foley was the commander of the YVSF from April 2000 though May 2001, and it was at his recommendation that plaintiffs were transferred out of the unit in the March 31, 2001 transfer.  (Ex. 7,  281).

94.     Along with the plaintiffs, Foley recommended the transfers of five other officers.  Of the seven officers transferred out of the YVSF in March 2001, four were black (including plaintiffs) and three were white.  (Ex. 7, 124 - 151, Ex. 2 ).

95.     Foley based his decision to request plaintiffs' transfers on: plaintiffs' involvement in off-duty arrests; Davin's critique of plaintiffs' unwillingness to share information; officers' unwillingness to work with them, and with regard to Brown, complaints made by Foley's administrative clerk.  (Ex. 7, 286).

96.     Foley was aware that Horne had arrested a fugitive in Chelsea, when he was off-duty.  Foley was aware of this because the Chelsea Police Department called the YVSF to complain.  (Ex. 7, 275).

97.     Foley understood that plaintiffs had been involved in other off-duty arrests as well, although he could not recall the details.  (Ex. 7, 277 ).

98.     Horne made off duty arrests on March 29, 2000, in Chelsea; on October 27, 2000, and on December 19, 2000.  (Ex. 11, police reports)

99.     Foley also knew that Brown was involved in a romantic relationship with his clerk, because she brought complaints about Brown to Foley.  Foley found the relationship, because of its volatility, was disruptive:  "When it was on obviously there was [sic] no problems.  When they were having an issue it became disruptive.  … She sits right outside my office and she would come in on numerous instances when there was a problem between the two of them … She would come in late saying that something had happened, she would leave early because she was emotionally upset …"  (Ex. 7, 193-194)  "…I had to make a decision between Marisa or Ron Brown. My choice, my decision, and I kept Marisa and transferred Ron Brown."  (Ex. 7, 460 – 473).

22

100.    Although Foley spoke with Sergeant Davin, the plaintiffs' supervisor at the time Foley made the decision to recommend their transfer, he did not speak to Sergeant Bulman about Horne or Brown:  "…I never had a conversation about Steve Horne or Ron Brown with Sergeant Bulman.  Sergeant Bulman was not their supervisor at the time.  All my conversations were directed over this period of time with Sergeant Davin."  (Ex. 7, 310 – 311).

101.    Foley made the decision to transfer plaintiffs not because they were bad officers:  "There was never any question that they were good officers.  The question was, were they a good fit for a specialized unit."  (Ex. 7,  366)

> [In making the decision to transfer the plaintiffs,] I would have evaluated or discussed with other supervisors, reviewed a lot of different issues.  As I mentioned, arrest was not the sole indicator that someone should stay or go.  It was a collection of things.  As I mentioned, in any small unit it was more than just being a good police officer.  It was getting along with others, others getting along with you, esprit de corps … communicating with others, sharing information with others. … it was the entire … assessment of their entire behavior or input or lack thereof, whether or not they were a problem or not to me or to others that I arrived at these decisions to transfer Steve, Ron, and others, I might add, out of the Gang Unit."  (Ex. 7,  393 – 394).

102.    Foley testified that he had recommended the transfer of officers other than the plaintiffs for similar reasons:  "Cellucci, Foundas, very uncommunicative … William Cloran … officers didn't want to work with him, he contributed nothing to the unit as far as communicating with the other officers, he just didn't fit.  He, however, did not make any off-duty arrests, so obviously that wasn't part of my decision-making process, but I just felt that he didn't fit in the Gang Unit."  (Ex. 7, 460, 465-66).  Foley also moved Gary Ryan, because "[h]e was unhappy with a command decision that I made and his – which was quite obvious in his … behavior and demeanor, which I felt was

unacceptable … after that incident he was not a team player, absolutely." (Ex. 7, 467 –

468). All four officers are white.

103. Foley also transferred other black officers: "Larry Celester, a

black officer, and actually an excellent police officer, but was told on numerous

occasions that there was a place for joking and it wasn't at roll call. .. He persisted in

playing, if you will, at roll call and I transferred him." (Ex. 7, 463). Foley also

requested the transfer of Mark Buchanon, a black officer, to work as a CSO (Community

Services Officer) in the Dorchester District station because "[h]e was a community

services officer, and we really had no need for a community services officer." (Ex. 7,

138).

104. Foley acknowledged that plaintiffs received a number of

commendations during their tenure at the YVSF. These commendations did not affect his

decision to recommend their transfer out of the unit because for him, it wasn't a question

of whether the plaintiffs were good officers, it was an issue of them being appropriate for

the YVSF. (Ex. 7, 366).

105. Plaintiffs were never the subject of discipline by any supervisor

while at the YVSF. According to Foley, "If I put something in their file [regarding his

critique of their job performance], it would be with them for their career. … I wanted to

avoid that, so we had conversations and then I made the decision to transfer them." (Ex.

7, 282, 283).

106. During the time period that plaintiffs were assigned to the YVSF,

August 1999 until March 2001, a total of 39 officers have been transferred out of the unit.

(Ex. 2)

107.    Gregory Long was transferred into the YVSF on March 31, 2001, along with 6 other officers. Frank McLaughlin was transferred into the unit on January 4, 2002.  (Ex. 2)

Overtime Opportunities

108.    As French and Foley testified, opportunities to earn overtime pay are greater in the districts than at the YVSF.  In districts C6 and B2, where Horne and Brown were transferred, respectively, officers who chose to work overtime worked an average of 218.5 hours (C6) and 284.9 hours (B2) during the period from August 1, 1999 though June 1, 2001.  In contrast, officers assigned to the YVSF worked an average of 83.4  overtime hours during the same period.  Comparative information for detail hours worked is unavailable, as the Department does not keep detail records for the YVSF separately (but rather counts all of Special Operations, including all its divisions).  (Ex. 12, payroll report and affidavit).

RESPECTFULLY SUBMITTED,
ERIC BULMAN and JOHN DAVIN
By their attorneys,


__/s/ Mary Jo Harris _____
Special Assistant Corporation Counsel
BBO # 561484
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109
(617) 523-6666


Dated: April 4, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), **including counsel for Plaintiff, Stephen A. Roach, Roach & Wise, LLP, 31**

**State Street, Boston, MA 02109** along with paper copies by first class mail, return receipt requested, as of this 4th day of April, 2006.

/s/ Mary Jo Harris
Mary Jo Harris