# Brown
## vs.
## City of Boston, et al.

## Ronald Brown

Volume 1

September 13, 2005
pp 1-279

**Jones Reporting**
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 14

1  A. I started a leasing business.
2  Q. I'm sorry, a leasing business?
3  A. Yes.
4  Q. What did you lease?
5  A. I, it was in the transportation industry,
6  it was I leased trucks to companies, and moved
7  products to various areas across the country.
8  Q. Did you operate a fleet of vehicles that
9  you leased out?
10 A. Yes, about four, about four.
11 Q. Did your company have a name?
12 A. Yes, it was called Brown & Brown Trucking
13 Limited.
14 Q. And did you go into business with another
15 relative?
16 A. Well, yes, my brother, Gregory, he was
17 supposed to, but he didn't have much interest, so I
18 ran the business myself.
19 Q. How long did Brown & Brown Trucking
20 operate?
21 A. Until I joined the Boston Police
22 Department.
23 Q. And just so I'm clear on this, do you
24 remember when you began the company, if you left

Page 15

1  Bank Boston in June of '86?
2  A. I think I started it right after that.
3  Q. So sometime in the summer of '86?
4  A. Yes, I believe I incorporated it either in
5  '86 or '87, I'm not sure.
6  Q. And until what point in time --
7  A. Until --
8  Q. -- did you operate?
9  A. Until, I would say until about January --
10 well, actually, until about January of '97 maybe.
11 Q. So about 10 years?
12 A. About 10 years, most likely, yes.
13 Q. Now, what made you decide to give up the
14 leasing business in order to enter the Boston Police
15 Department?
16 A. Well, prior to entering the Boston Police
17 Department I worked for the Postal Service also.
18 Q. When did you do that?
19 A. I joined the Postal Service in January of
20 '94.
21 Q. In what capacity?
22 A. I started as a letter carrier, but it was
23 about three months they made me what you call a
24 204B manager.

Page 16

1  Q. What does that mean?
2  A. Well, that means I was a manager of
3  carriers, so I managed letter carriers. I managed
4  Roxbury station, Mattapan station, and sometimes
5  they sent me out to manage managers. In other
6  words, I'd go out to various stations and oversee
7  what they're doing, the operation.
8  Q. Was there a competitive exam to be hired
9  by the Postal Service?
10 A. I believe so, but I think I took the exam
11 so long ago, I can't remember, but it was at the
12 time, yes.
13 Q. How long were you employed by the Postal
14 Service?
15 A. I stayed there until I joined the Boston
16 Police Department.
17 Q. And you joined the Boston Police
18 Department in January of '97?
19 A. June, I think I joined June of '97.
20 Q. June of '97?
21 A. Yes.
22 Q. And at the time that you were working for
23 the Postal Service were you still also operating the
24 leasing company?

Page 17

1  A. Yes, yes, I was.
2  Q. Why did you decide that you wanted to join
3  the Postal Service?
4  A. Well, it was a, like I said, it was a
5  Civil Service job. I was getting a little tired of
6  the leasing business, I mean, I loved it, but I
7  just, I don't know, I guess the benefits family wise
8  and stuff like that, I just joined the Postal
9  Service. They called me. They had called me
10 numerous times, and I never went, so that was pretty
11 much the last time they called me, so I decided to
12 go ahead and get the experience.
13 Q. Now, when you were running Brown & Brown
14 Leasing, did you have any employees who worked for
15 you?
16 A. Yes, I had a couple of employees.
17 Q. How many?
18 A. Off and on two or three, about three.
19 Q. Did you ever have any -- well, did you
20 ever have any litigation of any kind with your
21 employees at Brown & Brown Leasing?
22 A. No.
23 Q. No Worker's Comp. claims?
24 A. No.

Ronald Brown

Page 38

1  who participated in these activities?
2      A.  I think Jovan Lacet.  I think the second
3  year I started doing it before I got transferred I
4  believe I was working for a guy named Tom Ngyuen.  I
5  think Keisha or Tiesha Scheem or Tasha Scheem, I
6  don't remember her name directly, I may not be
7  saying it correctly, pronouncing it correctly, but
8  something like the name Tiesha Scheem, something
9  like that, she participated.  That's all I can
10 remember.
11     Q.  When you decided to apply for the youth
12 violence strike force posting, did you speak to any
13 of these officers about what the youth violence
14 strike force did?
15     A.  I spoke, basically, with Lieutenant French
16 about what they did.
17     Q.  Was that in the interview process?
18     A.  Yes.
19     Q.  Before you decided to apply did you speak
20 to anybody at C-11 about what the youth violence
21 strike force, what their responsibilities were?
22     A.  No, not necessarily, no.
23     Q.  Not necessarily or not at all?
24     A.  I don't recall speaking to anyone.  I may

Page 39

1  have, but I don't recall.
2      Q.  Do you recall speaking to your brother
3  about what the youth violence strike force did at
4  the time that you were considering applying?
5          MR. ROACH:  Objection.  Go ahead.
6      A.  I think, you know, I think I may have
7  spoken to him.  I don't know if I asked him exactly
8  what they do, because I only knew what he did, and I
9  didn't have too much interest in doing undercover
10 drug work, if that's what you mean.  He pretty much
11 explained to me what they do, you know, mostly
12 warrants, you know, schools, and pretty much that's
13 all he said, they worked directly and primarily with
14 schools, students in schools.
15     Q.  So he was doing undercover work, but he
16 said that the unit dealt primarily with schools?
17     A.  Or the day.
18     Q.  The day shift dealt primarily with
19 schools?
20     A.  Right.
21     Q.  Were you aware at the time that you
22 applied to the youth violence strike force that
23 there was also a school police unit?
24     A.  No.

Page 40

1      Q.  Did you become aware that there was a
2  school police unit at any point?
3      A.  You mean, officers in the school?
4      Q.  Yes.
5      A.  I think after I joined the youth violence
6  strike force I did.
7      Q.  Did you ever express an interest to
8  anybody to transfer into the school police unit?
9      A.  I think at that time there were only two
10 school officers I knew was Officer Teto and Officer
11 Braxton, but I thought they were assigned to other
12 units.  I didn't think they were members of the
13 violence strike force.
14     Q.  But you understood that they were officers
15 who were assigned exclusively to work in the
16 schools; is that correct?
17     A.  When I came to the youth violence strike
18 force, yes, I met Officer Grice, Singletary, and
19 Israel.
20         (Discussion off the record.)
21     Q.  And you understood that these officers
22 worked pretty much exclusively with youth and school
23 related issues; is that right?
24         MR. ROACH:  Objection.

Page 41

1      A.  Yes, about two weeks or so in the unit,
2  yes.
3      Q.  And at that point did you make any request
4  to be assigned those types of duties that Officers
5  Grice and Singletary had?
6      A.  Well, I didn't know the total function of
7  their duties.  I was assigned to work with them on
8  occasions by Lieutenant French, and I did work in
9  the schools with them on occasions, you know, during
10 their assignments there, and my assignment, yes.
11     Q.  Now, when you interviewed with Lieutenant
12 French -- or strike that.  When you applied to the
13 youth violence strike force, you submitted a letter
14 of interest; is that fair to say?
15     A.  Yes.
16     Q.  Do you recall what you said in that
17 letter?
18     A.  No, I do not.
19     Q.  And as a consequence of applying,
20 Lieutenant French asked you for an interview?
21     A.  Yes.
22     Q.  And can you tell me the substance of that
23 interview, what he said to you and what you said to
24 him?

Page 42

1  A. Well, we spoke, I spoke expressly about I
2  was interested in intervention and prevention
3  programs and the youth.
4  Q. I'm sorry?
5  A. I expressed that I was interested in the
6  intervention and prevention of youth violence, and
7  he indicated that's what he was looking for, people
8  to work, you know, with schools, and I was
9  interested, I guess I was excited, you know, that
10 that's what he did, and he expressed an interest
11 that he would love for me to come in to do it, to
12 work with them. And I think he brought up the
13 conversation about something that occurred downtown
14 at South Station. He asked me if I knew an officer,
15 the officer that was -- you know, he told me that
16 they do a lot of warrant apprehension --
17         THE REPORTER: I'm sorry, I'm having
18 trouble understanding. Could you slow down?
19         (Discussion off the record.)
20 A. It was an incident that occurred at South
21 Station, and I guess the youth violence strike
22 force, it involved a youth with a gun, and that was
23 a part of their task also. So he asked me if I knew
24 that officer who took the gun from the youth, and I

Page 43

1  said, Yes; and he said, Who was it; and I said, It
2  was me, and I told him it was me. And so he asked
3  me did I know anyone in the youth violence strike
4  force, and I told him, No, no other than my brother.
5  He didn't know I had a brother in youth violence,
6  and he asked me who that was. I told him Greg
7  Brown. And from there that was pretty much about
8  the conversation.
9  Q. How long did the interview last?
10 A. I want to say 10 minutes maybe, maybe
11 10 minutes.
12 Q. And the incident that you're referring to
13 in South Station, this is an incident where you took
14 a gun from a youth --
15 A. Yes.
16 Q. -- at South Station?
17 A. Yes.
18 Q. Is South Station part of C-11?
19 A. South Station is a part of, I want to say
20 C-6.
21 Q. Okay. And how did it -- was this an
22 overtime tour that you were working in C-6?
23 A. No, I was doing a detail, CAT detail for
24 the Central Artery.

Page 44

1         MR. ROACH: CAT.
2  A. CAT.
3  Q. Central Artery Detail, the acronym is CAT.
4  And when did that incident occur?
5  A. I was still at C-11. I want to say around
6  June of 1999.
7  Q. Do you know how that event came to the
8  attention of Lieutenant French?
9  A. Well, The Herald reported it in the
10 papers.
11 Q. Did it list your name as the arresting
12 officer?
13 A. I can't say, because I did not see it in
14 the papers, so I don't, I don't know.
15 Q. When you met with Lieutenant French, did
16 he describe for you at all the warrant apprehension
17 function of the youth violence strike force?
18 A. Yes, I believe he did.
19 Q. And what do you recall him telling you
20 about that function?
21 A. That we would be responsible also for
22 warrant apprehension, and that's tracking wanted
23 fugitives, and that was pretty much it.
24 Q. Had you any interest in tracking

Page 45

1  fugitives?
2  A. I had experience in warrant apprehension,
3  if that's what you want, you're asking.
4  Q. Well, I'm asking, is this work that you
5  wanted to do, warrant apprehension?
6  A. Yes. Well, if it involved investigative
7  work, yes, I did want to do it, yes.
8  Q. After you began working at the youth
9  violence strike force how much of your time, say,
10 let's just take it for the first two months, how
11 much of your time at the youth violence strike force
12 was spent on warrant apprehension activities?
13 A. You mean, the first, upon assignment?
14 Q. Yes, so from, say, August of 1999, say,
15 through to the end of October of 1999?
16         MR. ROACH: Okay, that would be --
17 well, that would be two months and three weeks,
18 approximately.
19 Q. And I'm not looking for mathematical
20 certainty here.
21 A. You're saying from August of 1999 to
22 October of 1999?
23 Q. Yes.
24 A. From August of 1999 to October of 1999 I

Page 46

 1  think we spent, well, I spent a lot of time working
 2  with the school officers doing anticrime and school
 3  assignments before I started doing any kind of
 4  warrant apprehension, because we were not introduced
 5  to it, may I say, although there were officers
 6  performing warrant apprehensions, but we were not
 7  introduced to it.
 8      Q.  When you say "we," who do you mean?
 9      A.  Well, I was assigned to TK-15 unit.
10      Q.  And just for the record, the TK-15 unit is
11  a car?
12      A.  Yes.
13      Q.  A call sign for a car?
14      A.  Yes, Tango Kilo, that's what it stands
15  for, unit 15, and I was assigned to it with Officer
16  Horne and Officer Brito.  We did not perform any
17  warrant apprehension activities, to my knowledge,
18  from August to October.
19      Q.  Okay.  What kind of activities did you
20  perform in that first couple of months?
21      A.  First two months, we were, like I said,
22  pretty much assigned anticrime and assignment to
23  schools.
24      Q.  What schools were you assigned to?

Page 47

 1      A.  We pretty much watched all the schools in
 2  the City of Boston.  We did Charlestown, we did East
 3  Boston, Hyde Park, Dorchester High, most all the
 4  schools that were having trouble at that time,
 5  Brighton High.
 6      Q.  Did you go into the schools?
 7      A.  Yes.
 8      Q.  You were in plain clothes?
 9      A.  Yes.
10      Q.  Did you work with any of the school police
11  supervisors when you went to the schools?
12      A.  We were working with -- Officer Teto had
13  most of the -- he was about the only one I can
14  remember.  When you say "school police," he's about
15  the only one I can remember, and he had pretty much
16  all the insight, and we would speak to him about
17  certain activities that were going on, certain
18  people he would want us to watch, certain things.
19  We would talk with him a lot about the things that
20  were going on.
21      Q.  What would you do when you went into the
22  schools?
23      A.  We would pretty much just, you know, watch
24  the people, certain players we know who was active

Page 48

 1  in criminal activities.  We would let it be known to
 2  Teto or to the principals that these people are drug
 3  dealers, or they may be, they may deal drugs, they
 4  may not, they may be active in certain things, if we
 5  know them; and if we don't know them, we just watch
 6  and see what happens, pretty much patrol, basically,
 7  that's what we were doing, patrolling the schools.
 8      Q.  Would you walk up and down the halls while
 9  class was in session?
10      A.  We were allowed to walk the hallways, they
11  were beginning of hallways.  We couldn't go
12  throughout the entire school, if that's what you
13  mean.
14      Q.  I'm sorry, I missed the beginning of that.
15      A.  We could not go into, inside the entire
16  school.  They didn't want police presence throughout
17  the school while school activity was going on, the
18  schools didn't want that.
19      Q.  So what did you do; when you say that you
20  worked with the schools, describe for me what that
21  meant?
22      A.  We would patrol the yards, watch the kids
23  when they got out, make sure no activities were
24  going on, you know, once they get out of school,

Page 49

 1  make sure there are no fights, so we would try to
 2  disperse them to make sure they would go where
 3  they're supposed to go.
 4      Q.  Now, this is a day unit; right?
 5      A.  Yes.
 6      Q.  So what time would the shift start?
 7      A.  Sometimes they would have overtime shifts
 8  that may start as early as 6:30, 7 o'clock in the
 9  morning; they were called school safety.
10      Q.  What time was the youth violence strike
11  force, what are the hours of that shift, the day
12  unit; is that a 7:30 to 4:30 shift?
13      A.  No, I believe it was 8:30 to 5.
14      Q.  And just on a regular tour now, when you
15  would start, you know, a regular day shift, would
16  you go to the youth violence strike force
17  headquarters on Warren Avenue to begin your day?
18      A.  Yes.
19      Q.  Would you stay at roll call?
20      A.  Sometimes.
21      Q.  When you were working in the schools,
22  would those assignments come about from roll call
23  assignments?
24      A.  Sometimes, and sometimes we may get a call

Ronald Brown

Page 58

1  violence strike force in August of 1999, were you
2  provided any briefing or training about what the job
3  would entail by any of the supervisors there?
4       A.  We were given a brief orientation by
5  Lieutenant French.
6       Q.  What do you recall of that orientation?
7       A.  I remember something about we would be
8  working closely with other agencies.  We would be
9  doing warrant apprehension.  We would be working
10  with the schools or in the schools, we were told.
11  We were told that we would be working with probation
12  officers, clergy, State Police, and working in the
13  community.  You know, I forget the name of that
14  community group that goes out sometimes, I forget
15  the name of them now, but, anyways, that come out to
16  kids and talk to kids and work closely with kids,
17  probably go out some nights with them to go visit
18  homes and to talk with kids; and that was about it.
19      Q.  Who was present when Lieutenant French
20  gave you the overview of what you'd be doing in the
21  unit?
22      A.  I believe it was myself, Officer Horne,
23  Officer Brito, Officer McCarthy, and Officer Langer,
24  possibly a couple of people from probation, and

Page 59

1  maybe a couple of clergy or clergy people may have
2  come in to give a little brief speak about how they
3  would be implemented with us, certain ministers may
4  have been there, I don't know which ones, I don't
5  recall.
6       Q.  Was this orientation given to the officers
7  that were new to the unit?
8       A.  Yes.
9       Q.  So it was not a unit wide briefing, it was
10  specifically directed to those of you who were
11  joining the unit?
12      A.  That's right, yes.
13      Q.  Did you know any of the other officers
14  that joined the unit along with you, I think you
15  referenced Officer Horne, Officer Brito?
16      A.  Officer Langer and Officer McCarthy.
17      Q.  Did you know them before the unit, before
18  joining the unit?
19      A.  I knew Officer Langer, because I worked in
20  Area C-11 with him.  I did not know Officer
21  McCarthy.  I knew of Officer Brito, because him and
22  I went to The Academy together, so I didn't really
23  know him personally, but I knew of him from that.
24      Q.  What about Officer Horne?

Page 60

1       A.  No, I did not know him.
2       Q.  You did not know him?
3       A.  No.
4       Q.  Did anybody tell you when you applied to
5  the gang unit that this was a bad place to work?
6       A.  No, they did not, no.
7       Q.  When you were selected to join the unit
8  did anybody say, you know, either that it's a good
9  place or a bad place to work, any of your colleagues
10  express an opinion about whether this was a good
11  move or a bad move?
12      A.  Yes.  Well, they made a reference that,
13  Forget about everything you learned in The Academy,
14  and forget about the stuff you learned in the
15  districts; that was referenced to me quite often.
16      Q.  And what did you understand that to mean?
17      A.  What did I understand it to be?
18      Q.  To mean, yes.
19      A.  I guess as they put it, I mean, we have
20  our rules and they have theirs, that's basically
21  what they said, you know, they do things their way,
22  we do things our way.  So I remember making the
23  comment once, Do we work for two different police
24  departments, I remember making that comment to

Page 61

1  someone who said that to me.
2       Q.  And who was it that said that to you?
3       A.  I can't remember the officer's name.  It
4  depends on what we were doing at the time.
5       Q.  Well, at the time that you said, "Does
6  this mean that we work for two different police
7  departments," do you remember who you said that to?
8       A.  No, I really don't.  I don't recall,
9  actually.  All I know is that, you know, we were
10  pretty new, I as a new officer, pretty much new to
11  the department.  I guess I was still, in my mind, a
12  lot of Academy training was still in my mind, and
13  probably I came to the gang unit with that training
14  still in my mind.  So I guess they were trying to
15  make a reference, Forget about what you learned in
16  The Academy, I mean, that's just a thing that all
17  officers tell you, I mean, that's part of the field
18  training, they tell you to forget about everything
19  you learned in The Academy, it doesn't go here.
20      Q.  Have you ever said that yourself to
21  anybody?
22      A.  No.  I was a field training officer, so,
23  no, I did not.  I would do just the opposite,
24  Remember everything you learned in The Academy.

16 (Pages 58 to 61)

JONES REPORTING COMPANY
617-451-8900

Page 62

1  Q. Did anybody when you came to work in the
2 gang unit instruct you to do anything that was
3 contrary to what you had been taught at The Police
4 Academy?
5     MR. ROACH: Objection, that's a pretty
6 broad question. Are you asking him to give you a
7 point by point account of every incident where a
8 rule was broken or he was told to break a rule.
9  Q. We can start generally and get specific.
10 Were you ever told to break a rule?
11     MR. ROACH: Objection.
12  A. Maybe it was implied to me to break a
13 rule, but, no, I would not break a rule.
14  Q. How many times was it implied to you that
15 you should break a rule?
16     MR. ROACH: Objection. Go ahead.
17  A. Maybe on two or three different occasions.
18  Q. Describe the first one for me.
19  A. Let me think of the very first one that I
20 can recall. It may have been on a serving of a
21 warrant, where we didn't have a warrant for a
22 particular address, and we were told just, you know,
23 forget about the warrant, go ahead and --
24  Q. I can't hear you.

Page 63

1  A. It was pretty much told to us, if we're
2 serving a warrant, sometimes let's say if I have a
3 warrant for this address, and find out the suspect
4 has gone to this address, and that's a third-party
5 address, so we don't have a warrant for that, so I
6 made the mention, This person is not here right now,
7 so we should leave. But they said, No, they're over
8 at their girlfriend's house. We go over the
9 girlfriend's house. We don't have a warrant for
10 that address.
11     And we go there and we knock on the
12 door, and the girlfriend may tell us, You can't come
13 in. We ask for consent. They say, No. Maybe the
14 officer would say, Go in anyways, push themselves
15 in. I may have said, Guys, that illegal. They'd
16 tell you, Forget about The Academy stuff you
17 learned; those types of things.
18  Q. How many times did that happen, that you
19 would enter a dwelling that you didn't have a legal
20 right to enter?
21  A. Where I observed officers enter?
22  Q. Yes.
23  A. I would say maybe twice that I can
24 remember.

Page 64

1  Q. And under whose instructions did those
2 entries occur?
3  A. One occasion was on Highland Avenue.
4  Q. Highland Avenue?
5  A. Highland Avenue, Roxbury, there was a
6 suspect, I believe the TK-16 unit had been looking
7 for. And that unit consisted of Officer Bailey,
8 Gerard Bailey, Michael DeStefano, and I believe Gary
9 Ryan. We knew they had been looking for this guy, I
10 think the suspect's name was Terence Howard. I
11 believe that was his name. I think he had a warrant
12 for, I don't know, maybe drug, violation of drug
13 laws, something like that.
14     And myself and Officer Horne were out
15 doing anticrime that particular day, and we heard
16 them on the radio, you know, talking to each other
17 on the radio doing different things. So we got on
18 the radio and asked do they need assistance, and
19 they said, yes, they wanted us to come in. We came
20 to the location they were at. Not knowing they
21 didn't have a warrant for the address, we just
22 thought, we anticipated they had one.
23     So we went around back, and we heard
24 them banging on the door, banging real hard, and the

Page 65

1 people wouldn't open the door. There was a female,
2 and I don't know her name. But, anyways, well, they
3 kept announcing, Police, police. They still refused
4 to open the door. So I guess maybe they were
5 participating in some kind of illegal activity in
6 the house, I don't know. But she opened the door,
7 they went in, they went in. And the guy, the
8 suspect, he was in a room with his son, he was doing
9 some kind of birthday party with the son.
10     And that was one incident I remember,
11 because we really didn't have a warrant for that. I
12 think Officer Gary became angry, because the girl
13 ran out the door and went somewhere; and I think he
14 had some kind, I don't know, some kind of
15 confrontation started. And I said, Well, you know,
16 where is the warrant for this address, who are we
17 looking for. We didn't even know who he was looking
18 for. We were just covering the back. We had no
19 idea who we were looking for.
20     I mean, it was customary that officers
21 would cover a location while other officers were
22 inside serving a warrant, you know, just in case
23 someone tried to jump out the windows, jump off the
24 balcony, whatever. So we were just covering the

17 (Pages 62 to 65)

Page 66

1  back entrances and the side.
2           So when the lady escaped, when Gary
3  said, Something went wrong, you let the girl get
4  away. I said, What girl? I saw her running. I
5  said, Where is the warrant at, what you all here
6  for. We had no idea who they were there for.
7           So when they told me later on when
8  they arrested Terence Howard, I heard Gerard in a
9  room arguing with the suspect, like they were about
10 to get into some kind of fight, that's when I
11 realized who they were looking for. I thought they
12 were looking for the girl. But I went in there, and
13 he was arguing with some suspect, and so I went in
14 to assist him.
15          Finally he calmed down, everything
16 calmed down, and the suspect got arrested. And I
17 guess there was a 15-year old boy, he decided, he
18 was crying, wanted to know why his father was
19 crying, and Gerard told him, Shut the fuck up, or,
20 Get the fuck out of here before I knock your fucking
21 head off. You know, and that kind of touched me in
22 a little way; I mean, here's a 15 years old kid. We
23 were there illegally in a way, illegally we were
24 there. So it kind of touched me a little bit, and

Page 67

1  Horne. And we were like, Oh, God, we didn't have a
2  warrant for this location, you know, what if
3  something had happened.
4     Q.  Who told you that there wasn't a warrant?
5     A.  Pardon me? Gary did.
6     Q.  Gary Ryan?
7     A.  Gary Ryan, yes.
8     Q.  And when did this occur?
9     A.  I can't remember the date, the exact date.
10    Q.  Can you tell me if it was before January
11 of 2000?
12    A.  I really don't remember the exact date.
13    Q.  Just for purposes of reference, one of the
14 incidents that you describe in your complaint is a
15 meeting that takes place with Lieutenant French in
16 regard to making strategic plans for Dorchester High
17 School?
18    A.  Um-hmm.
19    Q.  Do you recall when that meeting takes
20 place, the Dorchester High School meeting?
21    A.  I believe that -- you mean the meeting
22 that initiated the meeting between the officers at
23 the youth violence strike force?
24    Q.  Yes.

Page 68

1     A.  I believe that happened sometime in March
2  of 2000.
3     Q.  Does the incident that you've just
4  described on Highland Avenue, does that occur before
5  the meeting about Dorchester High School or
6  afterwards?
7     A.  I want to say it was afterwards.
8         MR. ROACH: You don't have to guess.
9     A.  I really don't, I really don't know the
10 exact date.
11    Q.  After that incident happened did you bring
12 your concerns to any of your supervisors?
13    A.  Yes, I discussed it, you know, I discussed
14 it about certain things we -- I wasn't pleased. I
15 didn't tell exactly what happened, if that's what
16 you mean.
17    Q.  No, I want to talk specifically about the
18 Highland Avenue incident. After the occasion you
19 just described where Officer Bailey and other
20 officers, including Gary Ryan, entered a dwelling
21 without a warrant, and then as you described Officer
22 Bailey was verbally abusive to an occupant of that
23 house, after that, after you cleared that scene did
24 you go back and talk to any of supervisors about

Page 69

1  what had just occurred?
2     A.  No. I think the only time I mentioned
3  that it happened was, you know, sometimes with
4  Lieutenant -- I don't recall going back clearly and
5  exactly speaking to no one about that.
6     Q.  Why not?
7     A.  Well, No. 1, we were late in the evening.
8     Q.  It was late?
9     A.  It was kind of late in the evening, and
10 nothing really occurred, I mean, nothing bad
11 happened, no one was hurt at that time, no one was
12 hurt. It wasn't that important, I don't think, at
13 that time, because we were on our way home, so I
14 think I just forgot about this.
15    Q.  You described this as an illegal entry in
16 somebody's house?
17    A.  I'm describing it now as an illegal entry.
18    Q.  Did you understand then that it was
19 illegal to enter a house without a warrant, forcibly
20 enter a house without a warrant?
21    A.  Well, at the time when we entered the
22 house, I didn't know they didn't have a warrant.
23 This all occurred after when they had arrested the
24 suspect.

18 (Pages 66 to 69)

Page 70

1  Q. And at some point you learned that you had
2  participated in the forcible breach of a house
3  without a warrant?
4  A. I think I learned the next day or two when
5  Officer Horne brought it up to my attention that we
6  didn't have a warrant to go in that house, that was,
7  like, I believe it was Sunday or Monday. I can't
8  remember the date.
9  Q. Did Officer Horne express concerns to you
10 that this had happened?
11 A. I don't know -- he expressed concerns
12 about what happened with the youth.
13 Q. And at that point did you bring those
14 concerns to any supervisor?
15 A. I didn't personally, no, I did not.
16 Q. And why not?
17 A. I don't have a clue why I didn't at that
18 time, but I don't know.
19 Q. And --
20     MR. ROACH: Before you move on with
21 more questions about this, you had asked him a
22 general question about whether he was told to break
23 any rules, and I believe he said there was an
24 implied directive to break rules, and he gave you a

Page 71

1  couple of incidents. And I'm wondering if you want
2  him to continue to give you a recitation where he
3  believes he was told to break rules.
4     MS. HARRIS: I appreciate the help,
5  Steve, but let me ask the questions. If you want to
6  do any kind of cross to clear anything up at the
7  end, you have every right to do so, but I'm going to
8  go through it the way I want to do it. Okay?
9     MR. ROACH: Okay, but I don't think
10 he's finished answering your question, you asked him
11 a question, that's all.
12 Q. Do you have anything else that you want to
13 describe about the incident on Highland Avenue?
14 A. No, not necessarily.
15 Q. Now, I believe you said that there were a
16 couple of instances, Highland Avenue being one of
17 them. I think you said that there were two or three
18 other instances where you felt that members of the
19 youth violence strike force were engaged in breaking
20 rules. Can you remember any other instances?
21 A. If you're asking me to recall street names
22 and suspect's names, no, I cannot.
23 Q. No. Can you give me descriptions of
24 events that occurred with specificity?

Page 72

1  A. I mean, serving warrants there are a lot
2  of times when people may bend the rules a little,
3  officers may bend the rules a little. It doesn't
4  necessarily -- they could -- I mean, I guess
5  sometimes you may say they can say it was a consent,
6  it all depends on what degree of consent, you know
7  what I mean, and so maybe a lot of times the rules
8  got bent when serving warrants.
9  Q. Do you have an impression as you sit here
10 today that the warrant apprehension unit when they
11 executed warrants that they obeyed the law or did
12 not obey the law when they did this?
13     MR. ROACH: Objection, that's a legal
14 question. I think the question is --
15 Q. I'll rephrase it. Do you have a sense as
16 you sit here today that officers who served warrants
17 in the gang unit acted in conformity with what you
18 were trained to do at The Academy, that you executed
19 warrants the right way according to what you were
20 trained in The Academy?
21 A. I would say that we executed them
22 differently than I was used to executing them at
23 C-11 as opposed to my training in The Academy.
24 Q. And describe for me what those differences

Page 73

1  are.
2     THE REPORTER: I'm sorry, but I need
3  to change my paper.
4     (Brief recess.)
5     (Record read as requested.)
6  Q. Do you want me to back up a little bit?
7  A. Yes, you may have to back up.
8  Q. I believe you said that things were done
9  differently in the gang unit than had been done in
10 the district, and I asked you to describe for me
11 what those differences were?
12 A. Well, when I was in Area C-11, I served
13 quite a few warrants. There was a certain amount of
14 respectful treatment, and we made sure that
15 everything we did was on the up and up, we had
16 warrants for the house, we knew exactly where we
17 were going, who we were looking for, and we'd go in
18 with that warrant, execute the warrant; if that
19 person was not there, we'd do what we're supposed to
20 do, leave.
21     As opposed to when I was part of the
22 warrant apprehension team in the gang unit, we would
23 go to a house, be more verbally abusive, a lot of
24 disrespectful to the tenants in the house, even if

Page 74

1  they gave us consent to come in to look around, we
2  would still do things that was a little out of the
3  norm to serving a warrant, especially a body
4  warrant. I mean, we would serve body warrants more
5  like we executed search warrants, and there was a
6  difference between the two. So, and that's the
7  difference I noticed.
8      Q. So we're clear on the record, a body
9  warrant is an arrest warrant for a specific person;
10 right?
11     A. Exactly right.
12     Q. And a search warrant is a warrant to
13 search a certain premises?
14     A. Yes.
15     Q. Just to be clear on that. Can you give
16 me, other than Highland Avenue, can you give me a
17 specific example of a situation where a warrant was
18 executed and people were treated disrespectfully or
19 the activities were not on the up and up?
20         MR. ROACH: I think he's talked about
21 two so far, but go ahead. Objection. Go ahead.
22     A. I think I may have listed certain examples
23 that came to mind, if you will allow me to view some
24 of the documentation I provided.

Page 75

1      Q. Let me just start, Highland Avenue you
2  just described?
3      A. Yes.
4      Q. Can you remember any other instances where
5  you feel that a warrant was served and the people
6  were treated disrespectfully? I think you told me
7  generally what your concerns were of verbal abuse,
8  things of that nature. I'm asking if you can tell
9  me a specific instance other than Highland Avenue?
10     A. Yes, there was an incident that occurred,
11 I believe it was at 148 Homestead Street. We were
12 executing a warrant, body warrant, for a suspect by
13 the name of Michael Finckley.
14     Q. Finckley?
15     A. Finckley, and this person, we had a
16 picture of the suspect, we had a copy of the
17 warrant. So when we went to the premises, we did
18 our protective sweep. There were a couple of other
19 individuals inside the house, and Mr. Finckley
20 wasn't present.
21         So we talked to a friend of his, which
22 was known to myself and possibly other members of
23 the unit, asked him, Do you know the whereabouts of
24 Mr. Finckley; he told us, no. He had a girlfriend

Page 76

1  there, she is a small, little, petite woman, and we
2  were not look for a petite woman. We were looking
3  for a 6-foot, 260 pound person, a male, black male
4  suspect.
5          So as we -- you know, we, I guess we
6  said, Well, okay, I know, you, Eric, that's where
7  you're hanging out at now. I know he was into other
8  activities, so we just took his information. We
9  already knew it. And there was this girlfriend, she
10 provided a name, but the name wasn't -- you know, we
11 were asking her name, she told us some name. We
12 said, okay. We were about to leave the premises.
13         I guess Officer Bailey was downstairs.
14 He probably heard certain things going on by radio
15 contact. So we could never get a really -- we
16 had -- officers of the youth violence strike force
17 always had the tendency to go in and serve warrants,
18 and when they served warrants, the person they were
19 looking for --
20         THE REPORTER: I'm sorry, can you slow
21 down and repeat that?
22     A. And when they serve warrants, they may not
23 always find the people that we're looking for, so
24 we'd do a protective sweep of the area, which is

Page 77

1  safety reasons, you know, you're supposed to. So we
2  may ask people their names, they may give us a name,
3  and we have to take it at face value, I guess, if we
4  don't know that person.
5          So this particular lady gave a name,
6  so we just took it at face value. We don't have no
7  warrant for her. We have no reason to question her
8  to detain her for any other reason. So Officer
9  Bailey came up, he took a chair, put it in front of
10 the woman, told her, "I don't think that's your
11 name, give me your name." So, I mean, after
12 constantly, you know, badgering the woman, we were
13 about to leave the premises, and that was Chris
14 Bailey, not Gerard Bailey, Christopher Bailey, and
15 he kept asking the woman her name over and over.
16 She kept giving names. I guess he kept calling the
17 base to do CORI checks, no, that's not your name,
18 that name isn't showing up. So eventually she gave
19 us a name that's close to it, you know, we may be
20 able to identify.
21     Q. Close to what her real name was?
22     A. Yes, close to what her real name is. So
23 something close came up on the CORI check that was
24 close to her. So I guess he continued saying,

Page 78

1  "Well, your name is certain, certain Williams,
2  right?" Eventually, yes, she admitted that she was
3  that person, and --
4     Q.  Is it your sense that this was improper,
5  that Officer Bailey's questioning the woman in the
6  premises where you're looking for someone with a
7  warrant to get her true identity was harassing or
8  somehow in conflict with what you understood the
9  rules of the department to be?
10    A.  Well, it's more on the rules of what that
11 we have learned in criminal law and certain things
12 how we're supposed to perform our duties.  It's
13 things that on a warrant, serving a warrant that we
14 shouldn't badger people, because if a person is not
15 free to leave, they're automatically under arrest.
16 So, actually, this woman was already under arrest
17 before, because she wasn't free to leave; and we
18 were there on a body search warrant, and that body
19 that we were looking for was not there.
20    Q.  When did this occur?
21    A.  I want to say this was around, I want to
22 say sometime in 2001.
23    Q.  In 2001?
24    A.  Yes, like around, I want to say around

Page 79

1  January, February, somewhere, 2001.
2     Q.  Was there a supervisor present for the
3  execution of this body warrant?
4     A.  No.
5     Q.  I'm sorry, you said when in 2001?
6     A.  I want to say around February or January,
7  maybe March.  I don't know exactly, between January
8  and March of 2001.
9     Q.  And when you left the scene at Homestead
10 Street, did you bring these concerns to any of the
11 supervisors in the youth violence strike force?
12    A.  Well, it was brought up to Lieutenant
13 Foley, and we spoke about it.
14    Q.  What did you say to him and what did he
15 say to you?
16    A.  Well, we explained the situation to him.
17    Q.  Let me interrupt you there.  Who is the
18 "we"?
19    A.  I think myself, I spoke with him.  I
20 believe Officer Horne spoke with him, and possibly
21 Officer Bailey may have spoken to him, too, I'm not
22 sure.
23    Q.  Tell me what you said to Lieutenant French
24 and what he said to you.

Page 80

1        MR. ROACH:  I think he said Lieutenant
2  Foley.
3     A.  Foley.
4     Q.  Excuse me, Lieutenant Foley, tell me what
5  you said to Foley and what Foley said to you.
6     A.  Well, we explained to Lieutenant Foley --
7     Q.  Just you now.
8     A.  I explained to Lieutenant Foley the
9  incident that had occurred, how it occurred and why
10 it occurred, and, basically, that was it, and just
11 gave him my point of view of it.
12    Q.  Did you express to him concerns about the
13 way that this woman had been questioned?
14    A.  Yes, we did.  Yes, I did.
15    Q.  And what did he say to you?
16    A.  He said -- me, I actually spoke to him
17 myself and Officer Horne at the same time, so there
18 was two of us in the office expressing our concerns
19 about this.
20    Q.  And what did Lieutenant Foley say when you
21 and Officer Horne brought these concerns to him?
22    A.  I don't know.  I believe he spoke to
23 Officer Bailey about it.  I don't know.  What he
24 said to Officer Bailey I have no idea.

Page 81

1     Q.  What did he say to you?
2     A.  Well, he just said he'd have to speak to
3  Officer Bailey about it.
4     Q.  He said he would speak to Officer Bailey
5  about it?
6     A.  Yes.
7     Q.  And did you have any subsequent
8  conversations with Lieutenant Foley after that one
9  conversation about this incident?
10    A.  No.
11    Q.  Did you have any conversation with Officer
12 Bailey about the incident --
13    A.  No.
14    Q.  -- on Homestead Street?
15    A.  No.
16    Q.  Do you remember any other instances other
17 than these two that you recall where officers in the
18 gang unit performed their duties in a way that you
19 questioned?
20        MR. ROACH:  Objection.  Go ahead.
21    A.  Similar to this?
22    Q.  Anything that gave rise to concerns in
23 your mind about whether they were performing
24 appropriately?