Page 114

1  just that one? I'm trying to focus you just on the
2  incident where Gerard Bailey allegedly said that
3  he's the Grand Wizard and had concerns about you
4  joining the gang unit because of issues that had
5  occurred with your wife when you were at C-11?
6      A.  No, I did not.
7      Q.  And is there a reason that you didn't
8  bring that up?
9      A.  Maybe at the time I didn't think about it.
10     Q.  Did you bring it up at any time after the
11 meeting with Lieutenant French and the minority
12 officers?
13     A.  No, I did not.
14     Q.  Did you bring it up at the meeting that
15 was held at the Police Post on American Legion
16 Highway?
17     A.  No.
18     Q.  Did you bring it up at the Park Plaza
19 training session that took place later, late spring,
20 early summer of 2000?
21     A.  No.
22     Q.  I think I had been asking you if you
23 believed that Sergeant Bulman was, didn't want to
24 work with you because you were black, and that you

Page 115

1  stated to me that you had this conversation with
2  Marissa Henderson regarding Gerard Bailey's
3  comments; was that correct?
4          MR. ROACH:  Objection.
5      Q.  If it's not, I can go back; it's an
6  awkward question.
7          MR. ROACH:  Do you have another
8  question for him?
9      Q.  Are there any -- strike that.  Did you
10 have the belief that Sergeant Bulman was reluctant
11 to work with you because you were black?  And I'm
12 focusing you again on August of 1999, when you
13 entered the unit and felt that yourself, Officer
14 Brito and Officer Horne were not given warrant
15 apprehension work to do?
16     A.  I would say, yes.
17     Q.  And can you tell me why you believe that
18 to be the case?
19         MR. ROACH:  Objection.  Go ahead.
20     A.  Well, upon my arrival to the unit he made
21 a comment that you have to prove yourself to remain
22 in this unit.  I also observed him make comments to
23 Officer Brito and Officer Horne that they were
24 taking the place of two other officers from Area

Page 116

1  B-3, Officer McLaughlin and Officer Long, and they
2  were white officers, and he stated to us that we had
3  to prove ourselves to remain in the unit.
4          And I asked him the question, What did
5  you mean I have to prove myself, I didn't quite know
6  what that meant, you know, I have to prove myself;
7  and he didn't really elaborate on it.  So I took it
8  as that he means that we have to work hard; you
9  know, I don't know what he mean by that.  And I
10 guess later on, about a week later, two weeks later
11 he made the same comment again to me that I had to
12 prove myself to stay in the unit, so --
13     Q.  I'm sorry?
14     A.  No, go ahead.
15     Q.  When is the first time that Officer Bulman
16 said to you, Sergeant Bulman, rather, said to you
17 that you have to prove yourself to remain in the
18 unit?
19     A.  I would say that was probably the second
20 week that I was there.
21     Q.  Do you remember the day that you
22 transferred into the unit?
23     A.  I believe I came to the unit on a
24 Wednesday, I think, I'm not sure.

Page 117

1      Q.  In the beginning of the month, the end of
2  the month?  I can check, I just don't know off the
3  top of my head.
4      A.  The 11th of August.
5      Q.  August 11th you transferred into the unit.
6  So sometime in August Sergeant Bailey said to you,
7  You're going to have to prove yourself to remain in
8  the unit?
9          MR. ROACH:  Sergeant Bulman.
10     Q.  Excuse me.  Thank you.  Sergeant Bulman?
11     A.  Yes.
12     Q.  In what context did this conversation take
13 place?
14     A.  I'll be honest, I mean, I'm not being
15 honest, I think Sergeant Bulman said that to me,
16 when he said it to me, I thought he was a patrolman,
17 I didn't know he was a sergeant, because he had
18 never officially introduced himself to me as a
19 sergeant.
20     Q.  Is this the first face-to-face meeting
21 that you had with Sergeant Bulman?
22     A.  Yes.
23     Q.  Who else was present?
24     A.  I believe Officer Horne and Brito was,

Ronald Brown

Page 138

1   A. I can't, that I don't want to, I mean, I
2   don't want to --
3   Q. I don't want you to guess. If you don't
4   remember, that fine.
5   A. I can't say that, no, I can't say one way
6   or the other.
7         MS. HARRIS: Why don't we break here
8   for a lunch break?
9         (Recessed at 1:02.)
10        (Resumed at 2:03.)
11        MS. HARRIS: Just to reflect a
12  conversation that we've had after lunch before going
13  back on the record. We have agreed amongst
14  ourselves that we're going to reschedule the 30(b)6
15  currently scheduled for September 19th, the
16  continuing deposition of Deputy Foley, scheduled for
17  Wednesday, the 21st, and the deposition of
18  Superintendent Joyce currently scheduled for
19  Thursday the 22nd. We're going to attempt to
20  complete the deposition of Foley and take Joyce's
21  deposition the last week of September, pending their
22  availability, and we have agreed to do the 30(b)6
23  deposition, if necessary, the first week of October.
24  And we've also agreed that we will cooperate with

Page 139

1   one another to the extent it's necessary to go over
2   into October to complete discovery. Fair enough?
3         MR. ROACH: I think that's right, and
4   I think I would make that the first two weeks of
5   October, rather than the first week of October, if
6   that's okay with you?
7         MS. HARRIS: That's fine.
8         MR. ROACH: Just so it's clear, with
9   regard to the 30(b)6, the parties have also agreed
10  that we will look at the deposition transcripts of
11  Foley, French, Dowd and Joyce to see if there's some
12  areas that we can agree that we don't need to
13  recover, but I'm reserving my right to still do the
14  deposition if there's more questions I need to ask
15  that haven't been covered in those depositions. And
16  that nobody is going to object, the parties will
17  agree that no one will object to doing discovery
18  through the first and second weeks of October, even
19  though the Court order told us that we're going to
20  limit it to, it's limited to the end of September.
21        MS. HARRIS: Okay. All set.
22        MR. ROACH: Everybody is agreed to
23  that?
24        MS. HARRIS: That's fine.

Page 140

1         MS. TIERNEY: Yes, we agree.
2   Q. I think, Officer Brown, prior to lunch we
3   were covering your career at the youth violence
4   strike force from August of 1999 when you
5   transferred into the unit and had talked about
6   incidents from August to the end of the year -- or
7   strike that.
8         Aside from what we have spoken about
9   this morning, are there any other events that
10  occurred between August of 1999 and the end of the
11  year, in December of 1999, that stick out in your
12  memory as being incidents involving racial
13  discrimination or racial harassment, either of
14  yourself, your colleagues, suspects or citizens that
15  you encountered?
16        MR. ROACH: Objection. Go ahead.
17  A. Yes, there were. There was an incident
18  where a young black suspect had came up to 364
19  Warren Street to retrieve some keys that he had left
20  a day prior.
21  Q. He had left the day prior?
22  A. Yes.
23  Q. Okay, sorry.
24  A. And those keys had been confiscated from

Page 141

1   the suspect by Bailey and -- Officer Chris Bailey
2   and Officer Steve Romano.
3   Q. Steve Romano?
4   A. Romano, I think that's how you pronounce
5   his name, Romano. The suspect was brought up there
6   because of an FIO, a field interrogation
7   observation.
8   Q. He was brought to the base because of an
9   FIO?
10  A. Yes.
11  Q. Okay.
12  A. And he had been transported from the area
13  of Geneva Avenue and Toplift Street to the base by
14  Officer Romano and Officer Bailey, because I guess
15  he would not, he was walking up the street, up
16  Geneva Avenue, and the officer wanted to FIO, for
17  whatever reason, they wanted to FIO him, it was, he
18  refused to give a name of who he was. So after
19  awhile he went to the base, they let him go from the
20  base.
21        The next day he came back to get his
22  keys, and he was standing in the hallway at 364
23  Warren Street waiting for his keys. I went back
24  into the guard room to look for his keys. Officer

36 (Pages 138 to 141)

Ronald Brown

Page 142

1  Bailey and Officer Romano were not present at that
2  time, so I went to look for his keys to give them to
3  him, and I could not find them. So I remembered, I
4  think Officer Bailey and Officer Romano had given
5  the keys to Officer Horne, who was off that day. So
6  Officer Horne had placed the keys someplace that I
7  couldn't locate them at the base. While this
8  gentleman was standing in the hallway Officer Ryan,
9  Officer Romano and Officer Bailey came into the
10 building, and they immediately started harassing him
11 in the hallway at 364 Warren Street.
12    Q.  What were they doing?
13    A.  Well, they start asking him information,
14 Give me your name, give me your name, are you going
15 to tell us your name; he never told us his name, to
16 this day. I mean, we found out later what his name
17 was. They continued to harass him, Give me your
18 name; so they started slapping him around.
19    Q.  They started slapping him around?
20    A.  Yes.
21    Q.  Physically hitting him?
22    A.  Physically hitting him, yes, that started
23 by Officer Ryan, slapped him around, beating him up.
24 And myself and Detective Chuck Collins observed what

Page 143

1  was going on, and we were standing in the hallway.
2  We ran out there and pulled them off. They were
3  beating him up in the hallway of 364 Warren Street,
4  jumping on the gentleman. He wasn't a suspect, came
5  at his own accord, but because he did not give them
6  his name the day prior, they started to physically
7  abuse him. I mean, a young, black male, I didn't
8  see no reason for that to occur.
9     Q.  When did this happen?
10    A.  This had to happen, I want to say it was
11 either the latter part, sometime, I want to say
12 sometime between November of 2000 and March of 2001.
13 I don't know the exact date.
14    Q.  And how did this incident end?
15    A.  Well, it ended by Sergeant Davin ordered
16 Officer Bailey and Officer Romano to take the
17 suspect to Area B-2 and book him, arrest him, but
18 when they got to Area B-2, they didn't know what to
19 arrest him on; they had no reason to arrest him. So
20 they were sitting down at Area B-2 with the
21 gentleman there in the back seat of their car under
22 arrest, but they didn't know what to arrest him on,
23 I guess, still didn't give his information, only way
24 to get the information was to take him inside and

Page 144

1  fingerprint him, and, hopefully, he'll come up with
2  some kind of record.
3          So they continued down there for
4  awhile. Sergeant Davin sent me down. I went down,
5  I spoke to the gentleman in the back seat. I asked
6  him how he was feeling, became a little friendly.
7  He finally told me his name, so he gave me his name.
8  I went back to the base and told Sergeant Davin what
9  his name was. I told him he gave me his name, so we
10 looked him up in the computer if that was actually
11 his name, and it was. I forgot his name right now.
12 And Sergeant Davin asked me to go down and book him.
13 I told him, you know, Unless you're ordering me to
14 do it, I'll do it, but if you're not ordering me,
15 I'm not going to arrest him for no apparent reason,
16 because we decide to jump on him because he came to
17 get some keys.
18          So Officer Ryan said he'll take the
19 blame for it, because he led the gang unit, I took
20 the blame for this. I don't know what happened, but
21 we didn't arrest the suspect. I went back down and
22 told Officer Bailey and Officer Romano what Sergeant
23 Davin had said, and they brought him back to the
24 base, and they let him go.

Page 145

1     Q.  Okay. I'm going to make sure I
2  understood. So Davin told you to arrest him, but
3  you had no charges upon which to arrest him; right?
4     A.  No, no.
5     Q.  And you told Davin that you wouldn't
6  arrest him unless you were given a direct order?
7     A.  If you give me a direct order, give me a
8  reason to arrest him, I would arrest him.
9     Q.  And did Davin give you a reason to arrest
10 him?
11    A.  No, he did not.
12    Q.  And ultimately this individual was
13 released?
14    A.  Yes, he was.
15    Q.  Did you have any conversation with
16 Sergeant Davin about what had transpired?
17    A.  Yes, yes, I did.
18    Q.  And what was that conversation?
19    A.  Basically, I told him, you know, This is
20 what occurs when we're ordered to go out and get
21 20 -- I mean, officers, we were told, he instructed
22 officers to go out and get 20 FIOs a day. I told
23 him that's what's happening when we go out in the
24 black neighborhoods, in the communities, and start

37 (Pages 142 to 145)

Page 146

1  harassing black youths, for no reason, other than
2  walk up on them, won't give us their name. If
3  they're doing something suspicious, we have a right
4  to detain them. If they're not doing anything,
5  they're not going to give us their names. I mean,
6  we can sit there all day long, they're going to get
7  hostile with us, once they get hostile the officer
8  is going to get hostile, and what that going to lead
9  to is a hostile situation, it happens all the time.
10         So, to prevent that, you know, I think
11  we should have a better approach, you know, upon our
12  FIOs in the communities to prevent -- I said a lot
13  of the youth are complaining that the police are
14  coming in and harassing them, they just be walking
15  the street, and we jump on them, stating that just
16  because they're young, black kids, black youths,
17  walking around with baggy pants, we just
18  automatically assume that they're all gang members,
19  and that's the wrong assumption to make. Every kid
20  that's walking around in baggy pants and because
21  they come from Dorchester High or Mattapan High
22  doesn't mean they're necessarily a gang member.
23    Q.  Now, is this what you were saying to Davin
24  in this conversation?

Page 147

1    A.  Well, that's the conversation we had, yes.
2    Q.  And what did he say in response to these
3  things that you were talking to him about?
4    A.  Well, I think he -- I don't know if he was
5  very -- he may have -- I don't know what he was
6  thinking.
7    Q.  Well, what did he say?
8    A.  I don't know exactly what he said. I
9  mean, here we are, you had a white officer jumping
10  on a black youth for no apparent reason, witnessed
11  by another white officer and myself, you know, you
12  don't discipline him, you don't instruct him, you
13  don't talk to him, nothing, I mean, you don't have
14  no meeting.
15         MR. ROACH:  Her question is what did
16  Davin say to you.
17    A.  He didn't say much of nothing. He just
18  left it alone, left it alone, just told me to go
19  down and tell Chris Bailey and Steve Romano to let
20  him go; that's what I did.
21    Q.  Did you tell Sergeant Davin your concerns
22  about the interaction with the black youths in the
23  neighborhoods?
24    A.  Yes, I did.

Page 148

1    Q.  That was during this conversation?
2    A.  Yes.
3    Q.  Is there any other incident that you can
4  remember between August of 1999 and December of
5  1999, and, you know, I'm not going to hold you to
6  these time frames, but just generally is there
7  anything else in the fall that you recall that gave
8  rise to concerns in your mind about racial
9  harassment or racial discrimination against any
10  person by members of the gang unit?
11         MR. ROACH:  Including himself?
12    Q.  Including himself, any other person?
13    A.  Yes. I mean, as previously stated, when
14  we first arrived at the unit --
15    Q.  Well, excuse me, just one second. I'm not
16  going to ask you to repeat what you've already
17  testified to at length this morning. I'm just
18  checking to see if there's anything that we haven't
19  spoken about.
20    A.  Yes. I observed, like I said, I saw it as
21  being racial when the supervisor would take officers
22  out and leave officers sitting in -- they would take
23  white officers out, you know, on their warrant, like
24  I said, warrant apprehensions, then leave other

Page 149

1  black officers sitting inside, and the white
2  officers is as new as I am, so if you can take him
3  out with you, then you can take me out with you, I
4  mean, if you're teaching him and not teaching me, if
5  that's what it's supposed to be, a learning
6  experience, why would you take these new officers
7  out and leave me sitting.
8    Q.  Who took new officers out on a learning
9  experience?
10    A.  Well, like I said, we were a part of a
11  warrant apprehension team, and, like I told you, we
12  were never assigned warrants. But I came up there
13  with Officer Langer and Officer McCarthy, myself,
14  Officer Brito and Officer Horne. Officer Horne and
15  Officer Brito and myself were black officers.
16  Officer Langer and Officer McCarthy were white and
17  Hispanic officers. I mean, you take them every
18  morning out with you, serve warrants, and you leave
19  us sitting inside with the other black State Police
20  officers, and we're all just sitting.
21    Q.  So let me make sure I understand you.
22  It's your testimony that when you came to the gang
23  unit, black State Police officers who were working
24  as a part of a task force with the gang unit, that's

38 (Pages 146 to 149)

Case 1:04-cv-10718-RGS   Document 21-7   Filed 04/04/2006   Page 5 of 12

Ronald Brown

Page 154

1  already told me?
2     A.  There was one other thing I found kind of
3  funny, I mean, kind of suspicious activity or
4  racial.  This was an incident that when we did start
5  serving warrants, at this time we were serving a
6  warrant on the supervision of Sergeant Davin, we
7  were looking for a suspect, I believe an ABDW, and
8  we had located that suspect in the Dorchester area
9  around, somewhere around Adams Street, I can't
10 remember what street it is, one of those side
11 streets, and he was a white suspect.  So we went to
12 the home looking for him.  He wasn't present at the
13 home.
14          The officers that went was myself,
15 Officer Horne, Officer Collander, Officer Chris
16 Bailey, Officer Steve Romano, and Sergeant Davin.
17 So Sergeant Davin asked Officer Horne and Officer
18 Collander to remain at the location that we went to
19 serve the warrants while we went to an address in
20 South Boston for the suspect, and I believe he had
21 gotten the address for South Boston from Sergeant
22 Detective Keeler.
23          And I think Sergeant, I know Sergeant
24 Davin informed us that the suspect now, whatever he

Page 155

1  did, assault with a deadly weapon, ended up into
2  some kind of murder charge, and I believe Sergeant
3  Keeler now was trying to get a murder warrant on
4  him, but we had an ABDW warrant on him anyways.
5          So we went to the house, someplace in
6  South Boston, I forget exactly where the location
7  was, myself, Sergeant Davin, Sergeant Bailey, I
8  mean, Officer Bailey, and Officer Romano.  So we got
9  to the location, did our usual surround the house
10 that we normally do when we serve warrants, and we
11 knocked on the door of the suspect, and we, I heard
12 a lot of running commotion, so I alerted Officer
13 Bailey and Officer Romano that we believe someone is
14 about to come out the back, we couldn't confirm
15 that, but, you know, from the running, it's a
16 possibility, so kind of alert them to be more alert
17 to the activities, now that we're looking for this
18 guy for murder.  I don't know if he knew that we
19 were looking for him for murder or not.
20    Q.  You alerted that on the radio?
21    A.  I don't know; it may have been the radio.
22    Q.  Where were you at the time that you heard
23 the running in the house?
24    A.  I was in the front of the house with

Page 156

1  Sergeant Davin.
2     Q.  And the other two guys were in the back?
3     A.  They were in the back.
4     Q.  Okay, go ahead.
5     A.  So Sergeant Davin knocked on the door,
6  they refused to open it, I think, at that time.  I
7  kept telling Sergeant Davin, I hear the commotion,
8  running, running.  I think Sergeant Davin was about
9  to put his foot through the door to make a forced
10 entry, but I'm not sure, but by that time the
11 gentleman came to the door and opened the door,
12 opened the door.
13         So he opened the door, a gentleman
14 came, and he approached us.  Sergeant Davin showed
15 him the warrant that we had for this gentleman's
16 arrest.  The gentleman said, Yes, he is here, you
17 know, he's here.  So we then go into the house to
18 get the suspect.  The gentleman asked Sergeant
19 Davin, Will it be all right if I bring the suspect
20 to the South Boston police station tomorrow, and I
21 will turn him in.  Sergeant Davin agreed to the
22 terms with the guy.
23         The next day came -- I became a little
24 furious, because I watch us go into black

Page 157

1  communities, we go into homes for lesser charges,
2  and we, you know, use derogatory means, tell people,
3  Shut the fuck up, sit the fuck down, and all that
4  kind of stuff, I hear that kind of stuff coming out
5  of your mouth, and then we go for a guy on a murder
6  warrant, you know, and Sergeant Keeler had informed
7  him that this kid was wanted for murder, and we
8  leave him there, and we don't even go in the house
9  to check, or nothing, we just turn around and leave.
10         And so when we get back to the
11 station, I tell Officer Collander what occurred, and
12 he became furious about it, we all became furious
13 about it, because it was just one of those things,
14 so.
15    Q.  When did this happen, do you recall; you
16 think it was in the fall of '99?
17    A.  I don't know when.  I can almost -- I
18 can't be sure who the suspect was.  I want to say
19 his name was George Pappas, I'm not certain that it
20 was, but I want to say that was his name.
21         MR. ROACH:  She asked you the year.
22    A.  Oh, the year; I thought you asked me the
23 name of the suspect.  I believe this was in, it may
24 have been 2000, I'm not sure if it was 2001 or not.

40 (Pages 154 to 157)

JONES REPORTING COMPANY
617-451-8900

Ronald Brown

Page 150

1  what you said?
2     A.  Yes.
3     Q.  That black State Police officers and
4  yourselves sat without assignment or direction in
5  the headquarters of the base on Warren Avenue; is
6  that correct?
7     A.  Yes.
8     Q.  For how long did you and the other black
9  officers sit in the base without any assignments?
10        MR. ROACH:  You mean, in the day, or
11  month wise, week wise?
12    Q.  Well, that's what I'm asking.  As I
13  understand your testimony, if I'm wrong, tell me,
14  from the time you came into the unit in August, '99,
15  you, Officer Brito, Officer Horne and members of the
16  Massachusetts State Police who were also black were
17  left sitting inside the base with no assignments?
18    A.  Yes.
19    Q.  For how long did that occur?
20    A.  Like I said, as far as serving warrants,
21  going on warrant assignments, we did ask Lieutenant
22  French, you know, what he wanted us to do, and he
23  would send us on assignments without Sergeant
24  Bulman.  Sergeant Bulman would be out on assignment

Page 151

1  with the officers serving warrants.
2     Q.  Let me understand, you actually did have
3  assignments, but they came from French, and not from
4  Bulman?
5     A.  Only if we asked Lieutenant French what
6  would he like for us to do, you know, since we are
7  sitting here, I mean, we're sitting here with no
8  assignment.  And that occurred, as a matter of fact,
9  the black State Police officers made a comment to me
10  and Horne and Brito, You guys better get used to
11  this, they always come in and leave us here, we
12  don't know what's going on, we're assigned here as a
13  part of the task force, but we just sit here all day
14  long, you might as well get used to that.
15    Q.  At some point were you given assignments
16  to perform on warrant apprehension tasks?
17    A.  Yes, when we brought it up to Sergeant
18  Bulman why we were not assigned folders to do
19  warrants, that's when he signed us the folders.
20    Q.  And how long after you were assigned to
21  the unit did that happen?
22    A.  I would say that probably went on for
23  about, approximately, six to eight weeks.
24    Q.  So six to eight weeks, the only time that

Page 152

1  you actually had an assignment was when you went to
2  Lieutenant French and asked for one, other than
3  that, you're sitting idle at the base?
4     A.  Yes, pretty much we were sitting at the
5  base or going out to the schools, you know, he would
6  send us to the schools with Dave Singletary, and
7  Neva, and Israel, if we asked him, you know, what we
8  need to do.
9     Q.  And who are the black State Police
10  officers that you're referencing?
11    A.  They were Officer Antoine Ramire --
12    Q.  Antoine Ramire?
13    A.  Yes.  State Trooper Carlton Jackson --
14    Q.  Carlton Jackson?
15    A.  Yes.  State Trooper Derek Outeridge, State
16  Trooper, I want to think it was Arthur Sturbridge,
17  or something to that effect, and I believe Sergeant
18  Al Pierce.
19    Q.  I'm sorry, Hal Pierce?
20    A.  Al Pierce, State Trooper.
21    Q.  And he's a sergeant?
22    A.  Yes.
23    Q.  And he's also black or Hispanic?
24    A.  He's black, I believe, black.

Page 153

1     Q.  So there are five or six Mass. State
2  Police officers, including the supervisor, who were
3  assigned to the gang unit, but not given any
4  assignments?
5     A.  According to them, they were not.
6     Q.  Are there any other instances that you can
7  recall between August of 1999 and December of 1999
8  that you perceived to be racially discriminatory?
9     A.  Yes, I mean, when those supervisors show
10  that type of favoritism towards white officers and
11  don't show it to black officers, of course it's
12  racial.
13    Q.  Okay.  But that's in addition, I'm asking
14  for you, in addition to what you just told me about
15  your perception that Bulman took white officers out
16  and did not take you out until you asked him to, is
17  there anything else that from your perspective
18  demonstrated favoritism to whites over black
19  officers?
20        MR. ROACH:  You're asking him in
21  addition to what he already testified to?
22        MS. HARRIS:  That's correct.  I don't
23  want to hear what he already testified to.
24    Q.  Just anything else that you have not

Page 158

1  I'm not sure, it may have been 2001, it may have
2  been 2000. I don't know, I'm not sure.
3      Q.  Was Davin your boss at the time this
4  happened?
5      A.  Yes, he was.
6      Q.  So it was after Bulman had left the unit?
7      A.  Yes, right.
8      Q.  Was it -- strike that.
9          MR. ROACH:  Objection. I don't think
10  Davin left the unit; he left the day tour.
11      Q.  Or Bulman left the day tour?
12      A.  And Bulman became the sergeant of the
13  detectives.
14      Q.  So this was after Sergeant Davin had
15  become the day sergeant of the warrant apprehension
16  unit?
17      A.  Yes.
18      Q.  Whenever you were working serving
19  warrants, arrest warrants, did you ever get asked by
20  suspects if they could turn themselves in or clear
21  up the warrant on their own?
22      A.  I have never been personally asked that,
23  no.
24      Q.  Have you ever told anybody that rather

Page 159

1  than be arrested on the warrant that you would let
2  them go to court or let them come in and clear it up
3  on their own?
4      A.  No, I have not.
5      Q.  Is this something that happened with great
6  frequency in your mind in the youth violence strike
7  force that individuals were not arrested on
8  warrants, but were told that they could clear them
9  up on their own?
10          MR. ROACH:  You mean white
11  individuals?
12      Q.  Any individuals, white or black, Asian,
13  Hispanic, anything?
14          MR. ROACH:  Objection. Go ahead.
15      A.  I can't say for sure. I mean, any suspect
16  that we arrested on a warrant, I mean, some officers
17  may have had a practice of doing that, I don't know,
18  they may have, but any suspects that we arrest, we
19  would arrest those suspects even if they would only
20  be information resources, we still arrest them, and
21  let them clear the arrest up with the Court,
22  anything they want to provide at that time, we let
23  them provide it. No, as far as, no, turn themselves
24  in, no.

Page 160

1      Q.  I think you had described an incident in
2  Charlestown where you said an individual was allowed
3  to, was not arrested on the scene, but was allowed
4  to clear up or turn themselves in to the Court later
5  on; is that correct?
6      A.  No, I did not say.
7      Q.  Okay, then maybe I misunderstood, I'm
8  sorry. I thought you told me about an incident with
9  Chris Bailey --
10      A.  No.
11      Q.  -- where they went to a housing project in
12  Charlestown. Okay. Strike it. If I'm
13  misunderstanding, then forget it.
14          Are there any other events that you
15  can think of that occurred just between August and
16  December of 1999 that you interpreted as being
17  racially hostile or racially discriminatory toward
18  any person, including yourself?
19          MR. ROACH:  Objection.
20      A.  There were events that I didn't find very
21  fun when I observed. I would go down to the
22  detectives unit sometimes with information to give
23  to Detective Fratalia or Detective Waggett or
24  Sergeant Bulman on certain information that we may

Page 161

1  receive on the street that would probably be more of
2  an investigation by the detectives as opposed to
3  officers, so we would pass that information along to
4  them.
5          And I would sometimes see them pull
6  suspects out of the terminal and hold them up, refer
7  to each other, Do you know this monkey, or, How
8  about this monkey. And one time I said to them, You
9  know, some certain people would find calling
10  suspects the name "monkey" as offensive. And I
11  think one of them stated, Well, we didn't say porch
12  monkey, Ron.
13      Q.  I'm sorry, We didn't say what?
14      A.  Porch monkey.
15      Q.  What does that mean?
16      A.  Well, porch monkey used to be a term that
17  they used to refer to in the slavery days about
18  blacks, I guess in the service of the house, or
19  something, and they were more the house servants,
20  and they're supposed to be the good blacks, as
21  opposed to the field servants, the bad blacks, so
22  they refer to them as porch monkeys. I don't know
23  where that term, I don't know if it originated more
24  under the black culture or the white culture, I

Ronald Brown

Page 178

1  that.
2  Q. I'll rephrase the question. Tell me,
3  Officer Brown, everything that occurred between
4  yourself and Sergeant Bulman that you interpreted as
5  being racially discriminatory or harassing from
6  August of 1999 up until the point that you had a
7  meeting with Lieutenant French to discuss strategies
8  at Dorchester High School?
9      MR. ROACH: Other than what he's
10 already talked about?
11 Q. Other than what you've already talked
12 about, and if you want to cover that ground again,
13 be my guest.
14 A. The only thing I can state is like I
15 previously stated, that the separation that he
16 allowed to occur in the unit between the officers,
17 the way he worked with certain officers, officers of
18 color weren't allowed to do certain things that
19 officers, that white officers were, and he allowed
20 that.
21     Another thing I can think of off my
22 head, as previously stated, when he first arrived,
23 he allowed our white colleagues to immediately work
24 directly with the experienced officers, but left us

Page 179

1  sitting there, I find that a little offensive, and
2  that could be because we were black officers, and he
3  didn't want more black officers on the day shift; I
4  don't know, it could be.
5  Q. Did he ever tell you that?
6  A. He didn't directly said that, no.
7  Q. And is there anything other than the fact
8  that you feel that you weren't riding with white
9  officers or getting the same attention as white
10 officers that leads you to believe that Sergeant
11 Bulman didn't want any more black officers on the
12 day shift?
13 A. Well, I --
14    MR. ROACH: Objection. Go ahead.
15 A. I can fairly say, I mean, it was implied.
16 I mean, you have a team of white officers serving
17 warrants, and the day shift was a warrant
18 apprehension team, we were not an anticrime unit;
19 that was the night crew, they were anticrime. We
20 were strictly mostly warrant apprehension, but
21 rather than having us to participate in the warrant
22 apprehension, the three black officers wind up
23 participating in anticrime.
24 Q. Did anybody ever tell you that Sergeant

Page 180

1  Bulman didn't want any more black officers on the
2  day shift?
3  A. Sometimes under circumstances actions
4  speak louder than words.
5  Q. Okay. Is it a yes or a no, anybody ever
6  tell you that Sergeant Bulman didn't want any more
7  black officers on the day shift?
8      MR. ROACH: Objection. When?
9  Q. Ever?
10    MR. ROACH: Objection. Go ahead.
11 A. No, I must say to that, no.
12 Q. Is there anything else other than what
13 you've described about Sergeant -- or strike that.
14    Did Sergeant Bulman ever have occasion
15 to critique your work, again, in the time between
16 August of 1999 and the time that you had the meeting
17 with Lieutenant French to discuss Dorchester High
18 School?
19    MR. ROACH: Objection. Do you mean an
20 occasion meaning an opportunity, or did he?
21    MS. HARRIS: Did he?
22 A. Later on after he assigned us the warrant
23 of the Brantly case he stated it was a good warrant,
24 he told us we do good work later on, I mean, after

Page 181

1  he found out that we were, I did, on the Brantly
2  case, he said, You officers did good work. He never
3  critiqued us in a negative way; is that what you're
4  saying?
5  Q. Any kind of critique; did he ever tell you
6  that you were not doing a good job?
7  A. No, he did not.
8  Q. Did he ever tell you that you were being
9  too secretive in your work?
10 A. The only time I, once again, the only time
11 I heard that out of Sergeant Bulman's mouth was an
12 incident that occurred, once again, in Hyde Park,
13 when we were under the direct supervision of
14 Sergeant Paul Murphy, actually, that was a suspect
15 by the name of Pendral Coakley.
16    MS. TIERNEY: Can you speak up? I
17 can't hear you.
18 A. Pendral, P E N D R A L, Coakley, I believe
19 it's spelled C O A K L E Y, and we had given the
20 TK-19 information on the suspect, his whereabouts,
21 his location, and they had set up surveillance to
22 try to find this suspect, and they did not -- they
23 had set up a surveillance on a Saturday, they were
24 watching the suspect, but the suspect never appeared

46 (Pages 178 to 181)

Page 182

1  where they thought he would appear, so they canceled
2  the evidence surveillance.
3        The next day sources phoned us, phoned
4  me and told me that this suspect was about to leave
5  town, preparing to leave town, and he was at this
6  certain location, same location that the TK-19 had
7  set up surveillance on the day prior.
8        So we called him in to Sergeant Paul
9  Murphy because he was the supervisor that morning,
10 and told him the scenario surrounding this case.
11 Sergeant Paul Murphy authorized me to go and set up
12 on the location until the other officers got there,
13 make sure he didn't leave, watch the location until
14 they arrived, and I did. So when they arrived, we
15 arrested the suspect. We got to -- a couple of
16 officers got hurt in the process of arresting the
17 suspect.
18    Q.  I'm sorry, a couple of officers got hurt
19 in the process?
20    A.  Yes, arresting the suspect.
21        MR. ROACH: Is that a yes?
22    A.  Yes, I'm sorry, yes. And Sergeant Bulman
23 became furious at Officer Horne and I because we
24 arrested the suspect.

Page 183

1     Q.  How did you know he was furious?
2     A.  Well, he called.
3     Q.  He called you?
4     A.  He called to the base and spoke to Stevie
5  Horne. Stevie Horne came back and relayed the
6  information to me what he had said to him.
7     Q.  And what did he say?
8     A.  That we should have waited until he came
9  in to arrest the suspect. Well, we told him, We are
10 working today, the TK-19 is off, they're off duty,
11 so if we had waited for the TK-19 to come in on
12 Monday morning, the suspect would have been far
13 gone.
14    Q.  Did you ever actually speak with Sergeant
15 Bulman yourself?
16    A.  Yes, the next day, he came in that Monday,
17 he called Stevie Horne and I and started once again
18 using his demeanor, tone, stating that, Well, you
19 guys, you guys failed to share information, you
20 shouldn't have arrested this guy, this is TK-19's
21 case, this and that, and you guys are too secretive
22 of --
23    Q.  You guys are too?
24    A.  Too secretive, you fail to share

Page 184

1  information. So we explained to Sergeant Bulman
2  that if you had, if you read the Lotus Notes
3  database that you trained us to use and put
4  information in as an intelligence tool, you would
5  have known that that information was there, it's all
6  there, right inside the Lotus information base about
7  this suspect, everything we found out about it, we
8  placed it there. We also had informed the TK-19
9  about his whereabouts the day prior, which they did
10 set up on him, but he just never showed up.
11    Q.  Did Sergeant Bulman express to you any
12 sense that officers were injured because you had not
13 shared information?
14    A.  Prior to the arrest of the suspect we
15 shared that information with the supervisor on duty,
16 which was Sergeant Paul Murphy. It was Sergeant
17 Paul Murphy's decision to execute that warrant, not
18 mine or not Stevie Horne's.
19    Q.  Okay. But the question is, did Sergeant
20 Bulman raise any concerns about officers getting
21 hurt because you hadn't shared information?
22    A.  No, he did not.
23    Q.  He did not?
24    A.  No.

Page 185

1     Q.  Did that conversation with Sergeant Bulman
2  occur prior to the discussion with Lieutenant French
3  regarding Dorchester High School?
4     A.  Without the records I can't answer that;
5  the date of arrest, I cannot answer that.
6     Q.  Are there any other instances, again,
7  prior to the discussion with Lieutenant French,
8  where Sergeant Bulman informed you that he didn't
9  feel that you had done a good job or had any
10 problems with your work performance?
11    A.  There was one incident with the Bobby
12 Brantly case.
13    Q.  Is this one we've already talked about?
14    A.  You didn't ask me Sergeant Bulman's
15 intentions on it.
16    Q.  Go ahead, okay.
17    A.  This is another suspect that we had been
18 searching for, I guess he had been in the youth
19 violence strike force warrant list for about
20 three years, and he was wrecking a lot of havoc
21 within the community with guns and all that type of
22 stuff. So this was a case that Sergeant Bulman when
23 we talked about assigning cases, he assigned it to
24 Horne and I.

### Page 202

1  Q. I'm going to move now to the beginning of
2  2001, or, excuse me, of 2000, and, specifically, I
3  want to turn your attention to the meeting that
4  Lieutenant French held with regard to strategies in
5  Dorchester High.
6       MS. HARRIS: Steve, do you have a
7  question?
8       MR. ROACH: Yes, I don't know if he
9  answered a question that you asked. You asked if
10 there were any documents he could review to refresh
11 his memories like Lotus Notes or one-ones. I don't
12 know if he answered that question. You started
13 talking about Operation Impact, and I'm not sure
14 that, I mean, you can leave it as you want, I just
15 don't know if that's something you want an answer
16 to.
17      MS. HARRIS: All I want the answer to
18 is what is in his mind.
19      MR. ROACH: Fine. Go ahead, let's
20 move forward, then.
21      MS. HARRIS: That's all I care about.
22  Q. Turning your attention to February of 2001
23 and a meeting that you had that occurred with
24 Lieutenant French. First of all, do you know what

### Page 203

1  I'm talking about?
2   A. A meeting that occurred in 2001, February
3  of 2001?
4   Q. Excuse me, 2000, I apologize. I can show
5  you -- off the record.
6       (Discussion off the record.)
7   Q. A meeting occurred in February, or
8  thereabouts, February of 2000, with Lieutenant
9  French with regard to Dorchester High School; is
10 that fair to say?
11  A. Yes, on or about February, March,
12 somewhere in that area.
13  Q. Can you tell me everything that you recall
14 about that meeting? First of all, were you present
15 for that meeting?
16  A. I was not present at that meeting.
17  Q. Okay. You were not present for that
18 meeting?
19  A. No.
20  Q. Okay. Are you aware that a meeting
21 occurred subsequent -- strike that.
22      MS. HARRIS: Off the record for a
23 second.
24      (Discussion off the record.)

### Page 204

1   Q. Officer Brown, I'm going to ask you to
2  look at page 16, actually, starting on page 15 of
3  your interrogatories, interrogatory answers, that's
4  interrogatory No. 6, which asks you to describe the
5  facts, the factual basis for your allegation that
6  white officers voiced racially derogatory remarks,
7  and asking you, essentially, when and where. And on
8  page 16 in the second, or the first full paragraph
9  you state that, White officers expressed racial
10 prejudice at a meeting between officers and
11 commanders of the unit in or around March of 2000;
12 do you see that?
13  A. Yes.
14  Q. Now, in your answer are you referring to
15 the meeting that occurred between Lieutenant French
16 and other officers in the gang unit about Dorchester
17 High School?
18  A. Yes, I am.
19  Q. And you were not present for that meeting?
20  A. No, I was not.
21  Q. So where does your information come from
22 about what happened at that meeting?
23  A. The next day when I came in, that
24 following Monday, Officer Brito informed me about

### Page 205

1  the information that had taken place concerning this
2  incident.
3   Q. Did Officer Brito tell you that at that
4  meeting officers referred to people within the
5  communities as animals, slobs, murderers, rapists,
6  living in unsanitary homes with rats and roaches,
7  and that they would not send their dogs to school
8  with?
9   A. Yes.
10  Q. That's from Officer Brito?
11  A. Yes, Officer Brito.
12  Q. Did Officer Brito tell you who said this?
13  A. He announced to me who, the people that
14 were present.
15  Q. Did he tell you who made -- excuse me. Go
16 ahead, I didn't mean to cut you off.
17  A. Yes, he specified what officers said
18 certain things.
19  Q. What officers said that people within the
20 communities were animals, slobs, murderers, and
21 rapists?
22  A. He stated that came from Officer Bailey,
23 Gerard Bailey.
24  Q. And that was statements that Officer

Page 206

1  Bailey, Gerard Bailey, made in the meeting with
2  Lieutenant French?
3      A.  Yes.
4      Q.  Who stated that people were living in
5  homes with rats and roaches?
6      A.  He stated that came from Officer Steven
7  Ridge.
8      Q.  And who said that they wouldn't send their
9  dogs to schools with those people?
10     A.  He stated that statement came from Officer
11 Bobby Fratalia.
12     Q.  What happened next after Officer Brito
13 gave you this information?
14     A.  He gave me -- he seemed like he was a
15 little bit upset about it.  He told me, Did Horne
16 say anything to you about it; I said, No, I didn't
17 see --
18     Q.  I'm sorry?
19     A.  He stated to me, Officer Horne didn't tell
20 you about it.
21     Q.  Officer Horne didn't tell you about it?
22     A.  Yes, and I said, No, I haven't seen
23 Officer Horne.  And I think while he was telling me,
24 I believe Officer Grice came in, she had said

Page 207

1  something to me about it also, and asked me had I
2  heard about it, and I told her no more than what I
3  was informed by Officer Brito about it.
4      Q.  What happened next?
5      A.  I think the next day Officer Horne came in
6  he was still a little upset about it.
7      Q.  Did you call Officer Horne after speaking
8  to Officer Grice and Officer Brito?
9      A.  No, I did not.
10     Q.  Did you speak to anybody other than
11 Officer Grice and Officer Brito on that Monday about
12 what had occurred at the meeting over the weekend?
13     A.  I believe Officer Singletary came in, and
14 Officer Grice and Brito expressed it to him while I
15 was standing there in the hallway about it, Officer
16 David Singletary.  They expressed their concerns to
17 him, and he became upset about it.
18     Q.  And did you speak with anybody other than
19 Officers Singletary, Grice, and Brito about what had
20 happened at the meeting over the weekend?
21     A.  Yes, I believe we did that night.  I
22 think, I can't recall if Officer Horne came in that
23 Tuesday, I think this was a Tuesday that they were
24 stating all this.  I believe Officer Horne may have

Page 208

1  had some concerns about it also.  And he told us
2  that he had said something to Lieutenant French
3  about it right after the meeting.  He told me he had
4  stated, or told me right after the meeting that he
5  didn't like the comments made, I guess that must
6  have been on a Sunday, because Officer Horne did not
7  come in that Monday, so he must have expressed that
8  Sunday.  I'm not sure what day, you know, or what
9  form.
10     Q.  So Officer Horne told you that he had
11 expressed displeasure to Lieutenant French at some
12 point?
13     A.  Yes.
14     Q.  What happened next?
15     A.  I think Officer Singletary made a comment
16 something like, This has been going on long enough,
17 you know, it's time for us to do something about
18 this, this has been going on too long.  So I think
19 that he went and spoke to Lieutenant French about
20 it, and after he spoke to Lieutenant French, I don't
21 know if he was satisfied or not, because I recall
22 the night shift came in, and he asked for all the
23 officers to come into a room --
24     Q.  "He" who?

Page 209

1      A.  Officer Singletary.
2      Q.  Okay.
3      A.  -- to respond to the room, he told all
4  them about it, and they got together, and they all
5  discussed it, and they were all thinking about
6  talking about how long it had been going on, and
7  they're pretty much tired of it, sick of it, too,
8  it's time to do something about it.  And they just
9  stated that this was going on long before you all
10 came up here, we just never did anything about it.
11 So, actually, I think they nominated Officer Greg
12 Brown and Officer Vance Mill to speak to the
13 Superior Officers about it, because I believe at the
14 time they may have been the most seniority officers
15 in the unit at that time.
16     Q.  Greg Brown has been in that unit since
17 1993, right, or thereabouts?
18     A.  Pretty much, yes.
19     Q.  What happened next?
20     A.  The next day after all this Lieutenant
21 French and Sergeant Bulman approach Officer Brito,
22 Officer Horne, and myself, and they had about a --
23 we went into a room, and we discussed all of this,
24 and they pretty much talked about hard feelings, all

Page 218

1  A. You're asking me do I have any knowledge
2  of speaking to Sergeant Bulman myself?
3  Q. Yes, yourself?
4  A. Other than with Lieutenant French?
5  Q. Other than with Lieutenant French?
6  A. No, not at that time.
7  Q. Do you have a memory of -- strike that.
8  Are you aware that there were a number of, whether
9  or not there were a number of meetings held at
10 Boston headquarters in response to the concerns that
11 were raised in the gang unit?
12 A. I was unaware of it for awhile. I think
13 Greg informed us that they were having such meetings
14 about this problem.
15 Q. Greg?
16 A. Greg Brown.
17 Q. Informed you that meetings were being held
18 at headquarters?
19 A. Yes.
20 Q. What did he tell you about meetings at
21 headquarters?
22 A. That they were having meetings, didn't
23 tell me any specifics about what the meetings were
24 about.

Page 219

1  Q. Did you know that they were about the
2  issues that had been raised about racial tensions in
3  the gang unit?
4  A. No, I did not. I was going to assume. He
5  didn't say they were necessarily directly related to
6  that.
7  Q. But you assumed that they were related to
8  these issues?
9  A. Yes, because Lieutenant French made it
10 known that he was going to let them know exactly
11 what was going on.
12 Q. Did Greg tell you that he had been present
13 for those meetings?
14 A. No, he did not.
15 Q. Did you ask Greg how he knew about the
16 meetings at headquarters?
17 A. No, I did not.
18 Q. Did anybody else in the unit tell you that
19 they had been present at meetings at headquarters
20 with Lieutenant French or any other members of the
21 command staff to talk about the issues that had been
22 brought up at the gang unit?
23 A. No.
24 Q. As you sit here today, are you aware that

Page 220

1  those, that such meetings occurred at headquarters?
2  A. Afterwards I was aware of it.
3  Q. When did you become aware of it?
4  A. I think after we had the meeting at Park
5  Square, I believe, after that.
6  Q. Do you remember when the meeting in Park
7  Square was?
8  A. I can't remember the exact date, no.
9  Q. If I suggest it was in late spring or
10 early summer of 2000, does that sound right to you?
11 A. I would say, yes, that sounds right, yes.
12 Q. So the first time you learned that there
13 may have been meetings at headquarters about the
14 issue surrounding the tensions in the gang unit was
15 sometime later after the Park Square or after the
16 Park Plaza training sessions?
17     MR. ROACH: Objection. Go ahead.
18 A. That may have been, there may have been
19 talks in the unit, you know, among the officers,
20 certain activities were unfolding because of this.
21 There was talk among officers at that meeting.
22 Q. I mean, people talk; right?
23 A. Yes.
24 Q. Do you remember anybody talking to you

Page 221

1  specifically about meetings that had happened at
2  headquarters, either people who had been present or
3  people who heard about things that had occurred at
4  the meeting at headquarters?
5      MR. ROACH: Objection. I think he's
6  already talked about Greg Brown. You mean, in
7  addition to that?
8  Q. In addition to that?
9      MR. ROACH: Objection. Go ahead.
10 A. I'm not aware of any specific officer. I
11 mean, like I said, there was talk amongst lots of
12 officers, I mean, indicating that, I mean, sometimes
13 officers at roll call would probably say something
14 bringing up that there are things going on
15 concerning that.
16 Q. So did you know anything other than things
17 were going on?
18 A. No, not necessarily, no more than what
19 Lieutenant French informed us of.
20 Q. What's the next thing that you remember,
21 that you recall happening after Greg and Vance Mills
22 said that they were considering taking their
23 concerns to Deputy Dowd? Do you know if they did
24 take their concerns to Deputy Dowd?

56 (Pages 218 to 221)