1

1        VOLUME: I

2        PAGES: 1 to 290

3        EXHIBITS: 1 to 17

4

5    UNITED STATES DISTRICT COURT

6    FOR THE DISTRICT OF MASSACHUSETTS

7  - - - - - - - - - - - - - - - - - x

8  STEVEN HORNE and RONALD BROWN,

9         Plaintiffs,

10   v.                Civil Action

11              No. 04-10718-RGS

12  CITY OF BOSTON, SGT. ERIC BULMAN,

13  and SGT. JOHN DAVIN,

14         Defendants.

15 - - - - - - - - - - - - - - - - - x

16

17     DEPOSITION OF SERGEANT ERIC W. BULMAN

18         June 28, 2005

19         10:15 a.m.

20         Roach & Wise, LLP

18  commanders, including Lieutenant French or people above

19  him, as to the kind of officers the youth violence

20  strike force is looking for?

21         MS. TIERNEY: Objection.

22     A.  I don't know if it's -- I would term it

23  input. If they have asked you a question, you would

24  answer the question relative to an officer or someone

54

1  within the unit, someone outside the unit.

2     Q.  Would this be including somebody who's

3  applying for a job within the unit?

4     A.  If asked, yes.

5     Q.  Did any of the commanding officers,

6  Lieutenant French or anybody above him, ask you your

7  views about Steven Horne or Ron Brown before they

8  joined the unit?

9     A.  I believe on one occasion Lieutenant French

10  did.

11    Q.  What did he say to you and what did you say
12  to him?

13    A.  I think he asked generally to a group of
14  supervisors that he was looking at these candidates,
15  had a list of candidates, and, you know, what -- you
16  know, "Steve Horne, do you know anything about him?" I
17  don't believe I knew much about Steve at that point
18  except he worked down at district 3.

19    Q.  What about Ron Brown?

20    A.  Ron Brown, I didn't know him personally.  I
21  believe I referred to that I knew his brother Greg, and
22  if he was half the policeman Greg was, we were going to
23  be in great shape, you know.

24    Q.  Is Greg a good police officer?

55

1    A.  He's an outstanding police officer.

2    Q.  What about Steve Horne; had you ever heard
3  anything about him by reputation other than what you've

```
18        MS. TIERNEY: Objection.

19    A.  I don't believe the way you phrased the

20  question.  Obviously I would say this guy's a good

21  worker, he's a hard worker.  You know, this guy seems

22  like a team player, something like that, but --

23    Q.  Does a member of the youth violence strike

24  force, do they have an opportunity to enjoy more
```

```
1  benefits than the routine patrol officer such as they

2  don't have to wear a uniform or any other benefits?

3        MS. TIERNEY: Objection.

4    Q.  That the officers --

5    A.  That's subjective if you think that's a

6  benefit.

7    Q.  What about do they get more overtime?

8    A.  I wouldn't be able to -- I don't know.  You

9  know, the overtime -- Our unit has no minimum manning,

10 or the youth violence strike force has no minimum
```

11  manning. Districts have minimum manning so they don't

12  have to hire. So I wouldn't be able to really answer

13  that. I think that -- Some people believe that it's

14  much more lucrative in a district and some people avoid

15  specialized assignments for that reason.

16    Q.  When Mr. Brown and Mr. Horne joined the unit,

17  did you have any conversations with them about whether

18  they should be there when they first joined the unit?

19        MS. TIERNEY: Objection.

20    A.  Whether they should be there?

21    Q.  Yes.

22    A.  No, I did not.

23    Q.  Did you ever say any words to the effect to

24  either or both of them that, "You guys have to prove

70

1  yourself to be in this unit"?

2        MS. TIERNEY: Objection.

3    A.  No, I wouldn't say something like that, sir.

4   I would say to new members within the unit that this

5   was a different working environment and that a lot more

6   was expected out of you within this function, and you

7   probably have to work a lot -- a lot harder, if that's

8   the term to use, than some other assignments.

9       Q.  Did you explain what you meant by that,

10  different working environment and they'd have to work a

11  lot harder when people joined --

12          MS. TIERNEY:  Objection.

13      Q.  -- the unit?

14      A.  You were given a different responsibility and

15  you were responsible for that.  If it was warrant

16  apprehension, you were given assignments.  Those were

17  assignments that had to be dealt with.  As opposed to

18  in a patrol car, you're taking calls in 20-minute

19  increments, and once you're done with that call, you're

20  done with it.  And if there's follow-up that needs to

21  be done on it, usually it's handled by a detective.

22  Whereas, in this unit you were given the

23  responsibility, whether it was a night officer handling

24  a problem in a neighborhood or it was a day officer

71

1  handling a fugitive case.

2     Q.  And so is it fair to say in this particular

3  unit, then, the youth violence strike force, officers

4  were given a task such as to track down a particular

5  fugitive out of state, for example, and it was their

6  job to find that person?

7     A.  Their job wasn't to track people out of -- I

8  mean you've used that term track them out of state.  An

9  investigation may lead you out of state, but the

10  majority of the arrests were made within the city or

11  within the state.

12    Q.  Okay.  Well, but my question is, by given a

13  certain task --

14    A.  Sure.

15    Q.  Let me finish the question.  -- they were

16  given a certain task such as to find a particular

17  individual who may be a fugitive from justice either

18  out of state or in state?

19    A.  Right.

20    Q.  And their job would be to stay on that until

21  they found them, among other tasks; is that correct?

22        MS. TIERNEY:  Objection.

23    A.  Or until a supervisor made a decision that it

24  was no longer -- you know, we were no longer going to

72

1  continue the investigation, either manpower issues or

2  other cases pending.  You know, that was the job of the

3  supervisor, to assess how long we would continue

4  investigating a particular person or folder.

5    Q.  And you said that you also told officers when

6  they joined they'd have to work a lot harder; is that

7  right?

8    A.  A lot would be -- A lot more would be

9  expected from them.

10    Q.  Why did you say that?

11   A.  Because it's a different responsibility than

12   coming from a patrol car, as I said earlier, where

13   you're handling, you know, 911 calls.

14   Q.  Well, how could it be a lot more?  I mean if

15   you're handling 911 calls, you could have many, many,

16   multiple calls within a day, right?

17   A.  I'm not trying to discount the work that

18   patrol officers go through because they do a very hard

19   and tremendous job every day.  It's just that it's a

20   different job, a different role, and more

21   responsibility as far as taking things to fruition,

22   finishing things out.  You were going to be expected to

23   finish things and take it from point A to point B.

24   Q.  As opposed to a patrol officer, which is a

73

1   little different job?

2   A.  Their job is to handle that call, make an

3   arrest, write a report, or to call on some other

4  investigator to carry on with the call if it needs be.

5  But, after that call, they are done with it and they

6  move on.

7     Q. I'm just focusing on your comment that when

8  new members came on board, you would say to people

9  under your command it would be a different working

10 environment and they'd be working a lot harder. And I

11 just want to ask you more about what you meant by a lot

12 harder.

13    A. I thought I just clarified what I said.

14    Q. So this position is harder than regular

15 patrol officers; is that right?

16    A. That is not what I meant.

17    Q. Go ahead. I'm here to hear your testimony,

18 sir. I don't want to suggest. You don't have to adopt

19 what I'm saying. I just want to understand what your

20 testimony is.

21    A. It's a different role as patrol officer and

22 uniform on the street, and you were expected -- you

23 were responsible to take a project and finish it,

24 whatever that individual case was. Again, it could be