Q. Do you remember Superintendent Bobby Johnson, Deputy Superintendent Dowd being there?

A. They may have been. I'm not sure.

Q. Do you remember whether Lieutenants French and Foley were there?

A. Definitely Lieutenant Foley was there.

Q. Do you remember whether Sergeant Davin was there?

A. Yes.

Q. Were you there?

A. Yes.

Q. Can you tell me what was stated at that meeting?

A. There were various speakers that came in both I believe from the police department and from various organizations.

Q. What were the various organizations?

A. I know the NAACP was there. I believe some of the reverends had come in.

Q. Which ones?

A. I'm not sure.

Q. Who from the NAACP?

A. I forget the gentleman's name.

Q. Leonard Alkins?

---



A. Leonard Alkins, yes.

Q. Anyone else?

A. Again, I think -- I don't know if Superintendent Joyce came in. I know Lieutenant Foley. And Superintendent Johnson may have been there. I'm not sure.

Q. And you're not sure whether Lieutenant French was there?

A. I'm not sure if he was there.

Q. Can you remember whether any of the issues

that we've discussed earlier were discussed at this meeting as well?

A. I don't recall if these issues came up.

Q. Why was this meeting held?

A. I'm not -- I don't know. It was obviously the commander of the unit that put it together.

Q. Who is that, Lieutenant French or Lieutenant Foley?

A. I think it was Lieutenant Foley.

Q. And did Lieutenant Foley tell you why he put it together?

A. No, he didn't.

Q. They just said to show up for the meeting?

A. They directed the whole unit to show up.



Q. How long did it last?

A. I'm not sure. It was -- I don't know if it was several days or, you know, one day or -- I think it

consisted more -- I think it was more than one day or it may have been one day. I'm not sure.

Q. How long after the American Legion Highway meeting of the entire unit did this meeting take place at the Park Square area?

A. To the best of my recollection, it was several weeks, I believe, after that.

Q. Do you have any idea why they would have this meeting if, in your view, all the issues had been resolved by the time you finished the American Legion meeting?

MS. TIERNEY: Objection.

A. I do not, no.

Q. Can you remember anything specific that was said at this meeting at Park Square?

A. Not -- No, I couldn't.

Q. Can you recall whether Officers Horne or Brown said anything at this meeting?

A. Not that I recall. Again, you know, I'm not sure exactly what was said. What was said, I just can't recall.

Q. Was it around racial issues and racial sensitivity?

A. Yes. There were probably other topics discussed, but I think that was a portion of it.

Q. That was the main content of it?

A. I believe so.

Q. Can you remember --

A. I'm sure there were other issues.

Q. Like what?

A. I'm not sure. Probably administrative or, you know, unit mission, unit direction, and stuff like that.

Q. And you don't recall one way or the other whether these issues that had been voiced before where there were meetings, that caused the meetings, were voiced again at this particular meeting or meetings?

A. They may have. I just don't recall

specifically.

Q. And you said there was more than one?

A. I'm not sure. It was a session, a training session. I'm not sure if that was more than one day or it was one day.

Q. Were there written materials?

A. Not that I recall. There may have been, but



I don't recall.

Q. Do you believe it resolved or assisted with the issue that had been raised earlier regarding racial comments that some officers found offensive?

MS. TIERNEY: Objection.

A. Yes, I believe that that was -- you know, had been addressed satisfactorily to everyone involved.

Q. Have you ever had an internal complaint of race discrimination against you?

MS. TIERNEY: Objection.

A. Not that I'm aware of, sir.

Q. Is Internal Affairs investigating this matter, this matter meaning this complaint by Officers Brown and Horne against you?

MS. TIERNEY: Objection.

A. Not that I'm aware of.

Q. You've never been notified by Internal Affairs about these allegations by Horne and Brown?

A. No.

MS. TIERNEY: Objection.

A. Not that I'm aware of.

Q. Had you ever heard yourself a white officer say they didn't want to go into black people's homes because they were nasty and full of roaches or anything



of that nature?

MS. TIERNEY: Objection.

A. No, I did not.

Q. Is that it?

A. No. He made good arrests, and when he made a good arrest, he was written up for it. But, you know, overall I thought we had a pretty good relationship.

Q. Did he do a good job?

A. When he did a good job, he did a good job. If he did something that was not the way we should be operating, I spoke to him about that. But he did -- you know, made good arrests, and, when he did, he was written up for them.

Q. And you said there were times you had to -- Strike that. Before I get on to that further, I'd like you to look at Exhibit 2, your answers to interrogatories. I'd like you to look at response number 7. Just take a moment and read your response number 7.

(Witness reviewed document.)

A. Well, I think it was -- I'm sure there was some verbal, but I could tell -- from his body reaction and having worked with him every day, I could tell that something was bothering him.

Q. Did he seem angry?

A. I don't know if angry is the word. I could just tell there was something bothering him.

---



Q. Now, back to Steven Horne in terms of your -- his performance. You had said there were times you had to speak to him about things you were concerned about; is that right?

A. Mm-hmm.

Q. Is that right?

A. Yes, sir.

Q. What was it you had to speak to him about?

A. Mainly the issues revolved around notifying me of what they were doing or what their cases -- where

A. Okay.

Q. Now, it says, "Without further waiving said objection," it says, "Bulman states he was approached in 1999 by a group of officers including but not limited to Officer Neva Grice and plaintiffs stating they were uncomfortable about some of the terms used" -- I believe the word "in" should be in

---



there -- "in a recent meeting run by Lieutenant Gary French." Did I read that correctly?

A. Yes.

Q. Now, does that refresh your memory as to the initial conversation you had with a particular officer about what had happened in that meeting run by Gary French the day before?

A. I'm not sure what you're --

Q. Well, you had stated that there was an officer that came up to you and told you what had

happened the day before with Gary French and some officers, right?

A. Right.

Q. And, reading this, does that refresh your memory as to whether it was Officer Neva Grice or the plaintiffs?

A. It could have been. I'm just not sure. I know I spoke with Officer Horne and Officer Brown afterwards and Officer Grice. I'm just not sure who originally came up to me.

Q. When you say afterwards, after your meeting with the officers yourself, your individual meeting with them?

A. No. The original --



Q. You said you spoke to Officers Grice, Horne, and Brown after. When was that?

A. No. No. No. What I said is an officer came

A. Well, I think it was -- I'm sure there was some verbal, but I could tell -- from his body reaction and having worked with him every day, I could tell that something was bothering him.

Q. Did he seem angry?

A. I don't know if angry is the word. I could just tell there was something bothering him.

---



Q. Now, back to Steven Horne in terms of your -- his performance. You had said there were times you had to speak to him about things you were concerned about; is that right?

A. Mm-hmm.

Q. Is that right?

A. Yes, sir.

Q. What was it you had to speak to him about?

A. Mainly the issues revolved around notifying me of what they were doing or what their cases -- where

they were at with their cases. They would go to houses on their own to conduct interviews, but the addresses were where a suspect could be present, so it became kind of an officer safety issue. And information that they had received either through sources or interviews or whatever, making sure that information gets properly documented in the right form.

Q. And what's the right form?

A. Well, if it's intelligence, it has to go into the Gang Intel so everybody has a chance to read it, and if it's more confidential source information, that it's documented on a form 26.

Q. The Gang Intel, is that the Lotus database computer?



A. Yes.

Q. And everybody had access to that?

A. Yes.

Q. Anything else that you had to speak to him --

A. Judgment issues basically on handling cases.

Q. What kind of judgment issues?

A. I don't remember specifically, but I remember there was one occasion that they had secured a key for a suspect girlfriend's house, and they were going in and out of it and checking her voice mail to see if the suspect called. I advised them that that was not a good practice. It could put them in some jeopardy should she make a false claim against them.

Q. How did you find out about that?

A. As I recall, I believe we -- they had called me up to meet them in the area of Blue Hill Ave. and Columbia by the turn-around and were apprising me of the case at that point, of the developments. And I think I asked about how they got the information, and they relayed to me they got it from inside the apartment or they had been checking voice mail or something like that within the apartment but entering the apartment when the occupant wasn't there.

Q. So that's one occasion where they did tell