194

1  you what they were doing and where they were going,

2  right?

3      A.  Right, but the judgment issue.

4      Q.  Any other specifics you can recall about the

5  judgment issues?

6      A.  There was a time that -- when we were looking

7  for a fugitive and the FBI was involved in the

8  investigation that I was hearing that Officer Brown had

9  some information that may be -- may assist in the

10  investigation.  It was brought to me by the special

11  agent Jake Drahan from the FBI and that he wasn't

12  having any luck getting the information from Officer

13  Brown and Officer Horne.

14          And we ended up -- I ended up having to bring

15  Ron into a front room with the agent and ask him about

16  the information.  And he told me he couldn't tell me

17  who gave him the information, and I told him that he

18  was required to give me the information. There was a

19  federal agent there asking about it. And eventually he

20  told me that it was a probation officer who gave him

21  the information after a lot of teeth pulling.

22     Q. Do you remember who the suspect was on the

23  other incident you told me about, the going in and out

24  of the girlfriend's house to check the voice mail?

195

1      A. I'm not sure.

2      Q. Don't remember the name?

3      A. I don't remember specifically --

4      Q. Who was the --

5      A. -- at this time who it was.

6      Q. Who was the fugitive that you just told me

7  about with --

8      A. His name is Sean Taylor.

9      Q. Any other judgment issues?

10     A. It was just times I would call them into the

11  office, "What are you doing?" Or one guy would show up

12  and the other guy wasn't there, and I would say, "Well,

13  where's your partner?" "I don't know." There were

14  issues that I was made aware of, off-duty arrests that

15  occurred on the evening shift that, you know, just

16  didn't seem to be --

17    Q. Can you tell me some specifics on those?

18    A. I recall there was one that happened in

19  Chelsea. And there was some information that Steve was

20  up there visiting his girlfriend or there was some

21  information that he may have just been up there looking

22  for the kid. And he did end up finding him and

23  arresting him I think with the assistance of the

24  Chelsea PD. I think there were some other off-duty

196

1  incidents that Lieutenant French had brought to my

2  attention.

3    Q. Can you recall the name of that off-duty

4    arrest person who you were just talking about, the

5    first one?

6        A.  No.  Again, these issues occurred, and these

7    are the ones that I can remember at this time off the

8    top of my head.

9        Q.  Now, looking at your response number 12 on

10   Exhibit 2 -- Before I get to that, are there any other

11   issues that you can think of that you had a concern

12   with with Officer Horne?

13       A.  Just in general about, you know, basically

14   those things, keeping people up to date with what

15   they're doing and case progress and, you know, again

16   doing things on their own.  And that unit operated as a

17   team and it was done for safety issues, make sure no

18   one got hurt.  They were usually trying to apprehend

19   some of the most violent people in the city.

20       Q.  Can you think of any specifics where they

21   were going into houses on their own initiative and

22   doing interviews with suspects and reporting to you

23   that's where they were?

24       A.  Specifically, no, not at this time.

197

1    Q. Did you document any of these issues or

2  concerns you just told us about in writing?

3    A. No, I didn't.

4    Q. Why not?

5    A. Because basically they were new to the unit,

6  and we were trying to build a team concept within the

7  unit, and it was my opinion at that time that may have

8  been counterproductive and was trying to guide them and

9  kind of bring them into the fold of why things are done

10  a certain way and the reasons why, you know.

11    Q. How would your keeping notes on what was

12  going on with them with these concerns you had be

13  counterproductive to building a team and bringing them

14  into the unit as a team? How would -- Let me rephrase

15  the question.

16        How would your taking notes on some of these

17  issues you had with them as you spoke to them about

18  them be counterproductive to bringing them into the

19  fold and working -- having the unit work as a team?

20            MS. TIERNEY: Objection.

21      A.  In my opinion, I felt that writing anything

22  down about what they did was a higher level of

23  discipline and something that could be turned over to

24  Internal Affairs, be on their record, and that wasn't

198

1   my intention to try to hurt them. I was just trying to

2   make sure they understood why we do things a certain

3   way, for their safety and for the procedures that we

4   had in place to safeguard everybody, both the officers

5   and the suspects.

6       Q.  Did you also consider the fact that taking

7   notes as to what they were doing on a day-to-day basis

8   might help you better supervise them and be a better

9   supervisor in helping to guide them by giving you

10  reminders of some issues they had in the past that you

11  told them about that still needed to be addressed?

12              MS. TIERNEY: Objection.

13      A.  No. I felt that I was with them every day

14  and -- for the most part. And, again, we were trying

15  to develop a team concept of everyone working together.

16      Q.  But they worked under you, right?

17      A.  Yes.

18      Q.  So you had the prerogative to make notes if

19  you wanted, right? There was nothing to prevent you

20  from doing that, right?

21      A.  No, nothing preventing me from doing that.

22      Q.  And they wouldn't necessarily have to know

23  that you were making notes, right?

24      A.  No, but I would know I made notes, and it

199

1   would be susceptible to getting on their records if it

2   was reviewed by Internal Affairs or someone else. And

3   that wasn't my intention. I was trying to build them

18  regarding another suspect, double homicide where

19  Callender is reporting work he and Officer Brown did,

20  right?

21      A.  Yes, sir.

22      Q.  And the next page, November 12, 2000, is a

23  similar report regarding location of firearms involving

24  Callender and Horne, right?

231

1       A.  Firearm information.

2       Q.  Right.  That's -- Okay.  And let's see.

3   Let's skip a few pages over.  We'll go to a report

4   dated December 12, 2000 by Steven Horne, form 26, to

5   Lieutenant Foley, apprehension of a wanted suspect.  He

6   was reporting to Lieutenant Foley apprehension of

7   Dwayne Peeples?

8           MS. TIERNEY:  Do you mean December 19?

9           MR. ROACH:  December 19, 2000.

10          MS. TIERNEY:  You said 12.

11   Q.  I'm sorry.  December 19, 2000.

12   A.  Yes, sir.

13   Q.  I'd like to focus on that for just a minute.

14   If you look at the second sentence, it says, "The

15   officer activated himself."  Do you know what that

16   means?  Do you see where it says that?

17   A.  "Officer activated himself with the

18   assistance of" -- Yes.

19   Q.  What does that mean?

20   A.  Activated yourself means you activate

21   yourself as a police officer to conduct a police

22   function.

23   Q.  Does that mean you were off duty?

24   A.  Yes.

232

1   Q.  Is there some rule that says that you can't

2   do that?

3   A.  No, not that I'm aware of.

4   Q.  So it appears from here that Officer Horne

5   was off duty, activated himself, meaning putting

6   himself on duty, and then worked with another officer

7   to arrest Dwayne Peeples; is that a fair statement?

8   A.  Yes.

9   Q.  And he reported that on a form 26 to

10  Lieutenant Foley; is that right?

11  A.  To Lieutenant Foley, yes, that's correct.

12  Q.  And, again, form 26s are generally available

13  in a file at the youth violence strike force for

14  officers to look at and share and get information on

15  suspects if they wish; is that right?

16  A.  No.  This kind of form 26 would be kept with

17  the commander of the unit.

18  Q.  And how would it be used?

19  A.  How would it be used?

20  Q.  Yes.  If at all.

21  A.  I'm not sure how we would use it.

22  Q.  What's the purpose of drafting a form 26?

23  A.  It's to relay information that necessarily

24  doesn't belong in a 1-1 report, internal information.

233

1   Q. And how is that internal information used, if

2  you know, if it's involving a suspect, let's say,

3  that's wanted for something?

4      A. How is it used? I'm not sure what you mean

5  how is it used. This appears to be a report from

6  Officer Horne notifying Lieutenant Foley that he

7  activated himself and that he made an arrest.

8      Q. Is there some rule that requires you to write

9  a form 26 form of this nature?

10     A. It would be, I believe, the discretion of the

11 commander.

12     Q. So the commander would ask the officer to

13 write the form 26 form after the officer reported what

14 had occurred?

15     A. It depends on the commander. I mean some

16 may, some may not.

17     Q. Well, I understand that. But what I want to

18  know is is there some rule in the Boston Police

19  Department --

20      A.  Not that I'm aware of.

21      Q.  Let me finish the question.  Is there some

22  rule in the Boston Police Department rules and

23  regulations to require a person to write a form 26 form

24  about activities concerning a suspect?

---

234

1       A.  I'm not aware of a rule.  You'd be directed

2  to write a 26 or asked to be written a 26 or volunteer

3  to write a 26.  It could happen in a bunch of different

4  ways.

5       Q.  Next document, drugs, firearms, it says,

6  12/28/2000, report by Horne and Brown again on the

7  Intel Lotus regarding some activity, some drug

8  activity?

9       A.  Yes, sir.

10      Q.  And the next page, similarly, 1/4/2001, Horne

248

1  specifically these -- You know, in general, I'm sure we

2  had talks all the time. Daily we were interacting with

3  each other, but there's nothing specific that, you

4  know, talked about --

5      Q. There was no specific incident that you can

6  recall that you told him about about Horne and Brown?

7      A. No. I mean, again, conversations happen

8  every day. Guys are together working together. I

9  don't recall anything specifically. He was the

10 commander. If he had asked me a question, I would

11 answer his question.

12     Q. Did you bring to his attention, however, the

13 concerns that you had raised with Brown -- Strike that.

14         Can you recall any specific matter of these

15 areas of concern that you discussed earlier that you

16 brought to the attention of Lieutenant French when you

17 were talking about Horne and Brown?

```
18        MS. TIERNEY: Objection.

19   A.   You mean relative to the safety issues we

20   talked about?

21   Q.   The safety issue, the secretive issues, the

22   off-duty arrest issue.

23   A.   I don't recall specifically.

24   Q.   And you said he's the one that brought up the
```

249

```
1    off-duty arrest issue?

2    A.   Yes, he brought that to my attention.

3    Q.   What did he say?

4    A.   I don't recall. Just in general that -- you

5    know, again, that Chelsea arrest that Steve had made up

6    there, find out what happened with that, and just make

7    sure that, you know, the people aren't out there on

8    their own working, and that it was an incident that

9    just occurred like that.

10   Q.   So he wasn't saying that it's something that
```

11  Horne or Brown couldn't do. He was just saying keep an

12  eye on it, right?

13      A.  From what I recall, and again this was a long

14  time ago, he was concerned about -- I don't know how

15  many incidents there were before this or after this or

16  what, but he expressed some concern about it, that he

17  didn't want people just on their own operating out on

18  their own.

19      Q.  And, in other words, if they were off duty,

20  they should call in some support to work with somebody

21  in working on something, right?

22      A.  If you're off duty, you're off duty. If you

23  see something, you have to activate. I got the

24  impression that he felt there was a -- he didn't want

250

1  it to become a pattern.

2      Q.  How did he find out about it?

3          MS. TIERNEY:  Objection.

4    A.   I don't know.  I think it was at night.

5    Q.   Back on response number 12 to Exhibit 2, you

6  talk about there being secretive, elusive, and other

7  performance related issues.  Do you see that?

8    A.   Yes.

9    Q.   So is it your testimony that on those

10 occasions that you felt they were -- Brown and Horne

11 were being secretive, elusive, and other performance

12 related issues, you brought that to Lieutenant French's

13 attention?

14   A.   I don't understand what you're saying.

15   Q.   Did you bring the --

16   A.   No.  Those were the matters we discussed

17 earlier.  I'm not sure if I mentioned them to

18 Lieutenant French again.  I was trying to handle them

19 another way.  Could it have come up in conversation at

20 some point?  Yes, but I wasn't, you know, trying to

21 make a point of it with them.

22   Q.   When it says other performance related

23 issues, do you see that?

24   A.   Yes.