68

1   A.  It was my understanding from what I was told,
2   both.
3   Q.  Did you learn about where these -- where any
4   of these meetings were held?
5   A.  I don't know where that meeting was held.
6   Q.  Any information as to who was at any of the
7   meetings other than what you've testified to?
8   A.  My knowledge was it was all the members of
9   the unit and maybe some command staff members.
10  Q.  And do you remember who told you about these
11  issues and the complaints that were raised?
12      MS. TIERNEY:  Objection.
13  A.  No, I don't remember.
14  Q.  Do you remember how long before you joined
15  the youth violence strike force you learned about this
16  matter?
17  A.  I probably learned about it when it was

18  ongoing. It was like talk within the station that, you

19  know, shit storm over here, and that was how I learned

20  about it. I wasn't part of the unit back then.

21     Q. Any other characterization of it other than

22  shit storm that --

23     A. No. Just talk in the station is what I can

24  remember.

69

1     Q. Now, when you say in the station, was this at

2  Hyde Park?

3     A. Yes.

4     Q. And that's district E18?

5     A. Correct.

6     Q. What about when you went to mobile operations

7  in March of 2000; did you hear of any talk of it there?

8     A. The only talk I got when I was up in mobile

9  operations that I believe all the issues were resolved.

10    Q. Do you remember who told you that or --

11        MS. TIERNEY: Objection.

12    A. I don't.

13    Q. Any idea how you learned about it?

14    A. Just -- I don't remember.

15    Q. Have you now told me everything you can

16 recall about what you heard about this issue before you

17 arrived in May of 2000 about this matter?

18    A. To the best of my memory, yes.

19    Q. Did you talk to Sergeant Bulman about it when

20 you first arrived?

21    A. I may have discussed it with Eric when I

22 first arrived.

23    Q. And can you tell me what he said to you and

24 you said to him?

1        MS. TIERNEY: Objection.

2    A. I don't remember exactly. I know when I

3 first started there I talked to Eric probably for the

4  first couple of days relative to how to run things,

5  how's this, how's that, and my memory is relative to

6  that issue is that the issue was resolved and that I

7  was walking into a place that had no issues.

8     Q.  And, again, just tell me as much as you can

9  remember.  Do you remember where you were when you

10  spoke to Sergeant Bulman about the issue?

11    A.  I don't.  The first couple of days there

12  Eric's basically getting me up to speed of how the unit

13  worked and ran and how the warrants were assigned and

14  who did what because it was new to me as a supervisor.

15  And I spent a lot of time with him, so I don't remember

16  where and when we discussed things.

17    Q.  Can you tell me, did he mention Horne or

18  Brown in any of these conversations you had with him

19  when you first got there?

20        MS. TIERNEY:  Objection.

21    A.  He may have.  We went through every officer

22  that was on days as to just who was on days, who did

23  what type thing, as to their function.

24    Q.  Yes.  I'm not asking about what the functions

71

1 were in terms of the day-to-day operation of the day

2 tour. I'm talking about the allegations of racism

3 within the youth violence strike force that arose

4 before you said you got there.

5   A. No, we didn't get into any specifics about

6 that. All that I was told was that all the issues were

7 resolved and everything was fine, was my understanding

8 when I started.

9   Q. Can you remember specifically what Sergeant

10 Bulman said to you and you said to him in that

11 conversation?

12     MS. TIERNEY: Objection.

13   A. I can't.

14   Q. So you've told me now everything you can

15 recall about what he said to you and you said to him in

16 that conversation or conversations?

17   A. Yes, to the best of my memory. I just don't

18  remember.

19     Q.  And, again, just so it's clear, in those

20  conversations you had with him, just about that issue

21  of the race -- allegation of racism within the force or

22  the unit, did Bulman mention Brown or Horne in any of

23  those conversations you had with him?

24          MS. TIERNEY:  Objection.

72

1     A.  I don't remember.

2     Q.  He may have; you just don't know?

3     A.  He may have.  I may have brought it up to

4  him.  I just don't remember my conversations from five

5  years ago.

6     Q.  In your assignment as a sergeant supervising

7  the day tour, from May of 2000 until April of 2001,

8  approximately a year, in that time, do you have any

9  memory as to who rode with who in terms of partnering

10  in cruisers in the youth violence strike force?

140

1  A. I don't --

2      MS. TIERNEY: Objection.

3  A. I don't remember if he did or he didn't.

4  Q. Can you tell me what you said, if anything,

5  at that meeting about Ron Brown or Steve Horne?

6  A. I vaguely remember -- I don't remember my

7  exact words, but I was asked to give my opinion of

8  every officer within that unit at which time I did.

9  And relative to Steve Horne, I felt, in my opinion,

10 that he was an excellent fugitive officer, did a great

11 job at finding where the bad guy was, but I felt at

12 times that he withheld information from me relative to

13 the case, how they came about finding the guy or where

14 they ended up or things to that nature.

15     And, with Ron, I had felt that as a team they

16 did a good job, but I felt that Ron, in my opinion, was

17 tactically lacking in training, whether he came up

18  there too soon as a police officer and hadn't learned

19  just basic patrol procedures relative to standing in

20  front of doors -- I mean we all make mistakes along the

21  way, but it was my opinion that Ron made more mistakes

22  than most of us. That was pretty much the extent of my

23  comments.

24      Q. Did you say anything about Ron Brown

1  withholding information?

2      A. I don't recall if I stated Ron Brown was

3  withholding information, no.

4      Q. Can you remember any specific examples of

5  observing Ron Brown not tactically employing the proper

6  procedures as a police officer when seeking or

7  apprehending suspects?

8      A. One incident that stood out to me was we were

9  in Jamaica Plain. I don't remember the exact street,

10  but it was off a street, off of Washington Street, and

11  it was early on, and myself being there as a new

12  sergeant. And the suspect was wanted for armed robbery

13  firearm, which is a very serious offense for us. And I

14  believe he was either up at the second or third floor

15  was his apartment, and the apartment faced the front of

16  the street. And there was a balcony that led up to

17  the --

18         There were different porches coming off from

19  where the suspect's door was, and it was like a glass

20  door that led out to a balcony. That was the front of

21  his apartment. It was like on the second or third

22  floor. And I remember people being in on the stairs,

23  and I was coming from the stairs back outside to see if

24  there was any movement outside. And somebody had said

142

1  they thought they heard something inside.

2         And I remember coming downstairs. I looked

3  up, and Ron was actually scaling it was like a metal

4  balcony to go up to where the slider was which

5  was -- there was no curtain in front of it, so -- to

6  climb over onto the porch to see if he could see in,

7  which to me as a supervisor, not only is it a huge risk

8  to try to climb up there, but once he's up in that

9  position, even try to come up over the railing, he

10  would be compromised. The guy could just come onto the

11  porch and either push him off or shoot him.

12       That's one incident that really stood out,

13  that even if he got over the railing safely, he was

14  still exposed to the open glass door. We make mistakes

15  all the time and we try to learn from them all the

16  time, but that was one that really stood out to me.

17       A lot of times there would be incidents where

18  instead of embarrassing the guy in front of everybody,

19  I would hold a briefing the next day and say, Hey,

20  listen, next time we go serve a warrant, how about we

21  try to do this or we try not to do this or we try to be

22  a little more tactical. And that way it doesn't put

23  that guy out there in front of everybody every time,

24  but as a group we could try to learn from it.

146

1  he -- If anybody was to have, it would have been him.

2    Q. It would have been Eric Bulman?

3    A. Yes. Whoever his supervisor was at the time
4  of the incidents.

5    Q. Do you remember Eric Bulman saying anything
6  about Brown or Horne similar to what you had expressed
7  about Brown and Horne at this meeting, specifically
8  Horne being someone -- an excellent fugitive officer
9  but withheld information and Brown tactically deficient
10 as a police officer?

11         MS. TIERNEY: Objection.

12   A. Eric, to my knowledge, didn't have any
13 comment relative to any aspect of it other than he may
14 have touched on the domestic issue, but I don't
15 remember if he did.

16   Q. You specifically remember that Sergeant
17 Bulman didn't say anything about Brown or Horne other

18  than potentially --

19  A.  Right, because I knew that was my

20  responsibility going into the meeting.  It wasn't his.

21  Q.  Did you talk to Sergeant Bulman about this

22  meeting last night before you came here today or this

23  morning?

24          MS. TIERNEY:  Objection.

147

1   A.  About which meeting?

2   Q.  About the PAM meeting we're talking about

3  now.

4           MS. TIERNEY:  Objection.

5   A.  No.  I had a very brief conversation with

6  Sergeant Bulman last night.

7   Q.  Did you talk to him this morning at all?

8           MS. TIERNEY:  Objection.

9   A.  No, I didn't.

10  Q.  Can you remember Lieutenant Foley or

18  this. I don't know.

19      Q. Is there anything that you see on Exhibit 11

20  that covered the areas that you just discussed about

21  Ron Brown and Steve Horne such that Steve might have

22  been withholding information as a deficiency in his

23  performance and that Brown tactically didn't follow the

24  right procedures as a police officer?

150

1           MS. TIERNEY: Objection.

2       A. In 1 through 8?

3       Q. Yes.

4       A. No, that's not how that came about.

5       Q. So why is it that if the meeting was

6   going to be covering categories 1 through 8 and the

7   other -- which I think includes the categories you had

8   discussed with the out injured and I think you said

9   accidents, why is it that you made these comments about

10  Brown and Horne at this meeting?

11      MS. TIERNEY: Objection.

12      A. The reason I was asked -- I don't remember if

13  it was by Chief Hussey. It may have been. Or it may

14  have been by Deputy Superintendent Dowd. I was asked

15  to go through my list of officers and give my opinion,

16  good and bad, of how I felt their work ethic was and

17  what they needed to work on, and that's what I did for

18  every officer on the day shift.

19      Q. So you were specifically asked?

20      A. I was.

21      Q. And you believe it was Chief Hussey or Deputy

22  Dowd who asked?

23      A. I do.

24      Q. Do you remember if Foley or Joyce asked,

151

1  inquired in that regard?

2      A. I believe it was either Hussey or Dowd, from

3  my memory, that I was specifically asked to go through

4  my list of personnel.

5    Q.  Were there any other members of the youth

6  violence strike force, in your opinion at that time,

7  having observed them and worked -- and supervised them,

8  that, like you said about Steve Horne, withheld

9  information and perhaps wasn't as good a team player as

10  he should have been?

11          MS. TIERNEY:  Objection.

12    A.  There were other officers with other issues,

13  but specifically to that, no.

14    Q.  What about other officers other than Ron

15  Brown who tactically perhaps either needed some

16  retraining or didn't understand how to proceed with

17  proper police procedure?

18          MS. TIERNEY:  Objection.

19    A.  I never said proper police procedure.  You

20  just mean --

21    Q.  The comments -- My question is this:  The

22  comments that you --

23    A.  Did I mirror the same comments for Ron to

24  another officer?  Is that what you're asking?