Q. Have you now told me everything that you can recall that was said at this meeting?

A. I have.

Q. Can you tell us anything positive you said about Ron Brown at this meeting?

A. Specifically, I believe I stated together that Ron and Steve were very good at tracking down their fugitives. And I don't remember specifically, but I know that I said that, you know, they were good fugitive investigators.

Q. Did you tell them that you had actually had them supervise other people that were new to the unit and they -- were they split up with I think you said it was Hardin and --

---

A. Callender.

Q. -- Callender?

A. I never said that they supervised anybody.

Q. Well, did you say that they helped show them how to perform the job by riding with those individuals?

A. I didn't, because I don't know if at that point they were. I don't remember time wise if that had happened yet. It may have. I just don't remember.

Q. I'd like for a moment to go to your answer to number 5 on Exhibit 18. Do you see that?

A. Interrogatory number 5?

Q. Yes. And it says, "Describe briefly but completely the qualifications that officers must meet in order to be considered for assignment to the youth violence strike force." Did I read that correctly?

A. You did.

Q. And your answer was, "See response number 3." Did I read that correctly?

A. You did.

Q. And your response to number 3 is, "Bulman and Davin are without specific knowledge as to the criteria that has been a factor of evaluation in connection with transferring an officer into the youth violence strike

A. I told Steve that I felt he was an excellent fugitive investigator; that, in my opinion, I felt sometimes he withholds information.

Q. Did you meet with them individually or together?

A. I believe it was individually. I don't -- It may have been together, but I believe -- I would have met with them individually.

Q. Well, the next sentence says, "Sergeant Davin met with the complainants to discuss his PAM comments." Did I read that correctly?

A. Yes, I did meet with them.

Q. That's a true statement?

A. That I met with them, yes. I just don't remember if it was together or individually.

Q. It was just one meeting?

A. Yes.

Q. And this one meeting, you either had one meeting with them together or one meeting with each of them individually. You just don't --

A. Correct. There was only one meeting. I don't remember if it was together or individually. I believe it was individually, but I met with them once after the meeting, correct.

---

Q. Your best memory is that you met with each of them once?

A. Correct.

Q. Or you might have met with them together once?

A. Correct.

Q. You just don't remember which?

A. Yes.

Q. What did you say to Steve Horne and what did he say to you in this meeting?

meeting with him?

A. No, I can't.

Q. You've now told us everything you can recall about what you said to him and he said to you at that meeting?

A. Right now, yes, that's all I can remember, it being a brief meeting.

Q. That's the next thing I was going to ask you. How long did the meeting last?

A. It was a brief meeting. I don't remember exactly how long it lasted.

Q. Well, the next sentence on Exhibit 1 says, "This meeting was not a performance review evaluation and only lasted a few minutes"; is that correct?

A. That's accurate.

Q. Then you met -- you also met with Ron Brown either individually or together with Steve Horne,

correct?

A. Correct.

Q. And what did you say to Ron Brown in this meeting, individual meeting, and what did he say to you?

A. I stated to Ron, again, that I thought he was a good fugitive investigator; that he lacked, in my

opinion, the tactical skills, basic skills involved in serving a warrant.

Q. Anything else you can recall you said to him?

A. Specifically -- And this is just in general. I don't remember specifically, no.

Q. Can you remember anything he said to you?

A. He said okay.

Q. Did he disagree with you?

A. I don't remember him disagreeing with me.

Q. Have you now told us everything you said to

Ron Brown and Ron Brown said to you in this meeting?

A. To the best of my knowledge, that's all I remember talking to him about.

Q. The next paragraph down, Exhibit 1, says that Sergeant Davin met with the complainants individually. Does that refresh your memory as to whether you met with them together or individually?

A. It doesn't change anything I just said. That was the best of my knowledge.

Q. I'm just asking you if this refreshes your memory as to whether it was individually or together. That's all.

MS. TIERNEY: Objection.

A. No, it doesn't.

---

Q. It doesn't. Okay. And then you said here, "Reported that he told the PAM that they were good police officers." Is that accurate?

Q. Did he become a superintendent?

A. He did.

Q. Do you know what his position was at the time that Brown and Horne were transferred out of the youth violence strike force in late March or early April of 2001?

A. He was a superintendent. I don't know what bureau he was assigned to, but --

Q. And back to your answer to number 1, your statement at various times you updated the commander of the unit as to the work of their officers, did you ever say anything to Lieutenant Foley, anything about Brown and Horne, about your concerns about them other than what you've already testified to that you can remember?

MS. TIERNEY: Objection.

A. I have.

Q. And what have you said?

A. We've talked about various incidents about all the officers but specifically them.

Q. What do you remember saying to him?

A. I remember telling him about how an officer had come to me with a complaint about them.

Q. Who was that?

A. It was Officer Grant Callender.

---

Q. And what did Callender say?

A. Callender came to me off the record and asked to be removed from their car.

Q. Why?

A. Because he felt his career was being jeopardized for the things they did out on the street.

Q. When did he say this to you?

A. I don't remember the specific date, but I believe it was shortly before they were transferred. I don't remember specifically.

Q. What did Callender say to you about them?

A. Callender had said to me, if you can excuse my language, that, "They do fucked up shit, and it's going to jeopardize my career if I ride with them."

Q. Did he give you details as to what he meant by fucked up shit?

A. Yes. I had told him -- He had asked me to keep it in confidence and not to pursue it, so I had told him he's got to give me something more than that for me to transfer him out of the car. You just can't come in and make blanket statements like that about somebody.

So Officer Callender told me that he had talked to Officer Horne and Brown relative to -- There

was a homicide investigation at 919 Blue Hill Ave., and that the suspect in that homicide was possibly the same suspect that Officer Callender had arrested in the past

for a shooting.

So I had received information from homicide that they were in the middle of trying to get a warrant, but they were giving us a heads up so we could put together the background on that suspect as to where he's located, et cetera.

And I knew that Officer Callender had worked that case before, so he would have good knowledge as to where that suspect would be. So I had told -- asked Officer Callender if he could research a little bit but to keep it very low profile because it may jeopardize the murder investigation that's still going on, and we didn't want there to be any issues with that.

So Officer Callender had come back to me and told me that he had told Steve and Ron about it because they were his partners, and he didn't --

Q. Told them about what?

A. About the investigation, about who the murderer may be, and that it may be this kid and there may be a warrant coming out for him and they may be looking to arrest him. And I explained to Grant that I

didn't want him to tell anybody because I didn't want more people to know than had to other than him because he had that case primarily.

So he had told me that he went back to Steve and Ron and said the sergeant doesn't want us doing anything with this that would jeopardize the murder investigation. So Grant said that after he had told that to them, they went and they were showing photos to prostitutes up around 919 Blue Hill Ave., because it's a rooming house; that he may have stayed there, to see if they could ID the suspect out of the photo array. And that's why he didn't want to be part of the car anymore.

Q. So they thought they might -- by not following what you had directed him and them to do, that it would jeopardize that investigation?

A. Yes.

Q. Is that a yes?
A. That's correct.
Q. So what happened with respect to that matter?
A. Well, with respect to that matter, I kept it in confidence. I kept it off the record. Because that's what Officer Callender asked me to do. And I went and I talked to Lieutenant Foley and explained to

him that, departmental wise and as far as calling them to the carpet on it, it would break the confidence that the officer had with me. And so I explained the situation to him, and that was it.
Q. The confidence meaning Callender's confidence with you?
A. Correct.
Q. And so what did Foley tell you to do in that regard?
A. Nothing.

know --

Q. If it was directed to Steve Horne, you don't know that?

MS. TIERNEY: Objection.

A. I'm not going to assume anything. I can assume it. If you want to know specifically, you'd have to ask him.

---

Q. It is directed to Steve Horne in this memo, as far as you know, right?

A. It is.

Q. And do you disagree with any of the statements that Captain Conway said in any of these three memos?

A. I'd have to look at the specific case as to what they were written for, but I don't disagree with any commendation I ever wrote for Steve or Ron. So I don't know if I wrote these or not.

Q. I'm not asking whether you disagree with any commendation you wrote. I'm just asking if you -- assuming -- Strike that. Whether you wrote a recommendation for a commendation or not, do you agree with these statements that Captain Conway made in these three memos --

MS. TIERNEY: Objection.

Q. -- about Steve Horne's qualities as a police officer?

A. I agree with Captain Conway's letters relative to these specific incidents about Steve Horne and his behavior during those incidents. I do.

Q. And does that comport with your understanding as to how Steve Horne conducted himself generally as a

---

police officer with the youth violence strike force?

A. These incidents are taken as specific commendable activities and they're written up for the