```
 1                            Volume:  I

 2                            Pages:   1 - 261

 3                            Exhibits: 39 - 42

 4

 5            UNITED STATES DISTRICT COURT

 6          FOR THE DISTRICT OF MASSACHUSETTS

 7            Civil Action No. 04-10718-RGS

 8   - - - - - - - - - - - - - - - - - - - - -

 9   STEVEN HORNE AND RONALD BROWN,

10                   Plaintiffs,

11

12   vs.

13

14   CITY OF BOSTON, SGT. ERIC BULMAN, AND SGT. JOHN

15   DAVIN,

16                   Defendants.

17   - - - - - - - - - - - - - - - - - - - - -

18          DEPOSITION OF KEVIN D. FOLEY

19          August 26, 2005 - 9:05 a.m.

20                 Roach & Wise, LLP

21                  31 State Street

22               Boston, Massachusetts

23

24      Reporter:  Donna J. Whitcomb, CSR/RPR/RMR
```

Kevin D. Foley                                                                08/26/2005

Page 66

1  took?
2      A.  They dealt with this but I don't honestly
3  remember if it was specifically.
4      Q.  And what do you do as director of Labor
5  Relations?  I believe you said you dealt with the
6  unions?
7      A.  There were a total of ten unions within
8  the police department, both sworn and civilian, and
9  all -- anything to do -- any labor issue gets
10 funneled to my office whether it's a grievance,
11 contract grievance, Unfair Labor Practice.
12 Commanders will call me with questions on contract
13 issues, how to interpret a contract or a particular
14 issue in the contract.
15     Q.  And that's a position you hold today?
16     A.  Correct.
17     Q.  Now, has your title changed from
18 lieutenant to anything else?
19     A.  I went from lieutenant to deputy
20 superintendent.
21     Q.  When was that?
22     A.  February of '04.
23     Q.  Did you have to take an exam for that?
24     A.  Negative; that's an appointment at the

Page 67

1  discretion of the police commissioner.
2      Q.  And you're here as the result of a
3  subpoena that was issued to you, correct, that your
4  attorney accepted?
5      A.  Correct.
6      Q.  I'd like to show it to you and ask if
7  that's the subpoena that was issued to you?
8      A.  It appears to be.
9          MR. ROACH:  I'd like to mark that,
10 please, as Exhibit 39.
11         (Document marked as Exhibit No. 39
12 for identification.)
13     Q.  And looking at Exhibit 39 it indicates
14 that you are to bring with you any documents in your
15 personnel possession that are listed in 1 through 4,
16 paragraphs 1 through 4 on page 2; do you see that?
17     A.  I could not hear you.  With the door
18 opening I couldn't hear you.
19     Q.  Exhibit 39 on page 2 requests you to bring
20 some documents that are listed in four paragraphs
21 there; do you see that?
22     A.  Uh-huh.
23     Q.  Is that a, "yes"?
24     A.  I do.

Page 68

1      Q.  Do you have any documents?
2      A.  I do not.
3      Q.  So that's why you didn't bring any today
4  then?
5      A.  I don't have any, no.
6      Q.  Can you tell me when you were commander of
7  the Youth Violence Strike Force from 1999 to 2003
8  what were your responsibilities and duties?  And I
9  think you've talked about it some about having the
10 grant money and overseeing the department and so
11 forth, can you just tell me briefly again what your
12 responsibilities were in that period of time?
13     A.  Well, we have all kind of administrative
14 requirements that we either delegate for someone to
15 do or in some cases do myself and then the ones that
16 others would do, obviously, I would have to review
17 before forwarding them up to headquarters which
18 would include attendance records, payroll records,
19 as I mentioned, auditing of all the grant money that
20 I was responsible for.
21         If someone was injured on duty there
22 was an investigative report I was required to fill
23 out with a cover letter and send it up to
24 headquarters.  Automobile accidents, same thing;

Page 69

1  there was an investigative report which was required
2  to be filled out, cover letter attached to it and
3  sent up.
4          We had a fleet of vehicles which
5  ultimately, you know, I was responsible for.  By
6  that I mean making sure that someone was maintaining
7  them, servicing them, repairing them.  Requisitions
8  perhaps for equipment or supplies and then obviously
9  the super -- responsible for everyone in the unit,
10 but the sergeants would -- information would -- you
11 know, I would read the arrest reports every day.  I
12 would read the ones every day -- I would read the
13 intelligence reports every day.  I would monitor,
14 you know, people's attendance and so forth.  The
15 supervisors would critique me, if you will, every
16 day -- not every day but --
17     Q.  I'm sorry, who would critique you?
18     A.  The supervisors, the sergeants.
19     Q.  Would critique your job or --
20     A.  I'm sorry, I would critique them but they
21 would -- I would try on a daily basis -- obviously
22 it wasn't done every day but sit down with them to
23 find out what happened prior tour of duty prior day.
24 I would sit down with detectives, not every day but

18 (Pages 66 to 69)

Kevin D. Foley                                                                            08/26/2005

Page 70

1  as often as I could, to see how they were doing, how
2  their investigations were going; those sorts of
3  things.
4      Q.  When you said you critiqued the
5  supervisors every day or would sit down with them
6  and review the events of the day on a day-to-day
7  basis, would that include the sergeants from the day
8  and the night shifts?
9      A.  Right, correct.
10     Q.  Would that include Sergeant Davin and
11 Sergeant Bulman when they were there?
12     A.  It was Sergeant Detective Borman and
13 Sergeant Detective Davin reported to me, correct.
14     Q.  When you said "Borman" you meant to say
15 "Bulman"?
16     A.  Bulman.
17     Q.  And you understand they're defendants in
18 this case, correct?
19     A.  I do.
20     Q.  Did you sit down with the other agencies
21 that were there from time to time, the ones that you
22 described such as ATF, FBI, U.S. Marshal, Department
23 of Corrections, MBTA, State Troopers, Boston Housing
24 Police and so forth?

Page 71

1      A.  I would talk to them, not every day, I've
2  got other administer duties at headquarters and so
3  forth but on a regular basis would be more accurate.
4  And then I would also meet and converse, if you
5  will, with their immediate supervisors who were not
6  assigned to the unit but whom they reported to.
7      Q.  That sounds like a very busy job.
8      A.  It was.
9      Q.  Can you tell me how much grant money was
10 involved on a, say, yearly basis that you had to
11 apply for?
12     A.  I didn't apply for it.  I would assist in
13 the application but it was -- we have a strategic
14 planning division which does all our grant
15 applications.
16     Q.  So you would assist with the Strategic
17 Planning Division in making the applications, you'd
18 give them the information?
19     A.  Correct.
20     Q.  And help them draft the grant
21 applications?
22     A.  I would provide the information, they
23 would draft and draw it.
24     Q.  How much grant money was involved on, say,

Page 72

1  a yearly basis if you can recall?
2      A.  It varied to -- when the unit was first
3  formed we had no grant money and then it actually
4  went up to a million dollars and then towards the
5  end started to decline.  Most of these grants were
6  for five-year periods and the ones that were renewed
7  were renewed at considerably less, you know, and I
8  think most of them now dried up.
9      Q.  But when you were there it was a million
10 dollars for the most part?
11     A.  Correct.
12     Q.  And where did this grant money come from,
13 the federal government?
14     A.  It was all federal money, yes.  It was
15 funneled through the state but it was all federal
16 money, yes.
17     Q.  I'm going to show you what's been marked
18 as Exhibit 2 in Sergeant Bulman's deposition and
19 point to -- the pages are not numbered but it's the
20 fourth page in.  It's an answer to Interrogatory No.
21 6 and I'd like you to read where it says, "Beginning
22 11 August '99" and just read that paragraph, please?
23         MR. ROACH:  Off the record for a
24 second.

Page 73

1         (Discussion off the record)
2  BY MR. ROACH:
3      Q.  Have you had an opportunity now to read?
4      A.  I have.
5      Q.  Is that accurate, that paragraph?
6      A.  Pretty much.  Just the very last sentence,
7  I believe Sergeant Bulman supervised a total of six
8  detectives not two but...
9      Q.  And this would have been -- I'm sorry, I
10 guess there were two paragraphs.  It says,
11 "Beginning August 11, '99"; let's start with that.
12     A.  Oh, okay.
13     Q.  That's fine you've read that already,
14 correct?
15     A.  Yes, I have.
16     Q.  And Bulman supervised six detectives
17 rather than two?
18     A.  I'm sorry, I read two paragraphs as
19 opposed to one.
20     Q.  Okay, let's start with the first
21 paragraph, "Beginning 11 August '99."  That
22 paragraph there; is that accurate?
23     A.  I believe so, yes.
24     Q.  Now, I believe you said earlier, and I

19 (Pages 70 to 73)

### Page 78

1  Q. And then who was under you and Sergeant
2  Bulman in the hierarchical structure?
3  A. Well, Sergeant Bulman was the only day
4  supervisor so then in the evening --
5  Q. Would be you, right?
6  A. I would be ultimately responsible for the
7  shift and then there was Sergeant Gary Barker.
8  Again, I'm not sure of the time frame that these all
9  came but these were all night supervisors -- Gary
10 Barker.
11 Q. Was under you?
12 A. Correct.
13 Q. He's a sergeant?
14 A. Correct.
15 Q. Who else?
16 A. I'm drawing a blank here.
17 Q. I'm just looking for your best memory. I
18 understand --
19 A. No, I'll have to go back there. It will
20 come to me.
21 Q. Okay, forgetting the names for a moment
22 just can you tell me the positions?
23 A. There were three night sergeants and then
24 obviously patrol officers on the night shift.

### Page 79

1  Q. And then on the day shift it would have
2  been Sergeant Bulman and then there were some
3  sergeants under him?
4  A. No, there was just Sergeant Bulman
5  initially.
6  Q. And then officers under him?
7  A. Officers. Some time later Sergeant Davin
8  came in as the day shift supervisor. Again, I don't
9  recall the time frame, and Sergeant Eric Bulman was
10 promoted to sergeant detective staying in the gang
11 overseeing the detectives on days.
12 Q. Now, where did the detectives fit in in
13 the hierarchy when you were the night supervisor
14 before you became the commander if you remember?
15 A. Well, detective is not a rank, it's a
16 specialty. They have no supervisory role.
17 Q. Okay, are they in -- they have no
18 supervisory roll over the officers?
19 A. Over patrol officers, correct.
20 Q. Who has supervisory control over them?
21 A. Well, any sergeant would but in the gang
22 unit it would be Sergeant Bulman would be the
23 sergeant detective overseeing the detectives on a
24 day-to-day basis and Sergeant Davin over the

### Page 80

1  uniforms on a day-to-day basis. But as sergeants,
2  forgetting the detectives, either one of them would
3  have authority over detectives or patrol officers.
4  Q. Okay, so when you were the night
5  supervisor you had authority over the patrol
6  officers and any detectives under you at night;
7  Sergeant Bulman had supervisory authority over any
8  patrol officers or any detectives in the day; is
9  that a fair statement?
10 A. His responsibility was over the
11 detectives. Because of his rank you could say his
12 authority was over everybody working.
13 Q. Now, when you became the commander after
14 Lieutenant French left the gang unit or the Youth
15 Violence Strike Force in May of 2000, can you tell
16 me what the hierarchical structure was within --
17 strike that.
18     Before I get to that, where did the
19 FBI, the Alcohol Firearms Tobacco and other agencies
20 come in in terms of supervisory authority over them
21 in the hierarchy, if at all?
22 A. Well, on a day-to-day basis they took
23 their direction from either a sergeant or myself.
24 Q. Okay, so they were under the supervisors

### Page 81

1  of the day and the evening shift; is that correct?
2  A. Right.
3  Q. Now, in 2000, May of 2000 when Lieutenant
4  French left and you became the commander of the
5  Youth Violence Strike Force, can you tell me what
6  the hierarchical command structure was at that time?
7  A. Well, I switched to the day shift and I
8  would have overall responsibility for everyone. On
9  the detective side, Sergeant Detective Bulman was a
10 Sergeant Detective by then; I'm sure of that. I'm
11 not sure of the time frame but reported to me and he
12 had six detectives working for him or under him
13 however you want to phrase it.
14 Q. Okay, so in May of 2000 you became the
15 commander of the entire Youth Violence Strike Force,
16 correct?
17 A. Right.
18 Q. And then under you was the day and evening
19 shift supervisors; is that correct?
20 A. Correct.
21 Q. And who were they when you were there?
22 A. Well, sergeant -- as I recall Sergeant
23 Bulman had six detectives, three day, three nights
24 and he worked the day shift. Sergeant Davin was the

Kevin D. Foley

08/26/2005

Page 82

1  only uniformed -- well, they were in plain clothes
2  but the only uniformed sergeant on days.
3          On nights we had three sergeants and
4  I'm drawing a blank on them, Gary Barker being one,
5  Michael Stratton, another -- it will come to me
6  during the -- I'm sure.
7      Q. Okay, if you remember; that's fine. So
8  when you became the commander of the Youth Violence
9  Strike Force in May of 2000 you were the commander?
10     A. Correct.
11     Q. Then under you were Davin and Bulman?
12     A. Correct. And then three additional
13  sergeants on evening.
14     Q. Were they of equal rank of Davin and
15  Bulman or were they under Davin and Bulman in terms
16  of --
17     A. Who are we talking about, the other
18  sergeants?
19     Q. Yes.
20     A. All sergeants are of equal rank regardless
21  of their shift. They all have equal rank and equal
22  authority.
23     Q. Okay, so underneath you were all the
24  sergeants?

Page 83

1      A. Correct.
2      Q. Who was under them, the officers?
3      A. Police officers, correct.
4      Q. Where do the detectives fall within the
5  hierarchy?
6      A. Again, detective is not a rank, it's a
7  specialty. So rank wise they are police officers,
8  patrolmen, so they reported on a day-to-day basis to
9  Sergeant Detective Bulman. But any sergeant would
10  have authority over them.
11     Q. Unless they were sergeants themselves,
12  right, the detectives?
13     A. Correct.
14     Q. For example, Michael Cox became a sergeant
15  detective, correct?
16         MS. TIERNEY: Objection.
17     Q. At some point?
18     A. He may have but not while he worked for
19  me.
20     Q. Let's assume somebody becomes a sergeant
21  detective, they're both a sergeant in rank and a
22  detective, correct?
23     A. Correct.
24     Q. So the sergeant is what gives them the

Page 84

1  rank in terms of hierarchy over somebody else?
2      A. Correct.
3      Q. Not the designation detective, correct?
4      A. Correct.
5      Q. Because a patrol officer could be a
6  detective, correct?
7      A. The rank is somewhat confusing but, yes.
8      Q. How do you become a detective?
9      A. It's an exam process.
10     Q. Is it a rank that is above a patrol
11  officers?
12     A. No, it's not a rank.
13     Q. What is it?
14     A. It's a specialty.
15     Q. Specialty?
16     A. It designates your job description as an
17  investigator. It has -- a detective has no
18  authority over a police officer. They're of equal
19  rank. The difference is that one works in plain
20  clothes and does investigations and the other is
21  considered a uniformed police officer. But
22  detective is not considered a rank or an authority.
23     Q. What about the officers in the Youth
24  Violence Strike Force, I understand they were doing

Page 85

1  investigations, correct?
2      A. They do limited investigations, yes.
3      Q. How is the investigation that the patrol
4  officers do limited?
5      A. Well, they don't investigate crimes, per
6  se. They can do a limited investigation to locate
7  an individual, they can do warrant checks, they can
8  do criminal history checks. They can check with
9  courts, probation, other agencies to perhaps get an
10  address. They can't do fingerprints, they can't
11  take fingerprints, can't dust for prints. They
12  can't do a follow-up investigation on a crime. They
13  can't have a line up, you know, an official line up.
14  There are other things I can't think of but --
15     Q. So there are some things detectives can do
16  and other -- that the patrol officer in the Youth
17  Violence Strike Force cannot?
18     A. Correct. Detective can do a search
19  warrant, a police officer cannot do one without a
20  detective assisting him.
21     Q. Detective has to sign for the search
22  warrant?
23     A. He has to oversee and review an affidavit
24  for a search warrant.

Kevin D. Foley                                                    08/26/2005

Page 94

1   A.  Again, it's a report that was prepared by
2   our Internal Affairs Division prior to having a pers
3   -- a PAM meeting.
4   Q.  When you were there from '99 through 2003
5   was Paul Joyce in the Youth Violence Strike Force in
6   any way, shape or form?
7   A.  He was not there when I was a commander
8   from '98 -- when I was there from '98 to 2000, I
9   don't believe.  He was there when I was a commander
10  the first three-and-a-half years, four years.
11  Q.  Which would have been when?
12  A.  '92 to '96.
13  Q.  Was he there at any time when Horne and
14  Brown were serving there?
15  A.  I don't honestly remember when he got
16  promoted to superintendent.  No, I don't believe --
17  well, not when I was there.  I believe he was in
18  homicide when I was there.  The second time when I
19  was there.
20  Q.  Do you remember Sergeant Bulman saying
21  anything to you at any time when you rejoined the
22  Youth Violence Strike Force in '99 until the time
23  Brown and Horne were transferred out in 2001 about
24  Brown and Horne taking the place of other officers

Page 95

1   who should be there?
2   A.  Say that one more time?
3   Q.  Did Sergeant Bulman ever say to you that
4   officers other than Horne and Brown should be in the
5   unit because they're more qualified than they are?
6   A.  No.
7   Q.  Do you ever remember him saying anything
8   about Officer Gergory Long or Francis MacDonald as
9   being officers that would be better for the unit
10  than Horne or Brown?
11  A.  No, I don't recognize the name MacDonald.
12  Q.  McLaughlin, I'm sorry, McLaughlin or
13  Gergory Long?
14  A.  No.
15  Q.  So you don't remember him saying anything
16  to you about recommending McLaughlin or Long to be
17  transferred into the Youth Violence Strike Force at
18  any time?
19  A.  Being transferred in?
20  Q.  Yes.
21  A.  Yes.
22  Q.  What did he say about them?
23  A.  When we -- are you ready?
24  Q.  Yes, I'm listening.

Page 96

1   A.  When we would post for openings in the
2   unit, in other words, when we were looking -- when
3   we had permission to get additional personnel or to
4   make changes we would post a position and anyone
5   throughout the city could apply for the position.
6   Those applications came to me.  I interviewed the
7   individuals.
8           As an example, I would be told you
9   could take in ten officers or you could move ten or
10  however it came about that we would have some
11  movement.  So I would do the interviews of all of
12  those people that applied.  I would check their
13  internal affairs record to see if there was any kind
14  of a problem within their history.
15          And then the ones that impressed me,
16  either through their qualifications, you know, their
17  work from the district they came and I felt may be a
18  good candidate, I would sit down with all my
19  supervisors and would just discuss the various
20  individuals.  If they knew something about -- you
21  know, I might have a stack of 15, 20 applications
22  that I had pulled out of probably 50 applications
23  that came in and we'd go over each one and ask if
24  they knew this one, if they knew that one.

Page 97

1   Sometimes they'd say, no, they didn't know the
2   individuals and sometimes they would say, yes.  If
3   they said they knew the individual I would ask, you
4   know, what kind of a police officer, what kind of a
5   work ethic did he have and we'd have some dialogue.
6           I would look at their attendance
7   record from the unit they were presently assigned to
8   to see if they were abusing sick time.  And we would
9   have a discussion and they would just give me their
10  opinion of all the applicants I have for the ones
11  that they may or may not know.  And then based on
12  that discussion amongst all of the supervisors I
13  would make decisions on who came into the unit.
14  Q.  You ultimately made the decisions on who
15  came into the unit?
16  A.  I would be the one who made that decision,
17  yes.
18  Q.  Did that decision have to be approved by
19  anybody above you?
20  A.  All transfers in and out were obviously
21  approved by bureau chief.
22  Q.  And who would that be?
23  A.  At the time I was commander the second
24  time during the time period I'm sure you're talking

25 (Pages 94 to 97)

Page 98

1  about it was Superintendent Joyce.
2     Q.  So when you were the commander from '99,
3  2000 through 2003 Commander Joyce would have the
4  ultimate authority for any transfers in or out; is
5  that correct?
6     A.  Superintendent Joyce.  I would send my
7  recommendations up and he would either -- he would
8  approve them, yes.
9     Q.  And were these in writing, the
10 recommendations?
11    A.  Usually I would send a list up with a
12 cover letter.  Yes, they'd be in writing, yeah.
13    Q.  And did your cover letter explain any of
14 the reasons why you'd like certain individuals?
15    A.  No, no.
16    Q.  So did you give him the rank of people you
17 recommended, in other words, in order of preference
18 with the list?
19    A.  As mentioned headquarters -- I would get
20 anywheres from 20 to 30, 40 applications and from
21 that I would send a list up of people that I would
22 prefer taking into the unit.
23    Q.  But can I --
24    A.  Did I rank them; is that what your

Page 99

1  question was?
2     Q.  Yes.
3     A.  No.
4     Q.  In other words, if you had ten individuals
5  that you were recommending be transferred in or out?
6     A.  Correct.
7     Q.  You would send that list to Joyce; is that
8  correct?
9     A.  Correct.
10    Q.  And on the list did you rank your --
11    A.  Preference?
12    Q.  Let me finish the question.
13    A.  Sorry.
14    Q.  On the list of officers to be transferred
15 either in or out did you rank your preference in
16 terms of order?
17    A.  No.
18    Q.  Do you still have that list?
19    A.  No.
20    Q.  Where would that be?
21    A.  I don't even know if I would have it.
22 Once I would send it up I would keep a copy until
23 the actual transfers took place and then I would
24 dispose of it.

Page 100

1     Q.  When you say you dispose of it, you mean
2  you throw it away after the transfer took place?
3     A.  Yes.
4     Q.  Is that a, "yes"?
5     A.  Yes.
6     Q.  What did Superintendent Joyce do with your
7  cover letter and list?
8     A.  I have no idea.
9     Q.  Did you dispose of your cover letter as
10 well?
11    A.  After the transfers, yes.
12    Q.  And this would include a transfer in or
13 out, correct?
14    A.  Correct.
15    Q.  Is that right?
16    A.  Correct.
17    Q.  Now, this process you just told us about
18 you followed when you made the recommendation to
19 transfer Brown and Horne out of the Youth Violence
20 Strike Force in March of 2001 effective April 2nd of
21 2001, correct?
22    A.  Right.
23    Q.  I'd like to show you Bulman Exhibit 5.
24 Can you tell me what that is, please?

Page 101

1     A.  It appears to be a city wide transfer
2  personnel order.
3     Q.  Is that the transfer order that includes a
4  transfer of Brown and Horne out of the Youth
5  Violence Strike Force?  And I'll direct your
6  attention to pages 1 and 3 of Exhibit 5.
7     A.  It is.
8     Q.  And does that transfer order also include
9  a transfer in of Greg Horne into the Youth Violence
10 Strike Force?  And I direct your attention to page
11 4.
12    A.  It does.
13    Q.  And that's, again, he was part of that
14 same process you just described as to your
15 recommendations, correct?
16    A.  Correct.
17    Q.  And did you follow the same process with
18 respect to the transfer in of Frances McLaughlin to
19 the Youth Violence Strike Force which is note the
20 here on Bulman Exhibit No. 8?
21    A.  Correct.
22    Q.  Now, was Superintendent Joyce the
23 superintendent at the time that Exhibit 5, the
24 transfer of Brown and Horne out of the unit and

Page 102

1  Gregory Long in; do you see the super --
2    A.  I honestly -- I believe so but I can't say
3  with certainty.
4    Q.  Was Superintendent Joyce the
5  superintendent at the time that the list dated
6  January 4, 2002, Bulman Exhibit 8, was created when
7  you submitted your recommendations to him?
8    A.  I believe so, yes.
9    Q.  Can you think of any other superintendents
10 other than Joyce that would have been the
11 superintendent at that time?
12   A.  No.
13   Q.  You said you believed it was him?
14   A.  No.
15   Q.  Okay.  Can you tell me what Joyce did
16 after he received the recommendations from you
17 either for a transfer in or a transfer out?
18   A.  What he did?
19   Q.  Yes.
20   A.  I have no idea.
21   Q.  Who had the ultimate authority to approve
22 your recommendation either in or out of the Youth
23 Violence Strike Force?
24   A.  The ultimate would be the police

Page 103

1  commissioner.
2    Q.  So Superintendent Joyce to your knowledge
3  would then submit it either to the commissioner or
4  somebody in between him and the commissioner; is
5  that correct?
6    A.  (Pause)
7    Q.  Your recommendations?
8    A.  I can give you the flow.  I can't say what
9  they did but --
10   Q.  No, that's right.  I just need the flow of
11 the approval process.
12   A.  My recommendation would go to the deputy
13 in charge of Special Operations who -- I don't
14 recall.  We had three deputies during the time I was
15 there.  I'm not sure which one was -- and then he
16 would approve my recommendations and send them to
17 Superintendent Joyce and then from there they would
18 go to the police commissioner.
19   Q.  And you said there was a deputy in between
20 you and Joyce at the time?
21   A.  Right.
22   Q.  Exhibits -- let me finish the question,
23 please.  There was a deputy between you and Joyce at
24 the time Exhibits 5 and 8 were created?

Page 104

1    A.  Correct.
2    Q.  Do you know who that was?
3    A.  I'm not sure.  There was Robichaud and
4  Dowd.  I'm not sure which was there at the time.
5    Q.  Okay, it would have been either Robichaud
6  or Dowd?
7    A.  Correct, or Cellucci.  I'm not sure of the
8  time frame; those were the three deputies that --
9    Q.  So it would have been one of those three
10 at the time Exhibits 5 and 8 were created; is that
11 correct?
12   A.  Correct.
13   Q.  You said you submitted a list and a cover
14 letter to Superintendent Joyce, did that also go to
15 the deputy superintendent?
16   A.  I would submit it to the deputy, period.
17 It would then -- he would then submit it to Joyce.
18   Q.  Okay, so your list and your cover letter
19 went to the deputy?
20   A.  Correct.
21   Q.  And then he submitted your cover letter
22 and list up to Joyce; is that correct?
23   A.  Correct.
24   Q.  And then Joyce would submit it to the

Page 105

1  commissioner?
2    A.  Correct.
3    Q.  Did you put your list or cover letter in
4  any file that you kept at the Youth Violence Strike
5  Force?
6    A.  It would go in my pending file until such
7  time something happened, and then once the
8  transfer -- whatever the recommend -- it would go in
9  a pending file and then when the transfer happened
10 or didn't happen I would just destroy it, throw it
11 away.  It was of no use to me after that.
12   Q.  Okay.  Now, when you say you had a pending
13 file, what did you use the pending file for?
14   A.  Pending issues.
15   Q.  And so your -- is there some rule or
16 regulation that governs --
17   A.  No.
18   Q.  -- creation of a pending file?
19   A.  No, anything that was outstanding or
20 pending I would have on my desk a pending file.  If
21 I was waiting for a report for somebody that I had
22 asked for it would be in that pending file.  It was
23 just -- and then when that task was accomplished or
24 completed I would --

Kevin D. Foley                                                                                                08/26/2005

Page 110

1   A.  I didn't keep a copy of the payroll.  That
2   was kept by the Special Operations commander.
3   Q.  And the attendance file you had to keep?
4   A.  I kept an attendance file.
5   Q.  What about the Night Light file?
6   A.  I kept that as well.
7   Q.  What would you keep in that?
8   A.  It was a combination of things.  It would
9   include the overtime documents for the officers that
10  did Night Light and it would include what was
11  referred to as the log of what they did that night
12  while performing the Night Light overtime.
13  Q.  Why did you keep that?
14  A.  Should I be -- it was all federal funded
15  grant money.  So in the event I -- well, for a lot
16  of reasons, if I was audited by the Feds on the
17  money I was spending, and the other was to keep
18  statistical information on how many Night Light
19  visits we made.
20  Q.  Was the Night Light funding used, the
21  grant money used to pay officers like Horne, Brown
22  and others overtime for work they're doing other
23  than their regular assigned duty time?
24  A.  All Night Light was done with the --

Page 111

1   Q.  With the Youth Violence Strike Force?
2   A.  Correct.
3   Q.  Would you say that was an advantage of the
4   Youth Violence Strike Force; that you had an
5   opportunity to earn additional overtime with some of
6   these special projects like Night Light and Home
7   Front?
8   A.  Actually, most officers in the gang unit
9   made less money than a district officer.
10  Q.  For overtime?
11  A.  For everything, overtime included.
12  Q.  How was that; did their salary decrease
13  when you became a youth force --
14  A.  No, the detail system -- if you're in a
15  district you can do details.  Could not do detail --
16  we did not have a detail base to do.  Districts have
17  minimum staffing, they have to put out so many
18  people.  If they don't, vacation, sick, whatever,
19  they hire people.  I had no minimum staffing.  If
20  one officer showed up that's all we went up.  It
21  never happened but I didn't have a minimum staffing
22  budget.
23  Q.  But if an officer was doing a Night Light
24  operation and they were a day tour or a day unit

Page 112

1   officer --
2   A.  Correct.
3   Q.  -- like Horne and Brown, they would be
4   paid extra for doing the Night Light operation; is
5   that correct?
6   A.  He would be paid four hours.  If he were
7   in a district working he would be paid eight hours.
8   So most officers took a substantial loss of income
9   coming to the gang unit.
10  Q.  Why?
11  A.  Why did they do it or why did they take
12  it?
13  Q.  Would an officer want to come to the gang
14  unit, the Youth Violence Strike Force, if they are
15  taking a pay cut for overtime and details?
16  A.  I like to think because they really enjoy
17  doing that kind of work.  I mean, obviously, it had
18  some advantages in that you had city wide
19  jurisdiction by -- not jurisdiction but you could go
20  anywhere in the city.  In other words, a district
21  officer officially is not supposed to leave a
22  district.
23          In a gang unit you can go anywhere in
24  the city and not be violating any rules.  You're in

Page 113

1   plain clothes you're in a unmarked police vehicle.
2   You did not take 911 calls, you jumped on the calls
3   that you chose to jump on but you weren't assigned
4   calls.  So there was a lot of advantages other than
5   financial gain.
6           So I would say all officers in the
7   gang unit made less if you compared them to officers
8   in a district, substantially less than those who are
9   assigned to a district.  And that, quite honestly,
10  was the reason that a lot of people didn't apply to
11  the gang unit because they would lose money.
12  Q.  It was a unit that had some prestige
13  attached to it?
14  A.  I think the officers in the unit thought
15  so.  I think the district officers would give you a
16  different answer.
17  Q.  What would they say?
18  A.  Well, I think they were jealous that they
19  couldn't ride around plain clothes.  So there was a
20  little bit of jealousy involved.
21  Q.  For the --
22  A.  For the uniformed police force, yes.
23  Q.  Would be a little jealous because they
24  couldn't --

Page 122

1  transferred in?
2      A.  I can recall my rationale and reasoning,
3  yes.
4      Q.  What was it?
5      A.  Greg Long?
6      Q.  Yes.
7      A.  He applied, he presented himself very well
8  during the interview process. In checking with the
9  captain of his district, I believe he came from just
10 District 3 -- yeah, he did. He came from District
11 3. I spoke -- as I did with all the applicants that
12 were being considered. He had an excellent
13 recommendation from the district captain.
14     Q.  Which district?
15     A.  District 3.
16     Q.  Okay, where is that?
17     A.  It's in the Mattapan section of Boston.
18     Q.  Area B-3?
19     A.  Correct.
20     Q.  Where is the actual station, if you know?
21     A.  It's on the -- it's on -- I'm not sure
22 what the address is. It's literally kitty-corner on
23 the intersection of Blue Hill Avenue and Morton
24 Street. I don't know whether they use Morton or

Page 123

1  Blue Hill Avenue for the address.
2      Q.  I know where that is. Okay, so you talked
3  to his captain, who was that?
4      A.  I don't recall who was there at the time.
5  I remember that he had just started law school.
6      Q.  Anything else?
7      A.  I checked his internal affairs record
8  which was clean; by that I mean there was nothing in
9  there that would concern me. I checked with the --
10 we have a time clerk -- I'm not -- attendance. I'm
11 not sure of his title but in headquarters we have
12 somebody responsible for all the attendance
13 information and I checked that and there was no red
14 flag, if you will, that he abused his calling in
15 sick before holidays, weekends; those are the things
16 I look for.
17     Q.  Anything else?
18     A.  People who call in sick before their days
19 off, after their days off on a holiday, on weekends.
20 I do this for everybody that I interview.
21     Q.  Anything else?
22     A.  So I made a decision --
23     Q.  I'm sorry, go ahead?
24     A.  In talking to both his commander and -- at

Page 124

1  the time I knew a few people who worked in District
2  3 and I asked them -- I don't remember their names
3  but, again, if I know someone in a particular
4  district I'll ask and he's got a great reputation.
5  So based on all of those I selected him.
6      Q.  Did you talk to Bulman and Davin about
7  him?
8      A.  Again, at the staff meetings I would go
9  over all the applications with all the individuals
10 that we had so I'm sure that everybody there has
11 either something or nothing to say.
12         Specifically Davin and Bulman, I
13 don't recall them saying -- saying anything
14 specific. But it would have been absolutely
15 discussed at the supervisor's meeting, yes.
16     Q.  Do you remember when the supervisors
17 meeting was closest to when the March 23, 2001 order
18 came out?
19     A.  I have absolutely no idea.
20     Q.  Now, Exhibit 5 is the March 23, 2001
21 transfer order, correct?
22     A.  It is, yes.
23     Q.  How long does it take from the time you
24 make up the list and cover letter to the

Page 125

1  superintendent that goes to the deputy, either Dowd
2  or another -- to Joyce, up to the commissioner
3  before the transfer order is actually issued; do you
4  know?
5      A.  It could take days, weeks or months. I
6  mean, there is no set pattern.
7      Q.  Well, looking at Exhibit 5 that's a fairly
8  long list, isn't it; is that correct?
9      A.  That is, yeah.
10     Q.  I mean, compared to most transfer orders
11 it's a pretty long one; isn't it?
12     A.  I would say twice a year we have one
13 similar to this in size. On average they're one or
14 two pages but I would -- every six months or so
15 you'll see one this large.
16     Q.  But transfer orders come out on a very --
17 weekly basis practically, right?
18     A.  No.
19     Q.  How often do they come out?
20     A.  They could come out -- there is no --
21 there was when I first came on the police department
22 but now they come out whenever. There is no
23 pattern.
24     Q.  Okay, but do you know how often -- they

Kevin D. Foley                                                                08/26/2005

## Page 126

1  come out quite a bit though, right?
2        MS. TIERNEY: Objection.
3    Q. Let me rephrase the question. How often
4  did transfer orders get issued?
5        MS. TIERNEY: Objection.
6    A. Personnel orders come out on a pretty
7  regular basis. Transfer orders come out on an
8  irregular basis.
9    Q. Can you define what you mean by
10 "irregular" versus "regular"?
11   A. I certainly can. We have a practice or a
12 policy, actually, if you're out injured, for
13 example, for 15 days you're transferred into medical
14 incapacitated so that would generate a personnel
15 order. And when you come back to full duty you're
16 transferred back to wherever, the district or unit
17 you came from. We have an average of over -- 100 to
18 110 people out injured on any given day so there are
19 -- every single week you will see personnel either
20 putting in medical incapacitated or coming out.
21   Q. And that's a transfer order, right?
22   A. Technically it's a transfer order. So
23 those you will see every week.
24   Q. Okay.

## Page 127

1    A. And then people actually being transferred
2  from one place to another, not on a regular basis.
3    Q. And when you say not on a regular basis
4  what do you mean?
5    A. You might go literally weeks and weeks and
6  weeks without seeing one; then you could see one
7  individual on it or two or three; there's no pattern
8  or procedure. But to answer your question, there's
9  probably a personnel order on a weekly basis most of
10 which deal with officers going and coming from
11 medical.
12   Q. When you say personnel order, transfer
13 orders and personnel orders, those are basically
14 interchangeable?
15   A. Correct.
16   Q. In terms of the terminology, correct?
17       MS. TIERNEY: Objection.
18   A. Correct.
19   Q. And it could include a transfer meaning
20 from a permanent -- not permanent but a transfer
21 from one unit to another such as the the nature of
22 the case here or could be just out on medical and
23 then back, correct?
24   A. No, you would never see a transfer of an

## Page 128

1  individual on the same order as a medical
2  incapacitated.
3    Q. Okay, so the transfer order also called
4  the personnel order called Exhibit 5 is not a
5  medical transfer?
6    A. Correct.
7    Q. These are people actually being
8  transferred into assignments; is that correct?
9    A. Correct.
10   Q. Now, looking at Exhibit 5, do you know how
11 soon before Exhibit 5 was issued that you began the
12 process of deciding to recommend the transfer of
13 Horne and Brown out of the Youth Violence Strike
14 Force?
15   A. I don't recall, no.
16   Q. Can you recall generally if not
17 specifically?
18   A. I made it a practice on a fairly regular
19 basis to re-evaluate, if you will, personnel. I
20 mean, if you looked at the history that was in the
21 gang unit, there were several transfer orders and as
22 exactly the time frame, I can't answer that.
23   Q. Do you remember when you first started
24 thinking about recommending that they be transferred

## Page 129

1  out of the Youth Violence Strike Force; "they" being
2  Horne and Brown?
3    A. Specifically, no. And a more general
4  response, I would say several months prior to the
5  actual order coming out.
6    Q. Now, you said there were staff meetings?
7    A. I beg your pardon?
8    Q. Strike that. When you said several
9  months, how many is "several"? Can you tell me what
10 "several" means?
11   A. I don't honestly recall but I would -- I
12 can't guess so I would --
13   Q. Estimate if you could?
14   A. Approximately, it would probably be a
15 three- or four-month process from the time I started
16 thinking about transferring anyone to it actually
17 occurring.
18   Q. So is it fair to say that you would have
19 started thinking about it at least probably in
20 December of 2000, seeing that this is dated March --
21 this being Exhibit 5 -- is dated March of 2001?
22   A. Again, there are several individuals that
23 I removed from the gang unit on this order so I
24 suspect that that process took several months for

LegaLink Boston
(617) 542-0039