Kevin D. Foley                                                                    08/26/2005

Page 130

1  me, you know, just based on my normal management
2  style, it would have been a, you know, process that
3  I went through.
4     Q.  So several months would have included some
5  time in 2000?
6     A.  Of evaluating these people on this order,
7  correct.
8           MR. ROACH:  Off the record.
9           (Discussion off the record)
10    Q.  Did you keep a separate folder for each
11 individual you were evaluating for transfer in or
12 out or did you keep it all in a pending file?
13    A.  It was all when they submitted their
14 application or -- it was all one big file.
15    Q.  In the pending file?
16    A.  Correct.
17    Q.  Can you tell me the criteria that you used
18 to evaluate Long for transfer in; is that the same
19 criteria that you used whenever you were evaluating
20 whether to recommend somebody be transferred into
21 the unit?
22    A.  It was.  And then one of the other things
23 that we would look for is people -- applicants, if
24 you will, from different parts of the city; by that

Page 131

1  I mean districts.  So that they would bring with
2  them a basis of knowledge of what's going on in that
3  particular district.
4     Q.  Did you have anybody in District 3 that
5  had come from District 3 at the time Long was
6  transferred in?
7     A.  Say that once again?
8     Q.  Was there anybody that was serving in the
9  Youth Violence Strike Force that had been in
10 District 3 at the time that Long was transferred in?
11    A.  They could have been.  I don't recall.
12    Q.  And determining whether Francis McLaughlin
13 should be transferred in can you tell me -- and that
14 is on Exhibit 8 -- did you use the same process for
15 him?
16    A.  It would have been the same process.
17    Q.  I note that he's from District 3 as well?
18    A.  He is.
19    Q.  Did you have a lack of officers who had
20 experience in District 3 in 2001 - 2002 that would
21 affect them strongly in your decision to transfer
22 Long and McLaughlin into the Youth Violence Strike
23 Force?
24          MS. TIERNEY:  Objection.

Page 132

1     A.  I honestly don't recall.  I would always
2  look for officers from 2, 3, 11.  The areas that we
3  spent most of our time.  I don't recall
4  specifically.
5     Q.  Do you recall where Horne and Brown came
6  from before they were transferred in?
7     A.  I believe it was District 2.  I wasn't
8  there at the time so I really don't know.
9     Q.  Okay.  Well, Exhibit 4, Bulman 4, has Ron
10 Borwn from C-11 and Steve Horne from area B-3?
11    A.  As I mentioned I was not there so I really
12 don't know.
13    Q.  Is that area B-3 is that District 3?
14    A.  It's referred to as District 3, correct.
15    Q.  And C-11 is District 11, right?
16    A.  Correct.
17    Q.  Have you now told me everything you can
18 recall about what you did when you made a decision
19 to transfer Gregory Long into the Youth Violence
20 Strike Force?
21    A.  I believe so, yeah.
22    Q.  You said you had an interview with him;
23 were you the only one there at the interview?
24    A.  Some of the interviews the deputy would be

Page 133

1  there, others I would be -- I would do it myself.
2     Q.  Is that Deputy Dowd?
3     A.  I forget which deputy was there during
4  this.
5     Q.  It could have been Deputy Dowd or it might
6  have been --
7     A.  Or it could have been just myself.  I
8  don't honestly recall.
9     Q.  Do you remember the interview?
10    A.  Vaguely, yeah.  I mean, I interviewed --
11 each time we put out the word that we were looking
12 for people I would get 50 applications.  So I don't
13 remember the interviews that specific, no.
14    Q.  Can you remember anything about the
15 interview?
16    A.  I remember he presented himself well.  I
17 was impressed with his responses.  I don't remember
18 the specifics of it, no.  I remember he told me, you
19 know, the law school issue.
20    Q.  Yes, what did he tell you about that?
21    A.  I just remember him bringing it up in the
22 interview.  I don't remember the specifics of it.
23    Q.  Do you remember -- you said he presented
24 himself well; what do you mean by that?

34 (Pages 130 to 133)

Kevin D. Foley                                                              08/26/2005

### Page 134

1  A. Very convincing; that he had a real desire
2  to come to the gang unit. As I said I also do a
3  background check, if you will, of all the
4  individuals but...
5  Q. And you've described that already, right?
6  A. Yeah. So he presented himself well. He
7  seemed generally enthused about -- you know, his
8  demeanor; everything appealed to me.
9  Q. Did you tell him he was going to earn less
10 money perhaps in overtime?
11 A. I tell everybody that.
12 Q. He didn't have a problem with that?
13 A. No.
14 Q. That's correct, he didn't have a problem
15 with --
16 A. I told him and obviously apparently he
17 didn't have a problem with it.
18 Q. What other responses do you remember him
19 saying other than he was going to law school that
20 impressed you?
21 A. I honestly -- as I said I interviewed 50
22 people. I honestly don't remember.
23 Q. You don't remember anything else other
24 than what you've told me?

### Page 135

1  A. Not specifically, no.
2  Q. Do you remember meeting with Brown and
3  Horne before you transferred them out and telling
4  them why they were being transferred out?
5  A. I don't remember the specific meetings but
6  we have had conversations, yes.
7  Q. What do you mean you had conversations?
8  A. I don't remember a specific meeting. You
9  asked me if I remember a meeting, I'm saying I don't
10 remember a specific meeting. I do recall that we
11 had some discussions about it, yes.
12 Q. Okay, discussions about transferring them
13 out?
14 A. Correct.
15 Q. When you made the decision to transfer
16 them out, before you submitted your list and your
17 cover letter do you remember sitting down with them
18 individually either with a superintendent or someone
19 else and saying to them, Officer Horne or Officer
20 Brown, I've made the decision to recommend that you
21 be transferred out to the Youth Violence Strike
22 Force?
23 A. No.
24 Q. You didn't do that?

### Page 136

1  A. I don't remember doing it that way, no.
2  Q. Why didn't you do that?
3  A. I don't honestly know. We're a
4  paramilitary organization and sometimes we make
5  decisions as managers that we make because, you
6  know, we have our own assessment process and they're
7  done. You know, I try to -- I don't remember
8  specifically, no, I don't.
9  Q. So your testimony is when you decided to
10 transfer them out, you didn't sit down with them and
11 say to them "I'm transferring you out"?
12 A. I don't remember specifically doing that,
13 no.
14 Q. Do you ever do that with anyone that
15 you've decided to transfer out of a unit?
16 A. I usually it's -- again, I don't remember
17 the specifics but my -- generally I tell people
18 prior to the order coming out that they're going to
19 be transferred, yes.
20 Q. You sit down with them individually and
21 tell them why?
22 A. As a rule I try to, yes.
23 Q. Any knowledge as to why you didn't do it
24 with Brown and Horne as opposed to the others?

### Page 137

1  A. I said, I don't remember specifically
2  sitting down with them. My style is to tell people.
3  I don't remember specifically that I sat down with
4  them but that's generally what I do, yes.
5  Q. Okay, you said that is your style
6  generally what you do. Specifically can you
7  remember sitting down and saying to them that
8  they're going to be transferred out of --
9  A. Again, I'm not -- I can't say specifically
10 that -- I wouldn't describe it or remember it as you
11 described it. I can tell you as an example -- would
12 you like me to?
13 Q. Yeah, sure.
14 A. Mark Bucannon.
15 Q. Is that on Exhibit 5?
16 A. Page 1, correct.
17 Q. Okay, you transferred him out to C-11
18 right?
19 A. Correct.
20 Q. Did you sit down and tell him why?
21 A. Again, I don't remember if I sat down but
22 I told him, yes, I told him.
23 Q. You did tell him?
24 A. Uh-huh.

Kevin D. Foley                                                                    08/26/2005

Page 138

1   Q. Is that a, "yes"?
2   A. I'm sorry, yes, I told him, yes.
3   Q. And was it something he wanted or is it
4   something that he didn't want?
5   A. Really I'm not sure. He was a community
6   service officer and we really had no need for a
7   community service officer. He came from District 11
8   initially and I -- I knew I could get -- we did a
9   lot of outreach as a unit so I looked at him as a
10  slot, if you will, so I could transfer him out and
11  get a working police officer, if you will.
12  Q. Okay, so looking --
13  A. So I said I'll make certain that you go
14  back to District 11 as community service officer,
15  which he did.
16  Q. So he was okay with the move then?
17  A. Correct.
18  Q. So actually that was probably good news
19  for him, right?
20  A. Probably. On page 2, Larry Celester.
21  Q. Yes?
22  A. Who -- excellent police officer but had a
23  big mouth. He was somewhat disrespectful. I warned
24  him several times. There was a time and place for

Page 139

1   the big mouth and if he didn't stop he would be
2   gone.
3   Q. You warned him several times?
4   A. Uh-huh.
5   Q. Was that a, "yes"?
6   A. I'm sorry, yes.
7   Q. Is he black?
8   A. He is.
9   Q. What did he have a big mouth about?
10  A. He would constantly joke at roll call and
11  I would constantly remind him that there's a time
12  and a place for joking; this is not the time or the
13  place. He persisted and I transferred him.
14  Q. Do people laugh when he joked, other
15  officers?
16  A. I don't remember. I didn't laugh.
17  Q. But was it disruptive to the unit when he
18  made jokes?
19  A. I felt it was, yes.
20  Q. Did he ever complain about anything racial
21  in terms of the operations of the unit or the
22  attitude or the comments of other officers within
23  the unit?
24  A. Never to me.

Page 140

1   Q. I'm not asking about you. I'm just asking
2   in general did you ever learn that he made any
3   complaints --
4   A. I'm not --
5   Q. Let me finish the question.
6        Did you ever learn that he ever made
7   any complaints of a racial nature concerning the way
8   the unit ran or any attitudes or operations of the
9   unit with respect to race?
10  A. I am not aware of him ever making a
11  comment, no. He did not make one to me, no, nor am
12  I aware of one.
13  Q. So you sat down with him and told him why
14  he was being transferred?
15  A. Again, I don't remember if I sat down but
16  I made it quite clear why I was transferring him.
17  Q. What was his response?
18  A. Actually, he was very good natured and I
19  understand -- I used to see him quite often
20  afterwards and he never -- he was always very
21  cordial, very polite. The next one that I
22  transferred in this order was Wil Cloran.
23  Q. I'm sorry, who was that?
24  A. Wil Cloran.

Page 141

1   Q. Oh, Cloran. He's on the list on
2   exhibit --
3   A. He's on the list, yeah.
4   Q. -- on page 2 of Exhibit 5. Let me ask you
5   a question before we get to Cloran. Was Celester
6   ever transferred back into the Youth Violence Strike
7   Force?
8   A. He was.
9   Q. Why?
10  A. If I may back up, Larry Celester's father
11  and I were classmates and that's why he got into the
12  unit and -- at my recommendation.
13  Q. But you didn't think he was qualified?
14  A. No, I thought he was very qualified and I
15  preface my remarks by saying he is an excellent
16  police officer. But we're a paramilitary
17  organization and I felt his immature joking attitude
18  was disruptive so I warned him and when he didn't
19  take my warning I transferred him. He knows that
20  and we have been friends since then and I understand
21  he is back there, yes.
22  Q. And did you have anything to do with him
23  being transferred back?
24  A. No.

Page 142

1    Q.  And who is his father that you were
2  friends with at the --
3    A.  Larry Celester also. He and I were in the
4  same academy class. His father has since passed
5  away.
6    Q.  He was a deputy superintendent?
7    A.  No, that was his brother. That was
8  Larry's uncle, William.
9    Q.  Oh, that was William Celester?
10   A.  Right.
11   Q.  What was Larry's title originally?
12   A.  I believe he was a -- I'm not sure. A
13  detective, I believe, when he passed away. I'm not
14  really sure. I forget.
15   Q.  When he transferred back to the Youth
16  Violence Strike Force, that being Larry Celester,
17  who was the commander at the time; do you recall?
18   A.  I'm assuming it would be the present
19  commander, a Lieutenant Kelly McCormack. I'm not
20  sure but I'm assuming so.
21   Q.  Do you know when he was transferred back?
22   A.  No, I don't remember. I remember reading
23  the order but I don't remember when.
24       MR. ROACH: One moment, please.

Page 143

1       (Discussion off the record)
2    Q.  Okay, so do you have any knowledge as to
3  why Officer Celester would be transferred back into
4  the Youth Violence Strike Force if he had the
5  problems that you had described?
6    A.  I have no knowledge of that, no.
7    Q.  You were going to talk about Robert
8  Colburn, I believe, or I'm sorry, William Cloran?
9    A.  Cloran, yeah. He's a white individual.
10  Some of the observations I --
11   Q.  Go ahead, I'm listening.
12   A.  Some of the people working with him had
13  indicated to me that when he was out on the street
14  he wasn't really paying attention to what was going
15  on around him. He was on the cell phone all the
16  time and they felt a little uncomfortable from a
17  safety perspec -- from a safety position. So I made
18  it a point to make some observations. I found that
19  he, in fact, was always on his cell phone, wasn't
20  really paying attention to his surroundings, so I
21  made a decision to transfer him.
22   Q.  Okay, anyone else on the list that you can
23  think of?
24   A.  John Foundas.

Page 144

1    Q.  John who?
2    A.  I'm on page 3.
3    Q.  Yes?
4    A.  White individual, very nice fella. No
5  problem at all but just didn't have, you know,
6  stat -- he was a very small individual, weighed
7  about 90 pounds. It just wasn't the right fit for
8  him, I felt, as the commander.
9    Q.  Going back to William Cloran for a minute,
10  who told you that he was on his cell phone a lot and
11  wasn't paying attention?
12   A.  I don't remember specifically but the
13  different people that he was working with felt that
14  they -- patrol officers, his fellow -- his peers, if
15  you will.
16   Q.  Would they come to you or would they go
17  through Davin and Bulman?
18   A.  They actually came to me reluctantly but
19  they were concerned about his lack of attention when
20  he was in the car.
21   Q.  Did those officers ever go to Davin or
22  Bulman and complain to them and then Davin and
23  Bulman pass the information on to you?
24   A.  They may have. I don't recall.

Page 145

1    Q.  Any reason why they wouldn't have gone to
2  Davin and Bulman and gone directly to you?
3    A.  They may have, I just don't recall.
4    Q.  You don't remember Davin and Bulman
5  talking to you about Cloran?
6    A.  I honestly don't. I forget -- you know,
7  some officers have felt more comfortable talking to
8  me, I guess, than others. But I do recall -- it
9  became an issue because people would indicate they
10  would rather not ride with him. And as I pursued
11  that I found, you know, after pushing that issue, I
12  found out that they were concerned about him being
13  on the phone all the time.
14   Q.  How did you pursue -- and, I'm sorry, what
15  were the words you used, you pursued it, and you
16  what investigated it?
17   A.  I actually went out some nights looking
18  for them. I believe he was a night officer.
19   Q.  And what did you find when you went out
20  looking for him?
21   A.  I remember once they were passing me going
22  the opposite direction, he was on his cell phone. I
23  observed them another time, they were making a car
24  stop and he was sitting in the back seat on the cell

Page 146

1  phone while his partners were approaching the -- at
2  the vehicle and that's actually the incident that
3  prompted me to transfer immediately.
4      Q.  Did you have any knowledge as to who he
5  was talking to on his cell phone?
6      A.  At that particular time?
7      Q.  At any time?
8      A.  I don't know.
9      Q.  Did he protest and say that he was doing
10 some investigative work on the cell phone?
11     A.  It wouldn't have mattered.  If his
12 partners were out at a vehicle he should have been
13 out there with them.
14     Q.  Did he complain about his partners?
15     A.  He accepted the transfer like a man and
16 never said a thing.
17     Q.  Now, what about Foundas; you said you had
18 some concerns with him?
19     A.  He was a very nice -- I say, kid, but I'm
20 dating myself -- very nice gentleman, good officer,
21 but he was small in stature.  He was not terribly
22 aggressive and I felt a little uncomfortable with
23 him, his physical appearance, and the type of work
24 that we do.  And he and I had some discussions and I

Page 147

1  basically said, you know, Do you really belong here?
2  And, you know, I made a decision that, you know, it
3  might be best for him to move on.
4      Q.  As an officer in a district as opposed to
5  the Youth Violence Strike Force where would you tend
6  to be more physical in terms of making an arrest, in
7  the Youth Violence Strike Force or as a patrol
8  officer making arrests or otherwise having physical
9  contact?
10     A.  It could happen in either environmnet.
11     Q.  But isn't it true that in the Youth
12 Violence Strike Force that the role of the officers
13 generally is more investigative than it is actually
14 making arrests?
15     A.  Negative.  We made more arrests than any
16 -- per officer we made more arrests than any
17 district in the city.
18     Q.  Okay, anyone else on the list other than
19 Brown and Horne that you met with and discussed --
20     A.  Again, I don't recall meeting but
21 certainly I would discuss.  I would never transfer
22 anyone without telling him or her other than Steven
23 and -- I don't recall anybody else.
24     Q.  Other than Steven and Ron you were going

Page 148

1  to say?
2      A.  Gary Ryan.  Gary Ryan on page 6.
3      Q.  Yes, page 6 of Exhibit 5, right?
4      A.  Yeah.  He's a white officer who worked, I
5  believe, days.  I had an opportunity to assign an
6  officer from our unit to the U.S. Marshal's service
7  which would -- it had some benefits:  They were
8  going to provide a take home car, they were going to
9  provide a cell phone and some other things.  I --
10 several officers applied, asked me if they could be
11 considered, Gary Ryan being one.
12     Q.  So he wanted to be transferred out?
13     A.  No, they were working in conjunction with
14 the gang unit but they would be paired up with the
15 U.S. Marshal and get a take home car that the
16 Marshal service paid for.
17     Q.  And this was something Gary Ryan wanted to
18 do?
19     A.  I made it known that I was going to add
20 this component to the unit.  Several individuals
21 indicated to me that they would be interested.  Gary
22 being one.
23     Q.  Okay?
24     A.  I selected someone else.  Gary Ryan gave

Page 149

1  me an attitude which I considered to be
2  disrespectful and he was transferred out of the
3  unit.
4      Q.  What kind of an attitude did he give you?
5      A.  We're a paramilitary organization.  I was
6  a lieutenant at the time, he was a police officer,
7  and he just accepts the decisions that the commander
8  makes and that's the end of it.  He demanded or
9  wanted to argue with me about how better qualified
10 he was and I explained that may be your perception,
11 that's not mine, and I'm making the decision, not
12 you.  And if you can't live with it you don't belong
13 here and he was transferred.
14     Q.  Did he want to stay at the Youth Violence
15 Strike Force?
16     A.  No, he informed me immediately that that
17 was fine with him.
18     Q.  So he basically asked to be transferred?
19     A.  No, I told him he was being transferred.
20     Q.  Okay?
21     A.  He didn't argue and then he -- he went out
22 -- to be honest with you he went out and went to a
23 district that he picked.  But he was told I was
24 getting rid of him because of his attitude and his

Page 150

1  disrespect.
2  Q. He asked to go to District 7 and you
3  accommodated?
4  A. Yeah, accommodated.
5  Q. What developed was he asked to go to Area
6  A-1?
7  A. He did.
8  Q. And did you assign him that?
9  A. No, I would have no say on whether he
10 ultimately went -- you know, I could make
11 recommendations but --
12 Q. Well, I'm asking did you make the
13 recommendation to go to Area A-1?
14 A. Correct, I did.
15 Q. What about for William Cloran did you make
16 the recommendation that he go to Area B-2?
17 A. I don't remember making any recommendation
18 for Bill.
19 Q. What about John Foundas, did he ask to go
20 to Area D-14?
21 A. He didn't ask me, no.
22 Q. Did either Brown or Horne to your memory
23 ask to go to a particular area, Ron Brown being Area
24 B-2 and Steven Horne being Area C-6?

Page 151

1  A. Not that I recall, no.
2  Q. Now, you said you had these staff meetings
3  at which time -- strike that.
4      Before I get to that, do you remember
5  any meeting specifically at any time you were at the
6  Youth Violence Strike Force that you had a
7  one-on-one with Steve Horne or Ron Brown about their
8  job performance?
9  A. I recall several conversations. I don't
10 know if you classify them as meetings but...
11 Q. Okay, let's start with the first
12 conversation. What's the first conversation you can
13 recall you had with either one of them?
14 A. (Pause)
15 Q. And I'm talking about performance related
16 conversation.
17 A. I'm not sure of which came first, the
18 chicken or the egg, which one happened first. I can
19 remember a series of conversations I had over a
20 period of time. I don't remember which --
21 Q. Either one of --
22 A. With either one of them, correct.
23 Q. Can you tell me what the period of time
24 was?

Page 152

1  A. Again, I can't. I can tell you the
2  different concerns I had but I can't tell you the
3  time frame.
4  Q. Okay, can you tell me any specifics of any
5  of the meetings? In other words, where you met, who
6  you met with, and what was said in any of the
7  meetings?
8  A. Well, they would have been at the Youth
9  Violence Strike Force.
10 Q. Okay, so the meetings that you had with
11 them were at the Youth Violence Strike Force?
12 A. Correct.
13 Q. Were they in your office?
14 A. I don't recall if they were -- if we were
15 in the outer office and no one was around or whether
16 -- if it was in the inner -- I don't honestly
17 recall.
18 Q. Do you remember how many meetings you had
19 with either one of them; let's take them one at a
20 time. What about Ron Brown, do you have any
21 specific meetings that you had with Ron Brown with
22 the Youth Violence Strike Force regarding any
23 performance issues or concerns you had with him?
24 A. I can remember conversations, again,

Page 153

1  apples and oranges, but I can remember conversations
2  I had with him, yes. One of the concerns that I had
3  in the conversations were the number of off-duty
4  arrests that they were making.
5  Q. And you said this to Ron Brown?
6  A. Correct.
7  Q. And you don't remember when that meeting
8  took place?
9  A. I do not.
10 Q. Do you remember who else was at the
11 meeting other than you and Mr. Brown?
12 A. I would never talk to someone with someone
13 else there.
14 Q. What about a supervisor like Bulman or
15 Davin?
16 A. Super -- any textbook on supervision says
17 you compliment in front of someone, you criticize in
18 private, so there would have been no one else there.
19 Q. Doesn't Davin or Bulman have supervisory
20 authority over them?
21     MS. TIERNEY: Objection. You can
22 answer.
23 A. Obviously, yes.
24 Q. So wouldn't it be important in textbook

Page 190

1    A.  I know there was a report sent through by
2  a District 2 sergeant. I don't know if it actually
3  ever went into a formal complaint.
4    Q.  Who initiated the Internal Affairs
5  complaint?
6    A.  I just said I don't know it if it resulted
7  in a complaint. I know there were several incidents
8  that I was not directly involved in so I don't have
9  the specifics.
10    Q.  Several incidents regarding Ron Brown and
11  Marissa Henderson?
12    A.  Correct.
13    Q.  And it somehow got to Internal Affairs?
14    A.  I believe. I don't know for certain.
15    Q.  What are you basing that on then?
16    A.  A report was -- a sergeant from District 2
17  responded to -- she come into District 2 and spoke
18  to a Sergeant Freeman and that's how I heard about
19  it. So I was aware of the ongoing relationship
20  problem which, as I say, became disruptive. I don't
21  get involved in those. It would go to Internal
22  Affairs which I'm not privy to.
23    Q.  So Sergeant Freeman talked to you about
24  it?

Page 191

1    A.  He mentioned it to me. I didn't ask. I
2  wasn't interested in the details.
3    Q.  Why not if Marissa Henderson and Ron Brown
4  were working both under your command wouldn't you
5  want to know the details of what's going on between
6  them if they're dating or whatever?
7    A.  No, I would want to know if it was an
8  issue. I would not want to know the details, it's
9  not my business. It went up to Internal Affairs.
10  It was up to them to decide what happened. It
11  became disruptive between the two, you know, that
12  became my concern and that was my involvement.
13    Q.  And disruptive within the unit is what you
14  described earlier, correct?
15    A.  Correct.
16    Q.  And at times is it fair to say when the
17  relationship wasn't going good and did she come in
18  and just more confide in you like a friend, like a
19  man or woman would about a relationship they're
20  having about how it's not going well?
21    A.  No, I'm not her friend, I'm her boss. She
22  came in to complain about it.
23    Q.  All right, but it wasn't a sexual -- it
24  wasn't a sexual harassment complaint, right?

Page 192

1    A.  I never received a sexual harassment
2  complaint.
3    Q.  And you never considered it that, right?
4    A.  Correct.
5    Q.  All right, I'd like to go back to Exhibit
6  1, please, page 5.
7    A.  Uh-huh.
8    Q.  And, again, the last sentence on the first
9  paragraph?
10    A.  Uh-huh.
11    Q.  Starts with, Finally -- I'm going to read
12  it again -- Finally, Lieutenant Foley had concerns
13  about Officer Brown's judgment because he had
14  temporary restraining orders issued against
15  him and had informal complaints raised against him
16  for dating and harassing a Youth Violence Strike
17  Force clerk; did I read that correctly?
18    A.  Uh-huh.
19    Q.  Is that a, "yes"?
20    A.  Yes, I'm sorry.
21    Q.  Okay, I see the word "harassing" is in
22  there; why is that in there?
23    A.  Yes, I don't see "sexual" though.
24    Q.  What kind of harassing was he doing?

Page 193

1    A.  Again, as I said I don't remember the
2  specifics. I do remember it was very disruptive on
3  a day-to-day basis for me as a commander.
4    Q.  Okay, so you didn't mean --
5    A.  Again, I don't remember the specifics
6  today.
7    Q.  So when you said harassing you didn't mean
8  sexual harassing here again; is that right?
9         MS. TIERNEY:  Objection, asked and
10  answered.
11    A.  I think I said that, sir.
12    Q.  But I understand you said it's disruptive,
13  I understand your testimony earlier. I'm just
14  trying to focus on what you meant by harassing a
15  Youth Violence Strike Force clerk meaning Marissa
16  Henderson; so what did you mean by that?
17         MS. TIERNEY:  Objection, asked and
18  answered.
19         MR. ROACH:  No, it hasn't been
20  answered.
21    A.  Yes, it has. It's been explained in great
22  length. She sits right outside my office and she
23  would come in on numerous occasions when there was a
24  problem between the two of them.

Kevin D. Foley                                                                                  08/26/2005

Page 194

1  Q. Yes?
2  A. She would come in late saying that
3  something had happened, she would leave early
4  because she was emotionally upset, she would be on
5  the phone allegedly talking to Ronald. I don't know
6  if she was or not. But it became disruptive and she
7  was -- at times would claim that he was -- when
8  things were not going well she would use the word
9  "harassing" her.
10 Q. Okay, so she said he was harassing her but
11 not sexually harassing her, correct?
12 A. Correct, never heard the word "sexual"
13 harassment.
14 Q. Now, it says here in this sentence: Had
15 informal complaints issued against him for dating
16 and harassing a Youth Violence Strike Force clerk;
17 do you see that?
18 A. I do.
19 Q. What is an informal complaint; what do you
20 mean by that?
21 A. It would mean her coming into my office
22 complaining about Ronald's actions.
23 Q. And the informal complaint raised against
24 him was for dating her as well as harassing her

Page 195

1  because you've got the word "dating" in here, too?
2  A. I'm sorry, which line are you on now?
3  Q. Well, we're on Exhibit 1.
4       MS. TIERNEY: What line are we on,
5  Steve, is the question.
6  Q. I'll bring you right to where we are.
7       MS. TIERNEY: What line are you on
8  was the question?
9       MR. ROACH: It's one, two, three,
10 four, five -- it's the sixth line down on page 5 on
11 Exhibit 1 in the first paragraph.
12 Q. Are we there?
13 A. I'm here.
14 Q. Do you see the word "dating"?
15 A. I sure do.
16 Q. What did you mean by "complaints against
17 Ron Brown were made for dating Marissa Henderson"?
18      MS. TIERNEY: Objection.
19 Q. You can answer.
20 A. As a result of her dating Ron Brown is
21 what was disrupting. In other words, they were
22 dating and while they were dating they were having
23 problems which became very disruptive.
24 Q. Well, but that's not really what it says

Page 196

1  here, is it?
2       MS. TIERNEY: Objection.
3  A. You asked me what it meant and I'm telling
4  you what I meant.
5  Q. Well, let me read this to you again. It
6  said, and I'm going to start in that same line, I'm
7  going to start after "and." And you're talking
8  about Ronald Brown here, right?
9  A. Uh-huh.
10 Q. And Ronald Brown had informal complaints
11 raised against him for dating and harassing a Youth
12 Violence Strike Force clerk; did I read that
13 correctly?
14 A. You did.
15 Q. So did you mean to say that when -- you
16 said informal complaints were raised against him for
17 dating the clerk, it doesn't mean that anybody
18 complained about the fact he was dating her, it was
19 other issues?
20 A. Resulting from them dating, correct.
21 Q. So you had no problem with them dating, it
22 was more the issues that she was complaining?
23      MS. TIERNEY: Objection.
24 A. It's not my business.

Page 197

1  Q. I'm just trying to understand what you
2  meant.
3  A. I think you do.
4  Q. Well, they're not my words, they're yours,
5  sir. Do you have any knowledge that Ron Brown and
6  Marissa Henderson actually didn't date until after
7  he left the Youth Violence Strike Force?
8  A. After they left?
9  Q. After he left, yes?
10 A. I would be surprised, yeah, as far as I
11 was under -- I was under the impression and
12 understood from her that they were dating while he
13 was there.
14 Q. Okay, I'd like to talk about the off-duty
15 arrest issue that you raised with Ron Brown, and I
16 apologize if I asked you this before. How many
17 off-duty arrests had he made?
18      MS. TIERNEY: Objection.
19 A. Did you ask me before?
20 Q. And you couldn't remember I think you
21 said.
22 A. I said several. I don't remember.
23 Q. Can you remember any specifics?
24 A. Specific numbers?

50 (Pages 194 to 197)

Kevin D. Foley, Vol. 2                                                                 11/29/2005

Page 275

1   A   It appears to be.
2   Q   All right. Can you think of -- strike
3   that.
4       Do you remember what you said to him
5   about this arrest?
6   A   Again, my --
7   Q   Let me ask you a different question.
8       Looking at 69, does that refresh
9   your memory in terms of the Chelsea arrest that
10  you spoke to Mr. Horne about?
11  A   Somewhat.
12  Q   Okay. Can you tell me what you remember
13  then?
14  A   I remember that a Chelsea police
15  officer, I don't recall at this point who it was,
16  had mentioned to me that Steven was with his
17  girlfriend or a girl, and I thought that it was
18  inappropriate to get involved in an incident like
19  this with a civilian, especially a female.
20  Q   And what did you say to Mr. Horne about
21  that, if anything, when you met with him?
22  A   Just what I said to you, that...
23  Q   Did you have any knowledge as to whether
24  the female was with him at the time of the arrest

Page 276

1   or whether he sent her away before he proceeded to
2   make the arrest?
3   A   Again, I don't honestly recall. I don't
4   honestly recall. I do recall speaking with the
5   Chelsea Police who mentioned to me he had a female
6   with him, and, again, I found it inappropriate to
7   get involved in an incident when you have a
8   civilian --
9   Q   Who was the Chelsea police officer you
10  spoke to?
11  A   At this point I have absolutely no idea.
12  Q   What did the Chelsea police officer say
13  to you, other than what you just told us, if you
14  can remember?
15  A   I don't remember the specifics of the
16  conversation, and that was one of the things that
17  he said that, you know, concerned me.
18  Q   Anything else he said that concerned
19  you?
20  A   Not that I recall.
21  Q   Do you remember what Mr. Horne said to
22  you with respect to the arrest?
23  A   I don't remember the specifics, no.
24  Q   Can you tell me in general?

Page 277

1   A   I honestly don't remember.
2   Q   Any other offduty arrests by either
3   Steven Horne or Ronald Brown that you can recall
4   that you spoke to them about that you haven't told
5   us about today?
6   A   I don't recall the specifics, the
7   specific number of arrests. My recollection is
8   that there were an unusual number of offduty
9   arrests, which I felt uncomfortable with.
10  Q   Other than the ones you've told us about
11  today, can you recall any others?
12  A   Again, other than my recollection that
13  there were several offduty arrests, which I
14  considered unusual, I don't remember the specifics
15  at this point in time.
16  Q   Okay. Before you used the word
17  "several," you keep using the word "several" in
18  this deposition, and we talked about the Webster's
19  New Twentieth Century Dictionary that -- you
20  remember quoting from that last deposition?
21  A   I certainly do.
22      MR. ROACH: All right. I'd like to
23  just mark the two pages from the Webster's New
24  Twentieth Century Dictionary that contains the

Page 278

1   word "several."
2       THE WITNESS: I thought we already
3   did all of this.
4       MR. ROACH: I didn't mark it.
5       MS. HARRIS: He's just marking the
6   exhibit.
7       MR. ROACH: I'd like to mark it as
8   Exhibit 70, please.
9       (Document marked as Exhibit No. 70.)
10  Q   And directing your attention again to
11  the definition of several --
12      MR. ROACH: And let the record
13  reflect that Steven Horne has joined us.
14  Q   When it talks about numbers, I think I
15  quoted from this before, one of the definitions
16  is, Consisting of a number more than two but not
17  many, of an indefinite but small number. Few, as
18  several persons were present when the event took
19  place. Did I read that correctly, sir?
20  (Indicating.)
21      (Witness perusing document.)
22  Q   Did I read it correctly?
23  A   You did.
24  Q   Thank you.

Page 279

1  And is that your understanding of
2  what the word "several" means when you use the
3  word "several" in this deposition?
4      A    I would disagree, at least with my
5  interpretation of several.
6      Q    What's your interpretation of several?
7      A    More than -- I believe what I had just
8  read said more than one but just a few.
9      Q    So that's your definition of it?
10     A    No, that's I believe what I just read,
11 and I would say several means more than two but
12 not necessarily a few.
13     Q    How many does it mean then when you say
14 several?
15     A    We had this discussion before. Several
16 means more than two, and I'll just leave it at
17 that.
18     Q    So it could mean three?
19     A    It could mean ten.
20     Q    So your testimony is when you say
21 several you don't remember how many times you
22 actually spoke to Mr. Horne and Mr. Brown, right?
23     A    At this point in time, no.
24     Q    And I'd like to show you, again,

Page 280

1  Exhibit 1 from the deposition of Mr. --
2  Sergeant Bulman. Directing your attention to
3  page 4 --
4      A    Um-hm.
5      Q    -- and the second to the last sentence
6  reads, "Despite numerous" --
7      A    What paragraph are you in?
8      Q    Second to the last sentence of page 4.
9      A    Okay.
10     Q    Last paragraph of page 4, second to the
11 last sentence.
12     A    Um-hm, okay.
13     Q    Let's start with the first paragraph,
14 and I'll just paraphrase to save time. During
15 this process, it says, the complainants, which are
16 Horne and Brown, were selected to be transferred
17 out of the Youth Violence Strike Force, correct?
18         MS. HARRIS:   That's what it says,
19 Steve.
20         MR. ROACH:    I'm asking him.
21     A    Correct.
22     Q    And then you were aware of this and you
23 were the commander at the time, right?
24     A    Aware of what, the first sentence?

Page 281

1      Q    You were aware that they were going to
2  be -- they were selected to be transferred out of
3  the Youth Violence Strike Force?
4      A    I was the one who made that decision,
5  yes.
6      Q    And then it says here in the third
7  sentence that you were aware of the ongoing
8  concerns that they refused to share information
9  with other officers and their supervisors,
10 correct?
11     A    Correct.
12     Q    And it says you were aware that these
13 issues had been brought to Horne and Brown's
14 attention during your tenure as the commander and
15 with the previous commander, right?
16     A    I can only speak for myself, correct.
17     Q    But it says here, "He was aware that
18 these issues had been brought to complainants'
19 attention during his tenure as commander and with
20 the previous commander, right?
21     A    Correct.
22     Q    And then it says, "Despite numerous
23 warnings that they were not open enough, neither
24 officer had altered their behavior." Do you see

Page 282

1  that?
2      A    Correct.
3      Q    What warnings were given to them?
4      A    I think it's mentioned that several
5  times either I or other super -- John Davin spoke
6  to them.
7      Q    So you gave them warnings?
8      A    Correct.
9      Q    And what's the procedure for giving
10 warnings in the Boston Police Department?
11     A    There is no procedure per se.
12     Q    Did you put anything in their file,
13 either the district file or their personnel file?
14     A    I did not.
15     Q    Why not?
16     A    Because I chose not to.
17     Q    Why did you decide not to?
18     A    If I put something in their file, it
19 would be with them for their career. I felt the
20 best way to deal with it was man to man, so to
21 speak.
22     Q    And is there -- under the police
23 department rules and procedures, you have that
24 discretion?

Kevin D. Foley, Vol. 2 — 11/29/2005

## Page 283

1   A   I do.
2   Q   Okay. And was it an oral warning?
3   A   I just said I spoke to them.
4   Q   But you considered it an oral warning,
5   right?
6   A   No. Are you talking discipline or are
7   you talking just a conversation? It was not a
8   discipline at that point, no.
9   Q   Did it ever become a discipline?
10  A   No, I wanted to avoid that, so we had
11  conversations and then I made the decision to
12  transfer them.
13  Q   Okay. So when you say "warnings," that
14  was not something that was an official warning
15  under the rules and procedures of the Boston
16  Police Department?
17  A   You're talking about which rule?
18  Q   I'm talking about any rule.
19  A   Are you talking about the discipline
20  rule?
21  Q   I'm asking you if there's any rule that
22  covers the warning that's referenced here in
23  Exhibit 1 that you said -- the numerous warnings
24  you said that were given to Horne and Brown.

## Page 284

1   A   Other than in the discipline rule, I'm
2   not aware of it, no.
3   Q   And is the discipline rule, Rule 109?
4   A   Correct.
5   Q   Was this warning or any of these
6   warnings given to Horne and Brown under the
7   disciplinary rule, Rule 109?
8   A   No, I wanted to avoid that.
9   Q   What about the warnings that had been
10  given to them by others?
11  A   Well, you'd have to ask them, but I'm
12  not aware of any discipline warning that was given
13  these gentlemen.
14  Q   Okay. Do you know what warnings were
15  given to the other -- strike that.
16      Do you know what warnings were given
17  by other supervisors to Brown and Horne; do you
18  know what they were specifically?
19  A   You'd have to ask them for specifics.
20  I'm not aware of specifics, no.
21      MR. ROACH: I would just like to
22  mark as the next exhibit a document that was
23  provided by your lawyer called the "Defendant City
24  of Boston's Designation of Officers in Response to

## Page 285

1   Plaintiffs' Notice of Taking Deposition," and
2   we'll stipulate that that's what it is?
3       MS. HARRIS: Yeah.
4       MR. ROACH: I'd like to mark that as
5   the next exhibit, please. That would be 71.
6       (Document marked as Exhibit No. 71.)
7   Q   Now, in looking at Exhibit 71, you
8   understand that you've been designated as the
9   spokesperson for the city of Boston?
10  A   I do.
11      MS. HARRIS: Just for clarification,
12  not on all of these topics.
13      MR. ROACH: Yeah, I understand that.
14  I'm just going to go through them now.
15  Q   You understand you've been designated as
16  the spokesperson speaking on behalf of the city of
17  Boston in whole or in part for numbers 1, 3, 4, 6,
18  7, 8, 11, 12, 13, 14, 15, 16, 19, 21, 22, 23, 26,
19  27, 28, and 29, correct?
20  A   Correct.
21  Q   Okay. And with respect to No. 6, you
22  were designated as a spokesperson for the reasons
23  Mr. Brown and Mr. Horne were transferred out of
24  the Youth Violence Strike Force; do you understand

## Page 286

1   that?
2   A   Correct.
3   Q   And it's your testimony you don't know
4   what the other people said to them in terms of
5   warnings, other supervisors said to them in terms
6   of warnings?
7   A   I believe you asked specific, and I am
8   not aware of the specific --
9   Q   Can you tell me in general what any of
10  them said to either of them?
11  A   In very general terms basically it's the
12  issues that we've been talking about through this
13  deposition, and that's a number of things:
14  Offduty arrests, their unwillingness to be
15  cooperative in sharing information, and other
16  officers unwilling to work with them.
17  Q   I believe you mentioned also some 209A
18  Orders and Marisa Henderson?
19  A   209A, Domestic Violence Complaints,
20  against Ron Brown, correct.
21  Q   And complaints by Marisa Henderson in
22  that regard?
23  A   There were several complaints from my
24  secretary, or clerk as she's referred to, against