Page 307

1  that the plaintiffs, Horne and Brown, refused to
2  share information with other officers, were not
3  open enough, and placed others at unnecessary
4  risk?
5       MS. HARRIS: Object to being asked
6  and answered. You can answer again.
7   A   Again, I don't recall the specifics, but
8  they were supervisors and other officers within
9  the unit. I don't recall specifically who they
10 were.
11  Q   I believe you talked about
12 Officer Callender earlier, correct?
13  A   Correct. He's one who came to me and
14 said he didn't want to work with these officers
15 any longer.
16  Q   Okay. And you don't remember what
17 specifically the reasons were?
18  A   Not at this point, no.
19  Q   Do you remember speaking to Davin or
20 Bulman about these issues?
21  A   It would have been Sergeant Davin.
22  Q   And what do you remember he said to you
23 in that regard?
24  A   I don't recall five years later.

Page 308

1   Q   Okay. Anyone else that you haven't told
2  us about you can recall talking to about these
3  issues with respect to Horne and Brown?
4   A   Me talking to them or them talking to me
5  or both?
6   Q   Either.
7   A   Again, there were several, both Sergeant
8  Davin and several other officers within the unit,
9  but I don't recall at this stage who they were.
10  Q   Do you remember anything that they said
11 specifically?
12  A   Just what I stated earlier, that they
13 felt uncomfortable, they were un --
14  Q   When you say they, I'd like to -- let's
15 break it down by who said what. I think you
16 talked about Callender before. Can you remember
17 anything Sergeant Bulman said specifically?
18  A   I do not, no, not at this point.
19  Q   Do you remember anything Sergeant Davin
20 said in that regard?
21  A   That they were uncooperative. He was
22 getting basically the same information from his
23 subordinates, that people were unwilling to work
24 with them, that they were not sharing information.

Page 309

1   Q   Were these the white officers or the
2  black officers that were saying this?
3   A   Both. Officer Callender is black, by
4  the way.
5   Q   I understand that.
6       When did you have this conversation
7  with Sergeant Davin?
8   A   I have absolutely no idea. It's five
9  years later.
10  Q   Do you remember how many conversations
11 you had with him?
12  A   Several.
13  Q   How many do you mean by several, sir?
14      MS. HARRIS: Objection. Steve --
15      MR. ROACH: It's his word. I'm just
16 trying to find out what he means.
17      MS. HARRIS: Okay. But if it's
18 going to become harassing, at some point I will
19 seek a protective order.
20      MR. ROACH: Well, I'm going to seek
21 an order to compel if it becomes evasive. I
22 mean --
23  A   I don't honestly remember the number of
24 times.

Page 310

1       MR. ROACH: He's throwing out
2  several. I'd like to know what he means by that.
3   A   On more than one occasion. My decision
4  was not made in a day or a week. It was over a
5  period of time where I constantly got the same --
6  either I observed the -- made the same
7  observations and was getting the same feedback
8  from others that I made the decision, and only I
9  made that decision. As to the specifics, five
10 years later I just don't honestly recall.
11  Q   You don't remember any specifics of any
12 observations you made personally; is that correct?
13  A   Other than in general terms as I've
14 described, no.
15  Q   Do you remember anything specific
16 Sergeant Davin said to you about them, other than
17 these general comments?
18  A   Again, no.
19  Q   Do you remember talking to any other
20 supervisor other than Sergeant Bulman or
21 Sergeant Davin about Horne and Brown?
22  A   I think I've said several times that I
23 never had a conversation about Steve Horne or Ron
24 Brown with Sergeant Bulman. Sergeant Bulman was

Page 311

1  not their supervisor at the time. All my
2  conversations were directed over this period of
3  time with Sergeant Davin.
4     Q   Okay. Any other supervisors that you
5  spoke to about Horne and Brown, other than Davin?
6     A   Again, the only ones I -- Sergeant --
7  I'm sorry -- Steve Horne and Ron Brown worked for
8  Sergeant Davin, he was the principal supervisor,
9  and my recollection is the only one I spoke to
10 about these two officers.
11    Q   Okay. Were Horne and Brown considered
12 troublemakers in the Youth Violence Strike Force?
13    A   I never felt that way.
14    Q   Did anybody else feel that way?
15    A   Not that I'm aware of.
16    Q   Can you tell me about the -- I'd like to
17 turn you to designation paragraph 26 of Exhibit --
18    A   20 what, 26?
19    Q   26, yeah, of Exhibit 71.
20        And you can just read it to
21 yourself, if you would.
22        (Witness perusing document.)
23    Q   And I believe it's fair to say on
24 pages 4 and 5 of Exhibit 1 to which this refers

Page 312

1  we're talking about the reasons that Mr. Brown and
2  Mr. Horne were transferred, correct?
3        MS. HARRIS: Can I just see that?
4        MR. ROACH: Sure. Pages 4 and 5 of
5  Exhibit 1.
6        MS. HARRIS: And, I'm sorry, I just
7  didn't follow your question. I'm sorry.
8     Q   Pages 4 and 5 of Exhibit 1 summarize the
9  reasons Brown and Horne were transferred, correct?
10    A   Correct.
11    Q   Okay. And designation 26 of Exhibit 71
12 asked the city, through you, to testify as to any
13 rules, policies, or procedures concerning
14 disciplinary, transfer, or retraining in place in
15 2001 relative to any of the concerns that were --
16 that you had about Horne and Brown.
17        And my question is: Can you tell me
18 whether there were any kind of rules, policies, or
19 procedures concerning any of these issues in terms
20 of disciplining them, transferring them, or
21 retraining them?
22        MS. HARRIS: I'll object but you can
23 answer.
24    A   Discipline is covered in Rule 109,

Page 313

1  transferring is purely a management prerogative --
2     Q   Okay.
3     A   -- and to my knowledge there are no
4  policies or procedures or rules on retraining.
5     Q   Okay. And you chose, again, I believe
6  you testified under Rule 109, not to undertake any
7  discipline with respect --
8     A   Correct, because it would become a
9  permanent part of their file.
10    Q   Okay. Now, you said transfer was a
11 management prerogative; is that correct?
12    A   Correct.
13    Q   Was there any rules or regulations with
14 regard to that management prerogative that you
15 know of?
16    A   Rules and regulations, no. We rely on
17 the Commissioner's statute for assignment and
18 staffing.
19    Q   Okay. That's under the Massachusetts
20 General Laws?
21    A   Correct.
22    Q   I'd like to ask you about the PAM
23 evaluation. I believe that --
24    A   PAM?

Page 314

1     Q   Yes.
2        MS. HARRIS: Not to interrupt your
3  question, but I've designated Dowd for that, not
4  Deputy Foley, with regard to 24, 25.
5        MR. ROACH: Okay. I was going to
6  ask him about 11 on 71.
7        MS. HARRIS: The Collective
8  Bargaining Agreement?
9        MR. ROACH: Yeah, Collective
10 Bargaining Agreement and its relationship with
11 PAM.
12    Q   So if you look at paragraph 11 -- you're
13 designated as the spokesperson for paragraph 11,
14 correct?
15    A   Correct.
16    Q   And I'd like to ask you about the PAM
17 evaluation that took place in 2001. Can you tell
18 me how it came into being?
19        MS. HARRIS: I'll object. That's
20 not the topic that's designated.
21        Can we go off the record for one
22 second?
23        (Off record.)
24    Q   Just from your own knowledge, do you --

Page 315

1  what do you know about, if anything, about the
2  Personnel Analysis Meetings, also known as PAM,
3  that occurred in 2001?
4      A   It was developed, as I understand, as an
5  early warning mechanism to review all personnel in
6  the department, not as a disciplinary tool, but a
7  management tool to assess each officer and perhaps
8  red flag any problems that we foresee in the
9  future with those officers.
10     Q   Okay. And this was going to be done
11 department wide?
12     A   It was done department wide.
13     Q   So every officer in the department had a
14 PAM evaluation of them?
15     A   The procedure or process was that the
16 team, which involved the commissioner, the chief,
17 and the superintendent, chief in charge of
18 Internal Affairs, would visit districts throughout
19 the city and units throughout the city, and they
20 would bring with them an assessment, if you will,
21 of all the personnel so they're assigned, and
22 starting with A, going to Z, they would review
23 every individual assigned to that district or
24 unit. They would discuss any Internal Affairs

Page 316

1  complaints that have ever been filed against that
2  individual, whether sustained or not, any motor
3  vehicle accidents that that officer may or may not
4  have had, his use of sick days, his injured -- how
5  many times was he out injured, and what were the
6  circumstances that he was out injured, and there
7  were some other things that I can't recall at this
8  time, but, as I say, every officer under that
9  particular command would be reviewed, and then
10 there would be a discussion on each officer,
11 usually involving the district or unit commander
12 and the specific supervisor that supervised that
13 individual on a day-to-day basis.
14     Q   And do you know in 2001 whether the --
15 whether the Youth Violence Strike Force officers
16 were evaluated under this process?
17     A   We did --
18         (Cell phone ringing.)
19         MS. HARRIS: Sorry.
20     A   We did have a PAM meeting. I don't
21 recall the exact date. In attendance were the
22 commissioner, at that time Superintendent Hussey,
23 who was commander or chief of Internal Affairs,
24 superintendent -- I'm sorry, Hussey was a chief,

Page 317

1  and I believe Dowd was the commander of Internal
2  Affairs, and then all -- and then in addition to
3  that, all supervisors from the Youth Violence
4  Strike Force were in attendance.
5          They presented a slide show, if you
6  will, of each officer, including supervisors,
7  within the unit, starting with the supervisors,
8  and I would make the comments on the individual
9  subject matter, and then going down to patrol
10 force and, again, each supervisor and myself
11 making observations -- comments on what was
12 presented.
13     Q   Okay. And is the slide show
14 presentation what we have marked here as Exhibit 7
15 in Bulman's deposition --
16         (Document exhibited to witness.)
17     Q   -- if you remember?
18         (Witness perusing document.)
19     A   It appears to be.
20     Q   And also Bulman Exhibit 6, I notice
21 there is some charts, was that also part of the
22 slide -- slide show?
23         (Document exhibited to witness.)
24         (Witness perusing document.)

Page 318

1      A   It appears to be.
2      Q   Anything else other than those two
3  exhibits, 6 and 7, you can recall seeing at the
4  slide show?
5      A   You know, as exhibits, not that I
6  recall, but as I say, each officer from A to Z,
7  and there was a discussion on every officer.
8      Q   No, I'm just asking about the slide show
9  for now.
10     A   That's all I recall, correct.
11     Q   6 and 7 is all you can recall?
12     A   Correct.
13     Q   Now, you said there was a discussion of
14 each officer. Were Brown and Horne discussed?
15     A   Each officer in the unit including Brown
16 and Horne, correct.
17     Q   And who was in on those discussions
18 regarding Brown and Horne?
19     A   Again, all of the individuals that I
20 named previously were in attendance, and that --
21     Q   The superior officers you mean?
22     A   Only -- no, the commissioner, the chief,
23 the chief of Internal Affairs, myself, and all
24 other supervisors only from the Youth Violence

Page 323

1  Q   As I understand the PAM evaluations to
2  be, they were to cover the topics that are listed
3  here in Exhibit 6, is that correct, and there's
4  Roman numeral I through VII covering accidents
5  with department vehicles, sick and injured days,
6  IAD complaints, drug use, restraining orders, use
7  of force, and commendations, correct?
8  A   No.
9  Q   Were there other areas other --
10 A   Those --
11 Q   Let me ask the question.
12     Were there other areas other than
13 that which were supposed to be within the scope of
14 PAM as you understood it?
15 A   There were.
16 Q   And what were those other areas?
17 A   Those topics of -- officers were
18 flagged, if you will, using that criteria, and
19 then in addition to that, we talked about
20 everybody in the unit, again, all the officers
21 from A to Z, you know, their performance,
22 everything.
23 Q   So it was -- so your understanding was
24 it was beyond the topics that were listed in

Page 324

1  Exhibit 6; is that correct?
2  A   Correct.
3  Q   Okay. And do you remember any comments
4  by Bulman or Davin within the -- at this meeting?
5  A   I think I just answered that but I'll be
6  happy to answer it again. I don't recall --
7  specifically with Horne and Brown?
8  Q   Yes.
9  A   I don't recall Bulman being involved in
10 that discussion, but I do recall Sergeant Davin,
11 their supervisor, being involved in that
12 discussion, yes.
13 Q   Okay. I think earlier you said you
14 didn't remember anybody saying anything, but --
15 A   That's not what I said.
16 Q   Oh, okay. Then I just want to
17 understand what --
18 A   I think I clarified it by saying that
19 Bulman was not involved in any discussion about
20 Steve Horne and Ron Brown because they did not
21 work for him --
22 Q   Okay.
23 A   -- Sergeant Davin did, and he had some
24 comments and we discussed the comments.

Page 325

1  Q   All right. And did Davin say anything
2  about the affair with -- or the relationship with
3  Marisa Henderson and Brown in this meeting, do you
4  know?
5  A   I don't honestly recall whether he
6  initiated it or I did, but -- I don't honestly
7  recall.
8  Q   Did Marisa Henderson complain to anybody
9  other than you about problems she was having with
10 Ron Brown?
11 A   If she did, I'm not aware of it.
12 Q   Did Davin talk about the offduty arrests
13 issue at this meeting?
14 A   He did -- at that meeting?
15 Q   Yes.
16 A   I don't honestly recall if it was at
17 that meeting or just in other meetings that we
18 would have with supervisors. I would meet with my
19 supervisors once a month.
20 Q   Do you remember Commissioner Evans
21 saying anything in this meeting about Brown and
22 Horne?
23 A   No.
24 Q   Did the issue of racial tension or any

Page 326

1  racial issues and Horne and Brown's involvement in
2  that come up in this meeting?
3  A   Not that I recall, no.
4  Q   Okay. Was there any other meetings with
5  this group under the auspices of the PAM process?
6  A   I don't believe so, no.
7  Q   I don't believe I've asked this to you
8  before, but did you ever speak to Commissioner
9  Evans about transferring Brown or Horne?
10 A   No, it would be inappropriate for me to
11 do that.
12 Q   Who above you did you speak to about
13 transferring Brown and Horne?
14 A   The only conversation I had with any
15 command staff member was Superintendent Joyce.
16 Q   And what did you say to him and what did
17 he say to you, if you remember?
18 A   I don't honestly recall. We talked
19 about transfers in general. There were several
20 people on that order, not just these two
21 gentlemen. And, again, my best recollection is
22 that I had a list of names that I submitted to
23 Superintendent Joyce with a recommendation to be
24 transferred, and we went over each name as to why

Page 363

1 Ronald Brown to the Brantley case to bolster the
2 ongoing efforts to capture him. Do you see that?
3     A    I do.
4     Q    And that would have been one of their
5 supervisors, correct, that would have done that?
6     A    Correct.
7     Q    And the day supervisor at the time
8 generally speaking was Bulman, correct?
9     A    No.
10    Q    Who was the day supervisor at the time
11 in February of 2000?
12    A    I don't remember the specific dates, but
13 when I went back to the Gang Unit as the
14 commander, if not already, shortly thereafter
15 Sergeant Bulman was rated sergeant detective, so
16 this would not be part of his responsibility.
17    Q    Okay.
18    A    I don't know when -- I don't recall the
19 dates he was actually rated as sergeant detective.
20    Q    I believe that Lieutenant Davin came to
21 the Youth Violence Strike Force in May -- I'm
22 sorry, strike that.
23         Sergeant Davin came to the Youth
24 Violence Strike Force in May of 2000 and took over

Page 364

1 the day unit; is that correct?
2     A    Okay. I don't recall the dates, but if
3 that's what the personnel order says, I would
4 believe that.
5     Q    Assuming that is correct, then Bulman
6 still would have been the supervisor?
7     A    Correct.
8     Q    Bulman still would have been the
9 supervisor in February of 2000, correct?
10    A    That's correct.
11    Q    All right. So it's likely that he -- he
12 or another supervisor would have said that he was
13 the one that assigned these officers to the
14 Brantley case, correct?
15    A    Correct.
16    Q    In other words, it could have been
17 another supervisor --
18    A    Right.
19    Q    -- if he wasn't there that day, right?
20    A    Correct.
21    Q    And this recommendation for commendation
22 goes on about commending these officers for their
23 action in his arrest; is that correct?
24    A    Correct.

Page 365

1     Q    And the last paragraph talks about their
2 dedication and commitment in gathering and
3 developing intelligence, correct?
4     A    Correct.
5     Q    Now, do you know who Brantley was, Bobby
6 Brantley?
7     A    I don't recall.
8     Q    Well, it says in the first paragraph
9 that he was one of the most wanted fugitives since
10 1997; is that correct?
11    A    Again, I don't recall, but if that's
12 what's stated, apparently that was the case.
13    Q    Did you look at this document,
14 Exhibit 78, before you decided to recommend that
15 Horne and Brown be transferred?
16    A    I don't recall looking at this
17 particular document, no.
18    Q    Did you review all of their
19 recommendations for commendations or other
20 citations or commendations that they received --
21    A    No.
22    Q    -- before you transferred them?
23    A    No, I reviewed -- a lot of different
24 issues were discussed, but I did not review each

Page 366

1 and every commendation, no.
2     Q    Okay. If you had reviewed the two we
3 just spoke about, Exhibits 78 and 22, would it
4 have made any difference in your decision?
5     A    No.
6     Q    Why not?
7     A    There was never any question that they
8 were good officers. The question was, were they a
9 good fit for a specialized unit.
10    Q    Okay. I show you another document dated
11 October 27, '99.
12         (Document exhibited to witness.)
13    Q    It's a recommendation for commendation
14 for Steven Horne. Do you see that?
15    A    I do.
16    Q    Okay. And does that appear to be a
17 recommendation for commendation for Steven Horne
18 that is part of his personnel file?
19    A    It appears to be, yes.
20         MR. ROACH: I'd like to mark that as
21 Exhibit 79, please. I think that's the next
22 number.
23         (Document marked as Exhibit No. 79.)
24    Q    And in Exhibit 79 it states that -- on

Page 371

1  warrants.
2    Q  I understand they all are, but I believe
3  you said there was a hierarchy, that some were
4  higher priority than others.
5    A  The warrants that we assigned, at
6  least -- I can't speak for the supervisors, but my
7  policy was that the warrants that were assigned to
8  all the officers on days were priority warrants.
9  Now, if you're asking within that group of
10 priority warrants was this a priority, you'd have
11 to ask Sergeant Bulman. I don't know.
12   Q  Would there be any reason that he would
13 say that he immediately prioritized it if it
14 wasn't an individual that had higher priority at
15 that time than others?
16   A  Again, you'd have to ask Sergeant
17 Bulman.
18   Q  But it's fair to say that he assigned to
19 Horne and Brown a prioritized case, right?
20   A  A priority warrant, correct.
21   Q  And through their work, they succeeded
22 in finding and arrested this individual, correct?
23   A  Correct.
24   Q  And someone at the Youth Violence Strike

Page 372

1  Force recommended them for a commendation because
2  of this, right, or at least Steven Horne, correct?
3    A  Correct.
4    Q  Is it fair to say that Brown was also
5  recommended for a commendation since it was about
6  both of them?
7    A  Correct.
8    Q  You said that the fugitives are issued
9  to the day shift. Can you tell me how that
10 process works; how are fugitive lists issued on a
11 day-to-day basis or week-to-week basis?
12        MS. HARRIS:  I'll object to this
13 having been asked and answered. You can go ahead.
14   A  Again, we have the capability of
15 generating a list of all warrants so that we could
16 literally or physically look at the list and see
17 who was wanted for what, and then from that list
18 we could get a priority list, if you will. We
19 also got requests from specialized units, the
20 homicide unit, sexual assault unit, and in some
21 cases districts for a particular individual who
22 was wanted.
23   Q  And who puts the list together?
24   A  It would be the supervisors. In this

Page 373

1  case either Sergeant Bulman while he was there,
2  and then Sergeant Davin when he was transferred
3  in.
4    Q  Okay. And did these lists result in
5  someone posting their pictures on a board in the
6  Youth Violence Strike Force?
7    A  Not all, but in some cases.
8    Q  And how did it get determined -- strike
9  that.
10        Who was responsible for posting the
11 wanted posters on the board of the Youth Violence
12 Strike Force?
13   A  Again, from my recollection back when I
14 was a commander, it was the individual
15 supervisors, and then eventually -- and I don't
16 recall if Steven and Ron were still there -- but
17 eventually I changed it so only those wanted on
18 murder are on the bulletin board.
19   Q  The supervisors would have been Bulman
20 and Davin and the other sergeants?
21   A  Originally Bulman and then passed on to
22 Davin, correct.
23   Q  Okay.
24   A  And I forget at what point I changed the

Page 374

1  policy to only putting wanted murderers up there.
2    Q  That was after Horne and Brown left?
3    A  No, I just said I'm not sure when it
4  happened, whether it was before or after.
5    Q  Why did you change it just to have
6  murder suspects?
7    A  Because we had so many.
8    Q  Where did the photographs come from that
9  were put on the bulletin board by the supervisors?
10   A  It was actually a wanted poster. Some
11 of them were generated by headquarters, some of
12 them were generated by the individual district or
13 unit that was looking for that individual, such as
14 the homicide unit. There's a template, if you
15 will, that you could bring up, the whole thing is
16 put together, you just plug in the name and the
17 basic information, and then you transfer the
18 booking photo to the -- and then you print --
19   Q  It's from the booking sheet?
20   A  Usually.
21   Q  And so Davin and Bulman were able to, on
22 the computer there at the Youth Violence Strike
23 Force, generate these wanted posters before they
24 put them on the board; is that a fair statement?

Page 391

1  Q  Did Horne and Brown not participate in
2  the bi-weekly meetings?
3  A  They would not. They were day people,
4  so the meetings were at night.
5  Q  Okay. What about the roll call?
6  A  Normally --
7  Q  My question -- let me strike that.
8     My question is did Horne and Brown
9  participate in the roll call discussions?
10 A  As a matter of practice, I did not
11 attend the day roll call.
12 Q  Okay. Did you ever hear that Ron Brown
13 or Steve Horne did not participate in the roll
14 call discussions?
15 A  Not specifically the roll call
16 discussions.
17 Q  Anything in general?
18 A  You know, again, I had complaints from
19 other officers in the unit as well as Sergeant
20 Davin from time to time, you know, that they
21 weren't communicating well and sharing
22 information.
23 Q  You said other officers. The one you
24 can remember, though, is Callender, right?

Page 392

1  A  I don't recall if he -- he and I talked
2  about that issue. He and I had a conversation
3  where he basically asked that he not ride with Ron
4  Brown and Steve Horne.
5  Q  Okay. Other than Davin, can you think
6  of any other officers? You mentioned officers
7  that complained about Horne or Brown not being
8  team players, not being communicative.
9  A  I can't recall at this date, no.
10 Q  You said the bi-weekly meetings of the
11 Youth Violence Strike Force were held at night?
12 A  Correct. They were held at 6:00 at
13 headquarters. Steve or -- Steve Horne or Ron
14 Brown may have attended some if they were working
15 overtime or whatever, but as a rule, they were
16 held after the day shift ended.
17 Q  So is it fair to say that none of the
18 day shift officers attended the bi-weekly meetings
19 as a general rule?
20 A  No, I would say that as a rule they did
21 not unless they were working overtime and they may
22 have attended.
23 Q  I think we were agreeing with each
24 other. I just want to be clear.

Page 393

1     So is it fair to say that as a
2  general rule the day tour officers, including the
3  day tour that Horne and Brown were in, did not
4  attend the bi-weekly meetings because they were
5  held at night?
6  A  Probably not, yes. They may have
7  attended some, but as a rule, no, they would not
8  attend.
9  Q  And that was true for all day
10 officers --
11 A  Right.
12 Q  -- as a general rule; is that right?
13 A  Correct.
14 Q  Did you evaluate -- before you decided
15 to transfer Horne and Brown, did you evaluate how
16 much or how well they had participated in the
17 inputting of the Lotus database notes?
18 A  I would have evaluated or discussed with
19 other supervisors, reviewed a lot of different
20 issues. As I mentioned, arrest was not the sole
21 indicator that someone should stay or go. It was
22 a collection of things. As I mentioned, in any
23 small unit it was more than just being a good
24 police officer. It was getting along with others,

Page 394

1  others getting along with you, esprit de corps, if
2  you will.
3     THE STENOGRAPHER: What is it?
4  A  Getting along with others. We'll just
5  say that. Communicating with others, sharing
6  information with others.
7  Q  Did you say esprit de corps?
8  A  I did, yes. I mean, we can use another
9  word if it's easier. So as I mentioned, it wasn't
10 just making arrests or not making arrests, it
11 wasn't just being good police officer, it was the
12 entire -- you know, an assessment of their entire
13 behavior or input or lack thereof, whether or not
14 they were a problem or not to me or to others that
15 I arrived at these decisions to transfer Steve,
16 Ron, and others, I might add, out of the Gang
17 Unit.
18 Q  But my question is more specific than
19 that. My question is: Did you, before you
20 decided to transfer Ron Brown, Steve Horne, look
21 specifically as part of your evaluation as to the
22 extent and quality of their participation in the
23 Lotus database system?
24 A  I would have, yes.

Page 399

1   A   Correct.
2   Q   Did you in your course of working with
3   Murphy ever talk to him about the complaints of
4   racism or race issues within the Youth Violence
5   Strike Force that Steve Horne and Ron Brown were
6   part of?
7   A   Not that I recall. When I returned --
8   or when I returned to the Gang Unit was after most
9   of the racial issues -- so-called racial issues or
10  concerns had taken place. I literally came in at
11  the tail end of that.
12  Q   When you say you came in, is that as the
13  commander of the Youth Violence Strike Force?
14  A   No, when I got transferred back there as
15  the night commander, as I say, when I went back
16  there as the night commander, I was not involved
17  in any of the alleged racial incidents.
18  Q   Okay. When you say racial incidents,
19  what I'm talking about is the --
20  A   Complaints.
21  Q   -- complaints.
22  A   Sorry. I was not privy or part of any
23  of those discussions --
24  Q   Okay.

Page 400

1   A   -- until almost the very end of it.
2   Q   In your prior deposition I might have
3   asked you a question inappropriately. You worked
4   from '68 to '74 as a real estate broker and then
5   you went to the police department; is that
6   correct?
7   A   Correct.
8   Q   Okay. You had also testified earlier
9   that you read some textbooks, a number of
10  textbooks, on supervision. Can you remember the
11  names of any of them off the top of your head?
12  A   Well, each promotional exam there is a
13  reading list. Some of those books on the reading
14  list are management, police management books.
15  Q   Can you recall the names of any of them
16  off the top of your head?
17  A   To be honest with you, I threw them away
18  each time I got promoted.
19  Q   Don't remember them?
20  A   No. Ianoni was one big one, Police
21  Management was another. I don't remember the
22  author.
23  Q   You also talked about -- used the word
24  "paramilitary" to describe the Boston Police

Page 401

1   Department. Can you tell me what you mean by
2   that?
3   A   Although -- you know, paramilitary,
4   obviously we're not the military but our
5   organization -- we are organized similar to a
6   military group, and we have a chain of command, we
7   have a flow of information, obviously we're in
8   uniform, we have rules and regulations similar to
9   the military service. It's not a democracy.
10  It's, I guess, a dictatorship in that you do what
11  you're told without question and then question it
12  afterwards. So we very much operate similar to
13  military organizations in that respect.
14  Q   When you say it's not a democracy, do
15  the officers in your view have civil rights, basic
16  civil rights, within that paramilitary
17  organization?
18  A   Our rules and organizations say that you
19  obey any and all commands unless they are illegal.
20  So obviously if it violates someone's civil
21  rights, you could conceivably say it's an illegal
22  order. So I would say yes.
23  Q   Can you tell me -- in looking at
24  Exhibit 48, I believe you are one of the City's or

Page 402

1   the City's designee for some of the people who
2   were transferred, or maybe all of them. But my
3   question is: In looking at Exhibit 48, it looks
4   as though a good number of people were transferred
5   out of the Youth Violence Strike Force in February
6   of 2000. Do you see that?
7   A   I do.
8   Q   Were you part of that process?
9   A   I was.
10  Q   Can you tell me what your involvement
11  was?
12  A   Individually or generally?
13  Q   Let's start with the general. What was
14  your role in general?
15  A   There were several officers on the
16  personnel order that left for a variety of
17  reasons, and then there are others who left
18  because I asked them -- I asked my commanders to
19  remove them.
20  Q   Who are the commanders you asked to
21  remove them?
22  A   I don't recall at this time.
23  Q   But what was your particular role in the
24  hierarchy in terms of making a decision or making

Page 403

1  a recommendation?
2  A   I think I mentioned that earlier. That
3  I would have written a Form 26, to-from-subject,
4  requesting that certain individuals be
5  transferred, and then as a result of that memo, I
6  would have gotten either a call or a visit and
7  asked why. I would have explained my reasoning.
8  And then they either were transferred or not.
9  Q   And the call or visit would have been
10 from whom?
11 A   Probably the superintendent -- I think
12 it was Joyce, but I can't be certain -- but it
13 would have been the superintendent that I had the
14 conversation with.
15 Q   All right. And were you making
16 decisions for both day and night officers?
17 A   All personnel.
18 Q   Wasn't Lieutenant French the commander
19 of the unit until you took over in May of 2000?
20 A   I did.
21 Q   Why wouldn't Lieutenant French have been
22 the one making the recommendations?
23 A   Well, he would have had the ultimate.
24 We all would have had input into the rationale or

Page 404

1  reason.
2  Q   Would it include Davin and Bulman?
3  A   They would have had input, but obviously
4  the decision rests with the commander.
5  Q   I believe -- I don't want to misstate
6  here -- I think Davin wasn't with the unit at that
7  time in February of 2000; I think it was just
8  Bulman; is that correct?
9  A   If you say so. I don't recall.
10 Q   Assuming -- okay. It would have been
11 the Sergeants Davin and Bulman included if they
12 had there; is that right?
13 A   It may have been, unless the reasoning
14 or the rationale was solely based on the
15 commander.
16 Q   Were there any on this list, Exhibit 48,
17 where the reasoning or rationale was based solely
18 on the commander, if you know?
19 A   We've already discussed why Paul Murphy
20 left. Jeff Bird was some input from me, and
21 obviously Gary French made the decision.
22 Cellucci, the same, it was input from me and
23 obviously Gary French concurred and made the
24 decision. Scotty Gillis was offered another

Page 405

1  assignment which he chose to take. Timmy Kelly,
2  input from me, decision made by the commander.
3  Langa got a better offer, so to speak, or another
4  assignment. Joel McCarthy, same thing, he was
5  offered another assignment, which he accepted.
6  Jimmy Moore actually stayed within the unit, but
7  on paper he was transferred. Jimmy Moore was
8  clerical or inside position. He just -- on paper
9  he moved but he actually stayed right with us.
10 John, same thing, he --
11 Q   John Nguyen?
12 A   Yeah, he wanted to go back.
13 Q   And just for the record, that's
14 N-G-U-Y-E-N, John Nguyen, right?
15 A   Correct, yeah. He wanted to go -- he
16 came from District 11, he wanted to go back. And
17 Kevin Yalmokas, Y-A-L-M-O-K-A-S, at my
18 recommendation, Gary French concurred, and he was
19 transferred.
20 Q   Okay. So it sounds as though of the --
21 what about Gary Barker?
22 A   He came into the unit.
23 Q   Oh, I'm sorry, he came in. All right.
24     So it sounds as though there were

Page 406

1  four officers who were transferred without any
2  input from them -- or any request by them or
3  better offer by them. There were four of them
4  that were transferred based on you and Lieutenant
5  French; is that right?
6  A   Those four officers -- let me just
7  check -- Bird, Cellucci, Kelly -- yes, those four
8  officers worked evenings with me, so that they
9  were transferred on my recommendation to Gary
10 French, correct.
11 Q   And that was Kelly Yalmokas, Bird, and
12 Cellucci?
13 A   Correct.
14 Q   Now, you said McCarthy left because he
15 had a better offer?
16 A   Correct.
17 Q   And that was at C-6 --
18 A   I'm sorry --
19 Q   -- District C-6?
20 A   -- which name?
21 Q   Joel McCarthy.
22 A   He went to C-6 at his choice.
23 Q   He requested to go?
24 A   Correct.

Page 407

1  Q   What about Langa, did he request to go
2  to area A-7?
3  A   Correct.
4  Q   Where is area A-7?
5  A   East Boston.
6  Q   Do you have any knowledge as to why they
7  wanted to go to those areas?
8  A   It wasn't what they thought it would be,
9  I guess, is the best way to describe it, and they
10 chose to move on.
11 Q   Do you remember what about it they
12 didn't like?
13 A   No. I think we all, as commanders, and
14 whether it was night or overall commander, we only
15 wanted people that wanted to be there. We didn't
16 want someone who, for whatever reason, chose not
17 to be or did not want to be there.
18 Q   Can you give me any more information as
19 to specifically why they didn't want to be at the
20 Youth Violence Strike Force, Langa and McCarthy?
21 A   I thought I answered that, but I don't.
22 I mean, Joel McCarthy is an outstanding police
23 officer. In fact, he's flying attack helicopters
24 as we speak in Iraq. So it was nothing to do with

Page 408

1  his qualifications. He just chose to move on. I
2  don't recall the specifics.
3  Q   Well, that was my question.
4      What about Langa, can you recall any
5  specifics about why he didn't want to be in the
6  Youth Violence Strike Force?
7  A   No, again, it was just -- he's now
8  driving the mayor, so obviously he's qualified,
9  but he chose that this wasn't what he expected it
10 to be and wanted to move on.
11 Q   So they made the request to move; is
12 that correct?
13 A   That's my recollection, yes.
14 Q   And Nguyen made the request to move and
15 he went to C-11; is that right?
16 A   As best I can recall, yeah.
17 Q   Do you know why he wanted to move?
18 A   I do not know, no.
19 Q   But his request was honored?
20 A   Yes.
21 Q   And the same with Scott Gillis, he
22 wanted to go to B-2?
23 A   Scott Gillis, yes.
24 Q   Do you know why he wanted to go to B-2?

Page 409

1  A   I don't recall.
2  Q   But, again, his request was honored that
3  he --
4  A   Again, I can only speak with certainty
5  on the four names that you mentioned. The others
6  I can't speak with certainty; Gary French would be
7  the one.
8  Q   Just your best knowledge.
9  A   My best knowledge, yeah.
10 Q   Your best knowledge was Scott Gillis
11 wanted to leave to go to B-2 and he was
12 accommodated; is that right?
13 A   Again, my best recollection. I had no
14 input in that way.
15 Q   I believe you said earlier he was
16 offered a position in B-2 where he wanted to go.
17 Did I miss --
18 A   The four names that you identified, I
19 had direct involvement in those officers being
20 transferred. They were transferred at my request
21 and Gary French honored that. The others I had no
22 -- it was not my decision. I'm just trying to
23 give you my recollection. I can't say with
24 certainty that that was my recollection.

Page 410

1  Q   So you were basing it on your
2  recollection when you were talking about Gillis --
3  the people other than the four that you've
4  mentioned?
5  A   Correct.
6  Q   Okay. Why was Kelly transferred out, if
7  you know?
8  A   Again, he worked evenings with me and he
9  just wanted out. It just wasn't what he expected.
10 Q   What was it he didn't like about it?
11 A   I don't recall. He came to me and asked
12 if he could be transferred, and I made -- I pushed
13 his request up and it was granted.
14 Q   And same with Yalmokas, same scenario?
15 A   Yalmokas?
16 Q   Yes.
17 A   No, Yalmokas, I asked to have him
18 transferred.
19 Q   Why?
20 A   I didn't think he fit into the Gang
21 Unit.
22 Q   Why not?
23 A   He just didn't meet the parameters that
24 I was looking for.

Kevin D. Foley, Vol. 2                                                              11/29/2005

Page 411

1    Q   Can you tell me what it was that made
2  him fall short of the parameters you were looking
3  for?
4    A   I don't recall at this time.
5    Q   Is he white or black?
6    A   He is white.
7    Q   Are any of these officers on this list
8  black?
9    A   Jeff Bird, who I asked to be removed, is
10 white. Charlie Cellucci, who I might whose father
11 was a command staff member at the time, I asked to
12 be removed, he's white. Timmy Kelly, he's white,
13 and he asked me to be transferred. And Kevin
14 Yalmokas is white, and I asked for him to be
15 transferred.
16   Q   What about Gillis, is he white or black?
17   A   He is white.
18   Q   Langa and McCarthy, are they white?
19   A   They are white.
20   Q   Moore and Nguyen, are they white?
21   A   Moore is black.
22   Q   And what about Nguyen?
23   A   Obviously he's Vietnamese.
24   Q   And Murphy, is he white?

Page 412

1    A   Paul Murphy is white, correct. Sergeant
2  Parker, I might add, coming in is black.
3    Q   Why did you ask Cellucci to leave?
4    A   He just -- again, it wasn't a fit for
5  him. I wasn't happy with his productivity. I
6  wasn't happy with his communication skills, by
7  that I mean communicating with me and the
8  supervisors, and I just felt he didn't belong
9  there.
10   Q   Communicating about what?
11   A   I don't remember the specifics.
12   Q   Okay. What about Bird, Jeffrey Bird?
13   A   Jeff Bird was just a little too
14 aggressive and I didn't think he fit either.
15   Q   Aggressive in what way?
16   A   I'll just leave it at that. I don't
17 recall.
18   Q   You don't recall?
19   A   Just a little too aggressive. I don't
20 remember the specifics.
21   Q   Aggressive with other officers in the
22 way he dealt with people or aggressive with the
23 citizens?
24   A   Just an aggressive personality, which I

Page 413

1  felt didn't belong there.
2    Q   Why not?
3    A   It didn't fit into my requirements or
4  what I felt a gang officer should have.
5    Q   In your view was he or did you hear
6  about him being too aggressive with suspects or
7  people on the street, witnesses?
8    A   I don't recall.
9    Q   I guess I'm just trying to find out what
10 is the basis of your saying that he was too
11 aggressive?
12   A   And I'm responding that I don't recall
13 the specifics. I'm telling you that my
14 recollection is that he was just too aggressive to
15 fit in the Gang Unit, and that's all you're going
16 to get from me.
17   Q   Verbally or physically?
18   A   We'll just leave it at --
19   Q   Well, no, sir, you have to answer the
20 question.
21   A   Well, both.
22   Q   And who was he too physically --
23   A   I don't recall.
24   Q   So it could have been members in the

Page 414

1  community or it could have been officers, you just
2  don't recall?
3    A   I just don't recall. I'm not going to
4  say what it could have been, should have been.
5  I'm telling you I don't recall.
6    Q   And who was he too aggressive verbally
7  with?
8    A   I don't recall.
9    Q   I believe we talked about Nguyen --
10 well, maybe we didn't. With respect to Nguyen,
11 you said he wanted to leave. Can you tell us why
12 he wanted to leave?
13   A   I think I told you he did not work for
14 me. I was not involved in that. My recollection
15 was that he didn't want to be there. I have no
16 specific knowledge. You'd have to ask Lieutenant
17 Gary French.
18   Q   Now, Eric Hardin and Grant Callender
19 came into the unit in May of 2000, correct?
20   A   Correct.
21   Q   Can you recall how they came to be put
22 into the unit?
23   A   I don't recall specifically, no.
24   Q   Do you remember interviewing them or --

LegaLink Boston
(617) 542-0039