```
                                                              Page 1
 1                              Volume: I
 2                              Pages: 1-265
 3                              Exhibits: 24-38
 4
 5          UNITED STATES DISTRICT COURT
 6        FOR THE DISTRICT OF MASSACHUSETTS
 7              CA No. 04-10718-RGS
 8
 9    - - - - - - - - - - - - - - - - - - -x
10    STEVEN HORNE and RONALD BROWN,
11                              Plaintiffs,
12    vs.
13    CITY OF BOSTON, SGT. ERIC BULMAN
14    and SGT. JOHN DAVIN,
15                              Defendants.
16    - - - - - - - - - - - - - - - - - - -x
17
18          DEPOSITION OF GARY FRENCH
19              August 23, 2005
20                 10:22 a.m.
21              Roach & Wise, LLP
22              31 State Street
23            Boston, Massachusetts
24         Reporter: Nancy L. Russo
```

Page 30

1  you other than the ones you mentioned during the time
2  you were there?
3     A.  Yes.
4     Q.  Who?
5     A.  Gary Barker, Rick Johnson, Eric Bulman,
6  probably one or two others.  I would have to really
7  look at that.
8     Q.  Was Sergeant Barker, Johnson and Bulman, were
9  they minority officers or were they white?
10    A.  Barker and Johnson were minorities and Bulman
11 was white.
12    Q.  Are Barker and Johnson still there, to your
13 knowledge?
14    A.  Barker, I believe, is still there and Rick
15 Johnson is with me over in District 18.
16    Q.  Did you ever go out in the street yourself
17 and work with the officers out doing investigations or
18 arrests?
19    A.  I did, but the majority of my time was
20 pushing papers.
21    Q.  Now, what kind of officers were you looking
22 for to be members of the Youth Violence Strike Force?
23    A.  I was looking for officers that were
24 relatively easy going but aggressive on the street,

Page 31

1  aggressive in the sense of searching out information,
2  searching out community contacts, searching out
3  informants.  I was looking for officers that weren't
4  problematic, didn't have a history of internal affairs
5  complaints, officers that didn't have a reputation for
6  being overly aggressive, officers that were progressive
7  in the sense of how they wanted to do policing,
8  officers that were familiar with the neighborhoods,
9  officers that had some experience -- enough experience
10 on the job to have a track record that I could check
11 with other police officers, sergeants, lieutenants and
12 captains about their reputation.
13    Q.  Those were the criteria you were looking for
14 when selecting someone to become a member of the Youth
15 Violence Strike Force?
16         MS. HARRIS:  Objection, but you can
17 answer.
18    A.  Yes.  I was looking for officers that would
19 fit in with the group, fit in with the other officers,
20 that the other officers knew and respected.
21    Q.  Did Steve Horne and Ron Brown fall within
22 that criteria when they first joined the unit?
23    A.  I didn't know a lot about either one of those
24 officers when they first joined the unit.  I had an

Page 32

1  interview process.  I interviewed everyone who put in
2  an application.  A lot of times you would have -- you
3  might have 30 or 40 people apply for three or four
4  positions.  A lot of it will go on reputation.  A lot
5  of it will go on trying to have a diverse unit.
6     Q.  You mean with some minorities?
7     A.  Yes.  A lot of times I would go to officers
8  who were in the unit, asked them who was out there, who
9  were the good police officers out on the street, double
10 check them with supervisors in different districts.
11    Q.  You would ask other officers in the unit --
12    A.  To recommend people and to speak with people
13 they felt would be a good fit in the unit and have them
14 submit applications.
15    Q.  Anything else?
16    A.  No.  I think that covers it.  The general
17 flavor is you wanted people to fit in the unit and
18 people who didn't have a lot of negative baggage, so to
19 speak, that were respected internally within the
20 department as good police officers.
21    Q.  Were you looking for any specific number of
22 years of experience before an officer joined the Youth
23 Violence Strike Force?
24    A.  I always felt the threshold was three years.

Page 33

1  That is what I was looking for.
2     Q.  Did you ever pick somebody that was less than
3  three years?
4     A.  I may have, but it would have been an
5  exception to the rule.
6     Q.  What were those exceptions?  Why would you
7  have those exceptions, if you can recall any?
8     A.  The only exception I would make personally is
9  if they had extremely high recommendations from their
10 supervisor and peers.
11    Q.  Do you know if Steve Horne or Ron Brown came
12 with extremely high recommendations from their
13 supervisors, superiors or peers?
14    A.  I don't recall, no.
15    Q.  Who made the final decision as to who would
16 be joining the unit?  When you say the gang unit, you
17 mean the --
18    A.  Youth Violence Strike Force.
19    Q.  Just wait until I finish the question before
20 you answer.  Just pause.  Your attorney may want to
21 object.  It makes the record clear in terms of question
22 and answer.
23    A.  Okay.
24    Q.  I just want to finish up with your

Page 34

1  Exhibit 25. You left in May of 2000 from the Youth
2  Violence Strike Force and went to another area?
3      A.  The sexual assault unit.
4      Q.  Where is that?
5      A.  91 East Concord Street.
6      Q.  Why did you leave and go to the sexual
7  assault unit?
8      A.  It was an opportunity that I wanted to take
9  at that time.
10     Q.  Why is that?
11     A.  I thought it was a good opportunity to
12 further my career.
13     Q.  Were you asked to go there or is it something
14 you applied for?
15     A.  I applied for.
16     Q.  You have been there up to the present?
17     A.  Up until November of 2004.
18     Q.  Then you went to another unit -- Area E, I
19 believe?
20     A.  Yes.
21     Q.  What are you doing in Area E?
22     A.  I am in charge of investigations.
23     Q.  Why did you leave the sexual assault unit and
24 go to Area E?

Page 35

1      A.  There was a change in the structure of BIS.
2  The bosses all changed around at BIS.
3      Q.  Bureau of --
4      A.  Investigative Services.
5      Q.  So they asked you to move over there?
6      A.  Yes.
7      Q.  Was that something you wanted to do or
8  something you did because you were told to go there?
9      A.  No. I wanted to go there.
10     Q.  Getting back to the qualifications for the
11 Youth Violence Strike Force, who made the final
12 decision as to who would join the Youth Violence Strike
13 Force?
14     A.  The police commissioner.
15     Q.  Can you tell me how the process works in
16 terms of who does the screening or who was involved in
17 the interviewing or other process of choosing somebody
18 for the strike force?
19     A.  Pretty much the posting goes out and that is
20 a notice to all officers in the city there are
21 positions open in the Youth Violence Strike Force and
22 they have X amount of days to respond back. Usually
23 it's 30 days to submit a short application. I believe
24 it's a one-page application and some people submit a

Page 36

1  form 26 which is a written report addressed to the unit
2  commander requesting to go over there.
3      Q.  Do those postings include the qualifications
4  you are looking for as you described earlier for the
5  type of officer you are looking for?
6      A.  Yes. They are a bit more formal than what I
7  stated, but that is generally what they are looking
8  for, yes.
9      Q.  Then what happens after the application is
10 made?
11     A.  My policy was to interview all the candidates
12 who submit an application.
13     Q.  So after the postings, the next step is that
14 you personally interview everyone who is a candidate?
15     A.  Yes.
16     Q.  Do you remember interviewing Ron Brown or
17 Steve Horne for the position back in August of '99?
18     A.  I remember interviewing Ron Brown. I really
19 don't recall the specifics of that interview. And I
20 know I interviewed Steve Horne also. Ron Brown, his
21 brother was in the Youth Violence Strike Force.
22     Q.  That is Greg Brown?
23     A.  Yes. And he was one of the best gang unit
24 officers in the city.

Page 37

1      Q.  Do you remember anything at all about Ron
2  Brown when you interviewed him?
3      A.  I really don't.
4      Q.  Do you remember anything about Steve Horne
5  when you interviewed him, anything that struck you from
6  a positive or a negative?
7      A.  I really don't, no.
8      Q.  But suffice it to say, you believe at the
9  time they had the qualifications to join the strike
10 force; is that correct?
11     A.  Yes.
12     Q.  What is the next step in the process after
13 you interview the candidates?
14     A.  What I would usually do is submit a list in
15 sending order of the people I was interested in.
16     Q.  To whom?
17     A.  My bosses who would be -- at the time it was
18 Captain Lyden, but usually I went directly to the
19 deputy in charge of special operations at that time I
20 believe was -- for a period of time it was Deputy
21 Superintendent Billy Johnson. And then later on, it
22 was Deputy Superintendent Larry Robichaud.
23     Q.  So you sent the list to either Superintendent
24 Johnson or Deputy Superintendent Robichaud?

Page 38

1   A.  They are both deputy superintendents.
2   Q.  And they were deputy superintendents at the
3   time that Horne and Brown applied?
4   A.  I believe Deputy Superintendent Robichaud was
5   in charge when Ron Brown and Steve Horne applied.
6   Q.  So Robichaud was the deputy superintendent
7   that you submitted the list to at the time Brown and
8   Horne applied?
9   A.  That would be the normal process.
10  Q.  Was that normal process followed with them,
11  if you recall?
12  A.  I believe it was.
13  Q.  Did you get any input from the sergeants --
14  strike that.
15      At the time that Brown and Horne applied
16  for the position at the Youth Violence Strike Force,
17  was Eric Bulman working the strike force at the time?
18  A.  Yes.
19  Q.  Did you get any input from him as to who
20  should be joining the Youth Violence Strike Force?
21  A.  I believe I sat down with all the supervisors
22  and went over the list of candidates that applied,
23  their strengths and weakness.  Whether that was
24  formally done or done individually or just passing the

Page 39

1   list around, getting what their thoughts are, whether
2   they had anyone they felt was somebody who should be
3   coming to the unit, whether they were advocating for
4   someone who wasn't on the list I was going to be
5   forwarding.  I know I did that as a matter of practice
6   with every supervisor in the unit.
7   Q.  Do you remember anything that Eric Bulman
8   said about Horne or Brown?
9   A.  No, I don't.
10  Q.  Do you remember Eric Bulman saying anything
11  about any other officer such as Gregory Long or Francis
12  McLaughlin?
13  A.  I believe that there were officers were we
14  interested in, but their particular captain -- there
15  are 11 policing districts and the captains have control
16  over those policing districts.  I believe if it is the
17  two individuals I am thinking of they were in
18  District 4 under Captain Cellucci.  And Captain
19  Cellucci refused to let them leave.  And the captains
20  have a lot of weight in the city as far as personnel
21  goes.  If they dig in their heels and say I can't
22  afford to lose these guys, they are too valuable,
23  chances are we're not going to get them.
24  Q.  Do you remember that specifically happened

Page 40

1   with Officers Long and McLaughlin that Captain Cellucci
2   refused to let them leave District 4 and join the
3   strike force?
4   A.  I am pretty sure that was the case, yes.
5   Q.  Were they people that you wanted to join the
6   strike force in place of Brown and Horne?
7   A.  No.
8   Q.  Why not?
9   A.  I didn't know either one of those officers.
10  I know they had a tremendous reputation but, like I
11  said, there are a lot of good officers out there that
12  applied and there were other candidates that were as
13  good as them.
14  Q.  How many people were assigned to the strike
15  force along with Brown and Horne at that time in
16  August of '99, if you can recall?
17  A.  How many people transferred in with them?
18  Q.  Yes.
19  A.  Probably no more than four or five at the
20  most.
21  Q.  After the list goes to Robichaud, then what
22  happens?
23  A.  I probably sit down with them and go over the
24  list and then that list would be forwarded up to

Page 41

1   headquarters.
2   Q.  I'm going to show you Exhibit 4 from
3   Bulman's deposition and it has the list of six
4   officers -- sorry -- five officers that appeared to
5   have been transferred to the Youth Violence Strike
6   Force in August of '99.  Does that refresh your memory
7   as to who you interviewed and how you narrowed the list
8   down?
9   A.  Yes.
10  Q.  Are those the officers you interviewed and
11  recommended be members of the strike force?
12  A.  I'm not sure if all these people are people I
13  recommended, but they are all people I interviewed.
14  Q.  Did you recommend Brown and Horne to be
15  members of the strike force?
16  A.  I believe I did.
17  Q.  Why?
18  A.  I thought they did good during the interview
19  process.  They didn't have a lot of problems in their
20  background, and I thought they would fit into the unit.
21  Q.  What about Brito -- Adolfo Brito, do you
22  remember interviewing him?
23  A.  I do.
24  Q.  Was he a good officer when he joined the

Page 42

1  unit?
2      A. Yes, he was.
3      Q. Was he a good officer while he was in the
4  unit?
5      A. Yes, he was.
6      Q. Is there anyone that you would have preferred
7  become a member of the Youth Violence Strike Force that
8  didn't get accepted and these people beat them out, so
9  to speak?
10     A. No.
11     Q. After it goes to Robichaud -- Deputy
12 Superintendent Robichaud who I believe is the deputy
13 superintendent with the Bureau of Investigative
14 Services?
15     A. No. He was in special operations. It's
16 Bureau of Field Services.
17     Q. So the Youth Violence Strike Force is under
18 the Bureau of Special Operations?
19         MS. HARRIS: I will object to the time
20 period.
21     Q. At that time?
22     A. At that time it was under Bureau of Field
23 Services.
24     Q. What was the Bureau of Field Services under?

Page 43

1      A. That was one of the main bureaus reporting
2  directly to the commissioner.
3      Q. And then after it went to Robichaud, where
4  did it go, the list of recommended applicants?
5      A. I would assume it would go to Superintendent
6  James Claiborne.
7      Q. Did you have any input after the list went to
8  Robichaud in talking with any of the --
9      A. No.
10     Q. So you wouldn't have talked to any of the
11 higher-up's, you would just submit the list to them?
12     A. Yes.
13     Q. Did you send a written recommendation as to
14 why you recommended any particular candidate or just
15 give them a list?
16     A. What I would usually do is give them a
17 list -- if we were looking for five openings, I would
18 give a list of ten names is usually the way I would do
19 it. I would do it in descending order with the number
20 one guy is the person I want the most down to the
21 number ten guy.
22     Q. Where were Horne and Brown on that list?
23     A. I don't know.
24     Q. Where is that list?

Page 44

1      A. I don't know.
2      Q. You said that list goes to Larry Robichaud.
3      A. Right.
4      Q. Do you know what happens with the list after
5  it is sent to them?
6      A. I would assume that after people are
7  transferred, the list is destroyed or filed or thrown
8  away. I'm not sure what happens to it.
9      Q. Do you have any comments on the ten as to why
10 you favor one person over another? Do you have any
11 specific comments or do you just order them one through
12 ten?
13     A. We just order them one through ten. I may
14 have something to the effect like it's my
15 recommendation that the following officers be
16 transferred to the unit in descending order.
17        MR. ROACH: Could you provide me with
18 that if you have it?
19        MS. HARRIS: Can you give us a formal
20 request so we don't forget about it?
21        (Discussion off the record.)
22     Q. Then after it goes to Robichaud, I believe
23 you said it goes to Claiborne?
24     A. The chain of command would be Superintendent

Page 45

1  Claiborne.
2      Q. From him, where would it go?
3      A. The commissioner.
4      Q. And the commissioner has the final approval?
5      A. Unless the mayor weighs in.
6      Q. How long is that criteria been in use; do you
7  know?
8         MS. HARRIS: I am objecting to the
9  form.
10     Q. How long has that process been in use; do you
11 know?
12     A. I don't know. That was the process I used
13 when I went there.
14     Q. Was there some kind of rule or regulation as
15 to how it is used?
16     A. No.
17     Q. It was just something that was part of the
18 system, part of the normal course of doing things?
19     A. I'm not sure what the rest of the city did,
20 but that is what I did.
21     Q. Okay. I want to show you Exhibit 3. This is
22 from Bulman's deposition.
23        (Exhibit No. 3 marked for
24 identification.)

Gary French                                                                08/23/2005

Page 46

1  Q. Do you recognize that document?
2  A. Yes.
3  Q. What is it?
4  A. This is for an open position in the Youth
5  Violence Strike Force.
6  Q. What is the purpose of this?
7  A. This is a notice that goes out to let
8  officers throughout the city know there are positions
9  open in the Youth Violence Strike Force and if they are
10 interested, it outlines the application process.
11 Q. Was this sent around in May of '99?
12 A. Yes. The document is dated May 24, '99.
13 Q. Do you remember seeing it at that time?
14 A. Yes.
15 Q. Can you tell me who came to draft this?
16 A. There was probably one from years earlier and
17 it was probably updated. I may have made some changes
18 in this.
19 Q. Is this a document you drafted?
20 A. I may have drafted this or I may have made
21 changes to it.
22 Q. Okay. This form that is attached to
23 Exhibit 3, is this the form that people complete if
24 they are interested in applying for the unit?

Page 47

1  A. Yes.
2  Q. Can you tell me what changes that you made in
3  this, if any, in this Exhibit 3 when you drafted it?
4         MS. HARRIS: I'll object. You can
5  answer.
6  A. This is a standard type of form for the unit.
7  It was probably in place for a number of years and I
8  may have tweaked it here and there, but basically it's
9  the same open position form that was used probably
10 historically in the Youth Violence Strike Force with
11 minor changes.
12 Q. So you believe this May 24, '99 document,
13 Exhibit 3, is something that largely was in place when
14 you were there, and you may have tweaked it and made
15 some minor changes to it?
16        MS. HARRIS: I'll object. You can
17 answer.
18 A. Right.
19 Q. Do you know what, if any, changes you made to
20 Exhibit 3 to make it the way it is?
21 A. No, I don't.
22 Q. Does this contain a summary of the
23 qualifications that you were looking for for a person
24 to be with the Youth Violence Strike Force?

Page 48

1         MS. HARRIS: I'll object. You can
2  answer.
3  A. (Witness reads.) Can you repeat that
4  question again?
5  Q. Does this contain the qualifications that you
6  were looking for to be a member of the Youth Violence
7  Strike Force?
8  A. Yes.
9  Q. That is where it says qualifications in the
10 middle of the first page?
11 A. Right.
12 Q. Can you tell me what, if any, benefits there
13 are to being a patrol officer who is a member of the
14 Youth Violence Strike Force as opposed to being a
15 regular patrol officer?
16 A. It's a prestigious position. It's in plain
17 clothes. You have a lot more flexibility to do
18 proactive patrols. You're not answering radio calls
19 one after another. It's a change from being a uniform
20 response car to doing something a little more
21 prestigious. It is self-initiated. It is a good job
22 for people who want to do that type of work.
23 Q. Is it fair to say that the duties described
24 in Exhibit 3 differ from the duties of a regular patrol

Page 49

1  officer?
2  A. I think a lot of the patrol officers do the
3  same type of duties except for the members of the Youth
4  Violence Strike Force can get much more involved in
5  those types of duties whereas patrol officers would
6  just barely scratch the surface of a lot of the duties.
7  Q. So is it fair to say that you have an
8  opportunity as a regular patrol officer to become
9  almost like a detective and investigator using your own
10 discretion and your own initiative as to what areas or
11 what gangs or what fugitives or what suspects you wish
12 to investigate?
13        MS. HARRIS: Objection. You can
14 answer.
15 A. You have more opportunity to follow up on
16 some of the crimes that take place.
17 Q. Is one of the advantages of being on the
18 Youth Violence Strike Force is it's citywide as opposed
19 to a certain district or neighborhood?
20 A. That could be looked at as an advantage.
21 Q. Any other advantages you can think of?
22 A. Not really, no.
23 Q. What about the opportunity to work with other
24 agencies like the FBI, the state police and so forth.

13 (Pages 46 to 49)

LegaLink Boston
(617) 542-0039

Gary French                                                             08/23/2005

Page 50

1  Do you have more of an opportunity to work with those
2  kind of agencies and interact with them as compared to
3  if you're a regular patrol officer?
4      A.  You do, but some people may not think that is
5  an advantage.
6      Q.  Fair enough.  What about the opportunity to
7  investigate fugitives from justice outside of the state
8  or city?  Is that something that is different from
9  regular patrol duty?
10         MS. HARRIS:  Objection.  Are we talking
11 different or advantage?  I just want to be clear what
12 the question is.
13     Q.  Okay.  Since advantage may be a question of
14 opinion, let's stick with different.  Is working with
15 the FBI and other state police and other agencies
16 something different that the strike force does as
17 opposed to the regular patrol duty?
18     A.  Once again, the regular patrol duties you may
19 have the opportunity at times to work with outside
20 agencies whereas in the youth violence strike force,
21 that's part of the job.  So it's a lot more involved.
22     Q.  What about tracking fugitives from justice
23 outside the state or investigating fugitives from
24 justice outside the state, is that something that you

Page 51

1  do more with the Youth Violence Strike Force as opposed
2  to regular patrol duty?
3      A.  As a patrolman with the Youth Violence Strike
4  Force you don't track people out of state.  You may
5  work with out-of-state agencies to track people and
6  they would do the tracking.  You can't move around the
7  metropolitan boston area into the surrounding
8  communities in the Youth Violence Strike Force with
9  outside agencies.
10     Q.  So you don't do the actual physical tracking,
11 but you do work with other agencies outside the city or
12 state who --
13     A.  Coordinate it, yes.
14     Q.  Let me finish the question.
15     A.  Sorry.  I keep on jumping.
16     Q.  It gives your lawyer a chance to object as
17 well.  So is it fair to say the Youth Violence Strike
18 Force officers coordinate and work with other agencies
19 outside the state or city in investigating fugitives
20 from justice; is that correct?
21     A.  Correct.
22     Q.  And that is something different than your
23 regular patrol officer; is that correct?
24     A.  Patrol officers may do that but, once again,

Page 52

1  not anywhere near as in depth or as often.
2      Q.  When you say the youth violence strike force
3  was a prestigious unit, in what way?
4      A.  I think the police officers that worked in
5  the unit had some of the best reputations in the city.
6  It was a close knit group and I think a lot of people
7  wanted to become part of that unit.
8      Q.  Is it fair to say it was prestigious because
9  it was responsible for bringing in or apprehending or
10 arresting some dangerous suspects?
11     A.  Yes.
12     Q.  Is it fair to say it was prestigious also
13 because it assisted with infiltrating and arresting
14 gang members?
15     A.  Yes.
16     Q.  Was it prestigious because it had success in
17 investigating and arresting and helping break up
18 illegal drug rings?
19     A.  Yes.
20     Q.  Was it prestigious because it had an
21 opportunity to do detective type work with FBI, state
22 agencies and other state and federal agencies in
23 investigating fugitives?
24         MS. HARRIS:  Objection.  You can

Page 53

1  answer.
2      A.  When you use the term investigate, in the
3  Youth Violence Strike Force we had detectives that did
4  investigations and most of the patrol officers were
5  involved in -- I don't know if I would call them
6  investigations, but they were involved in operations.
7      Q.  So they were involved in operations working
8  with the investigators, is that fair to say?
9      A.  Yes.
10     Q.  Who were the investigators in the youth
11 violence strike force when Brown and Horne were there
12 from August '99 through April of 2001?
13     A.  Robert Fratalia, Fred Waggett, Billy Dunn,
14 John McLean.  I believe Susan Antonucci was there at
15 that time.  I'm not sure of that.
16     Q.  Now, on Exhibit 3 it talks about on number
17 six "Will assist in the coordination of efforts between
18 specialized units within the department and other units
19 within the city."  Do you see that?
20     A.  Yes.
21     Q.  What specialized units within the department
22 does that refer to; if you know?
23     A.  The major case unit, the homicide unit, the
24 drug control unit.

14 (Pages 50 to 53)

### Page 54

1  Q. Number seven it says "Will maintain
2  intelligence files to identify new gangs, gang members
3  and associates and trends in gang and youth related gun
4  activity."  Do you see that?
5  A. Yes.
6  Q. How is the officer in the youth violence
7  strike force to do that?
8  A. We had a database that was Lotus notes and
9  they would submit weekly or daily intelligence reports
10 as to what they are saying out in the street, who they
11 are talking with, confidential informants or
12 cooperating people from the neighborhoods who are
13 providing information to the officers.
14 Q. We have marked as Exhibit 10 a number of
15 documents collectively, if you could ignore the yellow
16 sticker on here.  Exhibit 10 from Bulman's deposition,
17 are those the types of Lotus notes you're talking
18 about?
19 A. Yes.
20 Q. I would like to show you another document.
21 It is documents that are numbered and I put these
22 numbers on there that I'm producing today that my
23 client provided to me yesterday.  There are numbered
24 394 to 523 and ask you if those are also the same type

### Page 55

1  of Lotus.
2  A. Some of these are Lotus notes.  Others are
3  police reports and booking sheets and paperwork from
4  different agencies.
5  Q. And you weren't talking about the document I
6  just handed you.  You were talking about Exhibit 10,
7  correct?
8  A. Yes.
9  Q. So Exhibit 10 you just described comprised of
10 Lotus notes and the other types of materials you just
11 mentioned; is that right, sir?
12 A. Yes.
13 Q. The question before you now is the documents
14 I just handed you that were stamped 394 to 523 page
15 numbers that I have affixed is whether they also
16 contain the type of intelligence Lotus notes or other
17 intelligence information that you worked with at the
18 Youth Violence Strike Force?
19 A. Yes.
20    MR. ROACH:  I would like to mark this
21 document pages 394 to 523 collectively as Exhibit 26.
22    (Exhibit No. 26 marked for
23 identification.)
24 Q. Is another advantage of being in the Youth

### Page 56

1  Violence Strike Force that you don't have to wear
2  uniforms, you can wear plain clothes?
3  A. That could be considered an advantage.
4  Q. What about overtime, the ability to be paid
5  overtime?  Do you see any difference between being able
6  to obtain overtime pay with the Youth Violence Strike
7  Force as opposed to regular police duty?
8  A. It's my opinion that regular police duty you
9  get more opportunity for overtime and details than you
10 do in the Youth Violence Strike Force.
11 Q. Why is that?
12 A. There is just more available to you in a
13 district.
14 Q. Okay.  Can you tell me what the hierarchy is
15 when you were there at the Youth Violence Strike Force?
16 In other words, the command structure of the Youth
17 Violence Strike Force when you were there.
18 A. There was a deputy superintendent who is in
19 charge of all special operations.
20 Q. Who was that?
21 A. Deputy Robichaud or Deputy Johnson.
22 Q. Underneath them who?
23 A. They oversaw all of special operations which
24 consist of the motorcycles, the horses, the harbor

### Page 57

1  patrol, the Youth Violence Strike Force, the dogs.
2  Q. Let's go to the Youth Violence Strike Force.
3  Who would be the head of the Youth Violence Strike
4  Force?
5  A. I would be the head of the Youth Violence
6  Strike Force.
7  Q. Under you, who would there be?
8  A. There would be warrant apprehension,
9  sergeants that would be working days.
10 Q. Who were they when you were there?
11 A. Paul Fitzgerald was working days.  He was in
12 the charge of the warrant apprehension team at the time
13 of the Youth Violence Strike Force.
14 Q. Anyone else?
15 A. (Pause.)
16 Q. Who was under him?
17 A. The detectives and the patrol officers
18 assigned to the unit.
19 Q. Can you tell me who were there at the time
20 you were there?
21    MS. HARRIS:  Can you clarify the time
22 period?
23    MR. ROACH:  The whole time period.
24 Q. You've told me the sergeants who were there.

Page 70

1  officer -- you look at an experience police officer
2  from my perspective would be ten plus years on the job.
3    Q.  Well, to be in the youth violence strike
4  force, I thought you said two to three years would be a
5  minimum?
6    A.  Right.
7    Q.  So I assume someone who has been on the
8  police force for two to three years sees a suspect on
9  the street would know what to do in terms of arresting
10 them and how to proceed with working with the local
11 police department. Isn't that a fair statement?
12   A.  I think job maturity and experience are two
13 different things and using good judgement is sometimes
14 somebody with more time on the job -- if this isn't
15 making sense, let me know. Job maturity is important.
16 An officer with two to three years on the job sometimes
17 can be over enthusiastic. He needs supervision. He
18 needs people there with him. He needs more experienced
19 people there to assist him.
20   Q.  Was there anything in writing with the Youth
21 Violence Strike Force that advised officers as to what
22 do if they are off duty and they see a suspect in terms
23 of what the procedure is there to follow?
24   A.  No.

Page 71

1    Q.  How long into the job was Steven Horne and
2  Ron Brown before they took it upon themselves to arrest
3  this person when they were off duty?
4        MS. HARRIS:  I'll object. You can
5  answer.
6    A.  I think they were probably in the unit for
7  four or five months.
8    Q.  Your lawyer objected. Do you know what they
9  did with respect to this particular individual, whether
10 they arrested him or assisted with an arrest or
11 provided information to someone?
12       MS. HARRIS:  I will object. You can
13 answer.
14   A.  I don't recall the details of the arrest.
15   Q.  Are you saying, then, that there is no
16 written guidelines to the Youth Violence Strike Force
17 members in term of off duty and they are supposed to
18 know that when they are off duty, if they see somebody
19 they should arrest or follow or otherwise take action
20 upon, they are not to do anything until they get a hold
21 of someone at the Youth Violence Strike Force and get
22 some guidance as to how to proceed. Is that your
23 testimony?
24       MS. HARRIS:  Objection.

Page 72

1    A.  I think there are rules and regulations that
2  guide activation when you are off duty.
3    Q.  I'm not talking about police rules and
4  regulations off duty. I'm talking about Youth Violence
5  Strike Force. I think you testified with Youth
6  Violation Strike Force, the rule is you have to call in
7  and get guidance, right?
8        MS. HARRIS:  I will object to form.
9  You can answer if that is an accurate reflection of
10 your testimony.
11   A.  I don't think I mentioned the rule. You may
12 look at it as a rule of thumb that common sense
13 dictates that if you're going to be chasing a dangerous
14 fugitive and you are going to be following them off
15 duty, somebody should know about it and you shouldn't
16 and be doing it when you're off duty.
17   Q.  So your testimony is that when you're off
18 duty and you see a dangerous suspect, you're not to do
19 anything until you call the Youth Violence Strike
20 Force; is that right?
21       MS. HARRIS:  I'll object. You can
22 answer if that is a fair characterization.
23   A.  You shouldn't be tracking a dangerous felon
24 off duty, if that answers your question. And if you

Page 73

1  happen to cross a dangerous felon while you are off
2  duty, the very idea that he's dangerous felon -- and
3  most of these guys like we discussed earlier are
4  involved in violent crimes, shootings, homicides, et
5  cetera -- your best bet common sense dictates and this
6  is one of the things we try when we bring an officer on
7  to the unit is to ensure that they have a lot of common
8  sense. Common sense would dictate you contact the
9  local police department. You don't to anything until
10 they arrive and you contact the department, your
11 supervisor. Let them know where you are, what's going
12 on and we get additional people out there to assist
13 them.
14   Q.  What was it that Horne and Brown did that
15 violated that -- what do you want to call it a
16 procedure, rule?
17   A.  The perception that I had and that the
18 supervisors had at the Youth Violence Strike Force is
19 that they were working on their own --
20   Q.  I'm not asking you in general about --
21       MS. HARRIS:  Can he finish his answer?
22   Q.  Go ahead.
23   A.  Can you repeat the question?
24   Q.  Sure. What was it that -- I believe you said

Gary French                                                                    08/23/2005

### Page 74

1  earlier there is no written -- any kind of written rule
2  or procedure that is provided to officers at the Youth
3  Violence Strike Force to follow when they see a suspect
4  when they are off duty, correct?
5     A.  Correct.
6     Q.  What is it that they are supposed to do when
7  they do see a suspect when they are off duty?
8         MS. HARRIS:  Objection.  It's been
9  asked and answered.
10    Q.  Have you already answered that, sir?
11    A.  What are they supposed to do if they see a
12 suspect off duty?
13    Q.  Right.  I believe you've already answered
14 that.
15    A.  Yes.
16    Q.  How is what they are supposed to do as a
17 member of the Youth Violence Strike Force communicated
18 to them as an officer?
19    A.  Once again, it goes back to using common
20 sense in approaching a dangerous felon.
21    Q.  So one of the criticisms of Bulman to you was
22 they weren't using their common sense when they got
23 involved in an off duty -- with an off duty suspect in
24 terms of either arresting him or tracking him or

### Page 75

1  working to do something with him; is that right?
2     A.  The perception was they were tracking him
3  outside of the normal work.  So they were off duty
4  involved in a -- from my recollection -- involved in a
5  case that they were working.  And they were working
6  that off duty without the knowledge of their
7  supervisors.
8     Q.  So is the rule or custom or practice of the
9  Youth Violence Strike Force is they are not supposed to
10 do anything while they were off duty unless and until
11 the Youth Violence Strike Force knows about it and
12 approves it; is that right?
13    A.  No.
14    Q.  The rule is they are supposed to use their
15 own common sense?
16        MS. HARRIS:  I will object.  You can
17 answer.
18    A.  No.
19    Q.  Then what is the rule or procedure they are
20 supposed to follow?
21    A.  If they are off duty and they observe a
22 violent crime in progress or a crime in progress and
23 they are going to intervene on that crime, they can do
24 that.  There is not an issue with that.  The issue is

### Page 76

1  continuing an investigation, so to speak, into one
2  fugitive while they are off duty without anyone in the
3  unit being aware of the fact they are tracking that
4  person.  That was the issue that was brought to my
5  attention.
6     Q.  But that is not in writing anywhere.  You
7  rely upon the officer's common sense to know that; is
8  that right?
9     A.  That's correct.  It's police procedure.  You
10 don't run with an investigation when you're not
11 working.
12    Q.  And that would be the case even if they were
13 to call a local police department like in Chelsea, for
14 example?
15    A.  Correct.
16        (Recess taken.)
17 BY MR. ROACH:
18    Q.  Is the reason Bulman complained about off
19 duty work of Horne and Brown because he was jealous?
20    A.  Nothing further from the truth.
21    Q.  Let me show you a -- you said there was a
22 police rule and regulation about on duty and off duty
23 in terms of making an arrest, correct?
24    A.  Yes.

### Page 77

1     Q.  Do you know what the rule is?
2     A.  I don't.
3     Q.  Let me show you what we marked as Bulman
4  Exhibit 16 and for the record it says rule 102.  Is
5  that rule 102 of the police department?
6     A.  That is rule 102.
7     Q.  Does section three say anything about off
8  duty?
9         MS. HARRIS:  I will object on the
10 grounds the document would speak for itself.
11        MR. ROACH:  Absolutely.  I would agree
12 the document speaks for itself.
13    Q.  Does section three conduct say anything about
14 off duty?
15    A.  If I can read it.
16    Q.  Let me read it for you.  It says "Section
17 three conduct; employees shall conduct themselves at
18 all times both on and off duty in such a manner to
19 reflect most favorably on the department."  Did I read
20 that correctly?
21    A.  Yes.
22    Q.  Is that the rule you were thinking of?
23    A.  No.
24    Q.  What does the rule you were thinking of say?