Gary French                                                                    08/23/2005

Page 86

1  you can talk to them about what they are doing wrong,
2  how you can improve it.
3      Q.  Anything else?
4      A.  That was pretty much it.
5          (Discussion off the record.)
6      Q.  Is there any training program that is offered
7  on these issues to the Youth Violence Strike Force
8  officers when they first join the Youth Violence Strike
9  Force?
10     A.  My practice when I brought new officers into
11 the unit was to put them into cars with established
12 teams.  Usually we rode in three-man cars.  I would put
13 a fourth man in the car -- a fourth person in the car
14 whether it's male or female.
15     Q.  Is it fair to say that Officer Brito, Horne
16 and Brown were a team working together in a three-man
17 car?
18     A.  I don't know if Brito was with them
19 consistently.
20     Q.  Who was with them in the three-man cars most
21 of the time if not Brito?
22     A.  I'm not sure.  I don't recall.
23     Q.  But you do know Brito was with him for a
24 significant part of the time; is that correct?

Page 87

1      A.  Right.  And the majority of the time we had
2  three-man cars.  I mean, there were two-man cars in the
3  unit, but the majority of the time it was a three
4  person car.
5      Q.  Who was the senior or more experienced
6  officer you put with Brown and Horne when they first
7  joined the Youth Violence Strike Force?
8      A.  I think they had an opportunity to work with
9  every car in the Youth Violence Strike Force.  My
10 policy was to cycle them through the cars.
11     Q.  So each of them individually went and worked
12 with the other officers in their cars.  In other words,
13 they would be the fourth person in with three
14 experienced officers?
15     A.  Yes, or if someone was on vacation, they
16 would be the third person in, but I think whether it
17 was 30 days or 60 days, they cycled through every car
18 in the unit.
19     Q.  Who assigned officers to the specific cars?
20     A.  Sergeant did.
21     Q.  They had that authority?
22     A.  Yes.  Actually let me step back from that.  A
23 lot of times if officers sort of click together, we
24 would let them work together.  If there was conflict or

Page 88

1  they didn't like working together, we would let them
2  work with who they wanted to work with.  So it was
3  pretty much a self-selection process.
4      Q.  But the sergeants did have the authority
5  to --
6      A.  Yes.
7      Q.  Let me finish the question.  The sergeants
8  did have the discretion and authority to assign people
9  to certain cars to work together; is that correct?
10     A.  Yes.
11     Q.  Did you have any authority over the sergeants
12 to override their authority in that regard in terms of
13 who rides in what cruiser?
14     A.  Yes.
15     Q.  But you generally left it up to the sergeants
16 to make those decisions?
17     A.  Yes, unless I felt strongly about a
18 particular car or there was an issue that I wanted to
19 address.
20     Q.  Did Bulman ever meet with Brown and Horne on
21 the issues that you and he had discussed after that
22 first meeting with Bulman?
23     A.  Bulman was very conscientious and he was one
24 of those people who -- I would say, yes, he did meet

Page 89

1  with them.  I don't know specifically if that meeting
2  was a formal meeting or if he rode around with them for
3  a couple of hours in the car or he grabbed him in the
4  lunchroom and sat them down and spoke to them, but I'm
5  positive that meeting took place.
6      Q.  Why are you so positive it took place?
7      A.  Pretty much everything I asked of Sergeant
8  Bulman he did.
9      Q.  But he never reported back -- is it fair to
10 say he never reported back to you that he didn't meet
11 with them?
12     A.  I'm sure he did.
13     Q.  Do you have a specific memory?
14     A.  It was probably part of the ongoing dialog
15 between me and him regarding Brown and Horne.
16     Q.  Do you have any specific memory of Bulman
17 coming back to you after having -- strike that.
18         Do you have a specific memory of Bulman
19 coming to you and reporting to you that he hadn't met
20 with the plaintiffs, Brown and Horne, regarding the
21 issues you and he first met about?
22     A.  I don't.
23     Q.  When is the next time --
24     A.  If I could just clarify that.  If he didn't

23 (Pages 86 to 89)

Page 90

1  report back to him, I would call him in and ask him to
2  report to me. So I'm sure it did take place. I just
3  don't recall the conversation. If I gave a supervisor
4  an assignment and said take care of this and that
5  supervisor didn't get back to me in a reasonable amount
6  of time, I would go to that supervisor and say did you
7  take care of this? What happened?
8     Q. But you don't have any memory of what
9  transpired with Bulman -- strike that.
10        But you don't have any memory of Bulman
11 coming back to you specifically and reporting what
12 transpired in any meeting he may have had with Brown
13 and Horne; is that right?
14    A. I do recall there was a level of frustration
15 with Sergeant Bulman and that frustration was a result
16 of his ongoing conversations with Brown and Jones.
17    Q. Brown and Horne you mean?
18    A. Brown and Horne. I'm sorry.
19    Q. But my question is -- and I think you already
20 answered it. I don't want to beat this to death. You
21 don't have any specific memory of Bulman coming back to
22 you and reporting having met with the plaintiffs Brown
23 and Horne after your first meeting with Mr. Bulman
24 regarding his concerns; is that right?

Page 91

1     A. That is right.
2     Q. When was the next time you spoke to Sergeant
3  Bulman about Brown and Horne and his concerns about
4  them after the first time?
5     A. I don't recall the specific time frame for
6  the next time I spoke to him specifically about Brown
7  and Horne but, once again, it was daily conversations
8  we would have evaluating the unit, personnel in the
9  unit. It was an on going --
10    Q. I know you said that before and I want to
11 bring you back to Brown and Horne. You understand that
12 Brown and Horne are the plaintiffs in this case, right?
13    A. Right.
14    Q. And they have sued Bulman, Davin and the City
15 of Boston. You understand that?
16    A. Right.
17    Q. I would like to focus on Brown and Horne and
18 conversations you had with Bulman about Brown and
19 Horne, not about the unit in general unless I ask you.
20    A. Okay.
21    Q. When is the next time you can remember -- if
22 you can't remember, it is fair to say so. I am not
23 asking you to guess. When is the next time you can
24 remember, if any, that you met with Bulman about Brown

Page 92

1  and Horne and the concerns Bulman had about them?
2     A. I don't recall.
3     Q. Can you remember any specifics of any other
4  meetings that you had with Bulman about Brown and Horne
5  and concerns he had about them other than what you have
6  already described?
7     A. I recall discussing with Eric an incident
8  involving a person -- a fugitive we were looking for
9  who shot and killed a woman in Atlanta and wounded
10 another person in Atlanta and eventually shot a
11 Brookline police officer. I don't recall the -- it may
12 have been Tate was the person we were interested in or
13 looking for, if I recall properly. Brown and Horne
14 supposedly had information coming from a source about
15 the location of Tate. It was an extremely high
16 priority for the Youth Violence Strike Force with the
17 City of Boston and the Brookline Police and for
18 everyone else to find this guy. Brown and Horne had
19 some information which supposedly they had an informant
20 or a concerned citizen who was providing them
21 information. The flavor of the conversation I had with
22 Eric was the fact that Brown and Horne wouldn't share
23 that information not only with Eric but with other
24 members of the unit. And we had a full court press on

Page 93

1  to arrest this guy and there was a high level of
2  frustration in the unit regarding that.
3     Q. When you say there was a high level of
4  frustration in the unit, how did that manifest itself?
5     A. I believe Sergeant Bulman came to me and said
6  Brown and Horne have some information regarding this
7  guy. They are being very secretive about what they are
8  sharing with us. There is more information, but they
9  won't tell us. It was extremely frustrating for him
10 and frustrating for the unit.
11    Q. Can you recall anything else that Bulman said
12 to you or you said to Bulman about this gentleman who
13 I believe you said his name was Tate?
14    A. I'm not sure if that is his name. I think it
15 was Tate, but I can't be positive about that.
16    Q. Can you tell me what you said to Bulman and
17 he said to you other than what you just testified to?
18    A. No, I don't recall too much more about that.
19    Q. What did Bulman say they weren't doing with
20 respect to this gentleman Tate assuming his name is
21 Tate for the moment?
22    A. One of the things we wanted to do was
23 interview that informant, bring their source forward.
24    Q. This is the source regarding Tate?

Gary French                                                                                08/23/2005

Page 94

1   A.  Yes.
2   Q.  What happened?
3   A.  I don't think that source ever came forward.
4   Then it became a question of credibility, was there a
5   source, was there not a source. A lot of issues sort
6   of arose.
7   Q.  How far into their tenure at the Youth
8   Violence Strike Force did this incident occur, if you
9   can recall?
10  A.  I would say within -- I left there in
11  May of 2000. It was probably in March or April, I
12  think is when this surfaced.
13  Q.  Of 2000?
14  A.  Yes. I believe he was captured in the first
15  or second week of June. He wasn't captured actually.
16  The house was surrounded and he committed suicide.
17  Q.  Was the house surround and did the suicide
18  occur as a result in any way of the work of Horne and
19  Brown?
20  A.  I was out of the unit at that time. I don't
21  know how that information came.
22  Q.  So it could have been some work that resulted
23  from the work of Brown and Horne, you just don't
24  remember?

Page 95

1       MS. HARRIS:  Objection.
2   A.  It isn't that I don't remember. I wasn't
3   involved in the investigation at that point.
4   Q.  So you don't know one way or the other?
5   A.  No.
6   Q.  Any other specific instances you can remember
7   about specific informants or suspects that Bulman
8   discussed with you with respect to the job performance
9   of Brown or Horne?
10  A.  Specifics, no.
11  Q.  Do you remember if Bulman gave you any
12  specifics when he met with you in terms of specific
13  suspects or informants?
14  A.  No.
15  Q.  Did you, yourself, ever meet with Horne and
16  Brown over these issues that Bulman was bringing to
17  your attention?
18  A.  I believe I would have probably talked to
19  them. As far as calling a meeting, I don't know, but
20  I'm sure I would have talked to them.
21  Q.  I don't want you to guess, sir. I want you
22  to tell me if you can remember.
23  A.  I don't recall.
24  Q.  So you don't recall one way or the other

Page 96

1   whether you ever met with Brown and Horne yourself
2   about these issues that Bulman was bringing to your
3   attention; is that right?
4   A.  Right.
5   Q.  What would have been the procedure in that
6   regard, if any, you would have followed with respect to
7   doing anything about these concerns that Bulman was
8   bringing to your attention about Brown and Horne?
9       MS. HARRIS:  I will object. You can
10  answer.
11  A.  They were relatively new in the unit and I
12  felt that given more time, they may understand the
13  philosophy of the unit and how we operate. My concern
14  was how much time do we give them.
15  Q.  What was your concern in that regard?
16  A.  If there was a serious issue relating to
17  officer safety or not sharing intelligence information,
18  that would be something that would be -- they would
19  have to either change or they would have to be moved.
20  Q.  Did you have concerns with officer's safety
21  as a result of having spoken to Bulman about Brown and
22  Horne?
23  A.  Officer safety is one of the things I'm
24  always concerned about and there are always issues

Page 97

1   relating to that, procedures, having support and back
2   up from other officers, people knowing what's going on.
3   There is always a concern of officer safety in just
4   about every investigation that we do.
5   Q.  So is it fair to say that you had some
6   significant concerns about officer safety as a result
7   of the things Bulman was telling you about Brown and
8   Horne?
9   A.  Yes.
10  Q.  Did you take any steps to try to move
11  Officers Brown and Horne from the Youth Violence Strike
12  Force when you were there?
13  A.  No.
14  Q.  Why not?
15  A.  Once again, they were relatively new in the
16  unit. I think they may have worked for me for eight or
17  nine months. Once again, it's take a while to get up
18  to speed as to how the unit operates, get into the flow
19  of things and understand what is required of you as a
20  member of the youth violence strike force. And I think
21  there is a learning curve coming into the unit. They
22  were relative new. They were feeling their way around.
23  And I felt that if we could salvage them, we should
24  attempt to.

25 (Pages 94 to 97)

Page 98

1   Q. Why? If officers were in danger, why would
2   you attempt to salvage them?
3   A. I don't believe I said officers were in
4   danger. I said there was an officer safety issue that
5   I am always concerned about.
6   Q. If there was an officer safety issue you were
7   concerned about, why would you be concerned about
8   salvaging them and keeping them in the unit?
9   A. I think by working with them we could correct
10  that.
11  Q. Did you see any correction taking place by
12  the time you had left with respect to Brown and Horne?
13  A. I think there were still concerns being
14  raised throughout by Sergeant Bulman about the work
15  habits of Brown and Horne.
16  Q. So you hadn't seen any correction by the time
17  you left?
18  A. There was improvement, but I don't think it
19  was -- it was an issue I was going to have to deal with
20  if I stayed there.
21  Q. What would you have done if you stayed there
22  to deal with it?
23  A. I probably would have asked him where they
24  wanted to go if I were to transfer them out.

Page 99

1   Q. Did you ever sit down and have that
2   conversation with them?
3   A. No.
4   Q. Why not?
5   A. When I was there -- you asked me if I had
6   stayed there, I would have had to deal with them if
7   they didn't come around.
8   Q. Right.
9   A. Once again, when I was there, I was there
10  with them for a short period of time. I felt they may
11  understand what we're trying to accomplish in the Youth
12  Violence Strike Force and the importance of sharing
13  information -- sharing intelligence.
14  Q. On what basis did you -- what factual basis
15  do you base your testimony that you felt that they may
16  understand and come around and if you wanted to perhaps
17  salvage them?
18  A. I think in any unit there is a learning curve
19  when you go into the unit. You initially go in there
20  and you have your ideas about the unit and how they
21  operate. And I think once you're there for a period of
22  time, you understand it's really not what your
23  preconceived thoughts were about the unit. You sort of
24  change and understand the flow of the unit and how it

Page 100

1   operates. I think you have to give people time to pick
2   up on that.
3   Q. How much time?
4   A. I would say at least a year, a year and a
5   half. And, of course, it goes back to the job maturity
6   and the experience. You can have three years
7   experience but not really grasp what the job is all
8   about.
9   Q. I believe you said you had seen some
10  improvement with them with respect to the concerns
11  Bulman was bringing to your attention; is that right?
12  A. When you come into the unit at first, you
13  have a lot of learning you have to do. And over a
14  period of time you do understand some of the nuisances
15  of the unit. And that would be the improvement that I
16  would sort of say they started to understand what was
17  required of them. Whether or not they complied with
18  those requirements are a bit different. They can
19  understand -- I can go to them or Eric can go to them
20  and say you have to share information. You can't be a
21  free agent out there. It's very important. And they
22  can say, okay, I understand that, but whether or not
23  they actually comply with that are a different thing.
24  Q. Did they start to comply with it?

Page 101

1   A. I believe they were beginning to come around,
2   but then when the investigation into the person we were
3   looking for of the Atlanta shooting, I realized at that
4   point that they were really withholding vital
5   information to the unit and it was important to have
6   that addressed.
7   Q. So if I understand your testimony -- and
8   please feel free to correct me -- is it fair to say,
9   then, that your testimony is by the time you had left
10  in May of 2000 the Youth Violence Strike Force, you had
11  seen some improvement about the concerns Bulman had
12  raised about sharing information and secretive and so
13  forth with respect to Brown and Horne, but then this
14  incident involving the gentleman who you believe is
15  named Tate came up; is that right?
16  A. That came up prior to my leaving. Probably
17  within six weeks of my leaving that came up.
18  Q. I understand that. But before that came up,
19  is it my understanding of your testimony -- strike
20  that.
21      Before that incident occurred with the
22  gentleman I think you identified tentatively as Tate,
23  you had seen some improvement and the plaintiffs were
24  starting to come around with respect to their work in

Page 118

1  the typing and writes the intelligence report.
2      Q.  So it could be either?
3      A.  Yes.
4      Q.  Now, is it the experienced officer that is
5  assigned to train the inexperienced officer on how to
6  use the Lotus database notes?
7      A.  Yes. I think we had a one-week training
8  program where we brought in different people that we
9  worked with, different partners and we gave them an
10 overview -- an academic overview of the unit prior to
11 them going into that 30 or 60 day period. And it was
12 one week of instruction or just series of meeting that
13 took place at the Youth Violence Strike Force with
14 different representatives of the agencies we worked
15 with to come and give them an overview of whether it
16 was
17 a ten point coalition, the ATF, the DEA. They would
18 come in and give a presentation on what their agency
19 does and how they interact with us. And one of those
20 was Lotus notes from the tech. people would come in and
21 sit down and go over the different databases that we
22 use.
23     Q.  And would show the new officers how to use
24 the database?

Page 119

1      A.  Yes.
2      Q.  How many terminals at the Youth Violence
3  Strike Force were there when you arrived for officers
4  to input information on that Lotus database?
5      A.  I would maybe say a half dozen.
6      Q.  So there was plenty there for people to use.
7  Is that a fair statement?
8      A.  Yes.
9      Q.  So Brown and Horne couldn't have the excuse
10 they couldn't get to the computer because it was always
11 being used. Is that a fair statement?
12     A.  Yes.
13     Q.  This one-week training, do you know which
14 agency or other bureau came and actually trained Brown
15 and Horne when they were there?
16     A.  It was probably anywhere from 15 to 20
17 different speakers would come in for that block of
18 instruction.
19     Q.  From different agencies?
20     A.  Different agencies, community based agencies,
21 members of the gang unit. They would come in.
22 Different agencies that we worked with. Experienced
23 officers from the Youth Violence Strike Force would
24 come in and spend an hour just talking with them about

Page 120

1  what they do and the general flavor of how they
2  operate.
3      Q.  Did anybody at the Youth Violence Strike
4  Force sit down with Brown and Horne when they first
5  came in and said this is what you're expected to do
6  with the Lotus database system we have?
7      A.  Yes.
8      Q.  Who would have done that?
9      A.  We would have brought in probably John Daley.
10 I'm not positive, but someone from the intelligence
11 unit. I know this is our lifeline. This is bread and
12 butter, so to speak, the intelligence.
13     Q.  Meaning the Lotus database?
14     A.  The Lotus database, the FIO database, the
15 gang unit database. That is critical to the success of
16 the unit.
17     Q.  When you say the FIO database, what is that?
18     A.  Field interrogation database.
19     Q.  Is that different from Lotus database?
20     A.  Yes.
21     Q.  How does that work?
22     A.  You identify some people -- a person on the
23 street who is acting suspicious or he is a known felon
24 or a known gang member. You can either stop and talk

Page 121

1  to him, write down his data onto a -- it's a small
2  form. It gets entered into the computers. You can
3  track who is associated with who. So if you're stopped
4  with two other individuals and we pull up the two other
5  individual's names, we can reference it back to you to
6  determine who your associates are and the neighborhood
7  you hang out in, capture some of the conversation or
8  the reason for the stop.
9      Q.  Is that a separate database from the Lotus?
10     A.  Yes, it is.
11     Q.  The FIO database, would that include
12 debriefing information?
13     A.  No. Debriefing would largely go into either
14 Lotus notes or the individual -- if it's investigative,
15 it would go into his notes.
16     Q.  Into whose notes?
17     A.  The detective's notes.
18     Q.  Who were the detectives again when Brown and
19 Horne were there?
20     A.  Rob Fratalia, Fred Waggett, Susan Antonucci,
21 Billy Dunn.
22     Q.  Billy Dunn, Robert Fratalia -- Susan who?
23     A.  Antonucci-Sementelli.
24     Q.  Who else?

Page 126

1  Q. And those are things that should be in the
2  Lotus database notes or the FIO database or the other
3  documents we have talked about; is that correct?
4  A. Not necessarily but if there is a question
5  relating to the basis of knowledge on the intelligence
6  report, the supervisor would go to the officer and ask
7  him where did you get this? How reliable is it? A lot
8  of the intelligence report is just raw information or
9  street sources or it could be a confidential informant
10 who is carded and has credibility. So those are the
11 types of things supervisors and investigators were
12 interested in knowing.
13     So there could be raw data which is just
14 a rumor on the street that there is going to be a
15 shoot-out between Intervale and Castle Gate. There
16 could be a shoot-out between two gangs and it could be
17 a rumor they heard from a 13 year old kid who has
18 really no basis or knowledge or it could be from a
19 confidential informant within those gangs who has
20 worked with us in the past and said tonight at
21 7 o'clock there is going to be a conflict. They are
22 planning on doing something down on such and such a
23 street. And if that is the case, we're going to look
24 at that a lot more seriously than getting some

Page 127

1  scuttlebutt from a school kid who said he heard it at
2  school from a friend of a friend who lives on one of
3  those streets.
4  Q. So that's what you mean by the subtly's of
5  information of informants?
6  A. Yes.
7  Q. So is it your testimony --
8  A. That's a piece of it.
9  Q. What is the rest it?
10 A. Information that would generate questions out
11 of an intelligence report that are left unsaid in the
12 intelligence report that we're interested in and it
13 would be pretty much -- I don't want to say case by
14 case basis, but when you view the intelligence report,
15 it is going to prompt you to have questions in your
16 mind to go to the officer and say tell me more about
17 the specifics of this report.
18 Q. When you say intelligence report, you're
19 talking about a Lotus database report like Exhibit 26
20 or Exhibit 10?
21 A. Yes.
22     (Discussion off the record.)
23 Q. Is there anything else about the subtly's of
24 intelligence that the plaintiffs weren't provided other

Page 128

1  than what you just told me?
2  A. We encourage officers to write intelligence
3  reports whenever intelligence comes in. It may or may
4  not be done all the time. It may be discussed at a
5  roll call. It may be discussed among the officers at a
6  briefing where it's not actually put on to paper where
7  it's discussed openly with the officers in the unit.
8      MR. ROACH: Let's take a break.
9      (Lunch recess taken.)
10     BY MR. ROACH: I am going to mark by
11 agreement of the parties even though I'm only marking
12 the first page as confidential only unless otherwise
13 provided under your rights in the protective order.
14 This confidentiality would apply to all the pages of
15 Exhibit 26.
16 Q. Is there anything else other than what you
17 just discussed about the subtly's of intelligence
18 issues that you had with Horne and Brown?
19 A. No.
20 Q. Did I understand you correctly to say that
21 information that come in does not necessarily always
22 have to be written down or put into the Lotus database
23 or the FIO database or written down in any fashion, but
24 it must be shared verbally?

Page 129

1  A. Correct.
2  Q. Is it your understanding that the main
3  concern from Bulman was the plaintiffs were not sharing
4  the information verbally?
5  A. Yes. They weren't sharing in detail. I
6  think they were the two issues.
7  Q. Okay. When you say not in detail, is that in
8  addition to not sharing things verbally?
9  A. Yes. It was almost like they would give bits
10 and pieces but not give the full picture.
11 Q. So even when they were putting information
12 into the Lotus database, for example, was it Bulman's
13 concern that the plaintiffs, Horne and Brown, were not
14 putting in sufficient information or all the
15 information that one would normally be expected to put
16 in?
17 A. Probably in some intelligence reports that
18 was the case. In others, they were probably complete.
19 Q. When you say in some that was the case and
20 others they were complete, can you give me a breakdown
21 as to the percentage as to when they were complete and
22 weren't complete?
23 A. I couldn't, no.
24 Q. Well, on what are you basing your statement

Gary French                                                        08/23/2005

Page 170

1   A.   Nothing that jumps out in my mind, no.
2   Q.   What is the next thing that happened in this
3   regard?
4   A.   I think as soon as we finished up talking --
5   I think the conversation may have lasted 15 minutes to
6   a half an hour -- I went down to see my boss and let
7   him know that a formal complaint was filed or I felt it
8   was a formal complaint and that we had to address it.
9   Q.   When you say a formal complaint was filed,
10  was anything in writing?
11  A.   No.
12  Q.   Was there any procedure for any kind of
13  complaint of this nature?
14  A.   I believe there is a written procedure in the
15  police department in the city hall that outlines the
16  proper way to handle it.
17  Q.   Do you know what the rule number is?
18  A.   I don't, no.
19  Q.   Is it a Boston Police Department rule?
20  A.   I believe it is, but it may be a city policy.
21  I'm not sure.
22       (Recess taken.)
23  BY MR. ROACH:
24  Q.   What is the next thing that happened with

Page 171

1   respect to this issue?  I believe you said you went and
2   spoke to your boss.
3   A.   Yes. I think immediately after I concluded
4   with that group of officers I went down and spoke to my
5   deputy superintendent.  At that time it was Tommy Dowd
6   who just arrived in the unit about two or three weeks
7   prior.
8   Q.   What did you say to Dowd and what did he say
9   to you?
10  A.   I said we have a problem that we have to
11  address. We discussed it.  I went over as much as I
12  knew about it.  I tried to give him an overview of what
13  transpired. And then at some point either while I was
14  in the room or the follow day, he must have kicked it
15  up to his bosses, and then a series of smaller meetings
16  were held.
17  Q.   Who was his boss?
18  A.   That would have been James Claiborne, I
19  believe, at the time.
20  Q.   What did you say to Dowd and what did he say
21  to you in this meeting?
22  A.   Basically what I told the deputy was that
23  there was an issue -- there was an allegation of racial
24  hostility within the unit and they wanted -- it wasn't

Page 172

1   something that was informal.  I think I was approached
2   formally, and I told him I thought it should be handled
3   formally.
4   Q.   What did he say?
5   A.   He said fine.
6   Q.   Anything else you may recall he said to you
7   or you said to him?
8   A.   Like I said, he was relatively new in the
9   unit. Whether he was there six weeks, three or four
10  weeks -- I don't know, but he was there for about a
11  month. Maybe a little longer or a little less.  He
12  wasn't familiar with the unit.
13  Q.   What was his position again, deputy
14  superintendent?
15  A.   Deputy superintendent. He was in charge of
16  special operations.
17  Q.   And the Youth Violation Strike Force is under
18  that, right?
19  A.   Yes.
20  Q.   So he was your immediate supervisor?
21  A.   Yes.
22  Q.   Did you mention Horne or Brown in the meeting
23  with him?
24  A.   I'm sure I did. I probably went over the

Page 173

1   initial strategy meeting on Dorchester High, what
2   transpired at that meeting.  The comment that was made
3   by Bobby Fratalia, the fact it was viewed as being
4   insensitive and went over with him that I was
5   approached by a group of officers whether it was six or
6   eight officers that came in -- I'm not really sure of
7   the numbers and their position was that this was an
8   issue that had to be addressed.
9   Q.   Have you told me everything you can recall
10  about what you said to Dowd and he said to you in this
11  meeting?
12  A.   Yes.
13  Q.   What's the next thing that happened?
14  A.   I think within the following week or within
15  days of that meeting we sat down with -- I believe it
16  was some of the minority officers. Some of the people
17  I identified. Vance Mills I know was there.  Gregg
18  Jones was there. I think Brown and Horne were there.
19  Q.   Craig Jones?
20  A.   Craig Jones. I think we sat down with
21  Superintendent Ann Marie Doherty. I believe she was
22  in charge of professional development.
23  Q.   So when you say we, the officers you've
24  mentioned, yourself and who else?

LegaLink Boston
(617) 542-0039

Page 250

1  to you repeatedly have assigned Horne and Brown to such
2  a dangerous individual that was arrested here?
3      A.  It wouldn't be unusual, no.
4      Q.  Why not given all the concerns he supposedly
5  expressed to you?
6      A.  I don't know.
7      Q.  I would like to show you another document
8  dated April 12, 2000. Tell me what that is, sir.
9      A.  This is a letter from Captain Conway to
10 Ron Brown congratulating him on outstanding police work
11 on the morning of March 1st, 2000.
12         (Exhibit No. 37 marked for
13 identification.)
14     Q.  Looking at Exhibit 37, do recognize the
15 handwriting of Captain Conway?
16     A.  Yes, I do.
17     Q.  That is his writing?
18     A.  Yes.
19     Q.  Are you familiar with this job that Ron Brown
20 did in March of 2000?
21     A.  I don't recall it specifically, but I did
22 read the associated commendation that was given.
23     Q.  That would be on exhibit --
24         MS. HARRIS:  34.

Page 251

1          MR. ROACH:  34.
2      Q.  Is that right?
3      A.  Yes.
4      Q.  I have another document, March 10, 1999. Do
5  you recognize that?
6      A.  It's a letter from the commissioner to
7  Officer Ron Brown.
8      Q.  For what?
9      A.  Working on the recruitment efforts.
10     Q.  What is that?
11     A.  I'm assuming this is -- there was a big push
12 for minority candidates to apply for the police
13 department.
14     Q.  Why do you assume that?
15     A.  If I recall, they were concerned about the
16 lack of minorities applying for a position in the
17 Boston Police Department. They were trying to get a
18 more diverse department.
19     Q.  Was there a downturn in the number of
20 minorities in the department at that time in terms of
21 officers?
22     A.  I really don't know. I do recall they were
23 doing a lot of recruiting at schools and universities
24 in the community.

Page 252

1      Q.  And Ron Brown was part of that?
2      A.  Apparently.
3          MR. ROACH:  I would like to mark that
4  as Exhibit 38.
5          (Exhibit No. 38 marked for
6  identification.)
7      Q.  Looking at the Exhibit 38, do you recognize
8  Commissioner Evan's handwriting?
9      A.  Yes, I do.
10     Q.  Looking at Exhibits 12 and 13 starting with
11 13 for Ron Brown. The second page in -- second, third
12 and fourth pages in there is a recommendation for
13 commendation of May 14, 2001. Do you see that?
14         MS. HARRIS:  What was that?
15         MR. ROACH:  It's a document dated
16 May 14, 2001.
17     Q.  This is a recommendation for commendation
18 signed by Sergeant Eric Bulman with regard to Ron
19 Brown, correct?
20     A.  I think there were probably several officers
21 and Ron Brown being one of them that were given
22 commendations for this.
23     Q.  And that was signed by Bulman, correct?
24     A.  Yes.

Page 253

1      Q.  And it says in here Bulman -- it says in here
2  "Horne and Brown participated in operation deep
3  impact?"
4      A.  Correct.
5      Q.  And he singles out at the bottom of the page
6  "Steven Horne and others who immediately and without
7  hesitation pursued the suspect on foot," right?
8      A.  Correct.
9      Q.  He talks over in the next page about Horne,
10 Bailey and Scanlon involved in some teamwork to prevent
11 the gentleman's escape, correct?
12     A.  Correct.
13     Q.  At the bottom of the page, last paragraph,
14 first sentence Bulman says "I commend all these
15 officers for their actions in this incident. By
16 working cohesively as a team, these officers were able
17 to pull their expertise, et cetera." Did I read that
18 correctly?
19     A.  Correct.
20     Q.  Is that consistent with what Bulman was
21 saying to you about Horne and Brown and the concerns he
22 supposedly had?
23     A.  It can be. These were individual situations
24 or operations that took place that involved Horne and

Gary French                                                                08/23/2005

Page 254

1  Brown where they did exceptional work. And it's
2  tempered by the concerns Eric raised to me when I was a
3  unit commander there.
4      Q. Who is Captain Conway?
5      A. Captain Conway was over for there a period of
6  time just prior to my leaving, whether it was six to
7  nine months.
8      Q. Was he under your command or over you?
9      A. He was above me.
10     Q. How long was Captain Conway there when you
11 were a lieutenant in the unit?
12     A. I would say maybe nine months to a year.
13     Q. Was this the same time Brown and Horne were
14 there?
15     A. Yes.
16     Q. Did you ever bring any of your concerns
17 Bulman brought to you about Horne and Brown up to
18 Captain Conway?
19     A. No. Captain Conway was in -- how the
20 structure was in special operations you would have a
21 deputy. Then a captain. Then you would have the units
22 within special operations, the bomb squad, the dogs,
23 the motorcycles.
24     Q. So was Dowd your immediate supervisor and

Page 255

1  Conway was above Dowd at the time?
2      A. No. Conway was -- I guess you would call him
3  my immediate supervisor and Dowd was above Conway.
4      Q. Earlier we talked about how you brought
5  concerns of the racial problems and racial tension to
6  your immediate supervisor Dowd?
7      A. Correct.
8      Q. You didn't mention Conway. Why not?
9      A. He was getting ready to retire. I think he
10 was using up time.
11     Q. Did he retire?
12     A. Yes. I'm not sure if he retired before I
13 left or shortly thereafter.
14     Q. A few more pages in, January 26, 2000.
15     A. Exhibit 13?
16     Q. Yes. January 26, 2001 was a letter to
17 Ron Brown. "Job well done by Captain Conway." Do you
18 see that?
19     A. I do.
20     Q. It says in the first sentence "One of the
21 major overlooked areas in policing is the coordination,
22 communication and cooperation which occurred internally
23 in an organization."
24     A. Correct.

Page 256

1      Q. So he was commending Brown for coordination,
2  communication and cooperation within an organization in
3  apprehending Demetrius Wilson, correct?
4      A. Correct.
5      Q. Where would Conway have gotten that
6  information about Brown participating in coordination,
7  communication and cooperation internally with the Youth
8  Violence Strike Force?
9      A. I'm assuming that is coming from the
10 commendation written by Sergeant Bulman.
11     Q. So is it fair to say that Brown wasn't always
12 somebody who was not being communicative with his
13 fellow members of the unit; is that right?
14     A. There is group commendations and individual
15 commendations. And I believe he is referring to a
16 group commendation. I don't mean to split hairs, but
17 when Bulman is commending five or six people for an
18 arrest that was made as a group, there are praising the
19 efforts collectively as a group. And it is fair to say
20 that in that group effort on that particular day
21 coordination, communication and cooperation was very
22 important in making that arrest.
23     Q. Now, this actually was when Davin was there
24 supervising Ron Brown, correct, January of 2001?

Page 257

1      A. Correct.
2      Q. Not Bulman?
3      A. I don't know unless I start referring back to
4  some of these exhibits.
5      Q. A few pages in, it's dated October 30, 2001.
6  Do you see that? To Ronald Brown from Deputy
7  Superintendent Ruiz, the Trooper George L. Hannah award
8  for merit.
9      A. That's correct.
10     Q. What is that?
11     A. That's a very prestigious award.
12     Q. Ron Brown was awarded this in
13 October of 2001, correct?
14     A. Correct.
15     Q. When you say prestigious, why do you say
16 that?
17     A. It's given out annually at the statehouse.
18     Q. To whom and for what?
19     A. I'm not really sure. It's for courageous
20 actions. I'm not sure what he received that award for.
21 Is that in here?
22     Q. If I were to suggest to you that this award
23 was given for his work on the Sean Taylor matter, would
24 you agree with that?

65 (Pages 254 to 257)