UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10718-RGS

| | | |
|---|---|---|
| STEVEN HORNE and RONALD BROWN, | ) ) ) | |
| PLAINTIFFS | ) | **PLAINTIFFS RONALD BROWN and STEVEN** |
| v. | ) ) | **HORNE'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY** |
| CITY OF BOSTON, SGT. ERIC BULMAN, and SGT. JOHN DAVIN, | ) ) ) | **JUDGMENT OF DEFENDANTS SGT. ERIC BULMAN AND SGT. JOHN DAVIN** |
| DEFENDANTS | ) ) ) | |

## I.  INTRODUCTION

Plaintiffs bring this action against Defendants Eric Bulman ("Bulman") and John Davin

("Davin") for violation of their civil rights under 42 U.S.C. §1983 (Count One),  42 U.S.C.

§1985 (Count Two), 42 U.S.C. §1981 and M.G.L. c. 93, §102 (Count Three), 42 U.S.C. §2000e

and M.G.L. c. 151B, §4 (Count Four), M.G.L. c.12, §11I (Count Five),  and for interference with

contractual relations (Count Six). The Defendants incorrectly assert **(Defts' Memo at 2)** that the

other claims against the Defendant City of Boston "have been bifurcated." The Court bifurcated

discovery only.[1]

---

[1]It should also be noted that even if the Court were to allow the Summary Judgment
Motion of the individual Defendants Bulman and Davin it would not, under the law, dispose of
the independent claims against the Defendant City of Boston.

## II. MATERIAL FACTS AT ISSUE[2]

### 1. The YVSF was originally an elite all-white unit.

Created in 1993 as a prestigious, elite unit, the Youth Violence Strike Force ("YVSF"),

which originally was under previously existing Anti-Gang Violence Unit (a night unit), was

charged with reducing violence among Boston's youth and tracking fugitives. The YVSF was a

day tour unit. It later evolved to work with the FBI and other investigatory agencies. It is a

highly sought after assignment. Superintendent Joyce was a founder of the YVSF. Defendants

Davin and Bulman were among those initially in the unit with Joyce, and all were white. No

minorities joined the day tour from 1993 to at least 1996. **P Facts 20, 48e.**

### 2. Bulman and Davin kept the YVSF racially divided.

When African-American Plaintiff Officers Steven Horne ("Horne") and Ronald Brown

("Brown") arrived in August 1999, as the defense admits, YVSF cruiser assignments were

divided along strictly racial lines. With occasional exceptions, black officers rode together and

white officers rode together. Davin and Bulman nearly always rode with the white officers. **P**

**Facts 20, 21, 29, 48e.**[3] Davin, Bulman, and even their YVSF superiors, Lt. French and Lt.

Foley justified the practice as something that the officers themselves chose. Lt. French said

Bulman and Davin had authority to assign cruisers. As a black State Trooper said to Horne and

Brown during their first week when Bulman left them with no assignment, "Get used to it."

**P Facts 20.** Bulman (and later Davin) and the other white officers routinely worked with the

white state troopers assigned to the unit. Eventually, Horne and Brown sought an assignment

_____

[2] Citations are to the direct source to the Plaintiffs' Exhibits ("**P EX**") or to the Plaintiffs' Statement of Facts (**"P Facts"**), or those of the Defendants (**"D Facts"**).

[3] Bulman and Davin had authority to assign officers to cruisers and to hand out mission assignments. **P EX 9 at 212.**

from the YVSF commander, Lt. Gary French. When Horne and Brown voiced their complaint Bulman finally assigned them warrants on difficult "cold case" fugitives which the Plaintiffs solved. **P Facts 20, 21, 26, 48a-b.**[4]

The YVSF day tour fugitive trackers consisted of all white teams except when the Plaintiffs arrived. New minority Officers Brito, Brown and Horne worked together as TK15. Bulman placed two new white officers with white teams for training. In violation of procedure, Bulman did not assign the Plaintiffs for training. Unit TK18 (three black officers) was an administrative unit that worked in the schools with black state troopers. Accordingly, TK15 was the only minority day team tracking fugitives. At least since 1993, there has never been a black Sergeant assigned to the day tour. **P Facts 20, 26, 29, 39, 48a.** Bulman and Davin generally supervised warrant service or arrests with white officers. Bulman and Davin assigned white officers from other agencies with white officers.[5] A Superintendent admitted it was a racially divided unit due to lack of direction and leadership. **P Facts 40, 48b.** [6] Veteran black officers said the day tour was divided as "A Team - B-Team" with the A Team (all white) getting the more significant assignments. When a veteran black officer asked Bulman why there were not more blacks in the unit Bulman's response was "I don't know any aggressive black officers." **P Facts 21, 28.**

The racial division continued under Davin. Bulman and Davin did not make themselves

---

[4]During his first few days at the unit, Bulman did not even tell Brown that Bulman was his supervisor. **P EX 2 at 119-121.** Bulman often would credit the Plaintiffs' good work to the white officers. **P EX 1 at 68-73.**

[5]As examples, a white MBTA detective was assigned to ride with the TK16 or TK17 under Davin and a white Sheriff rode with the TK19, all white officers. **P Facts 21.**

[6]Joyce added there was a "lot of damage in the unit." **P Facts 21, 40, 48b.**

as available to accompany TK15 to serve warrants. When a new white YVSF officer who knew Horne wished to ride with him, white officers objected to Foley and the new white officer was assigned to white officers. **P Facts 29, 48a.**

Black officer units primary worked nights and were known as the "Soul Patrol." **P Facts 21, 48c.** When the Plaintiffs were on night tours they rode with blacks. A white YVSF officer was wearing an officer T-shirt as to the black unarmed New York City black man who died in a hail of officers' gunfire. A white officer, forgetting a black officer was in the back seat, referred to a black as nigger. A black YVSF officer beginning an overtime tour with a white refused to continue when the white officer called a black driver a "nigger." **P Facts 21, 29, 48c.** Bulman and Davin would not allow equal access to investigative tools and resources. **P Facts 21, 39.**[7]

### 3. Bulman and Davin preferred new white officers over the Plaintiffs.

Bulman repeatedly told the Plaintiffs that the Plaintiffs had to prove themselves were taking the place of white officers Long and McGlaughlin. When Horne asked Bulman to elaborate, Bulman walked away. New white Officers McCarthy and Langa were so not told. **P Facts 22, 23, 30.** White Officer Gerald Baily said that he did not want Brown there. **P Facts 22-23, 45.**

### 4. White YVSF officers routinely abuse minority witnesses and citizens.

White YVSF officers consistently abused black citizens, including children and older people. For example, three white officers beat black man at in the presence of Brown (who intervened), but Davin initially instructed them to make an arrest the citizen for an unknown reason. Davin dropped the matter after Brown intervened. Davin saw him bruised and bleeding.

---

[7]At times, when the Plaintiffs and black night shift officers were about to make an arrest Bulman ordered them to hold off and let the white day officers do it later. **P Facts 33, 39, 91.**

**P Facts 48i, 73-74, 76.** White YVSF officers in the YVSF would enter the homes of black families, sometimes without warrants, yell racial epithets, demand information, intimidate non-suspects and run CORI checks on them. **P Facts 48i.** White suspects were treated differently. For example, Davin and others knocked at the door, politely asked for the suspect on a warrant and accepted a relative's promise to him in next day; when the suspect did not appear Brown arrested him. Brown complained to Davin about the disparity. **P Facts 48i.**

### 5. White YVSF officers call minorities "monkeys" and "animals."

White YVSF officers referred to black suspects as "monkeys" and "good blacks" as "porch monkeys."[8] Brown voiced his objections. Officer Gerald Baily referred to himself and was known as the "Grand Wizard" (as in the Ku Klux Klan). **P Facts 22-23, 45, 48g.** The defense admits 80 to 100 fugitive posters on the three YVSF bulletin boards were exclusively minority until the Plaintiffs complained but, even then, only one white face appeared after Davin took over. Bulman and Davin chose whom to post.[9] Visiting black civilians made note of the disparity. White Det. Wagget, in Horne's presence, referred to a black Command Staff Superintendent as a "big headed monkey." Horne and Brown consistently took exception. **P Facts 48g.**

In a February 2000 meeting commander Lt. French ordered YVSF officers to work at Dorchester High School and to participate in special intervention and crime prevention programs such as home and school visits, white officers resisted. The participation of white officers in such programs was very low. One stated that he would not send his dog to Dorchester High.

---

[8]"Porch monkeys" were an obvious reference to the deep South house servants who served the owner in his house rather than as a slave in the fields. **P Facts 48g.**

[9]The YVSF was a city-wide unit not working only in minority areas. **P EX 9 at 122**

Another said only rapists, murderers, and people who committed violent crimes went there. White officers referred to Dorchester High students (which are predominately minority) as "animals." A third said he was to track fugitives and didn't want to go into people houses from Dorchester High because they were nasty and full of roaches. As to two black officers assigned to Dorchester High white officers asked "What the fuck are they doing up there? They don't do anything"!? **P Facts 44-45, 50, 54** [10]

### 6.    The Plaintiffs become "marked men"

After the February 2000 meeting described above, Horne brought his objections to Lt. French about racism in the unit. Horne and Brown approached French a number of times as a followup. French said he was taking it to the BPD command staff. French stated that Horne and Brown initially brought the issue forward in the unit. Horne and Brown enlisted other minority YVSF officers for support. Small and larger minority officer meetings ensued. Lt. French and Bulman met with Horne, Brown and Brito, and the Plaintiffs again gave an overview of their objections. Bulman noticed Horne as being the most upset and noted everyone started talking. **P Facts 48j.** French held separate meetings with minority-only and white-only officers. Superintendent Joyce held meeting of the Plaintiffs and a few other minorities, expressed his "disappointment" and, looking ominously directly at Horne, said that he created the unit was not going to let anyone destroy it. **P Facts 48k.** [11] After meetings with Commissioner Evans and other command staff, bigger meetings in May 2000 with all members of the YVSF, representatives of the NAACP, the Nation of Islam, Probation and others took place. No white

---

[10]Lt. Foley thought the unit had lost its focus and drafted away from its "original responsibility." **P Facts 14.**

[11]Joyce admits to being close friends with two white officers about whom the Plaintiffs also had complained and who started the YVSF with Joyce. **P Facts 48.**

YVSF officers spoke. Viewed as an instigator Horne, out of fear, did not speak. [12] **P Facts 51-54.**

The same racist behavior continued under Davin in May 2000; black officers were segregated and not given priority. **P Facts 7, 20, 48a-b.** Bulman also continued to supervise the Plaintiffs from time to time. **P Facts 55-60.** Davin ordered officers to obtain a minimum of 20 Field Interrogation Observation ("FIO") daily. Davin bragged that he could obtain 20 FIO's in front of the YVSF offices. Brown told Davin, to Davin's ire, that a quota to make FIO's could lead to a violation of people's civil rights. Foley encouraged FIOs as a competitive edge over other BPD units. **P Facts 44, 55-60.** Cruiser assignments continued along racial lines (new black officers were assigned to ride with the Plaintiffs) **(P EX 1 at 201),** and white YVSF officers continued to abuse minority citizens; the Plaintiffs continued to complain to new commander Foley. **P Facts 2, 55-60.** Davin assigned the Plaintiffs the one white suspect face which appeared on the bulletin board. **P Facts 71, 77.** Due to their initial complaints to French, white officers became hostile to them as "instigators", outcasts, marked men and "dogs"; French initially tried to keep it within the YVSF. **P Facts 69, 77.** The Plaintiffs complained to Foley and a Deputy Supervisor about the hostility. **P Facts 55-60.**

### 7. Horne and Brown are transferred out of the YVSF on specious grounds

French told Deputy Superintendent Dowd that the Plaintiffs' complaints were "pretty serious." Dowd then discussed it with Commissioner Evans and described it as "some serious issues." Dowd suggested to Evans that "We might have to consider moving some people out of the unit." Evans responded "we'll have to do what we have to do." **P Facts 50.** Lt. Foley

---

[12]The BPD brought in a "consultant" who admitted she is not trained in race relations and recalled little about it. **P Facts 51-54.**

regularly had discussions with Bulman and Davin about the Plaintiffs. [13] French spoke regularly to Bulman who told French that the Plaintiffs "did not fit in the unit." Davin told Foley that the Plaintiffs did not share information, but Foley was unable to give an example even when Horne asked him for one. **P Facts 91, 93.**

Bulman told Horne and Brown that they were "too secretive", were not team players, and "failed to share information" as to <u>one</u> incident. Bulman once told Brown that Horne was too secretive but would not elaborate. **P Facts 31, 91.** Such were the same terms Davin used when doing the so-called Professional Analysis Meeting ("PAM") evaluation of Horne and Brown shortly before they were transferred, and it was the <u>only</u> time they heard them from Davin. Previously, Davin had only told them they were doing a good job. **P Facts 91, 100.** No PAM had ever been conducted before or since, and PAM did not include the categories under which the Plaintiffs were "evaluated." Davin could give no examples as to how they were secretive. Davin did not talk to them about their own alleged issues, but only about the <u>other</u> Plaintiff's issues. **P Facts 82, 91.** Bulman admitted that both he and Davin "never counseled or warned plaintiffs about the type of conduct which would result in discipline or transfer" **P Facts 39.**

## II. ARGUMENT

### A. <u>Summary judgement is disfavored in discrimination cases.</u>

Summary judgment is a disfavored remedy in the context of discrimination cases. <u>Brunner v. Stone & Webster Eng'g Corp.</u>, 603 N.E.2d. 206, 211; 413 Mass. 698, 705 (1992). "Where motive, intent, or other state of mind questions are at issue summary judgment is often inappropriate." <u>Flesner v. Technical Communications Corp.</u>, 575 N.E.2d 1107, 1110, 410 Mass. 805, 809 (1991). As to whether offensive discriminatory conduct is unlawful is better resolved

---

[13] The BPD transferred Horne to South Boston. **P Facts 101.**

by a fact-finder at trial and not on summary judgment. <u>Andujar v. Nortel Networks, Inc.</u>

<u>Andujar</u>, 400 F.Supp.2d 306, 332 (D. Mass. 2005). The moving party bears the burden of

demonstrating the absence of a triable issue. <u>Grafton & Upton R.R. Co. v. Town of Milford</u>, 417

F.Supp.2d 171, 174 (D. Mass. 2006). This burden exists even if the moving party would have no

burden on an issue if the case were to go to trial. <u>Pederson v. Time, Inc.</u>, 532 N.E.2d 1211,

1213, 404 Mass. 14, 17 (1989). [14]

### B. Police officers have the same employment rights as all citizens.

Even though the BPD is a self-proclaimed "paramilitary" organization its police officers,

like all other citizens, are entitled to protection of employment rights in employment, civil rights

and otherwise. "A government employee does not lose his First Amendment right to comment

of matters of public concern by virtue of his employment with the government." <u>Perez v.</u>

<u>Pierluisi</u>, 339 F.3d 43, 50-51 (1st Cir. 2003); <u>see</u> <u>Forsyth v. City of Dallas</u>, 91 F.3d 769 (5th Cir.

1996)(police officers assert successful civil rights claims due to a transfer); <u>DelSignore v.</u>

<u>DiCenzo</u>, 767 F.Supp. 423 (D. RI 1991) (same).

### C. Counts One (Section 1983) and Five (M.G.L. Chapter 12) are well grounded.

### 1. Bulman and Davin are liable as supervisors.

Defendants contend that, as to Bulman and Davin, "since neither sergeant had the

authority to transfer anyone, and the unit commander, Lt. Foley, accepts full responsibility for

the employment decision..., there is no competent evidence from which a fact finder could

conclude that plaintiffs' speech was causally linked to the decision to transfer them." **(Defts'**

---

[14] All summary judgment material is viewed in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. <u>O'Connor v. Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993).

**Memo at 5).** Legally and factually, the Defendants are <u>incorrect</u>. <u>First</u>, police supervisors, and

even co-employee officers, can be liable for violating the civil and other rights of officers under

their command if the supervisors or other officers provide the information to the higher authority

who then relies on it to transfer the plaintiff officers. See <u>Tejada-Batista. v. Morales</u>, 424 F.3d

97 (1st Cir. 2005) (a police officer's supervisors could not hide behind their superior when the

supervisors' retaliatory recommendation ultimately led to the plaintiff's discharge); <u>Tejada-</u>

<u>Batista</u>, 424 F.3d 97 (1st Cir. 2005); <u>Forsyth v. City of Dallas</u>, 91 F.3d 769, 775 (5th Cir.

1996)(Section 1983 violation upheld against fellow officers who provided information for

transfer); <u>see also</u> <u>Webber v. Int'l Paper Co.</u>, 417 F.3d 229 (1st Cir. 2005) (tainted adverse

recommendation from a supervisor; <u>cf</u> <u>Broderick v. Boston Police Superior Officers Fed'n</u>, 803

F. Supp. 480, 482 (D. Mass. 1992).

  <u>Second</u>, Lt. Foley did <u>not</u> transfer the Plaintiffs but only recommended their transfer to

Commissioner Evans.  Foley relied upon the information Davin and Bulman supplied him.

Sergeants have the right to recommend a transfer. **P Facts 61, 91, 93,100-101.**

  **2. <u>Proof of temporal proximity is NOT required.</u>**

  The Defendants say that the Plaintiffs cannot establish proximate cause between the

Defendants' actions and the transfer because the time between the February 2000 meeting after

the Plaintiffs' first voiced their complaints and the Plaintiffs' retaliatory transfer is too far

removed. **(Defts' Memo at 5).**[15] Legally and  factually, the Defendants are in error. <u>First</u>, for

cases under 42 U.S.C. §1983 (Count One) and M.G.L. c. 12, §11I (Count Five),  as well as civil

---

  [15]The Defendants inaccurately classify this as <u>only</u> a First Amendment freedom of speech
case, when it is a case about <u>both</u> bald race discrimination as well as retaliation against African
Americans who chose to exercise their First Amendment rights about racism.

rights matters in general, there is **no** requirement to establish temporal proximity to prove

causation. See Chungchi Che v. MBTA, 342 F.3d 31, 38 (1st Cir. 2003) (Section 1983); Murphy

v. Cruz, 53 Mass. App. Ct. 414, 318 (2001)(Chapter 12). Second, a plaintiff sometimes can use

temporal proximity between a protected activity and an adverse employment action, by itself, to

carry the plaintiff's burden. Chungchi Che, 342 F.3d at 38; Murphy, 53 Mass. App. Ct. at 318;

Greene v. New England Deaconess Ass'n, Inc., 2002 WL 31677209 Mass.Super. Temporal

proximity is only needed when a plaintiff has nothing else to rely on.

Third, temporal proximity is not necessary when causation can be inferred from proof

that an employer has advanced a false reason for the adverse employment action. Chungchi Che,

342 F.3d at 38; see, e.g., Trustees of Health and Hospitals of the City of Boston Inc., v.

Massachusetts Com'n Against Discrimination, 839 N.E.2d. 861, 65 Mass.App.Ct. 329 (2005).[16]

Foley says that the Plaintiffs were transferred, based on information from Bulman and Davin,

because (1) they were not team players, (2) were "secretive", and (3) made too many off duty

arrests.[17]  **P EX 8, at 236-329.** There is substantial evidence that they were team players, shared

information with others,  received commendations, were assigned by Davin to train new YVSF

officers, tracked down dangerous fugitives, and were not told to not make off duty arrests[18] The

_____

[16]A jury may infer discriminatory animus and causation from proof that an employer has advanced a false reason for the adverse employment decision.  Knight v. Avon Products, Inc., 780 N.E.2d 1255, 1263, 438 Mass. 413, 422 (2003).

[17]The Defendants have apparently discarded as too obviously too transparent, an original alleged fourth reason for the transfer, use of "bad judgment" by Brown for allegedly dating a fellow female YVSF employee, as to which there is no prohibition within the BPD.

[18]Engaging in "too many" off-duty arrests was another alleged reason Bulman and Davin gave to Lt. Foley as grounds to transfer the Plaintiffs. **P EX 8 at 462-463, 469.** Brown made no off duty arrests with the YVSF and Horne made only two. **P EXS 15 & 28 at ¶2**

Defendants admit there is no BPD Rule or YVSF "rule" against off duty arrests, including one that Horne performed. **P Facts 32, 38.**[19] Foley said an officer "absolutely" has the discretion to make off duty arrests.  **P Ex 8, at 199.**[20] Causation is established there if there is some evidence that an adverse employment decision occurred in circumstances that would raise a reasonable inference of unlawful discrimination "'even in the absence of direct evidence that the actual motivation was discrimination,'" Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d. 522, 530, 444 Mass. 34, 45 (2005). [21]

Fourth, even a year without further incident does not matter. In Chungchi Che, eleven months lapsed but the Court  found a causal connection. Chungchi Che v. MBTA, 342 F.3d 31, 38 (1st Cir. 2003). Fifth, Lt. Foley admits he "started thinking" about transferring Horne and Brown out of the YVSF "several months" before he recommended the transfer, and Foley did not even arrive until May 2000. **P Facts 91.**  Sixth, the February 2000  meeting was the first time, not the last time, the Plaintiffs raised the issue. It instigated more meetings and action.  **P EXS - 8 at 438, 448; 1 at 110-121, 155-158; 6 at 179-184; 2 at 220.**

Seventh, the adverse action was not only the transfer but also the increased harassment and continued discrimination.  Fellow YVSF officers said they became "outcasts"or "dogs" and their complaint was "the first time any officers had actually taken the YVSF race issues to a complaint level to the YVSF commander."**P Facts 28, 68-69.**  In any event there were other

---

[19]French recalls only one off duty arrest about which Bulman or anyone allegedly complained. **P EX 7, at 79-80.**

[20]Foley recalls no other officer he recommended for a transfer, in part or in whole, for making off to many off duty arrests. **P EX 8,  at 461-463.**

[21]Not surprisingly, Defendants now make little or no mention of off-duty arrests in their Motion.

adverse actions which occurred closer in time to the transfer. The Defendants' demeanor toward the Plaintiffs became continuously hostile. **P Facts 55-60, 69, 77.** [22] The white officers did not want Horne and Brown to ride with a new white officer and complained to the commander about her wish to work with the Plaintiffs. **P Facts 20.** Bulman began addressing the Plaintiffs with a more negative demeanor and tone. **P EX 2 at 183**. Bulman and Davin began to tell Foley that Horne and Brown were not "team players," were "secretive", did not share information, and made too many off duty arrests. Foley cannot recall <u>any</u> specific details, of any conversations he had with the Plaintiffs or his own observations, about such allegations. **P Facts 78.**

Eighth, the Plaintiffs continued objecting until their transfer. Between January and March 2001, Brown and Horne complained to Lt. Foley about a white officer's abuse of black citizens in Roxbury. Brown complained to Davin about the assault at YVSF headquarters. **P Facts 74, 76.** The Plaintiffs complained to Davin and Foley that the FIO quotas pressured officers to violate civil rights. **P Facts 55-60.** Under Davin, the cruiser assignments along racial lines continued and the posters of nearly only minority suspects appeared on the bulletin boards. Brown complained to Davin about the continued racial division of officer teams, including new officers entering the unit. **P EX 2 at 271-273.** The Plaintiffs were the first in the YVSF to raise the issue of race. **P Facts 29.**

### 3. **The purported reasons for the transfer were pretextual and retaliatory.**

A plaintiff may show that the reasons for an action are not genuine, but instead are given to "obscure their real and unlawful motive". <u>Dorman v. Norton Co.</u>, 2003 WL 1962458

---

[22]At least one other black officer refused to complain for fear of being singled out. **P Facts 78 at n.18.**

Mass.Super. at 4. Pretext arises where "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994). "A decision foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, contradictory or weak." Fuentes v. Perskie, 32 F.3d 759, 765 n.8 (3rd Cir. 1994). The Supreme Court ruled that an employee can satisfy a pretext burden by showing a "mixed motive," in that even if an employer's reason for its conduct is true, it is only one reason, and another motivating factor is discriminatory in nature. Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003). "Direct evidence of discrimination is not required in mixed motive cases." Id. at 101-102. Circumstantial evidence of discriminatory motive "'is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" Id. at 100; see E.C. Waste, Inc v. NLRB, 359 F.3d 36, 42 (1st Cir. 2004) (same).

The Defendants' chief official grounds were that the Plaintiffs were secretive, not team players and engaged in "too many" off-duty arrests. These reasons are untenable. First, the Defendants and their superiors (including Superintendent Dowd and Foley) admit that there are no known rules against off-duty arrests, too many or otherwise. An officer has the discretion to make an off-duty arrest. Bulman says an officer can self-activate. A white YVSF officer was commended, with Foley's approval, for making an off duty arrest, even though Foley maintains he discourages such arrests. P Facts 28, 32, 38. [23] Second, Brown made no off-duty arrests. P

---

[23]That white Officer, Albert, was in a clique with Bulman. P Facts 28, 32, 38.

**Facts 32, 38.** Horne made two. **P EX 15.** <u>Third</u>, Horne reported to his superiors an off duty arrest he made of a dangerous fugitive. **P Facts 32.** Off duty arrests were not discouraged or mentioned by the YVSF supervisors; it was a made-up justification for the transfer. The Plaintiffs were never told they could not make them or warned against making "too many." **P Facts 28, 32, 38.**

<u>Fourth</u>, the given reasons for the Plaintiffs' transfer were never mentioned to Plaintiffs before the PAM evaluations. Davin gave the Plaintiffs no specific examples of this secretiveness even when the Plaintiffs sought details. The Defendants admit that there was no history of any kind of personal evaluations of BPD officers. **P Facts 11, 79, 81-82.** Other officers who had been there for many years, Officers Craig Jones and Ken Israel say none had been conducted on them. They had never heard of PAM. **P Facts 81, 94.**

<u>Fifth</u>, the Defendants admit that there are many examples of the Plaintiffs sharing information and being "team players" and conducting a great deal of valuable and thorough information in tracking fugitives. Davin admitted that the Plaintiffs were properly inputting the information on the system. **P Facts 79a.** YVSF officers use the Lotus Database computer to share information about fugitives, coordinate activities, and to keep other informed. Davin, Bulman and Foley did not compare the database to determine whether other officers used it as well or often as the Plaintiffs. French <u>admits</u> the Plaintiffs kept their information in exemplary form. Bulman admitted they were detailed and represented a variety of incidents. **P Facts 31, 34, 36, 79a.** French was unable to give any specifics about the secretiveness of the Plaintiffs that Bulman conveyed to French, other than one alleged incident near in time to the Plaintiffs' first complaint about racism. **P Facts 34.**

Davin too admitted that it was apparent that the Plaintiffs "were sharing information with other members of the unit." Davin could not recall any incidents where any officer complained that the Plaintiffs were not sharing information. **P Facts 34.** Davin said the Plaintiffs "were very good at tracking down their fugitives." **P Facts 34, 79b, 102.** Lt. Foley (who succeeded French as commander) could give no specific examples of the Plaintiffs' secretiveness or lack of being team members. **P Facts 34.**

Sixth, the Plaintiffs consistently earned excellent reviews and multiple commendations for their teamwork and dedication, from the Defendants and others. In 2001 Brown was awarded the "Trooper George L. Hanna Award For Merit" an annual statewide award, for multiple incidents. It is a medal of honor more difficult to obtain than a commendation. French called it a very prestigious award. **P Facts 79c, 85, 104.** Horne and Brown were recommended for commendations by French, Dowd, Foley, Bulman and Davin. Bulman admitted that the Plaintiffs made "several good arrests" and were "good officers who engaged in team work." Davin a recommended Horne on a skillful arrest which included "coordination, communication and cooperation." Davin recommended Horne where "Officer Horne displayed the highest qualities of the Boston Police Department."[24]    **P Facts 79c, 85, 104.**

Seventh, Davin assigned Horne and Brown to train new officers in the YVSF to show the new officers "how things were done" because they were good officers. Davin recalls no instances of talking to them about his alleged concerns, other than in his 2001 PAM "evaluation." **P Facts 79, 79a, 104.** Eighth, on urging of an Assistant DA who was impressed with the Plaintiffs' method of keeping warrant records, the YVSF established for the DA and the

---

[24]Davin recommended Brown for a commendation on March 6, 2001. **P Facts 79c, 104.**

16

YVSF the City - Wide Warrant Routing System modeled on the Plaintiffs' method. **P Facts 104**.

Ninth, the Defendants admit that the PAM evaluations did not cover any of the areas of the Plaintiffs' transfer but only the following: number of car accidents, sick and injured days, Internal Affairs complaints, drug use, restraining orders, use of force and commendations. Before 2001, and since, PAM "evaluations" were not conducted. Bulman and Davin conferred about the PAM "evaluations" before they were done. Foley admits previously conferring with Davin for a combined "PAM meeting" about the Plaintiffs, and Bulman was present. **P Facts 11, 82, 92.** French admits that the supervising sergeants give the unit commander "feedback" on the officers; it is a "small unit" and the commander relies on the sergeants. **P Facts 11, 100.** Bulman stated that he and Davin regularly updated the commander of the unit as to officers. Bulman told French that the Plaintiffs "did not fit in the unit.," **P Facts 11, 79, 91-92.** Foley stated that Davin and Bulman met with him often about the unit. Davin was the closet supervisor above the Plaintiffs and communicated daily with Foley. **P Facts 91, 93, 100.**

In January 2001 Davin admits he met with Foley, Bulman and others in the command staff about the Plaintiffs before Davin conducted his "PAM" evaluation of the Plaintiffs  Davin said he took it upon himself to conduct the PAM evaluations "on his own." Defendants admit that there was no history of any kind of personal evaluations of officers. **P Facts 11, 81-82, 91.**

Tenth, for officers other than Horne and Brown YVSF supervisors issued several warnings to them under threat of transfer, but they were not transferred. **P Facts 105.** Eleventh, the Defendants had no specifics instances when the Plaintiffs were secretive. **P Facts 11, 79, 91-92.** Davin could not come up with any example where they worked on their own rather than as "team members." **P Facts 39, 100.** Twelfth, the Defendants offered in their Memo

some vague statements about the Plaintiffs' shortcomings, but a close review of the record shows they are very short on detail. **(Defts' Memo at 9, 11-13)**. In this regard, Plaintiffs invite the Court to compare the **"D Facts"** to the responsive **"P Facts."**

Thirteenth  the points the Defendants make about certain "facts" surrounding Bulman and Davin **(Defts' Memo at 6-7)**, given the space constraints of this Memo, all will not be addressed. Bulman first states that he kept no notes on the Plaintiffs purportedly because, he says, "I felt that writing anything down about what they did was a higher level of discipline and something that could be turned over to Internal Affairs, be on their record, and that wasn't my intention to try to hurt them." Bulman then immediately admits that neither he nor Davin "counseled or warned plaintiffs" that the areas to which they now cite in their Memo was "the type of conduct which would result in discipline or transfer from the YVSF." **P Facts 41.** Bulman further contradicts himself when (1) he says that he issued the Plaintiffs "oral warnings" but (2) then says that his meetings and discussions with the Plaintiffs were not warnings. Bulman then tries to explain the "oral warnings" as "informal conversations." He then admits that there is no BPD rule on "informal warnings." He was then shown BPD Rule 109 on "Oral reprimand" which states that for "minor violations" a record is kept at the district level but that "no record of the reprimand goes into the permanent personnel file." Bulman then says he was not his intention to even give the Plaintiffs an oral reprimand for a minor violation. He further says that there is no rule on the kind of "informal warning" he supposedly gave the Plaintiffs.

Davin's deposition was taken the day after Bulman but Davin first conferred with Bulman. Davin then deleted from their once joint answers to interrogatories, which had been served the day of Bulman's deposition, the statement that "oral warnings received by plaintiffs

were informal warnings." [25] **P Facts 41.**

Fourteenth, the Defendants say that other officers who were chosen as the "spokesmen." Those officers (night unit or administrative), however, did little as "spokesmen" even though they once were initially designated at one meeting and attended another meeting. It was Horne and Brown, the first black day tour officers assigned to track fugitives along with the white "A-Team" (who once had that arena to itself) who got the ball rolling and became marked men. Fifteenth, after the May 2000 meetings, white officers other than the problem officers were transferred. **P Facts 48j-k; P Ex 1 at 144-145.**

Sixteenth, before he arrived in May 2000, Davin knew the Plaintiffs were among those who complained and, in Davin's words, it was a "shit storm." He conferred with Bulman about the Plaintiffs. French briefed Foley on it and Foley considered whether they "were a problem" as part of his decision to recommend the transfer. **P Facts 100.** Bulman and Davin regularly met with Foley where alleged issues were raised about the Plaintiffs and about the racial issues. **P Facts 100.** [26] Seventeenth, a transfer could be for a disciplinary reason. **P Facts 105.**

### D.  **Count Two (Sections 1985 & 2000e and M.G.L. Chapter 15B) are well grounded.**

### 1.  **The transfer out of the YVSF was a materially adverse employment action.**

A police officer's rank and position constitute property interests which are afforded the protection as basic civil rights. In DelSignore v. DiCenzo, 767 F.Supp. 423 (D. RI 1991) the

---

[25] Bulman had signed the answers to interrogatories but Davin had not yet signed them, but defense counsel had served them on the Plaintiffs' attorney the day before Davin appeared to be deposed as the answers for both. **P Facts 41.**

[26] For transfers of others a year earlier, Foley said Bulman and Davin had input. Superintendent Joyce says sergeants can recommend transfers and would be consulted.  **P Facts 100.**

Court ruled that, under the Fourteenth Amendment, a police officer had a property interest in his rank of sergeant. Id. at 425. As the U.S. Supreme Court recently ruled, a materially adverse employment action can exist when a reassignment occurs, even though the reassignment is not accompanied by a demotion and where the former position had more prestige and was considered an overall better job. Burlington Northern & Santa Fe Railroad Co. v. White, 126 S.Ct. 2405 (2006), 2006 WL 1698953. All job categories have some aspects that are less desirable then others, and a good way to discourage an employee from bringing a discrimination charge would be to make them perform the duties with more undesirable aspects. Id. Quoting Title VII (42 U.S.C. §2000e), the Court stated the "It shall be an unlawful employment practice for an employer ... to limit, segregate .... his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee, because of such individual's race." Id. An "employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." Id.

Adverse job actions can include "demotions, disadvantageous transfers, unwarranted negative job evaluations, and toleration of harassment by other employees." Andujar v. Nortel Networks, Inc., 400 F.Supp.2d 306, 329 (D. Mass. 2005) quoting Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998) (emphasis added). In Forsyth v. City of Dallas, the plaintiff police officers brought a Section 1983 claim against their supervising officers after they were transferred from an intelligence unit to uniformed patrol duty at no reduction in salary. Forsyth v. City of Dallas, 91 F.3d 769 (5th Cir. 1996). The plaintiffs asserted that they were denied their First Amendment right to free speech. Id. at 773. The

supervisors' actions were retaliatory after the Plaintiffs spoke out.  Id. at 773-74.  The defendants

unsuccessfully contended that the officers were not deprived of any "cognizable property right or

privilege" because their pay remained the same. The court found there are job benefits beyond

wages.  Id. at 774, citing Perry v. Sinderman, 408 U.S. 593, 597 (1972). The Intelligence Unit

positions were more prestigious and had better hours.  Id. at 774-775.

 The Defendants' contention, therefore, that the "plaintiffs suffered no diminution in pay

or the opportunity to earn overtime" **(Defts' Memo at 10)**, is immaterial and misplaced. As to

two deputy sheriffs asserting a Section 1983 claim a court said "transfers could be considered

demotions even though they suffered no reduction in salary."  Click v. Copeland, 970 F.2d 106,

109 (5th Cir. 1992). As to no pay loss the court said  "Money alone ... does not buy happiness."

Id.  The lost job was more interesting and prestigious. Id. [27]  In Andujar, the court said a transfer

with no diminution in pay may still be an adverse employment action.  400 F.Supp.2d at 331 (D.

Mass. 2005); see Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 23-25 (1st Cir. 2002) (transfer

with no loss  pay but accompanied by significant responsibility changes); Quazi v. Barnstable

County 2006 WL 619136 Mass.Super. (retaliatory action is "the discharge, suspension, or

demotion of an employee or other adverse employment action taken against an employee and the

terms and conditions of employment.").

 Lt. French admits a transfer within the BPD is a significant event in an officer's life and

can have a devastating effect.  The transfer of an officer should be a last resort.  **P Facts 105.** See

Mole v. Univ. of Massachusetts, 814 N.E.2d 329, 339,  442 Mass. 582, 592 (2004)(adverse

---

 [27]There is a factual issue in dispute as to whether the transfer caused the Plaintiffs a
decrease in pay. Brown experienced a decrease in overtime pay and others in the unit have
participated.  **P Facts 108.**

employment condition does not require loss pay or overtime where actions are to "to discharge, expel, or otherwise *discriminate* against an employee); Gerrie v. Karl Storz Endovision, Inc., 815 N.E.2d 614, 20 Mass.L.Rptr. 412 (2005)(retaliatory hostile work environment). "Although unlawful retaliation, typically, may involve a discrete and identifiable adverse employment decision, it may also consist of a continuing pattern of behavior that is, by its insidious nature, linked to the very acts that make up a claim of hostile work environment." Clifton v. Mass. Bay Trans. Auth., 62 Mass.App.Ct. 164, 815 N.E.2d 614 (2004). "The weight of authority supports the view that under Title VII the creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action under 42 U.S.C. 2000e-3(a)." Noviello v. City of Boston, 398 F.3d 76, 89 (1st cir. 2005); see Andujar, 400 at 329 (hostile work environment). The white officers' attitude worsened toward the Plaintiffs after their complaints; they became "marked men." **P Facts 68-69.** Bulman did not first start making negative comments to French until five or six months after they joined the unit, about the same time after the Plaintiffs raised the racism issues. **P Facts 69.**[28] The YVSF was a prestigious assignment with many advantages and had city wide jurisdiction. YVSF officers are like detectives. Plus, both Plaintiffs wished to work on youth intervention. Foley admits that "there were a lot of advantages other than financial gain." **P Facts 12, 20, 48e.**

The Defendants incorrectly state that the record does not support the Plaintiffs' contention that white Officers Long and McLaughlin replaced them. ( **Defts Memo at 9, n. 3).** First, the Plaintiffs did not contend that they were so replaced; the point was Bulman's attitude

---

[28]The Plaintiffs joined the YVSF in August 1999 and made their complaints to Lt. French in Feb. 2000, about five or six months later. **P & D Facts 8; P Facts 45, 48, 48j, 69.**

was that the Plaintiffs were taking their place. Second, Long was transferred into the unit the

same month that the Plaintiffs were transferred out. McLaughlin was transferred in less than a

year later. **P & D Facts. 107**. The Plaintiffs don't base their claim on a one-for-one exchange, an

issue not necessary. The Defendants misstate the law under Section 2000e on this point ( **Defts**

**Memo at 9)** in that the job can be filled by or remain open for a person with similar

qualifications, and then only in cases where the plaintiff alleges only disparate treatment.

Conward v. Cambridge Sch. Committee, 171 F.3d 12, 19 (1st Cir. 1999). As for M.G.L. Chapter

151B, the Defendants incorrectly state that the law is "substantially the same" ( **Defts Memo at**

**9)** because, again (as the cases the Defendants cite show), there is no requirement to show that

the plaintiffs were replaced. Allder v. Daniel O'Connell's Sons, 20 F.Supp.2d 210, 215 (D.

Mass. 1998). A plaintiff's burden as to establishing a prima facie case "is not intended to be

onerous." Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d. 522, 530; 444 Mass. 34, 45 (2005). The

fourth element (replacement to which the Defendants cite) under Chapter 151B cases applies

only to reduction in force cases. Id.

### E. Counts Three (Section 1981 & M.G.L. c. 93, §102) and Six (interference with contractual relations or prospective advantage) are well grounded.

Although the Defendants correctly state that a defendant cannot interfere with their own

contractual, they incorrectly apply the facts. The Plaintiffs do not have a contract with Bulman

or Davin.  The Plaintiffs' contract is with the Defendant City of Boston. If the defendant's

motive was to interfere with the plaintiff's contract because of his race the interference is

improper. Rubin v. Household Commercial Financial Services, Inc., WL 1186917 Mass.Super.,

1996.  The interference need not be economic. Mailhoit v. Liberty Bank & Trust Co., 510

N.E.2d 773, 777, 24 Mass.App.Ct. 525, 528 (1987); see Custom Blends, Inc. v. Pearlco of

Boston, Inc., 2006 WL 1537522 Mass.Super. at 5, quoting Netherwood v. American Federation of States, County and Municipal Employees, Local 1725, 53 Mass.App.Ct. 11, 21 (2001) (defendant subject to liability for intentional improper interference with an existing or prospective contract by inducing a third person). If the motive for interfering was proper, but the interference was accomplished through any improper means he may be liable. Netherwood, supra, at 13. PAM evaluations were not a recognized method of review (**P Facts 81**) and were not administered in a non-discriminatory manner. **P Facts 11, 79.** Bulman had no evaluation scheme of any kind for those under him. **P EX 6 at 131.** Bulman and Davin simply lied to Lt. Foley or Foley was in on the desire to transfer the Plaintiffs for speaking out. The Plaintiffs have a property entitlement to their positions on the YVSF. Burlington Northern & Santa Fe Railroad Co. v. White, 126 S.Ct. 2405, (2006), 2006 WL 1698953; Perez v. Pierluisi, 339 F.3d 43, 50-51 (1st Cir. 2003); Forsyth v. City of Dallas, 91 F.3d 769 (5th Cir. Tex 1996); DelSignore v. DiCenzo, 767 F.Supp. 423 (D. RI 1991).

As for §1981 and Chapter 93, §102, discriminatory actions gives rise to such claims. Cuffy v. Texaco Refining & Marketing Co., 684 F.Supp. 87 (D.Del.. 1988); Ellis v. Safety Ins. Co., 41 Mass. App. Ct. 630, 672 N.E.2d 979(1996). A plaintiff may establish a prima facie case under §1981 by showing that no employment rule was violated, or that as a member of a protected class the plaintiff was treated differently than other non-members who engaged in comparable acts. Cuffy, 684 F. Supp. at 92.

**F. The Defendants are not entitled to qualified immunity.**

Davin and Bulman claim that they are entitled to qualified immunity because of a supervising officer's right to critique a subordinate. (**Defts' Memo at 17**). This case goes far

beyond a mere critique of performance.  Even though (incorrectly) they say Foley made the

ultimate transfer, the Defendants are not insulated.[29]  In Tejada-Batista. v. Morales  a police

officer's supervisors could not hide behind a higher superior where the supervisors' retaliatory

recommendation led to discharge.  424 F.3d 97 (1st Cir. 2005).  There was no qualified

immunity. Id. at 103.  Qalified immunity is generally fact specific and not appropriate for

summary judgment. See Gilchrist v. Commissioner of Correction, 48 Mass. App. Ct. 60, 62-66,

717 N.E.2d 279 (1999); Longval v. Commissioner of Correction, 404 Mass. 325, 332, 535

N.E.2d 588 (1989); Ahearn v. Vose, 64 Mass. App. Ct. 403, 422, 833 N.E.2d 403 (2005).  It is

especially unavailable on summary judgment in discrimination cases where state of mind is at

issue. See Walker v. Schwalbe, 112 F.3d 1127, 1132 (11th Cir. 1997).

<div style="margin-left: 40%;">

PLAINTIFFS STEVEN HORNE AND
RONALD BROWN,
By their Attorney,


/s/ Stephen A. Roach
Stephen A. Roach, Esq.
ROACH & WISE, LLP
31 State Street
Boston, MA 02109-2705
(617) 723-2800

</div>

August 29, 2006

---

[29]Foley admits the Commissioner, not him, makes the final decision. Foley says he "threw away" his file which would have had information on the Plaintiffs' transfer.  **P Facts 101.**

## CERTIFICATE OF SERVICE

I, Stephen A. Roach, attorney for the Plaintiffs, hereby certify that I served the within document, and the Declarations and Exhibits referenced therein, on the attorney for the Defendants, Attorney Mary Jo Harris, by causing copies to be sent to her by hand on the 29th day of August, 2006.

Stephen A. Roach