UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10718-RGS

| | |
|---|---|
| STEVEN HORNE and | ) |
| RONALD BROWN, | ) |
| | ) |
| PLAINTIFFS | ) |
| v. | ) |
| | ) |
| CITY OF BOSTON, | ) |
| SGT. ERIC BULMAN, and | ) |
| SGT. JOHN DAVIN, | ) |
| | ) |
| DEFENDANTS | ) |
| | ) |

**PLAINTIFFS' CONCISE STATEMENT OF DISPUTED AND UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1
IN  OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF
DEFENDANTS SGT. ERIC BULMAN AND SGT. JOHN DAVIN**

Pursuant to Local Rule 56.1, Plaintiffs Ronald Brown ("Brown") and Steven Horne

("Horne") hereby submit the following material facts of record, some of which are admitted and

some as to which there is a genuine issue of a material fact  in response to the alleged "facts" of

Defendants Eric Bulman ("Bulman") and John Davin ("Davin") with regard to the Plaintiffs'

Opposition to the  Defendants' Motion for Summary Judgment. The Plaintiffs further submit

additional facts which the Defendants either omitted or did not completely address in the

"Defendants' Concise Statement of Undisputed Material Facts in Support of their Motion for

Summary Judgment Pursuant to Rule 56.1."[1]  The Facts set forth below are based on admitted

facts the Defendants set forth and the Declaration of Stephen A. Roach dated August 28, 2006

and the exhibits thereto (answers to interrogatories, depositions and exhibits thereto), the

Declaration of Ken Isreal dated August 23, 2006, the Declaration of Craig Jones dated August

26, 2006 the Declaration of Steven Horne dated August 27, 2006 and the Declaration of Ronald

Brown dated August 26, 2006.   All are attached pursuant to Rule 56.1 to the Roach Declaration

and referred to as a "**P EX.**"

**The Parties and Youth Violence Strike Force Commanders**

1.  The Plaintiffs admit the Defendants' facts of paragraph 1, <u>except</u> that the Plaintiff

deny and object to the use of the term "paramilitary organization" with regard to the Boston

Police Department ("BPD"), which is a self-proclaimed "paramilitary organization", a term

which carries no legal significance as to the rights of the Plaintiffs and, as a term, has no

independent legal meaning.  **P EX. 8, at 136 (Foley Dep. at 136).**  In fact,  The BPD police

officers, like all other citizens, are entitled to protection of employment rights in employment,

civil rights and otherwise.  "A government employee does not lose his First Amendment right to

comment of matters of public concern by virtue of his employment with the government." <u>Perez</u>

<u>v. Pierluisi</u>, 339 F.3d 43, 50-51 (1st Cir. 2003); <u>see</u> <u>Forsyth v. City of Dallas</u>, 91 F.3d 769 (5th Cir.

Tex 1996)(police officers assert successful civil rights claims due to a transfer); <u>DelSignore v.</u>

<u>DiCenzo</u>, 767 F.Supp. 423 (D. RI 1991) (same).

---

[1]Plaintiffs' counsel apologizes for the length of certain of the statements but, in responding to the Defendants facts, the Plaintiffs had to further elaborate to put the Defendants alleged "facts" into the proper context.  Because the Defendants did not include areas or facts the Plaintiffs wished to add, the were included in the area that seemed most logical to keep the numbering of the parties somewhat consistent.

2.   The Plaintiffs admit the Defendants' facts of paragraph 2.

3.   The Plaintiffs admit so much of the Defendants' facts of paragraph 3 as to the BPD headquarters, but object to the other facts in that they are not supported by the record and are incomplete as to the locale of certain specialized areas.

4.   Denied in part, admitted in part. The Plaintiffs admit  the Defendants' facts of paragraph 4 but <u>deny</u> that Horne and Brown were transferred in May 2001. The BPD transferred Horne and Brown <u>effective</u> April 2, 2001, <u>not</u> May 2001. The BPD advised Horne and Brown of the transfer in March 2001.   **P EX. 6 at 61-62 (Bulman Dep. 61-62 & Ex. 5).**

5.   The Plaintiffs **<u>object</u>** to bringing to the Court's attention Brown's alleged "felony offenses" on the grounds that it is irrelevant to the Plaintiffs' claim and is intended to and tends to prejudice the Court against Brown. <u>See</u> Fed.R.Evid. 609 It should be noted that the matter is under review.  The Court should disregard it as relevant or material in any way to this matter. The Plaintiffs admit to the first sentence of the facts found in paragraph 5. The Plaintiffs admit that the BPD terminated Brown's employment after he filed a claim in this matter and after a criminal charge was brought against him. Plaintiffs <u>deny</u> much of the other statements of paragraph 5. Plaintiffs deny that Brown was convicted of an offense "where he assaulted one or more persons with his firearm."  Brown was not convicted of multiple felonies, "felony offenses" as the Defendants. Brown was charged with five offenses, acquitted on three, and found guilty of one misdemeanor and one felony. The matter is on appeal. Criminal charges also were brought against the so-called "victims" who initiated an attack Brown.  After Brown brought this action, BPD officers worked with the District Attorney's office which prosecuted the criminal matter. **P EX. 28, ¶7 (Brown Decl. ¶7).**

3

The Plaintiffs admit that Brown was transferred into the YVSF on August 11, 1999 but deny that Horne was transferred in May 2001. The BPD transferred Brown effective April 2, 2001, not May 2001. The BPD advised Brown of the transfer in March 2001. **P EX. 6 at 61-62 (Bulman Dep. 61-62 & Ex. 5).**

6. The Plaintiffs admit the Defendants' Facts found in paragraph 6.

7. Admitted in part and denied in part. The Plaintiffs admit the facts Defendants' Facts found in paragraph 7 except, they deny that "Bulman had no further responsibility for the plaintiffs or other officers on the day shift." In fact, Bulman also continued to supervise the Plaintiffs from time to time. **P EX. 5 at 49-50 (Davin Dep. 49-50).** The same racist patterns and behavior the Plaintiffs allege continued after Davin replaced Bulman as the day tour supervisor in May 2000; black officers were segregated and not given priority in his supervision and assignments. **P EX. 2 at 292-301 (Brown Dep. 292-301); P EX. 6 at 57-58, 91, 98 (Bulman Dep. 57-58, 91, 98); P EX. 5 at 45-48 (Davin Dep. 45-48); P EX. 22 at Ans. 6 (Ex. 18 Ans. 6).** 8. The Plaintiffs admit the Defendants' Facts found in paragraph 8.

9. The Plaintiffs admit the Defendants' Facts found in paragraph 9.

10. The Plaintiffs admit the Defendants' Facts found in paragraph 10.

11. The Plaintiffs admit in part and deny in part the Defendants' Facts found in paragraph 11. The Commissioner does not have an "inherent right" to deploy officers (a legal conclusion) if it is done for a discriminatory reason or other reason in violation of an officers' civil rights. The BPD police officers, like all other citizens, are entitled to protection of employment rights in employment, civil rights and otherwise. "A government employee does not lose his First Amendment right to comment of matters of public concern by virtue of his employment with the

government." <u>Perez v. Pierluisi</u>, 339 F.3d 43, 50-51 (1st Cir. 2003); see <u>Forsyth v. City of</u>

<u>Dallas</u>, 91 F.3d 769 (5th Cir. Tex 1996)(police officers assert successful civil rights claims due to

a transfer); <u>DelSignore v. DiCenzo</u>, 767 F.Supp. 423 (D. RI 1991) (same).

      Plaintiffs <u>deny</u> that <u>only</u> commanders recommend officers for assignment. Sergeants like

Bulman and Davin confer with commanders, as they did with Lt. Kevin Foley here, in deciding

whether to transfer Horne and Brown. **P EX. 5 at 66-72 (Davin Dep. 66-72).**  Lt. French briefed

Foley on the race problem when Foley took over the unit from French. **P EX. 7 at 209 (French**

**Dep. 209); P EX. 8 at 209-211 (Foley Dep. 209-211).** Foley consider whether Horne and Brown

"were a  a problem or not" as part of his decision to recommend their transfer. **P EX. 8 at 393-**

**394 (Foley Dep. 393-394).**  The Defendants admit that the Personal Analysis Meetings ("PAM")

evaluations of the Plaintiffs, part of the alleged reason they were transferred, did <u>not</u> cover <u>any</u> of

the areas of the Plaintiffs' transfer. **P EX. 6 at 238-241 (Bulman Dep.  238-241); P EX. 23**

**(Bulman Ex. 11)**; **P EX. 5 at 148-150 (Davin Dep. 148-150 & Ex. 11); P EX. 10 at 211 (Dowd**

**Dep. at 211); P EX. 9 at 192-193 (Joyce Dep. 192-193 & Ex. 6, at 2).**  Before 2001, and since,

PAM "evaluations" were not conducted.  **P EX. 3 at Ans. Int. 13 (Horne Ans. Int. 13); P EX. 2**

**at 274-276 (Brown Dep. 274-276).**  Only the Plaintiffs had a PAM evaluation. **P EX. 2 at 276**

**(Brown Dep. 276).**  Bulman and Davin conferred about the PAM "evaluations" before they were

done. **P EX. 6 at 241-243 (Bulman Dep. 241-243).** Foley admits previously conferring with

Davin for a combined "PAM meeting" about the Plaintiffs, and Bulman was present. **P EX. 8 at**

**316-324 (Foley Dep. 316-324).**    The Defendants admit that the PAM "evaluations" were

conducted to "identify officers for transfer." **P EX. 6 (Bulman Dep. & Ex. 1, at 4).** Bulman says

that he spoke to Lt. French about the Plaintiffs but can't recall what he said. **P EX. 6 at 247-248,**

250 (**Bulman Dep. 247-248, 250**). French admits that the supervising sergeants give the unit commander "feedback" on the officers - it is a "small unit" and the commander relies on the sergeants in this respect. **P EX. 7 at 28-29 (French Dep. 28-29).** Bulman stated that he and Davin updated the commander of the units [i.e. French and Foley] as to the work of their officers." **P EX. 6 at 270-271 (Bulman Dep. 270-271); P EX. 21 (Ex. 2, at 2).** Bulman told Lt. French that the Plaintiffs "did not fit in the unit." **P EX. 7 at 107-109 (French Dep. 107-109).** Foley stated that Davin and Bulman met with him often on the unit. **P EX. 8 at 69-70 (Foley Dep 69-70).** Davin that Davin communicated daily with Foley, including "from time to time" how officers were working as a team. **P EX. 5 at 126-12 (Davin Dep. 126-12).** In January 2001 Davin admits he met with Foley, Bulman and others in the command staff about the Plaintiffs before Davin conducted his "PAM" evaluation of the Plaintiffs. **P EX. 5 at 137-145, 150-151 (Davin Dep. 137-145, 150-151).** Davin said he took it upon himself to conduct the PAM evaluations "on his own." **P EX. 5 at 165-166 (Davin Dep. 165-166).** He gave no specific examples to either Plaintiff of the alleged concerns he had. **P EX. 5 at 168, 173-174 (Davin Dep. 168, 173-174).** Bulman and Davin admit regularly updating the commander about the Plaintiffs. **P EX. 5 at 178 (Davin Dep. 178); P EX. 22 (Ex. 18, Ans. 1).** Defendants admit that there was no history of any kind of personal evaluations of BPD officers, including others in the YVSF at the time. **P EX. 5 at 179 (Davin Dep. 179); P EX. 27 (Israel Decl.).**

Otherwise, the Plaintiffs admit the balance of the Facts of paragraph 11.

12. The Plaintiffs admit the first sentence of Defendants Facts found in paragraph 12. Plaintiffs deny the second sentence. Brown experienced a decrease in the opportunity to earn overtime. **P EX. 4 (Brown Ans. Int. 21, at 42)**. Davin admitted that there is an opportunity for

any officer to participate in a lot of overtime as an officer in the YVSF unit. **P EX. 5 at 34 (Davin Dep. at 34).** The YVSF had many advantages over other units within the Boston police force. The officers working within the YVSF unit had city wide jurisdiction and the ability to go anywhere in the city as opposed to district officers who could not leave their district. **P EX. 8 at 112 (Foley Dep. at 112).** YVSF officers wear plain clothes and travel in unmarked vehicles. **Foley Dep. at 112**. Officers are not required to take 911 calls, only calls they choose. **P EX. 8 at 113 (Foley Dep. at 113); P EX. 7 at 48-53, 56 (French Dep. 48-53, 56).** YVSF officers are more like detectives than uniformed officers. **P EX. 8 at 114 (Foley Dep. at 114); P EX. 6 at 29-30, 52-53 (Bulman Dep. 29-30, 52-53).** Also, both Plaintiffs desired to work in the YVSF on youth intervention and prevention. Foley admits that "there were a lot of advantages other than financial gain." **P EX. 8 at 113 (Foley Dep. at 113).**

13. The Plaintiffs admit the Defendants' Facts found in paragraph 13.

14. The Plaintiffs admit the Defendants' Facts found in paragraph 14 but <u>deny</u> that the YVSF was supposed to focus <u>only</u> on Dorchester, Mattapan and Roxbury. In fact, the same problems were occurring in predominately white neighborhoods as well such as, for example, in Charlestown and South Boston. **P EX. 1 at 76-77, 80-92, 219-225 (Horne Dep. 76-77, 80-92, 219-225); P EX. 3 (Ans. Ints. 4, 6 &18); P EX. 4 (Ans. Ints. 4, 6 &18); P EX. 2 at 86-88, 155-157 (Brown Dep. 86-88, 155-157).** The Defendants admit that YVSF was a city-wide unit <u>not</u> working only in minority areas. **P EX. 9 at 122 (Joyce Dep. 122).**

15. The Plaintiffs admit the Defendants' Facts found in paragraph 15.

16. The Plaintiffs admit the Defendants' Facts found in paragraph 16.

17. The Plaintiffs admit the Defendants' Facts found in paragraph 17.

18. The Plaintiffs admit the Defendants' Facts found in paragraph 18 except that Langa was white-Hispanic.

19. The Plaintiffs admit in part and deny in part the Defendants' Facts found in paragraph 19. The Plaintiffs were basically ignored by Bulman upon arrival at the unit. At best the Plaintiffs were given a very cursory introduction at which time they were told they would have to prove themselves if they wanted to remain in the unit. The Plaintiffs approached Bulman personally to receive their first assignments because the Plaintiffs had been left at the station with no assignment for approximately the first six weeks in the YVSF. It was at this time the Plaintiffs were told by other minority officers to "get use (the treatment) it". **P EX. 6 at 122 (Bulman Dep. at 122); P EX. 3 (Horne Int. 4); P EX. 2 at 99 (Brown Dep. at 99).**

20. The Plaintiffs admit in part the Defendants' Facts found in paragraph 20. The Plaintiffs further state, however, that before they arrived the day tour was an all white unit since its inception in 1993. Created in October 1993 as a prestigious, elite unit, the Youth Violence Strike Force ("YVSF), which originally was under previously existing Anti-Gang Violence Unit (a night unit), was charged with reducing violence among Boston's youth and tracking fugitives. The YVSF was a day tour unit. **P EX. 9 at 37, 53-54, 71-72, 95 (Joyce Dep. at 37, 53-54, 71-72, 95); P EX. 5 at 42 (Davin Dep. 42); P EX. 6 at 27-28 (Bulman Dep. 27-28); P EX. 7 at 48-53 (French Dep. 48-53).** It later evolved into a unit which also works with the FBI, the Massachusetts State Police, the U.S. Marshall's office, ATF, the MBTA, the Sheriff's Office the U.S. Attorney's office, and other investigatory agencies tracking down and apprehending violent fugitives. **P EX. 9 at 38-39 (Joyce Dep. at 38-39); P EX. 6 at 29-30, 52-53, 278 (Bulman Dep. 29-30, 52-53, 278); P EX. 7 at 48-53 (French Dep. 48-53); P EX. 8 at 43-45, 49-52 (Foley**

**Dep. 43-45, 49-52).**  Defendants  Davin and Bulman were among those initially in the unit with Joyce, and all were white. **P EX. 9 at 48-50, 53, 75-76 (Joyce Dep 48-50, 53, 75-76); P EX. 5 at 24-27, 180 (Davin Dep. 24-27, 180).**  No minorities joined the day tour of unit from 1993 to 1996. **P EX. 8 at 67 (Foley Dep. 67).**  As their supervisors, Davin and Bulman, and <u>their</u> superiors,  admit, YVSF cruiser assignments were divided along strictly racial lines.  With occasional exceptions, black officers rode  together and white officers rode together.  Davin and Bulman nearly always rode with the white officers.  **P EX. 7 at 194 (French Dep. 194); P EX. 6 at 79-95, 172 (Bulman Dep. 79-95, 172); P EX.  23 (Exs. 6-7); P EX. 5 at 72-80 (Davin Dep. 72-80); P EX. 22 (Ex. 18, Ans. 6); P EX. 1 at 67-68, 73 (Horne Dep. 67-68, 73); P EX. 3 (Horne Ans. Int. 5); P EX. 4 (Brown Ans. Int. 5); P EX. 9 at 134-135 (Joyce Dept. 134-135).**  Bulman and Davin had authority to assign officers to cruisers and to hand out mission assignments. **P EX. 9 at 212 (Joyce Dep. 212).**

Bulman would credit the Plaintiffs good work to the white officers. **P EX. 1 at 68-73 (Horne Dep. 68-73).** As a black State Trooper said to Horne and Brown during their first week on the job when Bulman left them at YVSF headquarters with no assignment,  "Get used to it." **P EX. 2 at 93-99, 152, 149-154, 178-108 (Brown Dep.  93-99, 152, 149-154, 178-180); P EX. 3 (Horne Int. 4); P EX. 1 at 44-48 (Horne Dep. 44-48).**  In violation of procedure, Bulman did not assign the Plaintiffs to ride separately with and train with more experienced officers for the first 30-60 days. **P EX. 7 at 115-117 (French Dep. 115-117).**   Similarly, Bulman (and later Davin) and the other white officers routinely worked with the white state troopers assigned to work at the YVSF headquarters at  364 Warren Street, Roxbury.  **P EX. 9 at 47 (Joyce Dep. 47).**  Eventually, Horne and Brown sought an assignment from the YVSF commander, Lt. Gary

French, who gave them a non-warrant assignment. **P EX. 2 at 93-94 (Brown Dep. 93-94); P EX. 1 at 44, 219 (Horne Dep. 44, 219).** As Horne and Brown continued to complain about the failure of assignments, Bulman, after several weeks, then assigned them warrants on difficult "cold case" fugitives which the Plaintiffs solved. **P EX. 1 at 216-219 (Horne Dep. 216-219); P EX. 3 (Horne Ans. Int. 17); P EX. 4 (Brown Ans. Int. 17); P EX. 2 at 93-96 (Brown Dep. 93-96 ).**[2]

Davin, Bulman, and even their YVSF superiors, Lt. French and Lt. Foley (who incorrectly claims he made the ultimate decision to transfer the Plaintiffs out of the YVSF)[3] passed off the practice of racially segregated cruisers as something that the officers themselves choose. **P EX. 8 at 420-423 (Foley Dep. 420-423).** Lt. French, however, testified that Bulman and Davin had authority to assign officers to cruisers. **P EX. 7 at 87-88 (French Dep. 87-88).** The YVSF day tour consisted of four teams. Officers Brito (Hispanic), Brown and Horne worked together as Unit TK 15. White Officers McCarthy and Langa, who joined the YVSF when Brown, Horne and Brito arrived, of course rode together but Bulman placed them with the experienced white teams for training. **P EX. 1 at 39-48 (Horne Dep. 39-48).** Horne, Brown and Brito were self-trained. Unit TK 18 (three black officers) was considered an administrative unit that worked directly for Lt. French in the schools with black state troopers. **P EX. 9 at 82-84 (Joyce Dep. 82-84); P EX. 2 at 98-99 (Brown Dep. 98-99); P EX. 1 at 27-28 (Horne Dep. 27-**

---

[2]During his first few days at the unit, Bulman did not even tell Brown that Bulman was his supervisor. **P EX. 2 at 119-121 (Brown Dep. 119-121).**

[3] Only Commissioner Evans had authority to order a transfer. **P EX. 5 at 130 (Davin Dep. 130)**

**28); P EX. 3 (Horne Int 5).** When a new white YVSF officer who knew Horne from a prior

area wished to ride with Horne and Brown, white officers objected and the new white officer was

assigned to white officers. **P EX. 1 at 192-194 (Horne Dep. 192-194).** Accordingly, only Horn,

Brown Brito was the only minority day team engaged to the same work as the white teams,

primarily tracking fugitives. At least since 1993, there has never been a black Sergeant assigned

to the day tour. **P EX. 9 at 88 (Joyce Dep. 88).**

**<u>Bulman's Supervision of Plaintiffs - Bulman favored White Officers over Black Officers.</u>**

21. The Plaintiffs admit the Defendants' Fact found in paragraph 21 and further state not

only do they "believe" that Bulman favored white officers over minority officers, but the facts

show that Bulman <u>did</u> favor white prove this statement true At one point, black Officers Greg

Brown and Craig Jones asked Bulman why there were not more black officers assigned to the

YVSF, and he told us that "I don't know any aggressive blacks." Bulman nearly always rode

with the white officers. **P EX. 26, ¶2 (Jones Declaration ¶2).** Almost from the first day of

their arrival at the YVSF in August 1999, African-American Plaintiff Officers Horne and Brown

observed the disparity between the treatment of white and minority YVSF officers. As their

supervisors, Davin and Bulman, and <u>their</u> superiors, admit, YVSF cruiser assignments were

divided along strictly racial lines. With occasional exceptions, black officers rode together and

white officers rode together. Davin and Bulman nearly always rode with the white officers. **P

EX. 7 at 194 (French Dep. 194); P EX. 6 at 79-95, 172 (Bulman Dep. 79-95, 172); P EX. 23

(Exs. 6-7); P EX. 5 at 72-80 (Davin Dep. 72-80); P EX. 22 (Ex. 18, Ans. 6); P EX. 1 at67-68,

73 (Horne Dep. 67-68, 73); P EX. 3 (Horne Ans. Int. 5); P EX. 4 (Brown Ans. Int. 5); P EX.**

**9 at 134-135 (Joyce Dept. 134-135).** [4]   Bulman would credit the Plaintiffs good work to the white officers. **P EX. 1 at 68-73 (Horne Dep. 68-73).** As a black State Trooper said to Horne and Brown during their first week on the job when Bulman left them at YVSF headquarters with no assignment,  "Get used to it." **P EX. 2 at 93-99, 152, 149-154, 178-180 (Brown Dep.  93-99, 152, 149-154, 178-180); P EX. 3 (Horne Int. 4); P EX. 1 at 44-48 (Horne Dep. 44-48).**  In violation of procedure, Bulman did not assign the Plaintiffs to ride separately with and train with more experienced officers for the first 30-60 days. **P EX. 7 at 115-117 (French Dep. 115-117).** Similarly, Bulman (and later Davin) and the other white officers routinely worked with the white state troopers assigned to work at the YVSF headquarters at  364 Warren Street, Roxbury.  **P EX. 9 at 47 (Joyce Dep. 47).**  Eventually, Horne and Brown sought an assignment from the YVSF commander, Lt. Gary French, who gave them  a non-warrant assignment. **P EX. 2 at 93-94 (Brown Dep. 93-94); P EX. 1 at 44, 219 (Horne Dep. 44, 219).**  As Horne and Brown continued to complain about the failure of assignments, Bulman, after several weeks, then assigned them warrants on difficult "cold case" fugitives which the Plaintiffs solved.  **P EX. 1 at 216-219 (Horne Dep. 216-219); P EX. 3 (Horne Ans. Int. 17); P EX. 4 (Brown Ans. Int. 17); P EX. 2 at 93-96 (Brown Dep. 93-96).** [5]

Davin, Bulman, and even their YVSF superiors, Lt. French and  Lt. Foley (who incorrectly claims he made the ultimate decision to transfer the Plaintiffs out of the YVSF) [6]

---

[4]Bulman and Davin had authority to assign officers to cruisers and to hand out mission assignments. **P Ex. 9 at 212 (Joyce Dep. 212).**

[5]During his first few days at the unit, Bulman did not even tell Brown that Bulman was his supervisor. **P EX. 2 at 119-121 (Brown Dep. 119-121).**

[6] Only Commissioner Evans had authority to order a transfer. **P EX. 5 at 130 (Davin Dep. 130)**

12

passed off the practice of racially segregated cruisers as something that the officers themselves choose. **P EX. 8 at 420-423 (Foley Dep. 420-423).** Lt. French, however, testified that Bulman and Davin had authority to assign officers to cruisers. **P EX. 7 at 87-88 (French Dep. 87-88).** The YVSF day tour consisted of four teams. Officers Brito (Hispanic), Brown and Horne worked together as Unit TK 15. White Officers McCarthy and Langa, who joined the YVSF when Brown, Horne and Brito arrived, of course rode together but Bulman placed them with the experienced white teams for training. **P EX. 1 at 39-48 (Horne Dep. 39-48).** Horne, Brown and Brito were self-trained. Unit TK 18 (three black officers) was considered an administrative unit that worked directly for Lt. French in the schools with black state troopers. **P EX. 9 at 82-84 (Joyce Dep. 82-84); P EX. 2 at 98-99 (Brown Dep. 98-99); P EX. 1 at 27-28 (Horne Dep. 27-28); P EX. 3 (Horne Int 5).** When a new white YVSF officer who knew Horne from a prior area wished to ride with Horne and Brown, white officers objected and the new white officer was assigned to white officers. **P EX. 1 at 192-194 (Horne Dep. 192-194).** Accordingly, only Horn, Brown Brito was the only minority day team engaged to the same work as the white teams, primarily tracking fugitives. At least since 1993, there has never been a black Sergeant assigned to the day tour. **P EX. 9 at 88 (Joyce Dep. 88).**

With some exceptions, Bulman and Davin generally supervised warrant service or arrests with white officers. Bulman and Davin assigned white officers from other agencies with white officers. As but two examples, white MBTA Det. Collins was assigned to ride with the TK16 or TK17 (all white officers) under Davin. White Sheriff Deputy Stephen Scanlon rode with the TK19, all white officers. **P EX. 3 (Horne Int. 5).** A BPD command staff Superintendent,

13

speaking for the Defendant City,  observed that the YVSF as a racially divided unit due to lack of direction and leadership. **P EX. 9 at 114, 143-144 (Joyce Dep 114, 143-144).** [7]

Black officers comprised the majority of units working nights and, therefore, were known as the "Soul Patrol." **P EX. 2 at 166-167 (Brown Dep. 166-167).**  When the Plaintiffs occasionally  worked the night tour, they rode with black officers.  **P EX. 3 (Horne Ans. Int. 5); P EX. 4 (Brown Ans. Int. 5).**  A white YVSF officer was wearing a tee shirt displaying a target label with bullet holes depictions as to the slaying of Mr. Diallo, a black unarmed New York City resident who died in a hail of gunfire from New York City officers.  **P EX. 3 (Horne Ans. Ints. 6); P EX. 4 (Brown Ans. Ints. 6); P EX. 1 at 148 (Horne Dep. 148).** A white officer, forgetting a black officer was in the back seat, referred to a black as nigger. **P EX. 27, ¶5 (Israel Decl. ¶5); P EX. 7 at 168-169 (French Dep. 168-169); P EX. 1 at 148 (Horne Dep. 148); P EX. 2 at 232-233 (Brown Dep. 232-233).** Bulman and Davin would not allow the black officers access to the same investigative tools and resources as for the white officers.  **P EX. 2 at 341-345 (Brown Dep. 341-345)**.

22.  The Plaintiffs admit in part and <u>deny</u> in part the Defendant's Facts found in paragraph 22. When Horne asked Bulman to elaborate about his comments, Bulman walked away.  **P EX. 1 at 57,66 (Horne Dep. 57, 66).** When Bulman later repeated the comment "you guys must prove yourselves", Brown also asked for an explanation and got the same non-response from Bulman.  Upon arrival to the YVSF Bulman repeatedly told the Plaintiffs that the Plaintiffs had to prove themselves to remain in the YVSF and that the Plaintiffs were taking the place of White officers Greg Long and Frank McGlaughlin, who had applied but were not

---

[7]Joyce added there was a "lot of damage in the unit."  **P EX. 9 at 160 (Joyce Dep. 160)**

assigned to the YVSF.  **P EX. 6 at 122 (Bulman Dep. 122); P EX. 1 at 49-56, 66-67 (Horne Dep. 49-56, 66-67).** New white Officers McCarthy and Langa were not told that they had prove themselves or were taking the place of officers Long and McLaughlin. **P Ex. 2 at 116-126 (Brown Dep. 116-126).**  White Officer Gerald Baily, who was known as the "Grand Wizard" (as in the KKK) said that he did not want Brown in the YSVF.  **P EX. 2 at 58-59, 102 (Brown Dep. at 58-59, 102).**

      23.  The Plaintiffs admit in part and deny in part the Defendants' statements in paragraph 23. When Bulman later repeated the comment "you guys must prove yourselves" to Brown and Horne, Brown also asked for an explanation and got the same non-response from Bulman; Bulman simply walked away .  Upon arrival to the YVSF Bulman repeatedly told the Plaintiffs that the Plaintiffs had to prove themselves to remain in the YVSF and that the Plaintiffs were taking the place of White officers Greg Long and Frank McGlaughlin, who had applied but were not assigned to the YVSF. **P EX. 6 at 122 (Bulman Dep. 122); P EX. 1 at 49-56, 66-67 (Horne Dep. 49-56, 66-67).**  New white Officers McCarthy and Langa were not told that they had prove themselves or were taking the place of officers Long and McLaughlin. **P EX. 2 at 116-126 (Brown Dep 116-126).**  White Officer Gerald Baily, who was known as the "Grand Wizard" (as in the KKK) said that he did not want Brown in the YSVF.  **P EX. 2 at 58-59, 102 (Brown Dep. at 58-59, 102).**   Brown and Horne's belief that Bulman did not want black officers in the day unit are also based on the facts set forth herein in paragraph numbers 7, 19, 20-22 and others below.

      24. Admitted in part, and denied in part in that Horne at first did not recall when the statements from Bulman were first made but later recalled they were made within a short time

after his arrival at the YVSF.

25.  Objection and denied. The record the Defense cite does not support the statement and it is not clear what is meant by "this statement" to which the Defendants refer.

26.  Plaintiffs admit the first sentence of paragraph 25 of the Defendants' facts.  The Plaintiffs <u>also</u> state as to Langa and McCarthy, two white officers, however, Bulman placed Langa and McCarthy with the experienced white teams for training.  **P EX. 1 at 39-48 (Horne Dep. 39-48).** Horne, Brown and Brito were self-trained. Unit TK 18  (three black officers)  was considered an administrative unit that worked directly for Lt. French in the schools with black state troopers. **P EX. 9 at 82-84 (Joyce Dep. 82-84); P EX. 2 at 98-99 (Brown Dep. 98-99); P EX. 1 at 27-28 (Horne Dep. 27-28); P Ex. 3 (Horne Int 5).**

As for the second sentence of paragraph 25, the Plaintiffs admit the partial testimony of Horne but, later in the deposition Horne further discussed such testimony and stated that Bulman initially gave him a folder to investigate the first day and then showed him a photo of the suspect who Horne recognized.  Bulman then took the folder back from him and left.  Bulman gave Horne folders to investigate on his own "a few weeks later." **P EX. 1 at 216-217 (Horne Dep. 216-217).**  Moreover, in violation of procedure, Bulman did not assign the Plaintiffs to ride separately with and train with more experienced officers for the first 30-60 days. **P EX. 7 at 115-117 (French Dep. 115-117).**   Similarly, Bulman (and later Davin) and the other white officers routinely worked with the white state troopers assigned to work at the YVSF headquarters at 364 Warren Street, Roxbury.  **P EX. 9 at 47 (Joyce Dep. 47).** Eventually, Horne and Brown sought an assignment from the YVSF commander, Lt. Gary French, who gave them  a non-warrant assignment. **P EX. 2 at 93-94 (Brown Dep. 93-94); P EX. 1 at 44, 219 (Horne Dep.**

16

**44, 219).** As Horne and Brown continued to complain about the failure of assignments, Bulman, after several weeks, then assigned them warrants on difficult "cold case" fugitives which the Plaintiffs solved. **P EX. 1 at 216-219 (Horne Dep. 216-219); P EX. 3 (Horne Ans. Int. 17); P EX. 4 (Brown Ans. Int. 17); P EX. 2 at 93-96 (Brown Dep. 93-96).** The above is consistent with Horne's deposition testimony and answers to interrogatories. **P EX. 1 at 17 (Horne Int. 17).**

As the third sentence of paragraph 25, Plaintiffs <u>deny</u> that the record to which the Defendants cite is not with their filings. Even if it were with their filings, it is <u>not</u> entirely accurate. First, the record to which the Defendants cite shows that Brown testified that after having no assignments for two weeks, the Plaintiffs looked at the YVSF bulletin board (which contained the faces of only black suspects, even though their were white suspects as well), pulled a warrant, and asked permission from Lt. French to investigate that suspect; permission was granted. **P EX. 2 at 126 (Brown Dep. 126).** Finally, in October 1999, Bulman began to assign the Plaintiffs fugitive assignments. **P EX. 2 at 93-98 (Brown Dep. at 93-98).** As Horne and Brown continued to complain about the failure of assignments, Bulman then assigned them warrants on difficult "cold case" fugitives which the Plaintiffs solved. **P EX. 1 at 216-219 (Horne Dep. 216-219); P EX. 3 (Horne Ans. Int. 17); P EX. 4 (Brown Ans. Int. 17); P EX. 2 at 93-96 (Brown Dep. 93-96).** During his first few days at the unit, Bulman did not even tell Brown that Bulman was his supervisor. **P EX. 2 at 119-121 (Brown Dep. 119-121).** The is above consistent with Brown's deposition and answers to interrogatories. **P EX. 4 (Brown Ans. Int. 17).**

27. The Plaintiffs admit the Defendants' Facts found in paragraph 27 so far as it goes but

also incorporate their statement by reference above of paragraphs 19-26, so they need not be repeated here.

28.  Admitted.

29.  The Plaintiffs admit the Defendants' Facts found in paragraph 29 so far as stated but further incorporate their statement by reference above of paragraphs 19-26 and state the following. Bulman and Davin had authority to assign officers to cruisers and to hand out mission assignments. **P EX. 9 at 212 (Joyce Dep. 212).** In violation of procedure, Bulman did not assign the Plaintiffs to ride separately with and train with more experienced officers for the first 30-60 days. **P EX. 7 at 115-117 (French Dep. 115-117).**  Originally, the YVSF was a day tour unit.  **P EX. 9 at 37, 53-54, 71-72, 95 (Joyce Dep. at 37, 53-54, 71-72, 95); P EX. 5 at 42 (Davin Dep. 42); P EX. 6 at 27-28 (Bulman Dep. 27-28); P EX. 7 at 48-53 (French Dep. 48-53).** Defendants  Davin and Bulman were among those initially in the day unit with Joyce, and all were white. **P EX. 9 at 48-50, 53, 75-76 (Joyce Dep 48-50, 53, 75-76); P EX. 5 at 24-27, 180 (Davin Dep. 24-27, 180).**  No minorities joined the day tour of unit from 1993 to 1996. **P EX. 8 at 67 (Foley Dep. 67).** Even then, the minority officers of the day unit who were with the YVSF when the Plaintiffs arrived did not work with the white teams tracking fugitives but, rather, they did youth crime prevention in the schools and elsewhere.  Unit TK 18  (three black officers)  was considered an administrative unit that worked directly for Lt. French in the schools with black state troopers. **P EX. 9 at 82-84 (Joyce Dep. 82-84); P EX. 2 at 98-99 (Brown Dep. 98-99); P EX. 1 at 27-28 (Horne Dep. 27-28); P EX. 3 (Horne Int 5).**  When the Plaintiffs occasionally worked the night tour, they rode with black officers.  **P EX. 3 (Horne Ans. Ints. 5); P EX. 4 (Brown Ans. Ints. 5).**  When the Plaintiffs occasionally  worked the night tour, they rode with

black officers.  **P EX. 3 (Horne Ans. Ints. 5); P EX. 4 (Brown Ans. Ints. 5).**  Black Officer

Craig Jones, says: "During my assignment to the YVSF from 1993 though most of 2004, the

YVSF was a racially divided unit in that white officers rode in cruisers with white officers and

black and other minority officers rode together. This was true of both the day and night tours of

duty. At times, myself or other minority officers would work together with or ride with white

officers, but such was the exception.    **P EX. 26, ¶3 (Jones Decl. ¶3).**    Officer Jones says

further:  There was also a night shift commonly called the "Soul Patrol" because it generally was

comprised, percentage-wise, of more black officers, including myself, than the day tour. **P EX.

26, ¶2 (Jones Decl. ¶2); P EX. 2 at 190 (Brown Dep. 190).**

   Fellow YVSF black officer Kenneth Isreal says: "There was an "A team - B team

mentality" within the unit meaning the white officers were on the A team (especially a clique of

Sgt. Bulman and white Officers Ridge, Albert, Fayles, among others) and the minority officers

were on the B team." **P EX. 27, ¶3 (Isreal Decl. ¶3).**  Similarly, fellow Jones says:  There was

an A team - B team mentality within the day shift of YVSF when I was there, meaning the white

officers were on the A team (especially a clique of Sgt. Bulman and other white Officers) and the

minority officers considered themselves on the B team. The A team were given higher profile

fugitive and suspect assignments.  Although previously the minority officers had discussed and

complained among themselves about the racial issues in the YVSF, the complaints and issues

raised by Horne and Brown was the first time any officers had actually taken the YVSF race

issues to a complaint level to the YVSF commander.    **P EX. 26, ¶10 (Jones Decl. ¶10).**

   After the Plaintiffs had been with the YVSF for some months ,  a  new white YVSF

officer, Officer Michelle Williams, who knew Horne from a prior area told Horne she wished to

ride with Horne and Brown. White officer Chris Bailey was standing nearby, overheard the conversation, and entered the unit commander's office. After Officer Williams met later with the commander, she emerged from his office and told Horne she had "changed her mind" and would be riding with white officers Chris Bailey and John McNulty. **P EX. 1 at 192-194 (Horne Dep. 192-194).**

With occasional exceptions, black officers rode together and white officers rode together. Davin and Bulman nearly always rode with the white officers. **P EX. 7 at 194 (French Dep. 194); P EX. 6 at 79-95, 172 (Bulman Dep. 79-95, 172); P EX. 23 (Exs. 6-7); P EX. 5 at 72-80 (Davin Dep. 72-80); P EX. 22 (Ex. 18, Ans. 6); P EX. 1 at 67-68, 73 (Horne Dep. 67-68, 73); P EX. 3 (Horne Ans. Int. 5); P EX. 4 (Brown Ans. Int. 5); P EX. 9 at 134-135 (Joyce Dept. 134-135).** Bulman would credit the Plaintiffs good work to the white officers. **P EX. 1 at 68-73 (Horne Dep. 68-73).** As a black State Trooper said to Horne and Brown during their first week on the job when Bulman left them at YVSF headquarters with no assignment, "Get used to it." **P EX. 2 at 93-99, 152, 149-154, 178-180 (Brown Dep. 93-99, 152, 149-154, 178-180); P EX. 3 (Horne Int. 4); P EX. 1 at 44-48 (Horne Dep. 44-48).**

### Bulman's Racist Behavior Toward the Plaintiffs

30. Plaintiffs <u>deny</u> and dispute the alleged facts of Defendants' facts in paragraph 30. The record to which the Defendants' cite do not contain the pages cited. As to the pages the Defendants do cite, which the <u>Plaintiffs</u> have enclosed with <u>their</u> Opposition filings and exhibits, the facts as the Defendants have presented them are not accurate as presented. Within the first month the Plaintiffs joined the YVSF, Brown recalls that Bulman, while in the guard room, twice stated to Brown that the Plaintiffs would have to prove themselves. Contrary to the

Defendants' suggestion, <u>neither</u> time did Bulman's statement relate to the alleged warrant "incident" involving a suspect. **P EX. 2 at 136-137 (Brown Dep. 136-137).** In fact, Brown had no idea why Bulman twice made that statement to him. **P EX. 2 at 137 (Brown Dep. 137).**

Moreover, as to that alleged incident Brown had been at the YVSF for two weeks and Bulman still had assigned the Plaintiffs no fugitive warrants. **P EX. 2 at 125-126 (Brown Dep. 125-126).** Brown then saw a suspect on the YVSF suspect bulletin board, pulled the warrant papers on the suspect, and <u>asked</u> the YVSF unit Commander, Lt. Gary French if he, Brown, could serve the warrant. Lt. French gave Brown permission do to so. **P EX. 2 at 126 (Brown Dep. 126).** Accordingly, Brown then attempted to serve the warrant at the suspects's address but he was not home. **P EX. 2 at 126-127 (Brown Dep. 126-127).** Apparently, the suspect had been assigned to a white unit (TK19 - Officers Fayles and Cummings) who were upset that Brown tried to serve the suspect and complained to Bulman who starting "yelling and screaming" at Brown and his partner Brito. **P EX. 2 at 127-130 (Brown Dep. 127-130).** Brown described Bulman's statements and behavior as "derogatory", "negative", "non supervision type statements", and "inappropriate." **P EX. 2 at 132-134 (Brown Dep. 132-134).** Brown described Bulman's overall conduct, not his words, as racist. **P EX. 2 at 135 (Brown Dep. 135).**

Bulman also told the Plaintiffs not only did they have to prove themselves to remain in the YVSF but also that the Plaintiffs were taking the place of White officers Greg Long and Frank McGlaughlin, who had applied but were not assigned to the YVSF. **P Ex. 6 at 118, 122 (Bulman Dep. 118, 122); P EX. 1 at 49-56, 66-67 (Horne Dep. 49-56, 66-67).** When Horne asked Bulman to elaborate, Bulman walked away. **P EX. 1 at 57,66 (Horne Dep. 57, 66).** When

21

Bulman later repeated the comments, Brown also asked for an explanation and got the same non-response.   New white Officers McCarthy and Langa were not told that they had prove themselves or were taking the place of officers Long and McLaughlin. **P EX. 2 at 116-126 (Brown Dep 116-126).**

    31.   Plaintiffs <u>deny</u> facts of Defendants' paragraph 31 as presented.   It should be noted that the "facts" on which the Defendants' rely in paragraphs 30-31 of Bulman's alleged "crtitique" of the Plaintiffs are from the testimony of Brown, not Bulman, who remembered very few, if any, specifics as to how the Plaintiffs were allegedly "secretive."   In fact, Bulman never critiqued the Plaintiffs on their work in a negative way, with the possible exception described in paragraph 30, assuming it can be considered a critique. As to the actual work, Bulman never told them they were not doing a good job.  **P EX. 2 at 180-181 (Brown Dep. 180-181).**   Bulman once told Horne and Brown that they were "too secretive", were not team players,  and "failed to share information" as to <u>one</u> incident. **P EX. 2 at 181-184, 288-290 (Brown Dep. 181-184, 288-290).**  Even then, Bulman did not elaborate. **P EX. 2 at 356-357 (Brown Dep. 356-357).**   In fact, as to the one incident to which the Defendants refer, the Plaintiffs again were working on a suspect which the white TK19 unit had been watching but that unit, TK 19 failed to arrest the suspect. Later, at the direction, under the <u>supervision</u>, and with the <u>permission</u>  of a <u>different</u> Sergeant, Sergeant Paul Murphy, the Plaintiffs found and arrested the suspect.  **P EX. 2 at 180-182 (Brown Dep. 180-182).**  The TK 19 unit was off duty at the time. If the Plaintiffs had waited another day for TK 19 to return to duty the suspect "would have been far gone." **P EX. 2 at 183 (Brown Dep. 183).**   The next day, however, Bulman told them that the Plaintiffs should not have arrested the suspect, they should have waited for TK19 because it was "their case", that

22

they are "too secretive" and "failed to share information." To that, Brown and Horne told Bulman that the Plaintiffs used the Lotus Data Base Notes, had informed the TK19 of the suspects whereabouts and the suspect didn't show up. **P EX. 2 at 183-184 (Brown Dep. 183-184).** In fact, Sgt. Murphy made the arrest decision, not the Plaintiffs. **P EX. 2 at 184 (Brown Dep. 184).** The Lotus Database is a computer database YVSF officers use to share information about fugitives, coordinate activities, and  to keep other abreast of each officer's information. **P EX. 6 at 218-219 (Bulman Dep. at 218-219); P EX. 5 at 110-112, 228-230 (Davin Dep. 110-112, 228-230); P EX. 8 at 387-390 (Foley Dep. 387-390).**

Davin also could give no examples to them as to how they were secretive and not team players. **P EX. 1 at 188-192 (Horne Dep. 188-192); P EX. 2 at 307 (Brown Dep. 307).** Davin and Bulman had no specific instances when the Plaintiffs were secretive or demonstrated any qualitites inconsistent with being a good officer. **P EX. 6 at 187, 193, 254, 259 (Bulman Dep. at 187, 193, 254, 259); P EX. 5 at 80, 82 (Davin Dep. at 80, 82); P Ex. 8 at 149-153, 160-162, 186-187, 197-198**, **393-394 (Foley Dep. at 149-153, 160-162, 186-187, 197-198**, **393-394).**

32. Plaintiffs <u>deny</u> the facts set forth in the Defendants facts of paragraph 32. The Defendants are mixing together two totally different and distinct concepts, use of good judgment and the Defendants' allegations that one reason for the transfer of the Plaintiffs was that they allegedly engaged in "too many off duty arrests." The record to which the Defendants cite is <u>devoid</u> as to any discussion of off duty arrests. **P EX. 6 at 193-194 (Bulman Dep. 193-194).** In fact, Brown made **<u>no</u>** off duty arrests when he was with the YVSF. **P EX. 28, ¶2 (Brown Decl. ¶2).** Moreover, the record to which the Defendants cite is near a later discussion about an a different off duty arrest Horne made, discussed below. **P EX. 6 at 195 (Bulman Dep. 195).**

As to off duty arrests, the Plaintiff were <u>not</u> told to not make off duty arrests.  **P EX. 8 at 266-267 (Foley Dep. 266-267); P EX. 5 at 80-84 (Davin Dep. 80-84); P EX. 7 at 70, 73-74 (French Dep. 70, 73-74); P EX. 3 (Horne Ans. Int. 11); P EX. 4 (Brown Ans. Int. 11).** The Defendants admit there is <u>no</u> BPD Rule or YVSF "rule" against off duty arrests, including one that Horne performed.  **P EX. 7 at 70, 73-74 (French Dep. 70, 73-74); P Ex. 8 at 233-234 (Foley Dep. 233-234); P EX. 6 at 195-196, 231-232 (Bulman Dep 195-96, 231-232)**; **P EX. 9 at 193 (Joyce Dep. 193).**  In fact, Foley said an officer "absolutely" has the discretion to make them. **P EX. 8 at 199 (Foley Dep. 199).**

Bulman <u>admits</u> that there are no Boston Police Department rules against an officer "activating" himself, as Horne once did, by putting himself on duty and working with another officer to make an arrest.  **P EX. 6 at 232 (Bulman Dep. at 232).**  In fact, a <u>white</u> YVSF officer, Brian Alpert, even <u>commended</u>, with Lt. Foley's approval even though Foley maintains he discourages such arrests.  **P EX. 8 at 204-208 (Foley Dep. at 204-208); P EX. 15 (Foley Ex. 42); P EX. 3 (Horne Ans. Int. 9).**[8]

Engaging in "too many" off-duty arrests was another alleged reason Bulman and Davin gave to Lt. Foley as grounds to transfer the Plaintiffs. **P EX. 8 at 462-463, 469 (Foley Dep. 462-463, 469).**  Again, however, Brown made <u>no</u> off duty arrests with the YVSF. **P EX. 28, ¶2 (Brown Decl. ¶2).**  Foley recalls no other officer he recommended for a transfer, in part or in whole, for making off to many off duty arrests. **P EX. 8 at 461-463 (Foley Dep. 461-463).** French recalls only <u>one</u> off duty arrest about which Bulman or anyone allegedly complained. **P**

---

[8] That white Officer, Albert, was in a clique with Bulman. **P EX. 8 at 201-208 (Foley Dep. 201-208); P EX. 24 (Foley Exs. 40); P EX. 15 (Foley Exs. 42); P EX. 27 (Israel Decl.)** Albert got promoted to Sgt. **P EX. 5 at 157-158 (Davin Dep. 157-158).**

**EX. 7 at 79-80 (French Dep. 79-80).**

When Horne once made an off duty arrest he notified and made a report of the arrests to his superiors. On that occasion, Horne was instrumental in effecting the arrest of a dangerous fugitive when Horne was off-duty and had no obligation to act. **P EX. 6 at 232 (Bulman Dep. at 232).** Off duty arrests were not discouraged or mentioned by the YVSF supervisors, until stated as a justification for the transfer. **P EX. 2 at 24 (Brown Dep. at 24).** The Plaintiffs were never told they could not make them or were warned about making "too many." **P EX. 3 (Horne Ans. Int. 14).** Davin knew of none the Plaintiffs made in an improper way. **P EX. 5 at 225 (Davin Dep. 225).**

As for the questionable tactics Bulman mentioned, the Plaintiffs deny Bulman ever made such statement to them about any alleged "tactics" other than those discussed above as to paragraphs 30 and 31. Again they were never told not to make off duty arrests, were never told they could not make them or were warned about making "too many." **P EX. 2 at 24 (Brown Dep. 24); P EX. 3 (Horne Ans. Int. 14); P EX. 4 (Brown Ans. Int. 14).**

33.   Plaintiffs deny the Defendants' facts of paragraph 33 in that they cite to a record not on file, a cite to Bulman's deposition testimony which does not discuss it. **P EX. 6 at 188-193 (Bulman Dep. 188-193).** The Plaintiffs admit that in **<u>Brown's</u>** deposition and in his answers to interrogatories **P EX. 2 at 188-193 (Brown Dep. 188-193); P EX. 4 (Brown Ans. Int. 12, at 27).** Brown indicated that white unit TK19 had a competitive attitude, especially with the Plaintiffs' TK15 unit **P EX. 2 at 196 (Brown Dep. 196)**, as to the number of arrests TK19 made. In that regard, Bulman did ask Lt. Foley to instruct the Plaintiffs, who were working at night (an exception for them) with other black officers, to hold off on making an arrest on a suspect on

whom the Plaintiffs were closing in. The next morning, Bulman and a white unit made the arrest.
**P Ex. 2 at 188-193 (Brown Dep. 188-193); P EX. 4 (Brown Ans. Int. 12, at 27).** As African
Americans, the Plaintiffs' TK15 unit knew the black community well and "were able to retrieve
and obtain a lot of information that would lead to the arrests of suspects" but the Plaintiffs did
not look at it as competitive but just doing their job in the community they knew well. **P EX. 2
at 193 (Brown Dep. 193).**

34. The Plaintiffs <u>deny</u> the statements of the Defendants' facts of paragraph 34, and
<u>deny</u> that the Defendants accurately cited the record to which they refer. In fact, the Defendants
misstate the record. Furthermore, the documents served on the Plaintiffs do not contain the page
cites to which the Defendants refer. In fact, Lt. French (who was the unit commander when Sgt.
Bulman was the Plaintiffs immediate supervisor), in deposition stated that "I don't recall the
specifics of it" when asked what Bulman told him about the Plaintiffs' use of the Lotus Data
Base system, which the unit used to communicate information with one another. Lt. French did
suggest that Bulman may have said that "some of the subtleties [sic] of intelligence information
weren't being provided" but, as stated above, when asked for specifics Lt. French could not
recall the specifics. Lt. French could not "recall" whether Bulman ever told him that the
Plaintiffs were not adequately inputting information into the Lotus Data Base notes. Lt. French
could not "recall" whether Bulman ever told him that the Plaintiffs were not adequately inputting
information into the Field Observation Information ("FIO") data base (FIO's are reports from
stops of citizens on the street for information). Lt. French could not "recall" whether Bulman
ever told him that the Plaintiffs were not adequately providing debriefing forms to detectives and
others. Lt. French could not "recall" whether Bulman ever told him that the Plaintiffs were not

adequately providing From 26 forms to superior officers or detectives (Form 26 forms are the method of use for internal communications via memo form within the BPD). **P EX. 7 at 122-124 (French Dep. 122-124).** The pages to which the Defendants cite are only an explanation in general of how the Lotus Database notes and FIO database and other documents should be completed, <u>not</u> an explanation of any deficiencies by the Plaintiffs. **P EX. 7 at 125-126 (French Dep. 125-126).**

In fact, when shown Lotus Database, debriefing and other reports that the Plaintiffs completed, Lt. French <u>admits</u> the Plaintiffs kept their information in exemplary form within the Lotus Notes Data Base to which all other YVSF members had daily access. He added that the Plaintiffs also properly completed debriefing and other communication forms. **P EX. 7 at 55, 213-229 (French Dep. at 55, 213-229 & Exs. 10, 26, 27, 29, 30, 31); P EX. 2 at 89-90 (Brown Dep. at 89-90); P EX. 3 (Horne Ans. Int. 4); P EX. 17 (French Ex. 26); P EX. 18 (French Ex. 27); P EX. 15 (French Ex. 29); P EX. 19 (French Ex. 30); P EX. 20 (French Ex. 31).** Lotus Database is a computer database YVSF officers use to share information about fugitives, coordinate activities, and to keep other abreast of each officer's information. **P EX. 6 at 218-219 (Bulman Dep. at 218-219)**; **P EX. 5 at 110-112, 228-230 (Davin Dep. 110-112, 228-230); P EX. 8 at 387-390 (Foley Dep. 387-390).** Lotus was the primary means of communication within the unit. **P EX. 8 at 45 (Foley Dep. 45).**

Neither Davin nor Bulman never compared the database to determine whether other officers used it as often as the Plaintiffs. **P EX. 6 at 237 (Bulman Dep. 237); P EX. 5 at 229 (Davin Dep. 229); P EX. 16 (Bulman Ex. 10).** Foley did not review it either. **P EX. 8 at 394-395 (Foley Dep. 394-395).** Even though Bulman claimed that the Plaintiffs were not adequately

fulling in data into the Lotus Database, when he was shown an extensive amount of entries made in the database by the Plaintiffs, he could find nothing wrong with the reports. Bulman admitted they were detailed and represented a variety of incidents. **P EX. 6 at 212-232 (Bulman Dep. at 212-32); P EX. 16 (Bulman Exhibit 10); P EX. 7 at 122 (French Dep. at 122).** In addition, Lt. French was unable to give any specifics about the secretiveness of the Plaintiffs that Bulman conveyed to French, other than one alleged incident which coincided with the time that the Plaintiffs first complained about racism. **P EX. 7 at 80-84, 92-95, 114-115, 122-136, 394-395 (French Dep. at 80-84, 92-95, 114-115, 122-136, 394-395).** Even then, French said that the Plaintiffs would "come around" as they were new to the unit. **P EX. 7 at 98-102 (French Dep. 98-102).**

At deposition, Davin was also shown multiple Lotus Database entries. Davin too admitted that it was apparent that the Plaintiffs "were sharing information with other members of the unit" with regard to the Plaintiffs' activities. **P EX. 5 at 231 (Davin Dep. at 23); P EX. 16 (Bulman Ex. 10).** Additionally, Davin could not recall any incidents where any officer complained that the Plaintiffs were not sharing information. **P EX. 5 at 277 (Davin Dep. at 277).** Davin said the Plaintiffs "were very good at tracking down their fugitives." **P EX. 5 at 159 (Davin Dep. 159).** At deposition, Lt. Foley, who succeeded French as the Commander of the YVSF, could not give any specific examples of the Plaintiffs' secretiveness or not being team players. Foley and French were at the unit at the same time - French was the commander and Foley was a "night Lieutenant." **P EX. 7 at 139 (French Dep. 139); P EX. 8 at 57 (Foley Dep. 57).**

35.  Plaintiffs admit that Lt. French testified as to Bulman's statement to him about the

Plaintiffs. As to the suspect discussed (who was known under three different names beginning with "T"), the Plaintiffs consistently updated in writing and verbally Bulman and the FBI agent assigned to the YVSF as to the information about the suspect. **P EX. 2 at 325-330 (Brown Dep. 325-330).** The Plaintiffs consistently provided debriefing and Form 26 information to the unit. **P EX. 19 (French Ex. 30, at 196, 235, 296); P EX. 20 (French Ex. 31 at 327, 341-342).** In fact, the Plaintiffs reported to the unit a sighting of the suspect and the names of his associates. **P EX. 19 (French Dep. Ex. 30, at 235).** Moreover, Bulman cited the Plaintiffs as among the participating officers who captured the suspect. **P EX. 20 (French Dep. Ex. 31, at 299).** In addition, the Plaintiffs were **commended** for their role in that suspect's capture. **P EX. 13 (Bulman Dep. Ex. 12, at 8); P EX. 28, ¶6 (Brown Decl. ¶6).**

Bulman's comments to Lt. French about the Plaintiffs alleged failure to share information about that suspect took place in March or April of 2000. **P EX. 7 at 94 (French Dep. 94).** Bulman decided to start complaining <u>after</u> the Plaintiffs raised the issue of rampant racism within the unit to Lt. French, to Bulman and to his fellow minority officers which caused larger meetings. **P EX. 1 at 93, 95, 102-106, 133-139 (Horne Dep. 93, 95, 102-106, 133-139); P EX. 7 at 165, 206 (French Dep. 165, 206); P EX. 3 (Horne Ans. Ints. 7); P EX. 4 (Brown Ans. Ints. 7); P EX. 2 at 206-209 (Brown Dep. 206-209).**

Plaintiffs further state that Bulman once stated to French that the Plaintiffs were secretive and were not sharing information. **P EX. 7 at 80-89 (French Dep. 80-89).** French told Bulman to talk to the Plaintiffs and report back to French but he did not do so. **P EX. 7 at 89-91 (French Dep. 89-91).** Bulman never told Lt French that the Plaintiffs were making too many off duty arrests. **P EX. 7 at 82 (French Dep. 82).**

French can recall no other specific conversations with Bulman about the Plaintiffs being allegedly secretive other than about the one suspect to whom they cite. **P EX. 7 at 95 (French Dep. 95).** He also could not say whether that suspect, who was eventually captured (or committed suicide as he was about to be arrested), was found from the work of the Plaintiffs. **P EX. 7 at 94 (French Dep. 94).**

The Plaintiffs dispute that as to any matters that they failed to keep the unit updated on their work. They consistently shared information. The Plaintiffs further state that such suspect was not one Bulman ever mentioned to them as to a problem with their work. **P EX. 3 (Horne Ans. Ins. 9, 12, 15); P EX. 4 (Brown Ans. Int. 9, 12, 15).** In fact, a Suffolk County Assistant District Attorney, Mary Kelly, told Lt. Foley that Horne and Brown had done such a good job developing and documenting information about fugitives that the YVSF should establish records in the manner the Plaintiff were doing for the use of the DA. Accordingly, the YVSF established for the DA and the YVSF the City - Wide Warrant Routing System (Fugitive Tracking System) now in use. **P EX. 3 (Horne Ans. In 9); P EX. 4 (Brown Ans. Int. 9); P EX. 17 (French Dep. Exhibit 26, pages 422 to 523); P EX. 28, ¶4 (Brown Decl. ¶4).** .

36.  Plaintiffs admit that the Defendants state part of the testimony of Brown, but <u>deny</u> it is accurate as stated. Plaintiffs refer the Court to the facts in paragraph 35, already set forth, for the complete truth as to the matter. As to the "hush hush" comment Brown made about Bulman's instructions, the record shows that the Plaintiffs did not make entries in the Lotus Data Base Notes, which is a system to a wider audience, but did consistently shared information with the YVSF all information about that suspect. This is consistent with Bulman's order and admonition to not disseminate the information as widely as usual but to still keep those involved advised of

information on that suspect. The Plaintiffs consistently provided debriefing and Form 26 information to the unit. **P EX. 19 (French Dep. Ex. 30, at 196, 235, 296); P EX. 20 (French Ex. 31 at 327, 341-342.** Again, the Plaintiffs reported to the unit a sighting of the suspect and the names of his associates. **P EX. 19 (French Dep. Ex. 30, at 235).**

The record is replete with examples of the Plaintiffs consistently sharing information with the YVSF. **See, e.g. P EX. 17 (French Ex. 26); P EX. 19 (French Ex. 30); P EX. 20 (French Ex. 31); P EX. 16 (Bulman Ex. 10); P EX. 15 (Davin Ex. 23).** Even though Bulman claimed that the Plaintiffs were not adequately fulling in data into the Lotus Database, when he was shown an extensive amount of entries made in the database by the Plaintiffs, he could find nothing wrong with the reports. Bulman admitted they were detailed and represented a variety of incidents. **P EX. 6 at 212-232 (Bulman Dep. at 212-232); P EX. 16 (Bulman Exhibit 10); P EX. 7 at 122 (French Dep. at 122).** In addition, Lt. French was unable to give any specifics about the secretiveness of the Plaintiffs that Bulman conveyed to French, other than one alleged incident, described above in paragraphs 35 and 36, which coincided with the time that the Plaintiffs first complained about racism. **P EX. 7 at 80-84, 92-95, 114-115, 122-136, 394-395 (French Dep. at 80-84, 92-95, 114-115, 122-136, 394-395).** Even then, French said that the Plaintiffs would "come around" as they were new to the unit. **P EX. 7 at 98-102 (French Dep. 98-102).**

37. The Plaintiffs deny the implication of the statements French says Bulman made to him. The issue has already been discussed above in paragraphs 35 and 36.

38. The Plaintiffs admit that Lt. French made the selected statements which the Defendants quote in paragraph 38, but deny the implication that the Plaintiffs engaged in too

many off duty arrests, were told not to engage in off duty arrests and, therefore, used bad judgment in this regard.  <u>First</u>, Brown made <u>no</u> off duty arrests when he was with the YVSF. **P EX. 28, ¶2 (Brown Decl.  ¶2).**  French recalls only <u>one</u> off duty arrest about which Bulman or anyone allegedly complained. **P EX. 7 at 79-80 (French Dep. 79-80).**  That one arrest was made by only Horne. Horne contacted the Chelsea Police and the YVSF when he spotted a known suspect when Horne was off duty.  When Horne made that off duty arrest he even went so far as to notify and make a report of the arrests to his superiors. On that occasion, Horne was instrumental in effecting the arrest of a dangerous fugitive when Horne was off-duty and had no obligation to act.  **P EX. 6 at 232 (Bulman Dep. at 232).**

<u>Third</u>, the Plaintiffs were <u>not</u> told to not make off duty arrests.  **P EX. 8 at 266-267 (Foley Dep. 266-267); P EX. 5 at 80-84 (Davin Dep. 80-84); P EX. 7 at 70, 73-74, 214-216 (French Dep. 70, 73-74, 214-216); P EX. 15 (French Ex. 29); P EX. 2 at 24 (Brown Dep. at 24); P EX. 3 (Horne Ans. Ints. 11, 14); P EX. 4 (Brown Ans. Ints. 11, 14).**  Off duty arrests were not discouraged or mentioned by the YVSF supervisors.  The Plaintiffs were never told they could not make them or were warned about making "too many." **P EX. 3 (Horne Ans. Int. 14)**.

<u>Fourth</u>, the Defendants admit there is <u>no</u> BPD Rule or YVSF "rule" against off duty arrests, including one that Horne performed.  **P EX. 7 at 70, 73-74 (French Dep. 70, 73-74); P EX. 15 (French Ex. 29); P EX. 8 at 233-234 (Foley Dep. 233-234); P EX. 6 at 195-96, 231-232 (Bulman Dep. 195-96, 231-232); P EX. 9 at 193 (Joyce Dep. 193).**  <u>Fifth</u>, Lt. Foley, who succeeded French as the YVSF commander before Foley recommended the Plaintiffs' transfer, said an officer "absolutely" has the discretion to make them. **P EX. 8 at 199 (Foley Dep. 199).**

Sixth, engaging in "too many" off-duty arrests was another alleged reason Bulman and Davin gave to Lt. Foley as grounds to recommend the Plaintiffs' transfer out of the YVSF. **P EX. 8 at 462-463, 469 (Foley Dep. 462-463, 469).** Seventh, Foley recalls no other officer he recommended for a transfer, in part or in whole, for making off to many off duty arrests. **P EX. 8 at 461-463 (Foley Dep. 461-463).**

Eighth, Davin knew of no off duty arrests the Plaintiffs made in an improper way. **P EX. 5 at 225 (Davin Dep. 225).**

Ninth, a white YVSF officer was even commended, with Foley's approval, for making an off duty an arrest, even though Foley maintains he discourages such arrests. **P EX. 8 at 204-208 (Foley Dep. at 204-208); P EX. 15 (Foley Ex. 42); P EX. 3 (Horne Ans. Int. 9).**[9] That white Officer, Albert, was in a clique with Bulman. **P EX. 8 at 201-208 (Foley Dep. 201-208); P EX. 24 (Foley Ex. 40); P EX. 15 (Foley Ex. 42); P EX. 27, ¶3 (Israel Decl. ¶3).** Albert later got promoted to Sergeant. **P EX. 5 at 157-158 (Davin Dep. 157-158).**

Tenth, as former black YVSF officer Kenneth Isreal states, Officer Albert, Sgt. Bulman, and others were in a day tour clique of white officers known as the "A team" and minority officers were considered the "B team." **P EX. 27, ¶3 (Israel Decl. ¶3).** Current black BPD Officer Craig Jones, who served with the YVSF from 1993 to 2004 in the night tour, says "There was an A team-B team mentality within the day shift of YVSF while I was there, meaning the white officers were on the A team (especially a clique of Sgt. Bulman and other white Officers) and the minority officers considered themselves on the B team. The A team were given higher

---

[9]That white Officer, Albert, was in a clique with Bulman. **P EX. 8 at 201-208 (Foley Dep. 201-208); P EX. 24 (Foley Ex. 40); P EX. 15 (Foley Ex. 42); P EX. 27 (Israel Decl.).** Albert got promoted to Sgt. **P EX. 6 at 157-158 (Davin Dep. 157-158).**

profile fugitive and suspect assignments . **P EX. 26, ¶10 (Jones Decl. ¶10)**.

39.  The Plaintiffs  admit that the Defendants quote a statement from French
in that he said Bulman said he spoke to the Plaintiffs. The Plaintiffs <u>deny</u>, however, that Bulman
ever sat down and spoke with them about any issue.  In fact, Bulman testified that he "never
counseled or warned the plaintiffs about the type of conduct which would result in discipline or
transfer from the youth violence strike force."   Davin ever told the Plaintiffs before the so-called
2001 PAM "evaluation", discussed more below, that they were too secretive or not team players.
**P EX. 1 at 204 (Horne Dep. at 204).**  Neither Bulman nor Davin ever issued warnings to them.
**P EX. 2 at 358-359 (Brown Dep. 358-359).** In fact, Bulman admitted that both he and Davin
"never counseled or warned plaintiffs about the type of conduct which would result in discipline
or transfer from the YVSF." **P EX. 6 at 199 (Bulman Dep. 199); P EX. 21 (Bulman Ans. Int.
No. 12).**

As to the actual work, Bulman never told them they were not doing a good job.  **P EX. 2
at 180-181 (Brown Dep. 180-181).**  Bulman once told Horne and Brown that they were "too
secretive", were not team players,  and "failed to share information" as to an  incident. **P EX. 2
at 181-184, 288-290 (Brown Dep. 181-184, 288-290).**  Even then, Bulman did not elaborate. **P
EX. 2 at 356-357 (Brown Dep. 356-357).**

Upon arrival to the YVSF Bulman repeatedly told the Plaintiffs that the Plaintiffs had to
prove themselves to remain in the YVSF and that the Plaintiffs were taking the place of White
officers Greg Long and Frank McGlaughlin, who had applied but were not assigned to the
YVSF. **P EX. 6 at 118, 122 (Bulman Dep. 118, 122); P EX. 1 at 49-56. 66-67 (Horne Dep. 49-
56, 66-67).** When Horne asked Bulman to elaborate, Bulman walked away.  **P EX. 1 at 57, 66**

34

**(Horne Dep. 57, 66).**  When Bulman later repeated the comments, Brown also asked for an explanation and got the same non-response.   New white Officers McCarthy and Langa were not told that they had prove themselves or were taking the place of officers Long and McLaughlin. **P EX. 2 at 116-126 (Brown Dep 116-126).**  White Officer Gerald Baily said that he did not want Brown in the YSVF.  **P EX. at 58-59, 102 (Brown Dep. at 58-59, 102).**   At times, when the Plaintiffs and black night shift officers were about to make an arrest of a dangerous suspect, Bulman ordered them to hold off and let the white day officers do it. **P EX. 2 at 188-201 (Brown Dep. 188-201); P EX. 4 (Brown Ans. Int. 12).**  Bulman and Davin would not allow the black YVSF officers access to the same investigative tools and resources as for the white officers.  **P EX. 2 at 341-345 (Brown Dep. 341-345).**

**P EX. 6 at 122 (Bulman Dep. 122); P EX. 1 at 49-56, 66-67 (Horne Dep. 49-56, 66-67).**

        Bulman would credit the Plaintiffs' good work to the white officers. **P EX. 1 at 68-73 (Horne Dep. 68-73).** As a black State Trooper said to Horne and Brown during their first week on the job when Bulman left them at YVSF headquarters with no assignment,  "Get used to it." **P EX. 2 at 93-99, 152, 149-154, 178-180 (Brown Dep.  93-99, 152, 149-154, 178-180); P EX. 3 (Horne Int. 4); P EX. 1 at 44-48 (Horne Dep. 44-48).**  In violation of procedure, Bulman did not assign the Plaintiffs to ride separately with and train with more experienced officers for the first 30-60 days. **P EX. 7 at 115-117 (French Dep. 115-117).**

        The Defendants could give no specifics instances in deposition when the Plaintiffs were secretive or demonstrated any qualitites inconsistent with being a good officer. **P EX. 6 at 187, 193, 254, 259 (Bulman Dep. at 187, 193, 254, 259); P EX. 5 at 80,82 (Davin Dep. at 80, 82); P EX. 8 at 149-153, 160-162, 186-187, 197-198, 393-394 (Foley Dep. 149-153, 160-162, 186-**

**187, 197-198**, **393-394**)**.** Davin could not come up with <u>any</u> example where they worked on their own rather than as "team members." **P EX. 5 at 135-136 (Davin Dep. 135-136).**

40.  Plaintiffs admit that French made the statements in deposition to which the Defendants cite, but <u>deny</u> the implication the Defendants draw from it, i.e. the French had any legitimate grounds for the so-called "concerns" which the Defendants do not specify. As to the facts as to French's comments, Plaintiffs rely and incorporate by reference their facts set forth above in paragraphs 19-39.

Moreover, a BPD command staff Superintendent, Paul Joyce, speaking for the Defendant City,  observed that the YVSF as a racially divided unit due to lack of direction and leadership under Lt. French after he came in to meet the officers after the Plaintiffs complained of racism in the unit. **P EX. 9 at 91, 102-103, 114, 143-144 (Joyce Dep. 91, 102-103, 114, 143-144).** Joyce said there was a "lot of damage in the unit." **P EX. 9 at 160 (Joyce Dep. 160).** When he arrived in May 2000 as the new commander succeeding Lt. French, Lt. Foley thought the unit had lost its focus and drafted away from its "original responsibility." **P EX. 8 at 449-451 (Foley Dep. 449-451).**

41.  Plaintiffs admit in part and deny in part the Defendants' facts of paragraph 41. Although the Defendants cite to selected statements by Bulman, they are taken out of context. The following is what Bulman said in deposition and in his answers to interrogatories regarding warning or disciplining the Plaintiffs. Bulman first states that he kept no notes on the Plaintiffs because, he says, "I felt that writing anything down about what they did was a higher level of discipline and something that could be turned over to Internal Affairs, be on their record, and that wasn't my intention to try to hurt them." **P EX. 6 at 197-198 (Bulman Dep. 197-198).**

However, Bulman then said that neither he nor Davin "counseled or warned plaintiffs" as to "the type of conduct which would result in discipline or transfer from the YVSF." **P EX. 6 at 199 (Bulman Dep. 199); P EX. 21 (Bulman Ex. 2); P EX. 21 (Bulman Ans. Int. No. 12).** Bulman then contradicts himself and confuses his own story when (1) he says that he issued the Plaintiffs "oral warnings" in his Answers to Interrogatories but (2) then says that his meetings and discussions with the Plaintiffs were <u>not</u> warnings. **P EX. 6 at 202 (Bulman Dep. 202); P EX. 21 (Bulman Ex 2, No. 12).** Bulman then tries to explain the "oral warnings" as "informal conversations." He then admits that there is no BPD rule on "informal warnings." **P EX. 6 at 202-203 (Bulman Dep. 202-203); P EX. 21 (Bulman Exs 2, No. 12 & Ex. 9).** He was then shown BPD Rule 109 on "Oral reprimand" which states that for "<u>minor</u> violations" a record is kept at the district level but that "no record of the reprimand goes into the permanent personnel file." **P EX. 6 at 203 (Bulman Dep. 203 & Ex 9).** Bulman then says he was not his intention to even give the Plaintiffs an oral reprimand for a <u>minor</u> violation. He further says that there is no rule on the kind of "informal warning" he supposedly gave the Plaintiffs. **P EX. 6 at 203-204 (Bulman Dep. 203-204).** Accordingly, following his logic, the problems Bulman supposedly had with the Plaintiffs (1) were <u>less</u> than minor and (2) further contradict his testimony, discussed above, about making notes of his observations to avoid having them go into the Plaintiffs' personnel file and "hurt them."

Davin's deposition was taken the day after Bulman, Davin conferred with Bulman after Bulman's deposition was completed. **P EX. 5 at 147 (Davin Dep. 147).** Davin then <u>deleted</u> from their once joint answers to interrogatories, which had been served the day of Bulman's deposition as joint answers by Davin and Bulman, the statement that "oral warnings received by

plaintiffs were informal warnings." Davin changed his position and testimony.[10] **P EX. 5 at 15-18, 211- 212( Davin Dep. 15-18, 211- 212); P EX. 22 (Davin Ex. 2 & 18, Ans. 12).** It should be noted that Bulman had signed the answers to interrogatories by the time he was deposed, but Davin had not yet signed them. Even so defense counsel had served them on the Plaintiffs' attorney the day before Davin appeared to be deposed as answers of <u>both</u> Davin and Bulman. **P EX. 5 at 15-16 (Davin Dep. 15-16); P EX 31 (Davin Dep. Ex. 19).** The reasons the Plaintiffs were transferred, according to the City of Boston BPD spokesperson on this issue, Lt. Foley, was because (1) they were not team players, (2) were "secretive", and (3) made too many off duty arrests. **P EX. 8 at 236-329 (Foley Dep. 236-329).** As previously discussed above, Bulman and Davin made those same statements to the Plaintiffs but offered no specifics when the Plaintiffs asked for them.

42. Plaintiffs admit Defendants' fact of paragraph 42.

43. Plaintiffs incorporate by reference herein and refer the Court to the facts in paragraph 41 above. Again, the Defendants' statement is incorrect and disputed when placed in the context of all the facts of this case.

### Dorchester High School and Other Issues - White YVSF officers call minorities "monkeys" and "animals."

44. Plaintiffs admit and deny certain facts of paragraphs 44 of the Defendants fact statement. Plaintiffs admit in February 2000 Lt. French had a Saturday meeting with YVSF officers, including, Horne, and Brown was not present. Plaintiffs deny that "a spate of violence erupted in Dorchester High School" as the record they cite does not so support the statement.

---

[10] Davin was promoted to a Lieutenant in 2004. **P EX. 5 at 50 (Davin Dep. 50).**

45.  Plaintiffs deny the first sentence of paragraph 45 of the Defendants as the record to which  they cite does not support it. Plaintiffs admit the second sentence, except only white YVSF officers objected.  In the February 2000 meeting, commander Lt. French ordered YVSF officers to work at Dorchester High School <u>and</u> to participate in special intervention and crime prevention programs such as home and school visits, white officers resisted.  **P EX. 6 at 121-123 (Bulman Dep. 121-123); P EX. 3 (Horne Ans. Int. 4); P EX. 1 at 95-101, 128-132 (Horne Dep. 95-101, 128-132); P EX. 2 at  205-206, 233, 349-350 (Brown Dep. at 205-206, 233, 349-350).**  The participation of white officers in such programs was very low. One, Det. Fratalia, stated that he would not send his dog to Dorchester High. White Officer Gerald Bailey, the self-proclaimed "Grand Wizard",  (as in the "Grand Wizard" of the Ku Klux Klan) **P EX. 2 at 104-105, 110-113 (Brown Dep. at 104-105, 110-113); P EX. 1 at 208-209 (Horne Dep. 208-209)** said only rapists, murderers, and people who committed violent crimes went there. White officers also referred to Dorchester High students (which are predominately minority) as "animals." White Officer Stephen Ridge stated that the only thing he wanted to do was track down fugitives, and he didn't want to go into people houses with kids assigned to Dorchester High because their houses were nasty and full of roaches.  As to two black officers assigned to Dorchester High (Officer's Eric Braxton and Tito Whitington) white officers asked "What the fuck are they doing up there? They don't do anything"!? **P EX. 9 at 127 (Joyce Dep. 127); P EX. 3 (Horne Ans. Int. 4);P EX. 1 at 950-101, 128-132 (Horne Dep. 95-101, 128-132); P EX. 2 at 205-206, 233, 349-350 (Brown Dep. at 205-206, 233, 349-350).**

"Operation Night-Light", "Home Front Visits", "School Visits" were projects that white officers wished to avoid to minimize their physical contact with black suspects and witnesses. **P**

**EX. 3 (Horne Ans. Int. 6); P EX. 4 (Brown Ans. Int. 6).**

Deputy Superintendent Dowd admitted that the "unit seemed to get off track a little bit as to what the officers felt as though was important." He added that the unit had forgotten that the focus should have been more on high risk youth, especially with the white officers in the unit. **P EX. 10 at 148, 196-198 (Dowd Dep. 148, 196-198).**

46. Plaintiffs admit the facts of Defendants' paragraph 46 but deny it conveys the entire extent of the comments, set forth in paragraph 45 above.

47. Plaintiffs admit the facts of Defendants' paragraph 47 but deny it conveys the entire extent of the comments, set forth in paragraph 45 above.

48. Plaintiffs admit the first sentence of the facts of the Defendants fact statement of paragraph 48 as far is goes, but deny it conveys all the facts which prompted Horne to complain by himself, and later with his cruiser partner, Brown. There were many things which prompted Horne and Brown to complain. As Horne stated in his deposition, he met alone with Lt. French after the meeting to which the Defendants refer, where Dorchester High and other programs were discussed, to voice his complaints. Of that meeting, Horne was asked "And what did you talk about?" Horne testified that "...the way the unit was being run... the procession of the unit, especially...I didn't like the fact that what was stated at the meeting, and then everything just basically boiled into one, and just, you know, I told him how the unit was being run, I didn't really like." **P EX. 1 at 95-96 (Horne Dep. 95-96).** Accordingly, Horne complained not only about the comments at the meeting but how the unit was being run, as described below. Lt. French, Bulman, Brown, Horne and their minority cruiser partner Brito met alone. In that meeting, Brown and Horne, as Horne testified, "we basically laid out our dislikes about the unit

and what we was doing." **P EX. 1 at 101-102 (Horne Dep. 101-102).**   The following was what

was happening.   Due to the length, sub-paragraphs 48a to 48k. Plaintiffs find it is necessary to

do so because the Defendants' facts skip over much of the background and sequence of events.

      48a.   **Segregated cruisers and assignments**

Almost from the first day of their arrival at the YVSF in August 1999, Officers Horne

and  Brown, both African-Americans, observed the disparity between the treatment of white and

minority YVSF officers.   As their supervisors, Davin and Bulman, and <u>their</u> superiors,  admit,

YVSF cruiser assignments were divided along strictly racial lines.   With occasional exceptions,

black officers rode  together and white officers rode together.   Davin and Bulman nearly always

rode with the white officers.  **P EX. 7 at 194 (French Dep. 194); P EX. 6 at 79-95, 172**

**(Bulman Dep. 79-95, 172); P EX. 23 (Bulman Exs. 6-7); P EX. 5 at 72-80 (Davin Dep. 72-**

**80); P EX. 22 (Davin Ex. 18, Ans. 6); P EX. 1 at 67-68, 73 (Horne Dep. 67-68, 73); P EX. 3**

**(Horne Ans. Int. 5); P EX. 4 (Brown Ans. Int. 5); P EX. 9 at 134-135 (Joyce Dept. 134-135);**

**P EX. 27, ¶2 (Israel Decl. ¶2); P EX. 26, ¶3 (Jones Decl. ¶3). [11]**

Davin, Bulman, and even their YVSF superiors, Lt. French and  Lt. Foley (who

incorrectly claims he made the ultimate decision to transfer the Plaintiffs out of the YVSF)[12]

passed off the practice of racially segregated cruisers as something that  the officers themselves

choose. **P EX. 8 at 420-423 (Foley Dep. 420-423).** Lt. French, however, testified that Bulman

and Davin had authority to assign officers to cruisers. **P EX. 7 at 87-88 (French Dep.  87-88).**

---

[11]Bulman and Davin had authority to assign officers to cruisers and to hand out mission
assignments. **P EX. 9 at 212 (Joyce Dep. 212).**

[12] Only Commissioner Evans had authority to order a transfer. **P EX. 5 at 130 (Davin
Dep. 130).**

The YVSF day tour consisted of four teams.  Officers Brito (Hispanic), Brown and Horne worked together as Unit TK 15.  White Officers McCarthy and Langa, who joined the YVSF when Brown, Horne and Brito arrived, of course  rode together but Bulman placed them with the experienced white teams for training.  **P EX. 1 at 39-48 (Horne Dep. 39-48).** Horne, Brown and Brito were self-trained. Unit TK 18  (three black officers)  was considered an administrative unit that worked directly for Lt. French in the schools with black state troopers. **P EX. 9 at 82-84 (Joyce Dep. 82-84); P EX. 2 at 98-99 (Brown Dep. 98-99); P EX. 1 at 27-28 (Horne Dep. 27-28); P EX. 3 (Horne Ans. Int 5).**  When a new white YVSF female officer, Michelle Williams, who knew Horne from a prior area wished to ride with Horne and Brown, white officers objected and the new white officer was assigned to white officers.  **P EX. 1 at 192-194 (Horne Dep. 192-194).**

Davin, Bulman, and even their YVSF superiors, Lt. French and  Lt. Foley (who incorrectly claims he made the ultimate decision to transfer the Plaintiffs out of the YVSF)[13] said the practice of racially segregated cruisers as something that  the officers themselves choose. **P EX. 8 at 420-423 (Foley Dep. 420-423).**  Lt. French, however, testified that Bulman and Davin had authority to assign officers to cruisers. **P EX. 7 at 87-88 (French Dep.  87-88).** The YVSF day tour consisted of four teams.  Officers Brito (Hispanic), Brown and Horne worked together as Unit TK 15.  White Officers McCarthy and Langa, who joined the YVSF when Brown, Horne and Brito arrived, of course  rode together but Bulman placed them with the experienced white teams for training.  **P EX. 1 at 39-48 (Horne Dep. 39-48).**  Horne, Brown and Brito were self-

---

[13] Only Commissioner Evans had authority to order a transfer. **P EX. 5 at 130 (Davin Dep. 130).**

trained. Unit TK 18 (three black officers) was considered an administrative unit that worked directly for Lt. French in the schools with black state troopers. **P EX. 9 at 82-84 (Joyce Dep. 82-84); P EX. 2 at 98-99 (Brown Dep. 98-99); P EX. 1 at 27-28 (Horne Dep. 27-28); P EX. 3 (Horne Ans. Int 5).** When a new white YVSF officer who knew Horne from a prior area wished to ride with Horne and Brown, white officers objected and the new white officer was assigned to white officers. **P EX. 1 at 192-194 (Horne Dep. 192-194).** Accordingly, only Horn, Brown Brito was the only minority day team engaged to the same work as the white teams, primarily tracking fugitives.

48b. **Segregated assignments**

Bulman would credit the Plaintiffs good work to the white officers. **P EX. 1 at 68-73 (Horne Dep. 68-73).** As a black State Trooper said to Horne and Brown during their first week on the job when Bulman left them at YVSF headquarters with no assignment, "Get used to it." **P EX. 2 at 93-99, 152, 149-154, 178-180 (Brown Dep. 93-99, 152, 149-154, 178-180); P EX. 3 (Horne Ans. Int. 4); P EX. 1 at 44-48 (Horne Dep. 44-48).** In violation of procedure, Bulman did not assign the Plaintiffs to ride separately with and train with more experienced officers for the first 30-60 days. **P EX. 7 at 115-117 (French Dep. 115-117).** Similarly, Bulman (and later Davin) and the other white officers routinely worked with the white state troopers assigned to work at the YVSF headquarters at 364 Warren Street, Roxbury. **P EX. 9 at 47 (Joyce Dep. 47).** Eventually, Horne and Brown sought an assignment from the YVSF commander, Lt. Gary French, who gave them a non-warrant assignment. **P EX. 2 at 93-94 (Brown Dep. 93-94); P EX. 1 at 44, 219 (Horne Dep. 44, 219).** As Horne and Brown continued to complain about the failure of assignments, Bulman, after several weeks, then assigned them warrants on difficult

43

"cold case" fugitives which the Plaintiffs solved.  **P EX. 1 at 216-219 (Horne Dep. 216-219); P EX. 3 (Horne Ans. Int. 17); P EX. 4 (Brown Ans. Int. 17); P EX. 2 at 93-96 (Brown Dep. 93-96).**[14]

With some exceptions, Bulman and Davin generally supervised warrant service or arrests with white officers.  Bulman and Davin assigned white officers from other agencies with white officers.  As but two examples, white MBTA Det. Collins was assigned to ride with the TK16 or TK17 (all white officers) under Davin. White Sheriff  Deputy Stephen Scanlon rode with the TK19, all white officers.   **P EX. 3 (Horne Ans. Int. 5).** A BPD command staff Superintendent, speaking for the Defendant City,  observed that the YVSF as a racially divided unit due to lack of direction and leadership. **P EX. 9 at 114, 143-144 (Joyce Dep. 114, 143-144).** [15]

48c.    **Whites on the day tour were the "A Team"**

Black officers primarily worked nights and, therefore, were known as the "Soul Patrol." **P EX. 2 at 166-167 (Brown Dep. 166-167); P EX. 26, ¶¶2-4 (Jones Decl.  ¶¶2-4).**  When the Plaintiffs occasionally  worked the night tour, they rode with black officers.  **P EX. 3 (Horne Ans. Int. 5); P EX. 4 (Brown Ans. Int. 5).**   Once assigned to an overtime tour of duty, black YVSF officer Ken Isreal began the tour with a white officer.  The white officer called a black driver who cut them off in traffic as they were leaving the YVSF headquarters a "nigger." Officer Isreal then refused to ride with the white officer.  **P EX. 27, ¶5 (Israel Decl. ¶5).**  Black Officers Jones and Isreal state that the day tour white officers (including Bulman) were

---

[14]During his first few days at the unit, Bulman did not even tell Brown that Bulman was his supervisor. **P EX. 2 at 119-121 (Brown Dep. 119-121).**

[15] Again, Joyce added there was a "lot of damage in the unit."  **P EX. 9 at 160 (Joyce Dep. 160).**

considered the A team, and the black officers on the day tour were on the "B team." **P EX. 26, ¶10 (Jones Decl. ¶10); P EX. 27, ¶3 (Isreal Decl. ¶3).** A white YVSF officer was wearing a tee shirt displaying a target label with bullet holes depictions as to the slaying of Mr. Diallo, a black unarmed New York City resident who died in a hail of gunfire from New York City officers. **P EX. 26, ¶4 (Jones Decl. ¶4); P EX. 3 (Horne Ans. Int. 6); P EX. 4 (Brown Ans. Int. 6); P EX. 1 at 148 (Horne Dep. 148).** A white officer, forgetting a black officer was in the back seat, referred to a black as nigger. **P EX. 7 at 168-169 (French Dep. 168-169); P EX. 1 at 148 (Horne Dep. 148); P EX. 2 at 232-233 (Brown Dep. 232-233).** Bulman and Davin would not allow the black officers access to the same investigative tools and resources as for the white officers. **P EX. 2 at 341-345 (Brown Dep. 341-345).**

With some exceptions, Bulman and Davin generally supervised warrant service or arrests with white officers. Bulman and Davin assigned white officers from other agencies with white officers. As but two examples, white MBTA Det. Collins was assigned to ride with the TK16 or TK17 (all white officers) under Davin. White Sheriff Deputy Stephen Scanlon rode with the TK19, all white officers. **P EX. 3 (Horne Ans. Int. 5).** A BPD command staff Superintendent, speaking for the Defendant City, observed in March of 2000 after Horne and Brown complained that the YVSF as a racially divided unit due to lack of direction and leadership. **P EX. 9 at 91, 102-103, 114, 143-144 (Joyce Dep. 91, 102-103, 114, 143-144).**

48d. **Bulman's racist comment**

Black YVSF Officers Craig Jones and Gregory Brown once asked Bulman why there were not more black officers assigned to the YVSF. Bulman responded "I don't know any aggressive black officers." **P EX. 26, ¶2 (Jones Decl. ¶2).**

48e.    **The YVSF was originally an all white unit with Bulman and Davin**

Created in October 1993 as a prestigious,  elite unit, the Youth Violence Strike Force ("YVSF"), which originally was under previously existing Anti-Gang Violence Unit (a night unit), was charged with reducing violence among Boston's youth and tracking fugitives.  The YVSF was a day tour unit.  **P EX. 9 at 37, 53-54, 71-72, 95 (Joyce Dep. at 37, 53-54, 71-72, 95); P EX. 5 at 42 (Davin Dep. 42), P EX. 6 at 27-28 (Bulman Dep. 27-28); P EX. 7 at 48-53 (French Dep. 48-53).** It later evolved into a unit which also works with the FBI, the Massachusetts State Police, the U.S. Marshall's office, ATF, the MBTA, the Sheriff's Office the U.S. Attorney's office, and other investigatory agencies tracking down and apprehending violent fugitives.  **P EX. 9 at 38-39 (Joyce Dep. at 38-39); P EX. 6 at 29-30, 52-53, 278 (Bulman Dep. 29-30, 52-53, 278); P EX. 7 at 48-53 (French Dep. 48-53); P EX. 8 at 43-45, 49-52 (Foley Dep. 43-45, 49-52).**  For a Boston Police Officer, it is a highly sought after assignment, and the Boston Police Department ("BPD") routinely boasts of its status and accomplishments. Superintendent Joyce was a self-proclaimed founder of the YVSF, when he was a Sergeant-Detective.  **P EX. 9 at 39, 74-77 (Joyce Dep. at 39, 74-77); P EX. 8 at 16,39 (Foley Dep. 16, 39).**  Defendants  Davin and Bulman were among those initially in the unit with Joyce, and all were white.  **P EX. 9 at 48-50, 53, 75-76 (Joyce Dep. 48-50, 53, 75-76); P EX. 5 at 24-27, 180 (Davin Dep. 24-27, 180).**  No minorities joined the day tour of unit from 1993 to 1996. **P EX. 8 at 67 (Foley Dep. 67).**

48f.    **No black commanders or day tour Sergeants**

At least since 1993, there has never been a black Sergeant assigned to the day tour.  **P EX. 9 at 88 (Joyce Dep. 88).**   Officer Jones says that "During my tenure, there was never been

46

a black or minority commander of the YVSF." **P EX. 26, ¶4 (Jones Decl. ¶4).** Jones was with

the YVSF from 1993 to 2004 in the night unit. **P EX. 26, ¶1 (Jones Decl. ¶1).**

48g. **White YVSF officers call minorities "monkeys" and "animals."**

Both under Bulman and Davin, white YVSF officers, in front of Brown and other white

officers, referred to black suspects as "monkeys" as opposed to "good blacks", who were called

"porch monkeys."  Brown verbally objected to such terminology. **P EX. 2 at 159-164, 239-246**

**(Brown Dep 159-164, 239-246).**  "Porch monkeys" were an obvious reference to the deep South

house servants who served the owner in his house rather than as a slave in the fields.  **P EX. 2 at**

**160-162 (Brown Dep. 160-162).**

White officer Gerald Baily referred to himself, and was known as, the "Grand Wizard"

(as in the "Grand Wizard" of the Ku Klux Klan).  **P EX. 2 at 104-105, 110-113 (Brown Dep. at**

**104-105, 110-113); P EX. 1 at 208-209 (Horne Dep. 208-209).**  As the defense admits, the 80

to 100 fugitive posters on the three YVSF bulletin board were exclusively black or minority until

the Plaintiffs complained but, even then only one white face appeared after Davin took over.

Bulman and Davin chose whom to post.  **P EX. 8 at 372-373, 442-443 (Foley Dep. 372-373,**

**442-443); P EX. 10 at 61-62 (Dowd Dep. 61-62); P EX. 1 at 193-194 (Horne Dep. 193-194);**

**P EX. 2 at 193-194 (Brown Dep. at 193-194).**  Officer Jones says that "Posters of suspects on

the YVSF bulletin board were exclusively minority, with the exception of perhaps one white

face which later appeared after Officers Horne and Brown complained about racism in the YVSF

in 2000." **P EX. 26, ¶4 (Jones Decl. ¶4).**  Visiting black civilians made note of the disparity. **P**

**EX. 3 (Horne Ans. Int. 18); P EX. 4 (Brown Ans. Int. 18).**  Horne and Brown, until transferred

out, consistently took exception to the posters and the objectionable terminology.  **P EX. 3**

**(Horne Ans. Int. 18); P EX. 4 (Brown Ans. Int. 18).**  White YVSF Det. Wagget, in the presence of FBI Special Agent Jim Trahon and Horne,  referred to a black Command Staff Superintendent as a "big headed monkey."   **P EX. 3 (Horne Ans. Int. 6).**

48h.  **Bulman preferred white officers over the Plaintiffs for the YVSF.**

Upon arrival to the YVSF Bulman repeatedly told the Plaintiffs that the Plaintiffs had to prove themselves to remain in the YVSF and that the Plaintiffs were taking the place of White officers Greg Long and Frank McGlaughlin, who had applied but were not assigned to the YVSF. **P EX. 6 at 118, 122 (Bulman Dep. 118, 122); P EX. 1 at 49-56, 66-67 (Horne Dep. 49-56, 66-67).** When Horne asked Bulman to elaborate, Bulman walked away.  **P EX. 1 at 57, 66 (Horne Dep. 57, 66).**  When Bulman later repeated the comments, Brown also asked for an explanation and got the same non-response.  New white Officers McCarthy and Langa were not told that they had prove themselves or were taking the place of officers Long and McLaughlin. **P EX. 2 at 116-126 (Brown Dep. 116-126).**  White Officer Gerald Baily said that he did not want Brown in the YSVF.  **P EX. 2 at 58-59, 102 (Brown Dep. at 58-59, 102).**   These facts are discussed in above paragraphs in more detail.

48i.  **White YVSF officers routinely abuse minority witnesses and citizens**

White YVSF officers consistently abused black citizens, including children and older people. Citizens were treated differently based on race. **P EX. 1 at 74-75, 211-212, 219-224 (Horne Dep 74-75, 211-212, 219-224); P EX. 3 (Horne Ans. Int. 18); P EX. 2 at 60- 88, 140-147, 155-157 (Brown Dep. 60- 88, 140-147, 155-157); P EX. 4 (Brown Ans. Ints. 18).** For example, white YVSF Officers Chris Bailey, Steve Romano and Gary Ryan physically abused a young black male citizen at the YVSF headquarters in the presence of Brown and others, and

Davin initially instructed them to arrest the citizen for an unknown and not readily apparent reason.  Davin then decided not to charge the citizen with any crime after Brown intervened. Davin saw the citizen bruised and bleeding.  **P EX. 2 at 140-147 (Brown Dep. 140-147).**  On other occasions, white YVSF officers in the YVSF would, when not necessary, enter the homes of black families, sometimes without warrants,  yell racial epithets to the residents while demanding of  them information on black suspects, demanding identification of non-suspects and running CORI checks on minority citizens without any warrant or reason.   **P EX. 1 at 74-75, 211-212, 219-224 (Horne Dep 74-75, 211-212, 219-224); P EX. 3 (Horne Ans. Int. 18); P EX.2 at 60- 88, 140-147 (Brown Dep. 60- 88, 140-147); P EX. 4 (Brown Ans. Ints. 18).**  On one occasion, for example, white Officer Chris Bailey, placed a chair in front of a black non-suspect woman who refused to give her name and stated that he was not leaving until she surrendered her correct name; he then ran a CORI check on her. After another suspect's mother allowed the officers in, Officer Bailey began to badger an older black gentleman there for the older black non-suspect gentleman's identification. Officer Bailey performed a CORI on the man without cause. At another time, white officers would pull out their weapons to threaten black citizens who were not suspects or fugitives. **P EX. 3 (Horne Ans. Int. 18).**  Upon joining the YVSF, the Plaintiffs were told to forget what they learned in the Police Academy as to citizen rights. **P EX. 2 at 60-61, 72-74**, **82 (Brown Dep. 60-61, 72-74**, **82).**

With white suspects the white YVSF officers acted much differently. For example, on one occasion white YVSF officers, including Davin,  knocked at the door of the white suspect, politely asked for him on a warrant and accepted a relative's promise to bring the suspect to the station or to court the next day; when the suspect did not appear the next day, Brown secure an

the arrest.   Brown complained to Davin about the different approach. **P EX 1 at 76-77, 80-92, 219-225 (Horne Dep. 76-77, 80-92,  219-225); P EX 3-4 at 11, 17, 38 (Horne & Brown  Ans. Ints. 4, 6 & 18); P EX. 2, at 86-88, 155-157 (Brown Dep. 86-88, 155-157) .**

There are other examples cited in the record. They will not be all recounted here. **P EX 1 at 76-77, 80-92, 219-225 (Horne Dep. 76-77, 80-92,  219-225).  P EX 3-4 at 11, 17, 38 (Horne & Brown  Ans. Ints. 4, 6 & 18); P EX 2 at 86-88, 155-157 (Brown Dep. 86-88, 155-157) .**

48j.    **More smaller meetings ensued after Horne complained**

The Plaintiffs admit after they complained to Lt. French and Bulman, there were many more smaller meetings of black and white officers.  After the February 2000 meeting described above, Horne voiced his concerns to Lt. French about racism in the unit and with the treatment of the minority community. **P EX 1 at 93-102 (Horne Dep. 93-102); P EX 7 at 165 (French Dep. 165).**   Horne approached French numerous times, both initially and as a followup to see if any progress was being made, and French said he was taking it to the BPD command staff. **P EX 1 at 95, 102,103, 133-138 (Horne Dep.  95, 102-103, 133-138); P EX 3-4 at 21, 19 (Horne & Brown Ans. Ints. 7).**   French stated that Horne and Brown initially brought the issue forward. **P EX 7 at 206 (French Dep. 206).** Horne and Brown began to enlist other minority YVSF officers to support their decision to try to do something about it.  **P EX 1 at 105-106 (Horne Dep. 105-106); P EX 2 at 206-209 (Brown Dep. 206-209).** Small and larger meetings ensued of minority officers who agreed with Horne and Brown. **P EX 1 at 136-139 (Horne Dep. 136-139).**  As stated above, Lt. French and  Bulman then had a meeting with Horne, Brown and Brito, where the Plaintiffs again gave an overview of all the racial hostility and tension within the YVSF.  **P EX 1 at 101-102 (Horne Dep. 101-102)**; **P EX 2 at 112, 162-164, 209-213 (Brown Dep. 112,**

**162-164, 209-213).** Bulman noted Horne as being the most upset minority officer. **P EX 6 at 121,191 (Bulman Dep. 121, 191).** Bulman noted everyone in the unit starting talking about it. **P EX 6 at 175-177 (Bulman Dep. 175-177).**

    48k.  <u>**Commanders hold separate meetings of whites and blacks**</u>

    Lt. French then held separate meetings with minority-only and white-only YVSF officers. Superintendent Paul Joyce then called a meeting of the Plaintiffs and a few other minority officers at the YVSF and told the Plaintiffs that he, Joyce, created the unit and, looking directly at Horne, said that he was not going to let anyone destroy it. **P EX 1 at 107-108 (Horne Dep. 107-108).** Joyce recalls it as expressing his "disappointment." **P EX 9 at 112-113 (Joyce Dep. 112-113).** Joyce admits to being close friends with two white officers about whom the Plaintiffs had complained and who started the YVSF with Joyce. **P EX 9 at 153-154 (Joyce Dep. 153-154).**

    49.  Plaintiffs admit that Bulman made the statements to which the Defendants refer, but deny Bulman made any effort to correct the problems he created and perpetuated, as described above and below.

    50.  Plaintiffs admit that Lt. French began to convene meetings but deny that the meetings were only "to discuss their concerns about the issues raised at the Dorchester High School meeting" as the Plaintiffs describe above in paragraph 48. Plaintiffs admit the second sentence of paragraph 50 and further state the following. After the Plaintiffs complained meetings ensued with Commissioner Evans and BPD command staff members **P EX 10 at 267 (Dowd Dep. 267) P EX 7 at 176-177 (Lt. French Dep. 176-177).** Command staff began communicating with one another about it. **P EX 10 at 146-147, 291 (Dowd Dep. 146-147, 291);**

**P EX 7 at 173-176 (French Dep. 173-176).** Deputy Superintendent Dowd, who was over Lt. French said that French told Dowd that the matter was "pretty serious." **P EX 10 at 64 (Dowd Dep. 64).** Dowd then discussed it with Commissioner Evans and described it as "some serious issues." Dowd suggested to Evans that "We might have to consider moving some people out of the unit." Evans responded **"**we'll have to do what we have to do." **P EX 10 at 77 (Dowd Dep. 77).** Evans stated that "we'll address this." **P EX 10 at 81 (Dowd Dep. 81).** The BPD has no policy to handle race issues. **P EX 10 at 82 (Dowd Dep. 82).** Deputy Superintendent Dowd said Internal Affairs is not an appropriate place to make a complaint internally of racism. **P EX 10 at 83-84 (Dowd Dep. 83-84).**

Then  bigger meetings in May 2000 with all members of the YVSF, representatives of the NAACP, the Nation of Islam, Probation and the Boston Police Command Staff took place. **P EX 1 at 110-121, 155-158 (Horne Dep. 110-121, 155-158);P EX 6 at 179-184 (Bulman Dep. 179-184).**

51.  Plaintiffs admit that there was a meeting of commanders and supervisors at the BPD headquarters but deny that the record to which the Defendants cite show that "a number of YVSF officers" attended.   Plaintiffs deny that the BPD called in a consultant on race relations because it did not have one. **P EX 10 at 269 (Dowd Dep. 269).** As she admits, Joan Sweeney had no race relations experience and was not called upon to assist in any such endeavor in 2000 with the YVSF. **P EX 10 at 97-99 (Dowd Dep. 97-99); P EX 12 at 26, 50-57 (Sweeney Dep. 26, 50-57).**

52.  Plaintiffs admit the facts of the first sentence of Defendants facts of paragraph 52. Plaintiffs admit  the second sentence all officers of the YVSF were invited to attend. It was not a

mandatory meeting for YVSF officers. **P EX 2 at 225 (Brown Dep. 225).** Plaintiffs admit the third sentence that they attended. The Plaintiffs deny that any meaningful discussion ensued. The BPD set up a meeting to appease Horne, Brown and the other minority officers who later voiced issues about racism in the unit. There was no agenda, no point by point discussion of the matters the Plaintiffs raised, and no participation by white officers (other than maybe an acknowledgment by white officer Scott Gillis that he should not have worn the offensive T-shirt of the Diallo killing in New York City). Representatives of the NAACP, the Nation of Islam, Probation and the Boston Police Command Staff attended and made statements and speeches, certain YVSF issues were mentioned by a few black officers, but no specific resolutions were proposed or reached. **P EX 1 at 110-121, 155-158 (Horne Dep. 110-121, 155-158); P EX 29 (Horne Decl. ¶2); P EX 10 at 296 (Dowd Dep. 296); P EX 6 at 179-184 (Bulman Dep. 179-184).** As she admits, BPD consultant Joan Sweeney was present but she had no race relations experience and was not called upon to assist in any such endeavor. **P EX 10 at 97-99 (Dowd Dep. 97-99); P EX 12 at 26, 50-57 (Sweeney Dep. 26, 50-57).**

53.    Plaintiffs admit in part and deny in part paragraph 53 of the Defendants' facts. Plaintiffs admit that certain minority officers briefly raised the issues, but no white YVSF officers, including Bulman or Davin, who were present, discussed them. No command staff or commanders discussed the issues. **P EX 1 at 110-121, 155-158 (Horne Dep. 110-121, 155-158); P EX 6 at 179-184 (Bulman Dep. 179-184).** Bulman says some of the white officers spoke but he cannot recall what they said. **P EX 6 at 171 (Bulman Dep. 171).**

54.    Plaintiffs admit Horne did not speak at the meeting. As he said, he was scared because he had not held his voice, had spoken out, and the white officers now did not like him.

**P EX 1 at 115 (Horne Dep. 115).**  Plaintiffs admit not hearing white officers speaking. Plaintiffs deny Horne only heard discussion of the offensive shirt.  Other issues such as the minority only posters, Dorchester High and related comments, and violation of citizen rights by the white officers   were briefly mentioned only by some minority officers. **P EX 1 at 110-117 (Horne Dep. 110-117).**  Deputy Superintendent Dowd says no black officers spoke about race issues at the big meeting. **P EX 10 at 206 (Dowd Dep. 206)**, but he was only present for 45 minutes**.  P EX !0 at 296 (Dowd Dep. 296).**  Brown and Horne had complained about minority abuse issues to Lt. French. **P EX 3-4 at 17, 21, 38 (Brown & Horne Ans. Ints. 6, 7, 18).**

55-60. Admitted by Plaintiffs as to some of the statements Brown said in his Deposition, but Plaintiffs deny that the meetings resolved the issues they raised.  The same problems continued. The Plaintiffs incorporate the facts of paragraphs 50-54.  The meetings changed nothing. The same racist patterns and behavior continued, including after Davin replaced Bulman as the day tour supervisor in May 2000; black officers were segregated and not given priority in his supervision and assignments.  **P EX 2 at 292-301 (Brown Dep. 292-301); P EX 6 at 57-58, 91,98 (Bulman Dep. 57-58, 91, 98); P EX 5 at P EX 5 at 45-48 & P EX 22 at 3 (Davin Dep. 45-48 & Ex. 18 Ans. 6).**  Bulman also continued to supervise the Plaintiffs from time to time. **P EX 5 at 49-50 (Davin Dep. 49-50).**  Davin ordered  officers to obtain a minimum of 20 Field Interrogation Observation ("FIO") daily reports on citizens. **P EX 1 at 197-199 (Horne Dep. 197-199); P EX 2 at 145-147 (Brown Dep. 145-147).**  Davin bragged that he could obtain 20 FIO's in front of the YVSF offices near Warren Street. Brown told  Davin, to Davin's ire,  that a quota to make FIO's were unlawful and would lead to a violation of people's civil rights. Young blacks were targeted. **P EX 1 at 197-199 (Horne Dep. 197-199); P EX 29**

**¶2 (Horne Decl. ¶2 ).**  Foley encouraged FIOs as a competitive edge over other BPD units. **P EX 8 at 453-454 (Foley Dep. 453-454).** Under Davin, cruiser assignments continued along racial lines (including new black officers being assigned to ride with the Plaintiffs **P EX 1 at 201 (Horne Dep. 201)**, the bulletin boards didn't change,  and white YVSF officers continued to abuse minority citizens; the Plaintiffs continued to complain about these issues to Lt. Foley. **P EX 1 at 167-172, 205-207, 209-211 (Horne Dep. 167-172, 205-207, 209-211); P EX 2 at 358-359 (Brown Dep. 358-359).**  Davin assigned the Plaintiffs the one white suspect face which appeared on the Bulletin Board. **P EX 1 at 200-201 (Horne Dep. 200-201).**   After Horne and Brown raised their complaints to Lt. French, which led to the meetings, the white officers became hostile to them as "instigators", and Lt. French initially tried to keep it within the YVSF. **P EX 1 at 115, 162-170 (Horne Dep. 115, 162-170); P EX 3-4 at 21 & 27 (Horne & Brown Ans. Ints. 7 & 10); P EX 2 at 206-210,216,223-224 (Brown Dep. 206-210, 216, 223-224).**  The Plaintiffs complained to the commander, Lt. Foley, about the hostility and to a Deputy Supervisor. **P EX 1 at 115, 169-175 (Horne Dep. 115, 169-175).**

Abuse of minority citizens both before and after the meeting continued. White YVSF officers consistently abused black citizens, including children and older people. Citizens were treated differently based on race. **P EX 1 at 74-75, 211-212, 219-224 (Horne Dep. 74-75, 211-212, 219-224) ; P EX 3 at 38 (Horne Ans. Int. 18); P EX 2 at 60-88, 140-147, 155-157 (Brown Dep. 60- 88, 140-147, 155-157); P EX 4 at 35 (Brown Ans. Ints. 18).**

61.  Plaintiffs admit that Dowd had such a meeting, but deny that those that were the problem were transferred, including Bulman and those who are part of the facts of paragraphs 19-48 above.  The Defendants admit that Sergeants have the right to recommend a transfer. **P**

**EX 10 at 110 (Dowd Dep. 110).**   Moreover, Dowd did <u>not</u> transfer out white officers who had engaged in racist behavior, but only those who were not doing the job, the "mission" of the YVSF.  They were transferred for that reason only. **P EX 10 at 118 (Dowd Dep. 118); P EX 8 at 404-419 (Foley Dep. 404-419); P EX 26 at  ¶9 (Jones Decl. ¶9); P EX 28 at ¶5 (Brown Decl. ¶5).**

In fact, the ones who were transferred had been identified for transfer and were already on a list **<u>before</u>** the large meetings and at about the same time, February 2000, that the Plaintiffs complained. **P EX 10 at 191-192 & P EX 30 (Dowd Dep. Ex. 48).** The transfer list is dated February 25, 2000 **P EX 30 (Dowd Dep. Ex. 48).**   Deputy Superintendent (now Captain) Dowd admits that the transfers were ordered before the racism complaints surfaced. **P EX 10 at 191-192 (Dowd Dep. 191-192).**

62.  Admitted as stated above.  Also, the Plaintiffs were not transferred out and were not on the February 25, 2000 transfer list because they were doing their job and had not yet complained. **P EX 10 at 122-132 & P EX 30 (Dowd Dep. 122-132 & Ex. 48).**  <u>See also</u> paragraphs 48-60 above.

63.  Admitted as stated above.

64.   Admitted as stated but denied in that it resolved any problems, as the Plaintiffs state in paragraphs 48-61.

65.   Admitted except that Horne did not speak at the meeting in that he was scared because he had not held his voice, had spoken out, and the white officers now did not like him. **P EX 1 at 115 (Horne Dep. 115).**  Plaintiffs also incorporate paragraphs 48-61 above. At least one other black officer refused to complain for fear of being singled out. **P EX 2 at 252-254**

**(Brown Dep. 252-254).** Minority officers generally felt a fear of reprisal. **P EX 26 at ¶5 (Jones Decl. ¶5).**

66.    Denied as stated.  Plaintiffs admit Horne said there was an attempt but that the tension and problems increased, as the record to which the Defendants cite says. He was then considered an instigator of it all. **P EX ! At 162-163 (Horne Dep. 162-163).**

67.    Admitted Foley held separate meetings with black only and white only officers and testified that he made such statements, but denied that Foley meant what he said.  In fact, the Plaintiffs deny that Foley attempted to resolve the problems as they got worse, as set forth in paragraphs 55-60 above and described below.

68. Plaintiffs admit that Brown made those statements as to Foley's seemingly outward appearance attempts to address the issues the Plaintiffs raised, but he also questioned their success at the time.  Brown Dep. 161. In fact, Brown, and others, said that he and Horne later became "marked men" within the unit for their complaints.   The Plaintiffs became "marked men" or "outcasts" to the white officers until the transfer.  The Defendants' demeanor towards the Plaintiffs became continuously hostile, and this was the view of others as well. **P EX 1 at 193-194 (Horne Dep. 193-194); P EX 2 at 183, 251-252, 263-264, 271-272, 275, 345-347 (Brown Dep. at 183, 251-252, 263-264, 271-272, 275, 345-347); P EX 27 at ¶4 (Israel Decl. ¶4).**

69.    Denied.  The record does not support the Defendant's statement. Also,  the Plaintiffs stated above, Horne noted the statements of Bulman, Bailey, Fratalia and others, and was looked upon as an instigator. **P EX 1 at 115 (Horne Dep. 115).**  He and Brown were marked men and considered "dogs." **P EX 3-4 at 46 (Horne & Brown Ans. Ints. 23).** . The Plaintiffs became

"marked men" or "outcasts" to the white officers until the transfer. The Defendants' demeanor towards the Plaintiffs became continuously hostile. **P EX 1 at 193-194 (Horne Dep. 193-194); P EX 2 at 183, 251-252, 263-264, 271-272, 275, 345-347 (Brown Dep. at 183, 251-252, 263-264, 271-272, 275, 345-347); P EX 27 at ¶4 [16] (Israel Decl. ¶4 [17]).** Also, Bulman did not first start making negative comments to Lt. French about the Plaintiffs until five or six months after they joined the unit about the same time after the Plaintiffs raised the racism issues. **P EX 7 at 64.[18] (French Dep. 64.[19] ).**

The February 2000 meeting was the <u>first</u> time, not the last time, the Plaintiffs raised the issue of racism. It instigated many more large and small meetings, including afer May 2000 when Foley arrived. **P EX 8 at 438, 448 (Foley Dep. 438, 448); P EX 1 at 110-121, 155-158 (Horne Dep. 110-121, 155-158); P EX 6 at 179-184 (Bulman Dep. 179-184); P EX 2 at 220 (Brown Dep. 220)**.

70. Denied and the record cited does not support the Defendants' statement. Due to the problems of white officers harassing and abusing minorities, as set forth above (paragraphs 48i, 61) and in the record **P EX 1 at 167-172, 205-207, 209-211 (Horne Dep. 167-172, 205-207, 209-211); P EX 2 at 358-359 (Brown Dep. 358-359); P EX 1 at 74-75, 211-212, 219-224;**

---

[16]At least one other black officer refused to complain for fear of being singled out. **P EX 2 at 252-254 (Brown Dep. 252-254).**

[17]At least one other black officer refused to complain for fear of being singled out. **P EX 2 at 252-254 (Brown Dep. 252-254).**

[18]The Plaintiffs joined the YVSF in August 1999 and made their complaints to Lt. French in Feb. 2000, about five or six months later. **P EX 3 at 15 (Horne & Brown Ans. Int. 5).**

[19]The Plaintiffs joined the YVSF in August 1999 and made their complaints to Lt. French in Feb. 2000, about five or six months later. **P EX 3 at 15 ( Horne & Brown Ans. Int. 5).**

**(Horne Dep. 74-75, 211-212, 219-224); P EX 3 at 38 (Horne Ans. Int. 18); P EX 2 at 60-88, 140-147, 155-157 (Brown Dep. 60- 88, 140-147, 155-157); P EX 4 at 35 (Brown Ans. Ints. 18),** the Plaintiffs attempted to intervene with a black citizen white YVSF officers were seemingly abusing. .  (Admitted so far as it states but denied that Horne instigated an unwarranted confrontation.  **P EX 1 at 167-172 (Horne Dep. 167-172**)

71.   Admitted as to the first sentence. Admitted as to what Foley said, but denied as to Foley's sincerity and actions. Under Foley and Davin, the bulletin boards didn't change,  and white YVSF officers continued to abuse minority citizens; the Plaintiffs continued to complain about these issues to Lt. Foley. **P EX 1 at 167-172, 205-207, 209-211 (Horne Dep. 167-172, 205-207, 209-211); P EX 2 at 358-359 (Brown Dep. 358-359).**  Davin assigned the Plaintiffs the one white suspect face which appeared on the Bulletin Board. **P EX 1 at 200-201 (Horne Dep. 200-201).**

72.   Admitted as stated.

73.   Admitted in part, denied in part.  The abused child was a minority citizen. Brown and Horne complained about abuse issues to Lt. French. **P EX 3-4 at 17, 21, 38 (Brown & Horne Ans. Ints. 6, 7, 18).**

74.   Admitted, but denied as to anything being done by Foley; Brown does not know. Both Brown and Horne complained to Foley between January and March of 2001. **P EX 2 at 75-80 (Brown Dep. 75-80).**  The racism and abuse continued. Abuse of minority citizens both before and after the meetings of the YVSF discussed above. White YVSF officers consistently abused black citizens, including children and older people. Citizens were treated differently based on race. **P EX 1 at 74-75, 211-212, 219-224 (Horne Dep. 74-75, 211-212, 219-224); P**

**EX 3 at 38 (Horne Ans. Int. 18); P EX 2 at 60- 88, 140-147, 155-157 (Brown Dep. 60- 88, 140-147, 155-157); P EX 4 at 35 (Brown Ans. Ints. 18).**

75.   Admitted. But further stating, the suspect did not turn himself in and Brown had to find the suspect later, something that would not have been done for black citizens by white YVSF officers.  **P EX 3-4 at 17 & 38 (Horne & Brown Ans. Ints. 6 & 18).**

76.   Admitted so far as it goes but denied as to the total facts. YVSF Officers Chris Bailey, Steve Romano and Gary Ryan physically abused a young black male citizen in the Hallway of 364 Warren Street at Tango Base in the presence of Brown, "Arthur" (a Clerk) and MBTA Detective Chuck Collins.  The Officers were then instructed by Sgt. Davin to arrest the citizen for an unknown, not readily apparent, and seemingly baseless reason. Sgt. Davin decided not to charge the citizen with any crime after Brown intervened and obtained some information from him. Brown  protested any arrest or charges and Detective Collins and Brown intervened to protect the citizen during the beating.  Sgt. Davin saw the citizen bruised and bleeding. **P EX 4 at 15 (Brown Ans. Ints. 6).**

77.   Admitted that Davin so testified, but denied as to their truth and Davin's actual belief.  As stated above in paragraphs 48, 70, 71, 74, 75, and 76, the problems continued under Davin.   The same racist patterns and behavior continued, including after Davin replaced Bulman as the day tour supervisor in May 2000; black officers were segregated and not given priority in his supervision and assignments.  **P EX 2 at 292-303 (Brown Dep. 292-301); P EX 6 at 57-58, 91, 98 (Bulman Dep. 57-58, 91, 98); P EX 5 at 45-48 & P EX 22 (Davin Dep. 45-48 & Ex. 18 Ans. 6).**  Bulman also continued to supervise the Plaintiffs from time to time. **P EX 5 at 49-50 (Davin Dep. 49-50).**  Davin ordered  officers to obtain a minimum of 20 Field Interrogation

60

Observation ("FIO") daily reports on citizens. **P EX 1 at 197-99 (Horne Dep. 197-199); P EX 2 at 145-147 (Brown Dep. 145-147).** Davin bragged that he could obtain 10 FIO's in front of the YVSF offices. Brown told Davin, to Davin's ire, that a quota to make FIO's were unlawful and would lead to a violation of people's civil rights. Young blacks were targeted. **P EX 1 at 197-199 (Horne Dep. 197-199).** Foley encouraged FIOs as a competitive edge over other BPD units. **P EX 8 at 453-454 (Foley Dep. 453-454).** Under Davin, cruiser assignments continued along racial lines (including new black officers being assigned to ride with the Plaintiffs - **P EX 1 at 201 (Horne Dep. 201)**, the bulletin boards didn't change, and white YVSF officers continued to abuse minority citizens; the Plaintiffs continued to complain about these issues to Lt. Foley. **P EX 1 at 167-172, 205-207, 209-211 (Horne Dep. 167-172, 205-207, 209-211); P EX 2 at 358-359 (Brown Dep. 358-359).** Davin assigned the Plaintiffs the one white suspect face which appeared on the Bulletin Board. **P EX 1 at 200-201 (Horne Dep. 200-201).** After Horne and Brown raised their complaints to Lt. French, which led to the meetings, the white officers became hostile to them as "instigators", outcasts, and "dogs" **P EX 1 at 115, 162-170 (Horne Dep. 115, 162-170); P EX 3-4 at 21, 27, 46 (Horne & Brown Ans. Ints. 7, 10, 23); P EX 2 at 206-210, 216, 223-224 (Brown Dep. 206-210, 216, 223-224); P EX 1 at 193-194 (Horne Dep. 193-194); P EX 2 at 183, 251-252, 263-264, 271-272, 275, 345-347 (Brown Dep. 183, 251-252, 263-264, 271-272, 275, 345-3470; P EX 27 at ¶4 (Israel Decl. ¶4).** The Defendants' demeanor towards the Plaintiffs became continuously hostile. **P EX 1 at 193-194 (Horne Dep. 193-194); P EX 2 at 183, 251-252, 263-264, 271-272, 275, 345-347 (Brown Dep. 183, 251-252, 263-264, 271-272, 275, 345-347); P EX 27 at ¶4 (Israel Decl. ¶4).**

    78. Admitted that Davin so testified, but denied as to their truth and Davin' actual belief.

As stated above in paragraphs 48, 70, 71, 74, 75, 77 and 76, the problems continued under Davin.

The Defendants' demeanor towards the Plaintiffs became continuously hostile after the Plaintiffs complained. **P EX 1 at 193-194 (Horne Dep. 193-194); P EX 2 at 183, 251-252, 263-264, 271-272,  275, 345-347 (Brown Dep. 183, 251-252, 263-264, 271-272, 275, 345-347); P EX 27 at ¶4 (Israel Decl. ¶4).** [20] The white officers did not want Horne and Brown to ride with a new white officer. **P EX 1 at 193-194 (Horne Dep. 193-194); P EX 2 at 345-347 (Brown Dep. 345-347).** Bulman especially began addressing the Plaintiffs with a negative demeanor and tone. **P EX 2 at 183 (Brown Dep. 183).**  Bulman and Davin began to make false statements to Lt. Foley, the new commander of the unit as of May 2000, about Horne and Brown, such as they were not "team players," were "secretive", did not share information, and made too many off duty arrests.  Foley cannot recall <u>any</u> specific details beyond the above, even of any conversations he had with the Plaintiffs or his own observations , about such allegations even the number of incidents. **P EX 8 at 149-153, 160-162, 186-187, 197-198**, **214-222, 227-228, 236-237, 285-286, 306-307, 310 (Foley Dep. 149-153, 160-162, 186-187, 197-198**, **214-222, 227-228, 236-237, 285-286, 306-307, 310).**

79.  Admitted that Davin testified that Plaintiffs were good police officers. In fact, Davin admitted Horne was "an excellent fugitive investigator **P EX 5 at 168-169 (Davin Dep. 168-169).** But denied as to the balance of the paragraph. Davin <u>admits</u> he assigned Brown and Horne to train new YVSF officers, tracked down dangerous fugitives, and were <u>not</u> told to not make off

---

[20]At least one other black officer refused to complain for fear of being singled out. **P EX 2 at 252-254 (Brown Dep. 252-254).**

duty arrests[21] **P EX 8 at 266-267 (Foley Dep. 266-267); P EX 5 at 80-84 (Davin Dep. 80-84); P EX 7 at 70, 73-74 (French Dep. 70, 73-74); P EX 3-4 at 28 (Horne & Brown Ans. Int. 11)..** Davin admits he never concluded that the Plaintiffs were not competent. **P EX 5 at 83-84 (Davin Dep. 83-84).** Although Davin says he never counseled or warned the Plaintiffs about the type of conduct which could lead them to being transferred **P EX 5 at 193 (Davin Dep. 193)**, Davin was the one assigned to give them the so-called "PAM" evaluation which led to their transfer. Davin said he took it upon himself to conduct the 2001 PAM evaluations "on his own" but Davin gave no specific examples to either Plaintiff of the alleged concerns he had. **P EX 5 at 165-168, 173-174 (Davin Dep. 165-168, 173-174).** PAM evaluations, discussed more below, were done on no other officers other than the Plaintiffs, before or after the Plaintiffs' transfer. Other officers and the Plaintiffs have so stated**. P EX 26 at ¶8 (Jones Decl. ¶8); P EX 27 at ¶6 (Isreal Decl. ¶6).**

Before the PAM evaluations, Davin thinks he spoke to the Plaintiffs three times, but could not recall any details of **any** incidents. **P EX 5 at 196-200 (Davin Dep. 196-200).** Davin recalls no instances of talking to them about his alleged concerns, other than the March 2001 PAM "evaluation". **P EX 5 at 199-200 (Davin Dep. 199-200).** According to Brown previously, Davin had only told them they were doing a good job. **P EX 2 at 292, 303-307 (Brown Dep. 292, 303-307).**

Davin recalled only one alleged negative incident about Brown, but no specifics about them other than generalities. **P EX 5 at 144, 158-159 (Davin Dep. 144, 158-159).** Davin admits the Horne disagreed with Davin as to his opinion that the Plaintiffs "withheld information."

---

[21]Engaging in "too many" off-duty arrests was another alleged reason Bulman and Davin gave to Lt. Foley as grounds to transfer the Plaintiffs. **P EX 8 at 462-463, 469 (Foley Dep. 462-463, 469).** Brown made <u>no</u> off duty arrests with they YVSF.

**P EX 5 at 168-169 (Davin Dep. 168-169).** Davin said he took it upon himself to conduct the 2001 PAM evaluations "on his own" but Davin gave no specific examples to either Plaintiff of the alleged concerns he had. **P EX 5 at 165-168, 173-174 (Davin Dep. 165-168, 173-174).** Davin says the only time he criticized Brown in a sit down meeting with Brown was in the 2001 PAM evaluation. **P EX 5 at 143-144 (Davin Dep. 143-144).**

 More detail in this regard on Davin is set forth below in Paragraphs 79a to 79d.

 79a. The Defendants admit that there are many examples of the Plaintiffs sharing information and being "team players" and conducting a great deal of valuable and thorough information in tracking down dangerous fugitives. **P EX 6 at 212- 237 (Bulman Dep. 212-237).** Davin admitted that the Plaintiffs was properly inputting the information on the system. **P EX 5 at 230-231 (Davin Dep. 230-231).** The Lotus Database is a computer database YVSF officers use to share information about fugitives, coordinate activities, and to keep other abreast of each officer's information. **P EX 6 at 218-219 (Bulman Dep. at 218-219); P EX 5 at 110-112, 228-230 (Davin Dep. 110-112, 228-230); P EX 8 at 387-390 (Foley Dep. 387-390).** Neither Davin nor Bulman never compared the database to determine whether other officers used it as often as the Plaintiffs. **P EX 6 at 237 (Bulman Dep. 237); P EX 5 at 229 & P EX 16 (Davin Dep. 229 & Ex. 10).** Foley did not review it either. **P EX 8 at 394-395 (Foley Dep. 394-395).** As Lt. French, the commander of the YVSF at the time admits, the Plaintiffs kept their information in exemplary form within the Lotus Notes Data Base to which all other YVSF members had daily access; the Plaintiffs also properly completed debriefing and other communication forms. **P EX 7 at 213-229, P EX 16, P EX 17, & P EX 20 (French Dep. at 213-229 & Exs. 10, 26, 31); P EX 2 at 89-90 (Brown Dep. at 89-90); P EX 3 at 11 (Horne Ans. Int. 4).** Lotus was the

primary means of communication within the unit. **P EX 8 at 45 (Foley Dep. 45).** Even though Bulman claimed that the Plaintiffs were not adequately fulling in data into the Lotus Database, when he was shown an extensive amount of entries made in the database by the Plaintiffs, he could find nothing wrong with the reports. Bulman admitted they were detailed and represented a variety of incidents. **P EX 6 at 212-232 (Bulman Dep. 212-232); P EX 16 (Exhibit 10); P EX 7 at 122 (French Dep. 122).** In addition, Lt. French was unable to give any specifics about the secretiveness of the Plaintiffs that Bulman conveyed to French, other than one alleged incident which coincided with the time that the Plaintiffs first complained about racism. **P EX 7 at 80-84, 92-95, 114-115, 122-136, 394-395 (French Dep. 80-84, 92-95, 114-115, 122-136, 394-395).** Even then, French said that the Plaintiffs would "come around" as they were new to the unit. **P EX 7 at 98-102 (French Dep. 98-102).**

79b. At deposition, Davin was also shown multiple Lotus Database entries. Davin too admitted that it was apparent that the Plaintiffs "were sharing information with other members of the unit" with regard to the Plaintiffs' activities. **P EX 5 at 231 (Davin Dep. 231); P EX 16 (Exhibit 10).** Additionally, Davin could not recall any incidents where any officer complained that the Plaintiffs were not sharing information. **P EX 5 at 277 (Davin Dep. 277).** Davin said the Plaintiffs "were very good at tracking down their fugitives." **P EX 5 at 159 (Davin Dep. 159).** At deposition, Lt. Foley, who succeeded French as the Commander of the YVSF, could not give any specific examples of the Plaintiffs' secretiveness or not being team players. Foley and French were at the unit at the same time - French was the commander and Foley was a "night Lieutenant." **P EX 7 at 139 (French Dep. 139)**; **P EX 8 at 57 (Foley Dep. 57).**

79c. The Plaintiffs consistently earned excellent reviews and commendations for their

teamwork in the unit, from the Defendants as well as others, and those recommendations for commendations including numerous instances of good teamwork, quick thinking and selfless dedication. **P EX 6 at 252-265 (Bulman Dep. 252-265), P EX 13 & P EX 14 (Exs. 12 & 13); P EX 7 at 245-263 (French Dep. 245-263) & P EX 24 (Exs. 34-38).** For example, in a Bulman commendation of the performances of officers including Horne and Brown, he said "I commend all of these officers for their actions in this incident by working cohesively as a team." **P EX 6 at254 (Bulman Dep. 254).** The Plaintiffs were involved in capturing dangerous fugitives. **P EX 6 at 253-255 (Bulman Dep. 253-255).** Bulman grudgingly admitted that the Plaintiffs made "several good arrests" and were "good officers. **P EX 6 at 261-262 (Bulman Dep. 261-262).**As to Horne, Bulman said that "he was a good officer" who was written up when he did a good job. **P EX 6 at 187-188 (Bulman Dep. 187-188).** Horne and Brown were recommended for commendations by French, Dowd, Foley and Davin. **P EX 6 at 252 (Bulman Dep. 252); P EX 8 at 353-373, 377, 383-385 (Foley Dep. 353-373, 377, 383-385) & P EX 24 (Exs. 22 & 78-80); P EX 5 at 266 (Davin Dep. 266);P EX 13, P EX 14 & P EX 24 (Exs. 12-13 & 22)..** Bulman also specifically commended Officer Brown for his team work. and never told Brown he was not doing a good job. **P EX 6 at 259 (Bulman Dep. at 259); P EX 2 at 181 (Brown Dep. 181).** The overall head of the YSVF, Captain Conway, starting with a recommendation from Davin in January 2001, commended Horne on a skillful arrest which included "coordination, communication and cooperation." **P EX 5 at 231-238 (Davin Dep. 231-238) & P EX 13 at 2-4 (Ex. 12, at 2-4).** On October 25, 2000 Davin recommended Horne for a commendation where "Officer Horne displayed the highest qualities of the Boston Police Department." **P EX 5 at 230-240 (Davin Dep. 230-240) & P EX 13 at 5 (Ex. 12, at 5).** There were others for Horne as well

66

as Brown, including numerous comments of how they worked as a team on dangerous suspects .
**P EX 5 at 240-260 (Davin Dep. 240-260) & P EX 13 at 6-16; P EX 14 (Ex. 12, at 6-16, & Ex. 13).**  In fact, Davin recommended Brown for a commendation on March 6, 2001.  **P EX 5 at 248 ( Davin Dep. 248), P EX 14 at 5 (Ex. 13, at 5).**   In 2001 Brown was awarded the "Trooper George L. Hanna Award For Merit" an annual statewide award, and not for just one incident.  It is a medal of honor and a much higher award and more difficult to obtain than a commendation.
**P EX 5 at 250-254 (Davin Dep. 250-254) & P EX 14 at 8 (Ex. 13, at 8).**  French called it a very prestigious award. **P EX 7 at 257 (French Dep. 257).**

79d.  Moreover, the Plaintiffs were obviously so competent that Davin assigned Horne and Brown to train <u>new</u> officers in the YVSF.  **P EX 5 at 80-84 (Davin Dep.  80-84).**  Davin assigned the Plaintiffs to ride with the newer officers to show the new officers "how things were done" in the YVSF.  Davin admitted he did so because they were good officers doing a good job. **P EX 5 at 82 (Davin Dep.  82).**

80.  Admitted Davin so stated, but denied as to its truth as described above in paragraph 79. Also, the Plaintiffs' minority cruiser partner, Officer Brito, said the Plaintiffs were good team members and shared info. **P EX 11 at 49 (Brito Dep. 49).**  He said they would  report regularly their activities to their superiors**. P EX 11 at 69-70 (Brito Dep. 69-70).**  He said that Brown used Lotus Data base notes regularly to   keep all officers informed of his activities, including Bulman and Davin.**. P EX 11 at 75-78 (Brito Dep. 75-78).** Brito  asked to work with the Plaintiffs; he liked working with them. **P EX 11 at 89-90 (Brito Dep. 89-90).** He said the Plaintiffs were assigned to train new officers.  **P EX 11 at 93-97 (Brito Dep. 93-97).** Brito never heard Bulman or Davin say too to him that the Plaintiffs were secretive. **P EX 11 at 78 (Brito**

**Dep. 78).** Brito says Davin and Bulman assigned cruisers to the officers as to who would ride together. **P EX 11 at 194 (Brito Dep. 194).** Davin <u>admits</u> he assigned Brown and Horne to train new YVSF officers, Callender and Hardin. **P EX 8 at 266-267 (Foley Dep. 266-267);  P EX 5 at 80-84 (Davin Dep. 80-84); P EX 7 at 70, 73-74 ( French Dep. 70, 73-74); P EX 3-4 at 28 (Horne & Brown Ans. Int. 11); P EX 28 at  ¶8 (Brown Decl. ¶8).**. Brito now works under Bulman at Special Investigation Unit; Bulman asked Brito to join him there. **P EX 11 at 173-174 (Brito Dep. at 173-174).**

Brito says that they were not told to not make off duty arrests. Foley did not discourage P EX 11 at Brito Dep. 101-103. He knows Horne and Albert each made one.  **P EX 11 at 102-103 (Brito Dep. 102-103).**  He says there was racial tension in the unit. **P EX 11 at 136-137, 149-150 (Brito Dep. 136-137, 149-150).**

81.  Admitted as to the meeting, but denied as to all officers being reviewed and that the others were evaluated for transfer from PAM. The Plaintiffs, Officers Jones and Isreal, and the Officers' <u>union</u> representatives all so state. **P EX 3-4 at 32 (Brown & Horne Ans. Ints. 13); P EX 26 at ¶8 (Jones Decl. ¶8); P EX 27 at ¶6 (Israel Decl. ¶6).**   Officer Brito never heard of PAM. **P EX 11 at 190 (Brito Dep. 190).** The Defendants admit that there was no history of any kind of personal evaluations of BPD officers, including others in the YVSF at the time.  **P EX 5 at 179, 284-285 (Davin Dep. 179, 284-285).**

82.  Admitted as to what Foley said in his deposition, but denied as to context and how it is applied to the Plaintiffs.  No PAM had ever been conducted before or since, and PAM did not include the categories under which the Plaintiffs were "evaluated" and the alleged reasons for their transfer. The Defendants admit that the PAM evaluations did <u>not</u> cover <u>any</u> of the areas of

the Plaintiffs' transfer. **P EX 6 at 238-241 (Bulman Dep. 238-241) & P EX 23 (Ex. 11).** The evaluations covered <u>only</u> the following: number of car accidents, sick and injured days, Internal Affairs complaints, drug use, restraining orders, use of force and commendations. **P EX 5 at 148-150 (Davin Dep. 148-150) & P EX 23 (Ex. 11); P EX 10 at 211 (Dowd Dep. 211); P EX 9 at 192-193 (Joyce Dep. 192-193) & P EX 23 at 2 (Ex. 6, at 2).** Before 2001, and since, PAM "evaluations" were not conducted. **P EX 3 at 32 (Horne Ans. Int. 13); P EX 2 at 274-276 (Brown Dep. 274-276).** Only the Plaintiffs had a PAM evaluation. **P EX 2 at 276 (Brown Dep. 276); P EX 26 at ¶8 (Jones Decl. ¶8); P EX 27 (Israel Decl.).** Bulman and Davin conferred about the PAM "evaluations" before they were done, even though Bulman purports not to recall whether Davin discussed the Plaintiffs. **P EX 6 at 241-243 (Bulman Dep. 241-243).** The Defendants admit that there was no history of any kind of personal evaluations of BPD officers, including others in the YVSF at the time. **P EX 5 at 179, 284-285 (Davin Dep. 179, 284-285).**

83. Admit that Davin spoke about the Plaintiffs, but denied as to the other officers on the areas for which the Plaintiffs were transferred, i.e. "secretive", not "team players" and "too many off duty arrests." **P EX 8 at 236-239 (Foley Dep. 236-239); P EX 3-4 at 32 (Brown & Horne Ans. Ints. 13); P EX 26 at ¶8 (Jones Decl. ¶8); P EX 27 at ¶6(Israel Decl. ¶6).** According to Brown previously, Davin had only told them they were doing a good job. **P EX 2 at 292, 303-307 (Brown Dep. 292, 303-307).** As stated above in paragraphs 79-80, Davin did not speak truthfully, and so the Plaintiffs deny the balance of the paragraph.

84. Admitted as to what Davin said, but denied as to making any truthful statements as to the Plaintiffs. As stated above in paragraphs 79-80, Davin did not speak truthfully as to the Plaintiffs.

85.   Admitted as to what Davin said, but denied as to making any truthful statements as to the Plaintiffs. As stated above in paragraphs 79-80, Davin did not speak truthfully as to the Plaintiffs. In 2001 Brown was awarded the "Trooper George L. Hanna Award For Merit" an annual statewide award, and not for just one incident.  It is a medal of honor and a much higher award and more difficult to obtain than a commendation.  **P EX 5 at 250-254 (Davin Dep. 250-254) & P EX 14 at 8 (Ex. 13, at 8).**  French called it a very prestigious award. **P EX 7 at  257 ( French Dep. 257).**

According to Brown, previously Davin had only told them they were doing a good job. **P EX 2 at 292, 303-307 (Brown Dep. 292, 303-307).** Davin recommended the Plaintiffs for commendations on being team players, and did not disagree with Captain Conway, his superior that the Plaintiffs, including Brown, "showed highly skilled ability, strong sense of teamwork, well-coordinated plan of action, overall commitment was exceptional." **P EX 5 at 256 (Davin Dep. 256)  & P EX 14 at 12 (Ex. 13 at 12).**  Davin said in a commendation recommendation that Brown's professional manner and skillful interviewing techniques, and that Brown "displays the highest qualities of the Boston Police Department." **P EX 5 at 256 (Davin Dep. 256) & P EX 14 at 16 (Ex. 13, at 16).**  Davin made similar  comments about Horne**. P EX 5 at 239 (Davin Dep. 239) & P EX 14 at 16 (Ex. 13, at 16).**  In fact, Davin did not disagree with many commendations issued to the Plaintiffs when shown to him one by one. **P EX 5 at 231-258 (Davin Dep. 231-258); P EX 13, P EX 14 (Exs. 12-13).**

When shown the reports the Plaintiffs made in the course of their work to the unit, Davin admitted that they were in good order. **P EX 5 at 231 (Davin Dep. 231) & P EX 16 (Ex. 10).**  Davin never compared the Plaintiffs' work in this regard to other officers.  **P EX 5 at 229**

**(Davin Dep.  229).**

Commanders above Davin, including Commissioner Evans, consistently commended the Plaintiffs for their "outstanding" or "heroic" work. **P EX 13, P EX 14, P EX 24 (Exs. 12,13, 37, 38, 80).**

86.  Admitted that Davin so stated in Deposition but denied as to its truth for the reasons set forth in paragraphs 79-85. Davin did not speak truthfully as to the Plaintiffs.

87-89.  Plaintiffs admit that Davin so testified in his deposition, as the Defendants state in paragraphs 87 to 89,  but they deny the truth of it.  To the contrary, the complaining officer about whom Davin speaks, Grant Callender, did not make such statements about the Plaintiffs and their work, especially in the offensive words and tone Davin suggests. In fact, black officer Callender is a close personal friend of Brown and his family.  Callender and Brown have been continual friends since they were at the Police Academy together in 1997.  Callender applied to the YVSF on Brown's encouragement. They socialize together outside of work. Callender never told Brown that Brown and Horne had a problem working with them or in the way they did their job. Callender worked with the Plaintiffs on many cases.  **P EX 28 at ¶8 (Brown Decl. ¶8).**  Davin admits he assigned Brown to train Callender to show Callender how the YVSF worked. **P EX 5 at 80-84 (Davin Dep. 80-84); P EX 7 at 70, 73-74 (French Dep. 70, 73-74); P EX 3-4 at 28 (Horne & Brown Ans. Int. 11); P EX 28 at ¶8 (Brown Decl. ¶8).**

Officer Brito asked to work with the Plaintiffs; he liked working with them. **P EX 11 at 89-90 (Brito Dep. 89-90).**  Brito heard no complaints by Callender about Horne or Brown. **P EX 11 at 168-169 (Brito Dep. 168-169).**

Accordingly, the Plaintiffs dispute the Defendants facts of paragraphs 87-89 as false.

90.  Admitted.

91.  Admitted that Brown so believes, but denied as to the implication that Davin's PAM evaluation was not racially motivated. Lt. Foley regularly had discussions with Bulman and Davin about the Plaintiffs before he decided to recommend their transfer.  **P EX 8 at 117 (Foley Dep. 117).**  French as well spoke regularly to Bulman who told French (after the Plaintiffs complained of racism) that the Plaintiffs "did not fit in the unit."  **P EX 7 at 107-109 (French Dep. 107-109).**  Davin told Foley that  Davin felt as though the Plaintiffs did not share any information, but when pushed for detail on this point at deposition, Foley was unable to give an example **P EX 8 at 217 (Foley Dep. at 217)**, even when Horne asked him for one at the time**. P EX 1 at 203-204 (Horne Dep. 203-204).**  Davin admitted that he would give his opinion to Foley as to how an officer was working, including his opinion of whether the officer was working as a team. **P EX 5 at 128-129 (Davin Dep.  128-129).**  Bulman once told Horne and Brown that they were "too secretive", were not team players,  and "failed to share information" as to <u>one</u> incident. **P EX 2 at 181-184, 288-290 (Brown Dep. 181-184, 288-290).** Bulman also would made the same statement to Brown about Horne generally but did not elaborate. **P EX 2 at 356-357 (Brown Dep. 356-357).**  Such were the same terms Davin used when doing the so-called Professional Analysis Meeting ("PAM") evaluation of Horne and Brown shortly before they were transferred, and it was the only time they heard them from Davin. **P EX 3-4 at 23, 33 (Horne & Brown Ans. Ints. 9, 14); P EX 2 at 288-291, 301-306 (Brown Dep. 288-291, 301-306).**  Previously, Davin had only told them they were doing a good job. **P EX 2 at 292, 303-307 (Brown Dep. 292, 303-307).**   No PAM had ever been conducted before or since, and PAM did not include the categories under which the Plaintiffs were "evaluated."  Davin could give no

examples to them as to how they were secretive and not team players. **P EX 1 at 188-192 (Horne Dep. 188-192); P EX 2 at 301 (Brown Dep. 307).**  In fact, Davin did not talk to them about their own issues, but only about the other Plaintiff's issues.   **P EX 1 at 188-192 (Horne Dep. 188-192); P EX 2 at 306-308 (Brown Dep. 306-308).**   Neither Bulman nor Davin ever told them before the PAM "evaluation" that they were too secretive or not team players.  **P EX 1 at 204 (Horne Dep. 204).**[22]  Neither Bulman nor Davin ever issued warnings to them. **P EX 2 at 358-359 (Brown Dep. 358-359).**  In fact, Bulman admitted that both he and Davin "never counseled or warned plaintiffs about the type of conduct which would result in discipline or transfer from the YVSF." **P EX 6 at 199 (Bulman Dep. 199) & P EX 21 at (Ex. 2, Bulman Ans. Int. No. 12).**

The given reasons for the Plaintiffs' transfer were never mentioned to Plaintiffs before the PAM evaluations that Davin gave .  **P EX 2 at 23 (Brown Dep. at 23) & P EX 6 at 193 (Bulman Dep. 193).**  In addition, the first time anything was ever mentioned to the Plaintiffs about secretiveness at all, was during the "PAM" evaluation in February 2001 and even in that meeting the Defendants gave the Plaintiffs no specific examples of this secretiveness even when the Plaintiffs sought details.  **P EX 2 at 29, 303, 307 (Brown Dep. at 29, 303, 307).**  Lt. Foley does not recall even meeting with the Plaintiffs to advise them of the transfer, something he routinely does when a transfer occurs.  **P EX 8 at 136-137 (Foley Dep. 136-137).**   The Defendants admit that there was no history of any kind of personal evaluations of BPD officers, including others in the YVSF at the time.  **P EX 5 at 179, 284-285 (Davin Dep. 179, 284-285).**

---

[22]At times, when the Plaintiffs and black night shift officers were about to make an arrest of a dangerous suspect, Bulman ordered them to hold off and let the white day officers do it. **P EX 2 at 188-201 (Brown Dep. 188-201); P EX 4 at 26 (Brown Ans.  Int. 12).**

Davin only spoke to Brown about Horne, not about Brown. **P EX 4 at 21 (Brown Ans. Int. 9).**

Foley started thinking about transferring the Plaintiffs "several months" before he recommended it.  **P EX 8 at 128-130, 448 (Foley Dep. 128-130, 448 & Ex. 5).**

See also the facts of paragraphs 76-85 incorporated herein.

92.  Plaintiffs admit that Davin spoke to each of them about his alleged problems with the other, rather than to the one he was allegedly "evaluating."  Denied as to why that  being the only reason Horne held this belief.  **P EX 3 at 23 & 32 (Horne Ans. Ints. 9 & 13).**  Horne repeats the facts of paragraph 91 in this regard. See also the facts of paragraphs 76-85 incorporated herein.

The Defendants admit that the PAM evaluations did <u>not</u> cover <u>any</u> of the areas of the Plaintiffs' transfer. **P EX 6 at 238-241 (Bulman Dep. 238-241) & P EX 23 (Ex. 11)**.  The evaluations covered <u>only</u> the following: number of car accidents, sick and injured days, Internal Affairs complaints, drug use, restraining orders, use of force and commendations.  **P EX 5 at 148-150 (Davin Dep. 148-150) & P EX 23 (Ex. 11); P EX 10 at 211 (Dowd Dep.  211); P EX 9 at 192-193 (Joyce Dep. 192-193) & P EX 23 (Ex. 6, at 2).**  Before 2001, and since, PAM "evaluations" were not conducted.  **P EX 3 at 32 (Horne Ans. Int. 13); P EX 2 at 274-276 (Brown Dep. 274-276).**  Only the Plaintiffs had a PAM evaluation. **P EX 2 at 276 (Brown Dep. 276).**  Bulman and Davin conferred about the PAM "evaluations" before they were done, even though Bulman purports not to recall whether Davin discussed the Plaintiffs. **P EX 6 at 241-243 (Bulman Dep. 241-243).** Foley admits previously conferring with Davin for a combined "PAM meeting" about the Plaintiffs, and Bulman was present. **P EX 8 at 316-324 (Foley Dep. 316-**

324).    The Defendants admit, however, that the PAM "evaluations" were conducted to "identify officers for transfer." **P EX 6 (Bulman Dep. & Ex. 1, at 4).** Bulman says that he spoke to Lt. French about the Plaintiffs but can't recall what he said. **P EX 6 at 247-248, 250 (Bulman Dep. 247-248, 250).** French admits that the supervising sergeants give the unit commander "feedback" on the officers - it is a "small unit" and the commander relies on the sergeants in this respect. **P EX 7 at 28-29 (French Dep. 28-29).** In his deposition Bulman says he had no recollection about talking to Lt. Foley about transferring the Plaintiffs. **P EX 6 at 247,251 (Bulman Dep. 247, 251).** In his answers to interrogatories, however, Bulman stated that he and Davin updated the commander of the units [i.e. French and Foley] as to the work of their officers." **P EX 6 at 270-271 (Bulman Dep. 270-271 & Ex. 2, at 2).** In his deposition Bulman says he "I don't recall" when asked if he gave any information to Foley about transferring the Plaintiffs. **P EX 6 at 280-281 (Bulman Dep. 280-281).** Lt.  French testified that, in ongoing discussions with Bulman, Bulman told French that the Plaintiffs "did not fit in the unit," and Bulman repeated his view within three to six months of their arrival.  **P EX 7 at 107-109 (French Dep. 107-109).** Foley stated that Davin and Bulman met with him often on the unit. **P EX 7 at 69-70 (Foley Dep. 69-70).** After some evasive answers, Davin finally admitted he was the closet supervisor above the Plaintiffs and that Davin communicated daily with Foley, including "from time to time" how officers were working as a team. **P EX 5 at 126 -127 (Davin Dep. 126-127).** In January 2001  Davin admits he met with Foley, Bulman and others in the command staff about the Plaintiffs before Davin conducted his "PAM" evaluation of the Plaintiffs. **P EX 5 at 137-145, 150-151 (Davin Dep. 137-145, 150-151).** He recalled only one negative incident about Brown, but no specifics about them other than generalities.  **P EX 5 at**

**144, 158-159 (Davin Dep. 144, 158-159).**    Davin said he took it upon himself to conduct the PAM evaluations "on his own." **P EX 5 at 165-166 (Davin Dep. 165-166).**  He gave no specific examples to either Plaintiff of the alleged concerns he had. **P EX 5 at 168, 173-173 (Davin Dep. 168, 173-174).** Bulman and Davin admit regularly updating the commander about the Plaintiffs. **P EX 5 at 178 (Davin Dep. 178 & Ex. 18, Ans. 1).**   Defendants admit that there was no history of any kind of personal evaluations of BPD officers, including others in the YVSF at the time. **P EX 5 at 179 (Davin Dep. 179); P EX 27 at ¶6 (Israel Decl. ¶6); P EX 26 at ¶8 (Jones Decl. ¶8).**

93.    Admitted that Foley recommended the transfer, but denied he made the decision on his own. Bulman and Davin began to make false statements to Lt. Foley, the new commander of the unit as of May 2000, about Horne and Brown, such as they were not "team players," were "secretive", did not share information, and made too many off duty arrests.  Foley cannot recall <u>any</u> specific details beyond the above, even of any conversations he had with the Plaintiffs or his own observations , about such allegations even the number of incidents. **P EX 8 at 149-153, 160-162, 186-187, 197-198**, 214-222, 227-228, 236-237, 285-286, 306-307, 310 **(Foley Dep. 149-153, 160-162, 186-187, 197-198**, 214-222, 227-228, 236-237, 285-286, 306-307, 310).** Lt. Foley regularly had discussions with Bulman and Davin about the Plaintiffs before he decided to recommend their transfer. **P EX 8 at 117 (Foley Dep.  117).**  French as well spoke regularly to Bulman who told French (after the Plaintiffs complained of racism) that the Plaintiffs "did not fit in the unit." **P EX 7 at 107-109 (French Dep. 107-109).**  Davin told Foley that  Davin felt as though the Plaintiffs did not share any information, but when pushed for detail on this point at deposition, Foley was unable to give an example **P EX 8 at 217 (Foley Dep.**

**217), even when Horne asked him for one at the time. P EX 1 at 203-204 (Horne Dep. 203-204).** Davin admitted that he would give his opinion to Foley as to how an officer was working, including his opinion of whether the officer was working as a team. **P EX 5 at 128-129 (Davin Dep. at 128-129).** Bulman once told Horne and Brown that they were "too secretive", were not team players, and "failed to share information" as to <u>one</u> incident. **P EX 2 at 181-184, 288-290 (Brown Dep. 181-184, 288-290).** Bulman also would made the same statement to Brown about Horne generally but did not elaborate. **P EX 2 at 356-357 (Brown Dep. 356-357).** Such were the same terms Davin used when doing the so-called PAM evaluation of Horne and Brown shortly before they were transferred, and it was the only time they heard them from Davin. **P EX 3-4 at 23, 33 (Horne & Brown Ans. Ints. 9, 14); P EX 2 at 288-290, 301-306 (Brown Dep. 288-291, 301-306).** Previously, Davin had only told them they were doing a good job. **P EX 2 at 292, 303-307 (Brown Dep. 292, 303-307).** No PAM had ever been conducted before or since, and PAM did not include the categories under which the Plaintiffs were "evaluated." Davin could give no examples to them as to how they were secretive and not team players. **P EX 1 at 188-192 (Horne Dep. 188-192); P EX 2 at 307 (Brown Dep. 307).** In fact, Davin did not talk to them about their own issues, but only about the other Plaintiff's issues. **P EX 1 at 188-192 (Horne Dep. at 188-192); P EX 2 at 306-308 (Brown Dep. 306-308).** Neither Bulman nor Davin ever told them before the PAM "evaluation" that they were too secretive or not team players. **P EX 1 at 204 (Horne Dep. at 204).**[23] Neither Bulman nor Davin ever issued warnings to them. **P EX 2 at 358-359 (Brown Dep. 358-359).** In fact, Bulman admitted that both

---

[23]At times, when the Plaintiffs and black night shift officers were about to make an arrest of a dangerous suspect, Bulman ordered them to hold off and let the white day officers do it. **P EX 2 at 188-201 (Brown Dep. 188-201); P EX 28 (Brown Ans. Int. 12).**

he and Davin "never counseled or warned plaintiffs about the type of conduct which would result in discipline or transfer from the YVSF." **P EX 6 at 199 (Bulman Dep. 199) & P EX 21 (Ex. 2 Bulman Ans. Int. No. 12).**

Foley started thinking about transferring the Plaintiffs "several months" before he recommended it. **P EX 8 at 128-130, 448 (Foley Dep. 128-130, 448 & Ex. 5).**

Foley suggested that Brown had a "lot" of off duty arrests, but he had no records or no number and, when pressed, could not give an example of any he had concerns about. **P EX 8 at 186-187 (Foley Dep. 186-187).** Brown says he made no off duty arrests with the YVSF. **P EX 28 at ¶2 (Brown Decl. ¶2).** Foley says he lost his file with a letter in it about this and other issues about the Plaintiffs. **P EX 8 at 187 (Foley Dep. 187).**

94. Admitted, but denied as to the implication. The Plaintiffs, Officers Jones (who had been with the YVSF since 1993 until 2004), Ken Israel (1996-2006 with the YVSF), Brito and their union never heard of PAM.. **P EX 3-4 at 32 (Brown & Horne Ans. Ints. 13); P EX 26 at ¶¶1, 8 (Jones Decl. ¶¶1, 8); P EX 27 at ¶¶1, 6 (Israel Decl. ¶¶1, 6); P EX 11 at 190 (Brito Dep. 190).**

Moreover, YVSF Officers Jones and Greg Brown asked (probably Foley) why Bulman was not transferred out and was told that Bulman was too valuable to the unit to transfer out. **P EX 26 at ¶9 ( Jones Decl. ¶9P.**

95. Admitted as to Foley's testimony but denied as to its truth. The Defendants admit that the PAM evaluations did not cover any of the areas of the Plaintiffs' transfer. **P EX 6 at 238-241 (Bulman Dep. 238-241) & P EX 23 (Ex. 11**) The evaluations covered only the following: number of car accidents, sick and injured days, IAD complaints, drug use, restraining

orders, use of force and commendations. **P EX 5 at 148-150 (Davin Dep. 148-150);P EX 23 (Ex. 11);     P EX 10 at 211 (Dowd Dep. 211); P EX 9 at 192-193 (Joyce Dep. 192-193) & P EX 23 (Ex. 6, at 2).** As described above in paragraphs 79, 82, 83, 91 among others herein, the alleged transfer reasons are inaccurate and untruthful. For example, the Plaintiffs or their partner Brito were never told not to make off duty arrest. **P EX 11 at 101-103 (Brito Dep. 101-103).** Horne and Albert each made one. **P EX 11 (Brito Dep. 102-103).** Brito says Foley did not discourage them**. P EX 11 at 101-103 (Brito Dep. 101-103).** Albert, a white officer, was commended for one. Plaintiffs were <u>not</u> told to not make off duty arrests **P EX 8 at 266-267 (Foley Dep. 266-267); P EX 5 at 80-84 (Davin Dep. 80-84); P EX 7 at 70, 73-74 (French Dep. 70, 73-74); P EX 3-4 at 28 (Horne & Brown Ans. Int. 11**). The Defendants admit there is <u>no</u> BPD Rule or YVSF "rule" against off duty arrests, including one that Horne performed. **P EX 7 at 70, 73-74 (French Dep. 70, 73-74); P EX 8 at 233-234 (Foley Dep. 233-234); P EX 6 at 195-96, 231-232 (Bulman Dep. 195-96, 231-232); P EX 9 at 193 (Joyce Dep. 193).** Brown made no off duty arrests. **P EX 28 at ¶2 (Brown Decl. ¶2).** In fact, a <u>white</u> YVSF officer, Brian Alpert, even <u>commended</u>, with Lt. Foley's approval even though Foley maintains he discourages such arrests. **P EX 8 at 204-208 (Foley Dep. 204-208 & Exs. ); P EX 3 at 23 (Horne Ans. Int. 9).**[24]

      See also the facts of paragraphs 76-85 incorporated herein.

      As for the alleged "complaints made by Foley's administrative clerk" there was nothing filed, there was no claim of sexual harassment, and Foley listened to her talking about

---

[24] That white Officer, Albert, was in a clique with Bulman. **P EX 8 at 201-208 (Foley Dep. 201-208 & Exs. 40-42); P EX 27 (Israel Decl.)** Albert got promoted to Sgt. **Davin Dep 157-158.**

relationship dating issues with Brown. This is discussed more in paragraph 99. **P EX 8 at 181-197 (Foley Dep. 181-197).**

96. Plaintiffs admit the first sentence. Plaintiffs <u>deny</u> Foley said that the Chelsea Police called him to complain. The record the Defendants cite does <u>not</u> support it. The dispute its truth as well as materiality to this matter. As to off-duty arrests, the Plaintiffs position has been set forth above in paragraphs 31, 32, 35 and 95.

97. Plaintiffs admit that the Defendants have quoted from various parts of Foley's deposition. As for the alleged "complaints made by Foley's administrative clerk" there was nothing filed **P EX 8 at 189-190 (Foley Dep. 189-190)** and there was no claim of sexual harassment. **P EX 8 at 192 (Foley Dep. 192). P EX 8 at 181-197 (Foley Dep. 181-197).** The complaint was "verbal." **P EX 8 at 184 (Foley Dep. 184).** Foley did not know that the relationship actually may have started <u>after</u> Brown had already been transferred. **P EX 8 at 197 (Foley Dep. 197).** Foley said he had no problem with them dating. He repeatedly said he knew no details and that it was "none of my business." **P EX 8 at 196 (Foley Dep. 196).** Foley could not "remember the specifics" of how it was allegedly disruptive. **P EX 8 at 193 (Foley Dep. 193).** All he could recall was that it was "disruptive." **P EX 8 at 190 (Foley Dep. 190).** Foley says he discarded his "pending file" and notes regarding it. **P EX 8 at 186-187 (Foley Dep. 186-187).**

100. Plaintiffs admit the Defendants fact statement that Foley had conversations with Davin about the transfer of the Plaintiffs, but deny the Defendants's facts statement that Foley did not speak to Bulman about the Plaintiffs. Foley admits previously conferring with Davin for a combined "PAM meeting" about the Plaintiffs, and Bulman was present. **P EX 8 at 316-324**

**(Foley Dep. 316-324).**    The Defendants admit that the PAM "evaluations" were conducted to "identify officers for transfer." **P EX 6 Bulman Dep. & Ex. 1, at 4.**

"On a regular basis" Bulman and Davin met with Foley to assess officers' performances, including the Plaintiffs, where alleged issues were raised about the Plaintiffs, and about the racial issues.  **P EX 8 at 209, 214-215, 238-242, 392, 426 (Foley Dep. 209, 214-215, 238-242, 392, 426).**  Bulman and Davin made the same comments to French. **P EX 8 at 240 (Foley Dep. 240).** For transfers of others a year earlier, Foley acknowledged that Bulman and Davin had input. **P EX 8 at 403-404 (Foley Dep. 403-404).** Superintendent Joyce says sergeants can recommend transfers and would be consulted. **P EX 9 at 169, 204-205 (Joyce Dep. 169, 204-205).** When the Plaintiffs were transferred, Joyce was the Superintendent of the Bureau of Special Operations under which the YVSF existed. **P EX 9 at 202-204 (Joyce Dep. 202-204).**

Bulman says that he spoke to Lt. French about the Plaintiffs but can't recall what he said. **P EX 6 at 247-248, 250 (Bulman Dep. 247-248, 250).**  French admits that the supervising sergeants give the unit commander "feedback" on the officers - it is a "small unit" and the commander relies on the sergeants in this respect.  **P EX 7 at 28-29 (French Dep. 28-29).** Foley says that the Plaintiffs were transferred, based on information from Davin including not sharing information.  **P EX 8 at 238-241 (Foley Dep. 238-241).**

Bulman and Davin conferred about the PAM "evaluations" before they were done, even though Bulman says he does not to recall whether Davin discussed the Plaintiffs. **P EX 6 at 241-243 (Bulman Dep. 241-243).**  Before he arrived in May 2000, Davin knew the Plaintiffs were among those who complained and, in <u>Davin's</u> words, it was a "shit storm" within the unit. **P EX 5 at 66, 68 (Davin Dep. 66, 68).** When he arrived, he conferred with Bulman about it and "may

have" discussed the Plaintiffs.  **P EX 5 at 69-72 (Davin Dep. 69-72).**

Bulman once told Horne and Brown that they were "too secretive", were not team players,  and "failed to share information" as to <u>one</u> incident. **P EX 2 at 181-184, 288-290 (Brown Dep. 181-184, 288-290).** Bulman also would made the same statement to Brown about Horne generally but did not elaborate. **P EX 2 at 356-357 (Brown Dep. 356-357).**  Such were the same terms Davin used when doing the  PAM evaluation of Horne and Brown shortly before they were transferred, and it was the only time they heard them from Davin. **P EX 3-4 at 23, 33 (Horne & Brown Ans. Ints. 9, 14); P EX 2 at 288-291, 301-306 (Brown Dep.  288-291, 301-306).**  Previously, Davin had only told them they were doing a good job. **P EX 2 at 292, 303-307 (Brown Dep. 292, 303-307).**   Also, French briefed Foley on the race problem the Plaintiffs initiated when Foley took over the unit from French. **P EX 7 at 209 (French Dep. 209); P EX 8 at 209-211 (Foley Dep. 209-211).**  Foley consider whether they "were a  a problem or not" as part of his decision to recommend their transfer. **P EX 8 at 393-394 (Foley Dep. 393-394).**


The Defendants had no specifics instances when the Plaintiffs were secretive or demonstrated any qualitites inconsistent with being a good officer. **P EX 6 at 187, 193, 254, 259 (Bulman Dep. 187, 193, 254, 259); P EX 5 at 80, 82 (Davin Dep.  80, 82); P EX 8 at 149-153, 160-162, 186-187, 197-198**, 393-394 **(Foley Dep. 149-153, 160-162, 186-187, 197-198**, 393-394).**  Davin could not come up with <u>any</u> example where they worked on their own rather than as "team members." **P EX 5 at 135-136 (Davin Dep. 135-136).**

101. Plaintiffs admit that Foley so testified in his deposition, but <u>deny</u> Foley made the decision. Only the Commissioner can order a transfer. Foley recommended the transfer.   Foley

admits the Commissioner, not him, makes the final decision. **P EX 8 at 97-105 (Foley Dep. 97-105); P EX 9 at 174 (Joyce Dep. 174).** Foley says he "threw away" his file which would have had information on the transfer. **P EX 8 at 99-100, 118-119, 187-188, 346-347 (Foley Dep. 99-100, 118-119, 187-188, 346-347).** The Commissioner relies on verbal recommendations from others. **P EX 9 at 175 (Joyce Dep. 175).** Foley would have initiated the first written draft transfer recommendation that developed into a final written order. **P EX 9 at 178-181 (Joyce Dep. 178-181 & Ex. 5).**

The BPD transferred Horne to South Boston. **P EX 9 at 164-165 (Joyce Dep. 164-165 & Ex. 5); P EX 1 at 196 (Horne Dep. 196); P EX 6 at 106-107 (Bulman Dep. 106-107 & Ex 5); P EX 5 at 270 (Davin Dep. 270).**

Plaintiff further incorporate by reference paragraph 100.

Neither Davin nor Bulman compared the database to determine whether other officers used it as often as the Plaintiffs. **P EX 6 at 237 (Bulman Dep. 237); P EX 5 at 229 (Davin Dep. 229) & P EX 16 (Ex. 10).** Foley did not review it either. **P EX 8 at 394-395 (Foley Dep. 394-395).** As Lt. French, the commander of the YVSF at the time <u>admits</u>, the Plaintiffs kept their information in exemplary form within the Lotus Notes Data Base to which all other YVSF members had daily access; the Plaintiffs also properly completed debriefing and other communication forms. **P EX 7 at 213-229 (French Dep. 213-229);P EX 16 (Ex. 10), P EX 17 (Ex. 26), P EX 20 (Ex. 31); P EX 2 at 89-90 (Brown Dep. 89-90); P EX 3 at 11 (Horne Ans. Int. 4).** Lotus was the primary means of communication within the unit. **P EX 8 at 45 (Foley Dep. 45).** It was used to communicate about fugitives, coordinate activities, and to keep other abreast of each officer's information. **P EX 6 at 218-219 (Bulman Dep. 218-219); P EX 5 at**

**110-112, 228-230 (Davin Dep. 110-112, 228-230); P EX 8 at 387-390 (Foley Dep. 387-390).**

102.  Plaintiffs admit that Foley so testified but deny the implication.  As the Plaintiffs and other officers state, the YVSF did not transfer out the white officers who were considered the problem with regard to racism within the unit.   The BPD did <u>not</u> transfer out white officers who had engaged in racist behavior, but only those who were not doing the job, the "mission" of the YVSF.  They were transferred for that reason only. **P EX 10 at 118 (Dowd Dep. 118); P EX 8 at 404-419 (Foley Dep. 404-419);P EX 26 at ¶9 (Jones Decl. ¶9); P EX 28 at ¶5 (Brown Decl. ¶5).**

In fact, the ones who were transferred had been identified for transfer and were already on a list **before** the large meetings and at about the same time, February 2000, that the Plaintiffs complained. **P EX 10 at 191-192 & P EX 30 (Dowd 191-192 &  Ex. 48).** The transfer list is dated February 25, 2000 **P EX 30 (Ex. 48).**   Deputy Superintendent (now Captain) Dowd admits that the transfers were ordered before the racism complaints surfaced. **P EX 10 at 191-192 (Dowd Dep. 191-192).**

Even though Bulman claimed that the Plaintiffs were not adequately fulling in data into the Lotus Database, when he was shown an extensive amount of entries made in the database by the Plaintiffs, he could find nothing wrong with the reports. Bulman admitted they were detailed and represented a variety of incidents. **P EX 6 at 212-232 (Bulman Dep. 212-232); P EX 16 (Exhibit 10); P EX 7 at 122 (French Dep. 122).**  In addition, Lt. French was unable to give any specifics about the secretiveness of the Plaintiffs that Bulman conveyed to French, other than one alleged incident which coincided with the time that the Plaintiffs first complained about racism.  **P EX 7 at 80-84, 92-95, 114-115, 122-136, 394-395 (French Dep.  80-84, 92-95, 114-**

**115, 122-136, 394-395).**  Even then, French said that the Plaintiffs would "come around" as they were new to the unit. **P EX 7 at 98-102 (French Dep. 98-102).**

At deposition, Davin was also shown multiple Lotus Database entries. Davin too admitted that it was apparent that the Plaintiffs "were sharing information with other members of the unit" with regard to the Plaintiffs' activities.  **P EX 5 at 231 (Davin Dep. 231); P EX 16 (Exhibit 10).**  Additionally, Davin could not recall any incidents where any officer complained that the Plaintiffs were not sharing information.  **P EX 5 at 277 (Davin Dep. 277).**  Davin said the Plaintiffs "were very good at tracking down their fugitives." **P EX 5 at 159 (Davin Dep. 159).** At deposition, Lt. Foley, who succeeded French as the Commander of the YVSF, could not give any specific examples of the Plaintiffs' secretiveness or not being team players.  Foley and French were at the unit at the same time - French was the commander and Foley was a "night Lieutenant." **P EX 7 at 139 (French Dep. 139); P EX 8 at 57 (Foley Dep.  57).**

103. Admitted Foley so testified, but denied for the implication as to Officer Celester. Before he was transferred black Officer Celester  had voiced complaints of racism after the Plaintiffs first raised the issue in February 2000, including abuse of minorities in the community at the large joint YVSF meeting.  He spoke for a "few minutes" about it. He stood up and said he "didn't like the way the minority community was being treated, and he gave a specific example. **P EX 2 at 114 (Brown Dep. 114); P EX 1 at 147 (Horne Dep. 147); P EX 3-4 at 35 (Horne & Brown Ans. Ints. 16**).    Celester was also among a group of black officers who met privately with both superintendent Joyce and Lt. French about the race concerns after the Plaintiffs complained. **P EX 9 at 103 (Joyce Dep. 103); P EX 7 at 161 (French Dep. 161).**

Foley says he transferred Celester for "joking at roll call."  **P EX 8 at 463 (Foley Dep.**

**463).**

Bulman was not transferred out, however, when he was suspended for a day for, as a joke, telling another sergeant from another district to apply for a supervisor position in the YVSF and to report for an interview. There was no job, and Bulman did it as a joke. **P EX 10 at 222 (Dowd Dep. 222); P EX 25 (Ex. 52).**

104.  Admitted Foley so testified, but denied as to the truth of Foley's statement that the Plaintiffs were not, in his words, "a good fit", for the unit. **P EX 8 at 366 (Foley Dep. 366).** As stated above in  paragraphs 79-102, the Plaintiffs dispute the truth of Foley's statements.

The Plaintiffs consistently earned excellent reviews and commendations for their teamwork in the unit, from the Defendants as well as others, and those recommendations for commendations including numerous instances of good teamwork, quick thinking and selfless dedication. **P EX 6 at 252-265 (Bulman Dep. 252-265); P EX 13 ( Ex. 12); P EX 14 (Ex. 13); P EX 7 at 245-263 (French Dep. 245-263); P EX 24 (Exs. 34-38)**  For example, in a Bulman commendation of the performances of officers including Horne and Brown, he said "I commend all of these officers for their actions in this incident by working cohesively as a team." **P EX 6 at 254 (Bulman Dep. 254).**   The Plaintiffs were involved in capturing dangerous fugitives. **P EX 6 at 253-255 (Bulman Dep. 253-255).**  Bulman admitted that the Plaintiffs made "several good arrests" and were "good officers. **P EX 6 at 261-262 (Bulman Dep. 261-262).** As to Horne, Bulman said that "he was a good officer" who was written up when he did a good job.  **P EX 6 at 187-188 (Bulman Dep. at 187-188).**  Horne and Brown were recommended for commendations by French, Dowd, Foley and  Davin.   **P EX 6 at 252 (Bulman Dep. 252); P EX 8 at 353-373, 377, 383-385 (Foley Dep. 353-373, 377, 383-385); P EX 24  Exs. 22 & 78-80**

(Exs. 22 & 78-80); P EX 5 at 266 (Davin Dep. 266); P EX 13, P EX 14 & P EX 24 (Exs. 12-13 & 22).. Bulman also specifically commended Officer Brown for his team work. and never told Brown he was not doing a good job.  **P EX 6 at 259 (Bulman Dep. 259); P EX 2 at 181 (Brown Dep. 181).**  The overall head of the YSVF, Captain Conway, starting with a recommendation from Davin in January 2001, commended Horne on a skillful arrest which included "coordination, communication and cooperation." **P EX 5 at 231-238 (Davin Dep. 231-238) & P EX 13 at 2-4 (Ex. 12, at 2-4).**  On October 25, 2000 Davin recommended Horne for a commendation where "Officer Horne displayed the highest qualities of the Boston Police Department." **P EX 5 at 230-240 (Davin Dep. 230-240) & P EX 13 at  5 (Ex. 12, at 5).**   There were others for Horne as well as Brown, including numerous comments of how they worked as a team on dangerous suspects . **P EX 5 at 240-260 (Davin Dep. 240-260); P EX 13 at 6-16 (Ex. 12, at 6-16); P EX 14 (Ex. 13).**   In fact, Davin recommended Brown for a commendation on March 6, 2001.  **P EX 5 at 248 (Davin Dep. 248), P EX 14 at 5 (Ex. 13, at 5).**   In 2001 Brown was awarded the "Trooper George L. Hanna Award For Merit" an annual statewide award, and not for just one incident.  It is a medal of honor and a much higher award and more difficult to obtain than a commendation.  **P EX 5 at 250-254 (Davin Dep. 250-254) & P EX 14 at 8 (Ex. 13, at 8).**  French called it a very prestigious award. **P EX 7 at 257 (French Dep. 257).**

Moreover, the Plaintiffs were obviously so competent that Davin assigned Horne and Brown to train new officers in the YVSF.  **P EX 5 at 80-84 (Davin Dep.  80-84).**  Davin assigned the Plaintiffs to ride with the newer officers to show the new officers "how things were done" in the YVSF.  Davin admitted he did so because they were good officers doing a good job. **P EX 5 at 82 (Davin Dep.  82).**

Davin recalls no instances of talking to them about his alleged concerns, other than the March 2001 PAM "evaluation". **P EX 5 at 199-200 (Davin Dep. 199-200).**

A Suffolk County Assistant District told Lt. Foley that Horne and Brown had done such a good job developing and documenting information about fugitives that the YVSF should establish records in the manner the Plaintiff were doing for the use of the DA.  Accordingly, the YVSF established for the DA and the YVSF the City - Wide Warrant Routing System now in use. **P EX 17 at 422-523 (Deposition Exhibit 26, pages 422 to 523); P EX 28 at ¶4 (Brown Decl. ¶4).**

105.  Plaintiffs admit they were not the subject of discipline except for the transfer. Superintendent Joyce with the BPD Command staff said transfers could be for a disciplinary reason. **P EX 9 at 197 (Joyce Dep. 197).**

The Plaintiffs dispute the remainder of the Defendants' facts, as described above in paragraphs 38 and 41. Moreover, Foley admitted that he threw away his notes on his reasons for the transfer. **P EX 8 at 119, 187-188 (Foley Dep. 119, 187-188).**  He also threw away his letter to Superintendent Joyce recommending their transfer and the reasons for the recommendation. **P EX 8 at 118-119 (Foley Dep. 118-119).**

A transfer within the BPD is a significant event in an officer's life and can have an adverse effect on an officer.  **P EX 7 at 102-103 (French Dep. 102-103).** [25] The transfer of an officer should be a last resort when solving a problem because the transfer can have a "devastating impact" on the officer.  **P EX 7 at 103,104 (French Dep. 103, 104).**

---

[25]French added that the officer could get a "chip on their shoulder" or an "attitude." **P EX 7 at 103 (French Dep. 103).**

For officers other than Horne and Brown YVSF supervisors issued several warnings to them under threat of transfer, but they were <u>not</u> transferred.  **P EX 8 at 138-139 (Foley Dep. at 138-139).**

106.  Admitted.

107. Admitted. Long was transferred into the unit the <u>same</u> <u>month</u> that the Plaintiffs were transferred out and McLaughlin was transferred in less than a year later.  **P EX 5 at 266-269 (Davin Dep. 266-269 & Exs.  8 &  22).**

108.  Plaintiffs object to the Defendants' Exhibit 12, as it has not been produced to Plaintiffs under Rule 26 or in discovery. Plaintiffs deny that they have less opportunity on the YVSF.  Brown lost overtime pay.  **P EX 4 at 41 (Brown Ans. Int. 21).** Overtime work is available.  **P EX 27 at ¶5 (Israel Decl. ¶5).**    Davin admitted that there is an opportunity for any officer to participate in a lot of overtime as an officer in the YVSF unit.  **P EX 5 at 34 (Davin Dep. 34).**

> PLAINTIFFS STEVEN HORNE AND
> RONALD BROWN,
> By their Attorney,
>
>
>
> /s/ Stephen A. Roach
> Stephen A. Roach, Esq.
> ROACH & WISE, LLP
> 31 State Street
> Boston, MA 02109-2705
> (617) 723-2800

August 29, 2006

89

<u>CERTIFICATE OF SERVICE</u>

     I, Stephen A. Roach, attorney for the Plaintiffs, hereby certify that I served the within document, and the Declarations and Exhibits referenced therein, on the attorney for the Defendants, Attorney Mary Jo Harris,  by causing copies to be sent to her by hand on the 29th day of August, 2006.


                        _____
                        Stephen A. Roach