UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10718-RGS

| | |
|---|---|
| STEVEN HORNE and<br>RONALD BROWN,<br><br>PLAINTIFFS<br><br>v.<br><br>CITY OF BOSTON,<br>SGT. ERIC BULMAN, and<br>SGT. JOHN DAVIN,<br><br>DEFENDANTS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF OFFICER CRAIG JONES**

I, Craig Jones, hereby declare as follows:

1. I am employed as an uniformed Police Officer for the Boston Police Department for the City of Boston. I have been so employed since 1986. I am an African American. From approximately April 1993 until about December of 2004, when I was transferred to Area A-1 in Boston, I was assigned to the Youth Violence Strike Force ("YVSF"), previously known as the Anti-Violence Gang Unit, of the Boston Police Department. While with the YVSF, I came to know the Plaintiffs, Officers Steven Horne and Ronald Brown, the Defendants Sgt. Eric Bulman and Sgt. John Davin, as well as their superior officers at the time, Lt. French, Lt.

1

Foley, Superintendent Dowd, as well as the other officers and supervisors of the YVSF at that time. As such, I have personal knowledge of the matters set forth in this Declaration.

2. There was also a night shift commonly called the "Soul Patrol" because it generally was comprised, percentage-wise, of more black officers, including myself, than the day tour. At one point, Officer Greg Brown and I asked Sgt. Eric Bulman why there were not more black officers assigned to the YVSF, and he told us that "I don't know any aggressive black officers." Officer Brown and I then just walked away from Sgt. Bulman.

3. During my assignment to the YVSF from 1993 though most of 2004, the YVSF was a racially divided unit in that white officers rode in cruisers with white officers and black and other minority officers rode together. This was true of both the day and night tours of duty. At times, myself or other minority officers would work together with or ride with white officers, but such was the exception.

4. There were other forms of behavior which I found racially divisive and offensive in the YVSF. For example, I observed a white officer wearing a tee shirt from the New York Police Department which depicted the Diallo incident where an unarmed black man was riddled with many bullets by New York

2

police. Posters of suspects on the YVSF bulletin board were exclusively minority, with the exception of perhaps one white face which later appeared after Officers Horne and Brown complained about racism in the YVSF in 2000. During my tenure, there was never been a black or minority commander of the YVSF.

5. In February 2000, I learned from Plaintiff officers Ronald Brown and Steven Horne, who I knew then and know now, as well as from other YVSF officers at the time, both black and white, that Horne and Brown complained to the YVSF Commander, Lt. Gary French, about many of the racially divisive issues described above, as well as some other similar instances, and demanded that the situation be addressed and corrected. Although before then minority officers had discussed and complained among themselves about the YVSF situation, this was the first time any officer had actually taken the issues to a complaint level to the YVSF commander. Horne and Brown also began to discuss the racial issues among other minority YVSF officers and began to try to gain their support to continue to bring the matter into the open and to complain to those in the command staff. In my time with the BPD, I had never seen such an effort by a minority officer to address issues of racism in any area where I worked, including the YVSF. At the meetings and at that time, I felt safer to speak about my personal observations and concerns to the YVSF

3

commanders because Officers Horne and Brown had broken the silence for minority officers. During one or both meetings, I spoke, for example, about my objections to the tee-shirt described above. In general, however, both at that time until I left the YVSF in December 2004, minority officers expressed to me a fear of reprisals or retaliation, including, for example, a transfer, if they said anything about the problem with racism in the YVSF.

6. After Horne and Brown raised the complaints described above, the Boston Police Department Command ("BPD") staff decided to have meetings to address the racial problem issues within the YVSF. There were then two YVSF meetings attended by all YVSF commanders, some members of the BPD command staff and others.

7. It was my own observation and belief, and I heard from other YVSF officers, as well as Horne and Brown directly, that Horne and Brown had first raised the issue of racism within the YVSF, and were commonly considered the officers who caused meetings with the YVSF members and upper command staff of the BPD. After Horne and Brown raised their complaints, I had occasion to speak to them continuously a number of times until they were transferred out of the YVSF in 2001. On those occasions they expressed their anger to me about how the white officers and their supervisors were acting toward them. After Horne and Brown

4

complained, one white YVSF officer told me that Officer Horne should have spoken privately to YVSF Detective Robert Fratalia who had stated in a meeting that he, Detective Fratalia, would not send his dog to Dorchester High, to resolve any issues rather than complain further to Lt. French.

8. In 2001, neither myself nor any other YVSF officer of whom I am aware, other than Officers Horne and Brown, underwent any so-called "PAM" evaluation. During my tenure with the YVSF had I never had one for myself nor am I aware of any having been done for any other officer in the YVSF, including my cruiser partners.

9. It was Officers Brown and Horne who started the process in 2000 with their initial complaint about racism in the YVSF, and they continued to the issue in meetings and conversations with superior officers and minority officers. After the meetings in the Spring of 2000 caused by the complaints Officers Horne and Brown raised about racism in the YVSF, nothing changed to remedy the situation. The segregation and other problems described above continued. Soon after the meetings of the entire YVSF in 2000, a number of white officers were transferred out of the YVSF but they were generally not the officers who I, and other minority officers, considered were the main problem with regard to racism. In fact, in that regard myself and another black officer, Officer

Greg Brown, approached and asked superior officer in the YVSF, perhaps Lt. Foley, why Sgt. Bulman was not transferred out. That superior officer told us that Sgt. Bulman was "too valuable" to the unit to transfer out.

10. There was an A team - B team mentality within the day shift of YVSF when I was there, meaning the white officers were on the A team (especially a clique of Sgt. Bulman and other white Officers) and the minority officers considered themselves on the B team. The A team was given higher profile fugitive and suspect assignments. Although previously the minority officers had discussed and complained among themselves about the racial issues in the YVSF, the complaints and issues raised by Horne and Brown was the first time any officers had actually taken the YVSF race issues to a complaint level to the YVSF commander.

Pursuant to 28 U.S.C. §1746, I declare under the penalties of perjury that the foregoing is true and correct this 23rd day of August, 2006

_____
Officer Craig Jones

6