UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10718-RGS

| | | |
|---|---|---|
| STEVEN HORNE and<br>RONALD BROWN,<br><br>PLAINTIFFS<br>v.<br><br>CITY OF BOSTON,<br>SGT. ERIC BULMAN, and<br>SGT. JOHN DAVIN,<br><br>DEFENDANTS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <u>LEAVE TO FILE SUR-REPLY</u><br><u>GRANTED BY COURT NOV. 21, 2006</u><br><br>PLAINTIFFS RONALD BROWN AND STEVEN<br>HORNE'S SUR-REPLY TO DEFENDANTS'<br>REPLY TO PLAINTIFFS' OPPOSITION<br>TO DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT |

Plaintiffs Steven Horne ("Horne") and Robert Brown ("Brown") hereby respond to the Reply of Defendants Eric Bulman ("Bulman") and John Davin ("Davin") in reliance on the Plaintiffs' Memorandum of Law, certain of the admissions contained in the Defendants' materials filed in support of their Motion, and the materials Plaintiffs filed with Opposition. Plaintiffs further rely on their Motion to Strike certain of the materials the Defendants filed and on the Plaintiffs' Opposition to the Defendants' Motion to Strike certain of the Plaintiffs' materials filed in Opposition to the Defendants' Summary Judgment Motion.

1. <u>The Defendants misstate the law and facts in contending that the Plaintiffs did not suffer an adverse action recognized under the law.</u>

The Defendants argue that the Plaintiffs failed to "present any evidence" that a transfer from the YVSF to the district stations was "materially adverse" other than it was an "elite" unit which provides the Plaintiffs to work with other agencies in plainclothes. **(Defts' Reply at 2).** While the Defendants are factually incorrect on this point in that it is not complete, as discussed below, they also fail to point out that this case is not only about a transfer out of the YVSF.

1

### a. The transfer was not the only adverse action.

The Defendants overlook that as African Americans, the repeated indignities, harassment, and race based prejudice the Plaintiffs suffered are, by themselves, sufficient even without the transfer. As the Court stated in denying summary judgment in another employment race discrimination case, the Plaintiffs raise "a genuine issue of material fact as to whether the atmosphere was infused with discriminatory animus." Allder v. Daniel O'Connell Sons, 210 F.Suppe2d. 210, 217 (D.Mass. 1998). Here, the transfer was the culmination of an ongoing series of discriminatory actions to which the Defendants, and others in the Department, subjected the Plaintiffs. From the moment they arrived until they were transferred the Plaintiffs observed, experienced, and were subjected to the following (to name only some):[1] (1) cruisers segregated by race; (2) posters displayed of only minority fugitives even though there were many whites wanted; (3) being largely and/or comparatively ignored by Bulman, and later Davin, and finally seeking out Lt. French for a fugitive (or any assignment); (4) witnessing the hands on training Bulman afforded to new white YVSF officers McCarthy and Langa (who were six months later transferred out for incompetence) while being left to train themselves; (5) being subjected to a white officer's self-proclamation of being the "Grand Wizard" who tracks down black "monkeys"; (6) suggesting to one of the Plaintiffs that he is a "porch monkey"; (7) White Det. Wagget, in Horne's presence, referring to a black Command Staff Superintendent as a "big headed monkey"; (8) white officers resisting assignments at Dorchester High School, refusing to participate in special intervention and crime prevention programs such as home and school

---

[1] In the interest of brevity, the Plaintiffs will not cite to the record on the summary of some of the facts set forth above. They are already set forth in great detail in the Plaintiffs' Statement of Facts. Some, but not all, are discussed and cited to in the Plaintiffs' Opposition Memorandum.

visits, and referring to the minority students as "animals," rapists, murderers, and people who committed violent crimes; (9) white officers referring to blacks as "niggers" or wearing an offensive race-sensitive T-Shirt; (10) a white officer saying he didn't want to go into people houses from Dorchester High because they were nasty and full of roaches; (11) abusing, physically and otherwise, and unduly harassing minority witnesses and otherwise treating them with less respect than they do with white witnesses; (12) Davin requiring daily FIO quotas, especially involving blacks, and bristling at the Plaintiff Robert Brown's objection that a quota will force YVSF officers to violate citizens' rights; (13) the unavailability of Bulman and Davin to supervise or otherwise support the Plaintiffs' efforts to apprehend a suspect on whom they are closing in for an arrest; (14) Bulman criticizing the Plaintiffs, who were working a night shift, from arresting a fugitive (who might otherwise have escaped) that night rather than allowing Bulman and his white officers to move in for the arrest the next day; (15) Bulman telling the Plaintiffs upon their arrival at the YVSF that they were taking the place of white officers McLaughlin and Long (who were later transferred in after the Plaintiffs were transferred out); (16) Davin assigning to the Plaintiffs the only white face on the YVSF poster board that appeared after the Plaintiffs complained that only black faces appeared there; (17) Bulman falsely telling the Plaintiffs, while refusing to give details, that the Plaintiffs were "secretive" and not "team players"; (18) Davin repeating to the Plaintiffs in the so-called PAM evaluation, again without specifics, that the Plaintiffs were "secretive" and not "team players"[2]; (19) being the only officers who were subjected to a "PAM evaluation"; (20) Bulman finally assigning cold cases to the Plaintiffs with no expectation of success (but which the Plaintiffs solved in some

---

[2] This was the <u>first</u>, and <u>only</u>, time the Plaintiffs heard such comments from Davin. **P Facts 91, 100.**

3

instances).³ With regard to the PAM evaluations, then Deputy Superintendent Thomas Dowd, a commander over the YVSF, <u>admitted</u> that PAMs were not "designed or used for evaluating every officer in the department." **P EX 10, at 35, 212 (Dowd Dep. 35, 212).** Dowd further stated that "It was <u>not</u> my understanding that PAM was to generate a meeting between supervisors and every officer, no, sir." (emphasis added) **P EX 10 at 214-215 (Dowd Dep. at 214-215).** Moreover, Dowd was the Defendant City of Boston's Rule 30(b)(6) designee as to PAM evaluations. **P EX 10 at 2085 (Dowd Dep. at 208).**

    b.    <u>There are sufficient facts such that a jury could find that the transfer was an adverse action.</u>

Created in 1993 as a prestigious, elite unit, the Youth Violence Strike Force ("YVSF), which originally was under previously existing Anti-Gang Violence Unit was charged with reducing violence among Boston's youth and tracking fugitives. It later evolved to work with the FBI and other investigatory agencies. It differed from routine police duty in many ways. <u>First</u>, officers had an opportunity to work consistently with the FBI, ATF, the U.S. Marshall's office and many other federal, state, and out of state investigative agencies. <u>Second</u>, unlike routine police work (traffic tickets, domestic disputes, traffic jams, taking inebriated people into protective custody, clearing the neighborhoods of prostitutes and johns, drug busts, and the like), YVSF officers tracked down and apprehended very dangerous and violent criminals.⁴ They were part of a nationally recognized unit. <u>Third</u>, YVSF officers not only wore plainclothes but they had the opportunity to use their imagination and could use any reasonable and legal investigative

---

³ This list is not exhaustive.

⁴ In many instances, the fugitives or suspect were well known including, for example, a man arrested for the stabbing of Boston Celtics star Paul Pierce.

technique they chose. <u>Fourth</u>, YVSF officers had an opportunity to patrol, investigate and explore the entire City of Boston, not just one neighborhood or area within a specific time frame. <u>Fifth</u>, YVSF officers had access to, and learned to work on, a vast YVSF databases and communications with other agencies.  <u>Sixth</u>, the Plaintiffs were allowed to develop new and improved reporting and communicative techniques, including a fugitive tracking system they developed which the YVSF now uses.[5]  The Plaintiffs received numerous commendations and awards for their work. [6] <u>Seventh</u>, the Plaintiffs' work was like that of a Detective, with opportunities to investigate fugitives and meet a great variety of people from many other areas of law enforcement. <u>Eighth</u>, the Plaintiffs joined and enjoyed the YVSF as an opportunity, unlike in the district stations, to work with inner city youth in multiple programs designed to not only penetrate gang violence but also to prevent young people from getting involved in crime in the first instance. <u>Ninth</u>, Superintendent Joyce with the BPD Command staff said transfers could be for a disciplinary reason. **P Facts 105, P EX 9 at 197 (Joyce Dep. 197).**[7]

"Prevailing case law in the First Circuit and elsewhere supports a fairly liberal approach in determining what constitutes and adverse employment action." <u>Rennie v. United Parcel Service</u>, 139 F. Supp.2d 159, 169 D. Mass. 2001). As one Court said in discussing adverse employment actions, "anyone who has worked knows that opportunities for variety in day-to-day

---

[5] The YVSF commander when the Plaintiffs first arrived, Lt. French, admits a transfer within the BPD is a significant event in an officer's life and can have a devastating effect. He said that the transfer of an officer should be a last resort. **P Facts 105.**

[6] Brown was awarded the "Trooper George L. Hanna Award For Merit" an annual statewide award, for multiple incidents. It is a medal of honor more difficult to obtain than a commendation.

[7] Also, at least as to Brown, there was a loss of overtime opportunity. At a minimum, it is an issue of fact, as discussed in the Plaintiffs' Opposition Memo.

tasks and reasonably palatable physical surroundings may make the difference between a tolerable and a flatly unbearable working environment." Brown v. F.L. Roberts & Co, Inc., 419 F. Supp.2d 7, 14 (D. Mass. 2006). Adverse job actions can include "demotions, disadvantageous transfers, unwarranted negative job evaluations, and toleration of harassment by other employees." Andujar v. Nortel Networks, Inc., 400 F.Supp.2d. 306, 329 (D. Mass. 2005) quoting Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998) (emphasis added). Here, in addition to the transfer, the Plaintiffs have set forth sufficient facts to show harassment and unwanted negative job evaluations.

This matter cannot simply be chalked up in the mere disappointment or a "that's life in the big city"category, as the Defendants seek to do when they say "Transfers are a part of life in a large urban police department." **(Defts' Reply at 4).** The Plaintiffs did not undertake to initially complain about the racism and then file this suit lightly. They had no problems with their work as police officers until they became the first black officers to join the fugitive search unit of the YVSF day tour and met up Bulman, and then Davin. The actions of Bulman, Davin, and other white officers and superiors in the YVSF amounted to a violation of their civil and other legal rights. It would have been easy for them to go quietly to their new posts. They undertook to bring this action at great personal risk. It is not easy to sue one's employer, especially the City of Boston.

As for the Defendants' "distinguishing" the cases cited, the Plaintiffs simply stand by the discussion in their original Opposition and the holdings and Court's discussion within them. Similarly, the Plaintiffs reiterate that the "transfers" were not the only adverse actions which give rise to a civil rights violation, but it has been discussed already on pages 12-13 and 19-23 of the Opposition Memo and in their Statement of Facts. The actions of the Defendants, and others,

both before and after the Plaintiffs sought to complain constituted adverse employment actions.

### c. The Defendants overlook the Plaintiffs' other claims.

An adverse employment action is not an element the Plaintiff's must establish for all their claims. For example, the Plaintiffs also bring claims under M.G.L. c.12, §11I (Count Five), for interference with contractual relations (Count Six- mislabeled Count Five), and for violations of 42 U.S.C. §1985 (Count Two). It is well established that M.G.L. c.12 §11I (the Massachusetts Civil Rights Act - the "MCRA"), "like other civil rights statutes, is remedial" and is "entitled to a liberal construction of its terms." Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985); see Buster v. George W. Moore, Inc., 438 Mass. 635, 645 (2003)(same). There are many actions which may form the basis of a civil rights violation which come within the meaning of the "threats, intimidation or coercion" provision of the MCRA. For example, a defendant's statement that he would "do anything at any cost to prevent the plaintiff's construction of a tennis court" established a "threat." Bell v Mazza, 394 Mass. 176, 183-184 (1985). A uniformed officer's orders to a plaintiff to stop soliciting and distributing handbills at a shopping mall constituted "sufficient intimidation or coercion to satisfy the statute." Batchelder, 393 Mass. at 823; see also O'Connell v. Chasdi, 400 Mass. 686, 687-688(1987) (Offensive sexual harassment sufficient to constitute threats and intimidation). It is well established "that, in certain circumstances, economic coercion, standing alone, may be actionable under the act." Buster v. George W. Moore, Inc., 438 Mass. 635, 648 (2003). Moreover, a "physical threat" or physical force is not "a decisive consideration" in determining whether the MCRA has been violated. Broderick v. Roache, 803 F. Supp. 480, 486 (D. Mass. 1992). By breach of a contract a defendant violated the MCRA where, whether intended or not, a defendant cancelled a concert and thereby coerced an actress not to exercise her First

Amendment freedom of speech. <u>Redgrave v. Boston Symphony Orchestra, Inc.</u>, 399 Mass. 93, 95 (1987).

Similarly, the constant harassment and indignities the Plaintiffs suffered under Bulman who told them, for example, that they were taking the place of white officers falsely told them they were not team players, and kept the unit racially segregated, among other acts, fall within the ambit of the MCRA. Bulman admonished them for not allowing white officers to make an arrest the next day. Davin kept the unit cruisers racially segregated, chafed at their protests against FIO quotas and assigned to them the one white face that finally appeared on the YVSF wanted poster board. Coercion under the MCRA is broadly construed. <u>See</u>, <u>Buster v. George W. Moore, Inc.</u>, 438 Mass. 635, 646 (2003).

Likewise, as already discussed in the Plaintiffs' Opposition Memorandum at 23-24, the Defendants' actions violated their rights by interfering with their contractual relations with the City (Count Six). Also, the actions of Bulman and Davin together constitute a violation of the Plaintiffs' rights under 42 U.S.C. §1985 whereby Bulman and Davin conspired to deprive the Plaintiffs of their rights. <u>See Powell v. City of Pittsfield</u>, 143 F.Supp. 2d 94, 129-131(D. Mass. 2001)(portions of black police officer's conspiracy claims to go forward). Bulman told Horne and Brown that they were "too secretive", were not team players, and "failed to share information" as to <u>one</u> incident. Bulman once told Brown that Horne was too secretive but would not elaborate. **P Facts 31, 91.** Such were the same terms Davin used when doing the so-called Professional Analysis Meeting ("PAM") evaluation of Horne and Brown shortly before they were transferred, and it was the <u>only</u> time they heard them from Davin. Previously, Davin had only told them they were doing a good job. **P Facts 91, 100.** No PAM had ever been conducted before or since, and PAM did not include the categories under which the Plaintiffs were

"evaluated." Davin could give no examples as to how they were secretive. Davin did not talk to them about their own alleged issues, but only about the <u>other</u> Plaintiff's issues. **P Facts 82, 91.** Bulman admitted that both he and Davin "never counseled or warned plaintiffs about the type of conduct which would result in discipline or transfer." **P Facts 39.**

### 2. There are sufficient facts such that a jury could find causation.

Because the Plaintiffs have briefed these issues in their Opposition Memorandum at 9-16, they need not further address them here other than to say for cases under 42 U.S.C. §1983 (Count One) and M.G.L. c. 12, §11I (Count Five), as well as civil rights matters in general, there is **no** requirement to establish temporal proximity to prove causation. See <u>Chungchi Che v. MBTA</u>, 342 F.3d 31, 38 (1st Cir. 2003) (Section 1983); <u>Murphy v. Cruz</u>, 53 Mass. App. Ct. 414, 318 (2001)(Chapter 12). A plaintiff sometimes can use temporal proximity between a protected activity and an adverse employment action, by itself, to carry the plaintiff's burden when the Plaintiff has nothing else to rely on. <u>Chungchi Che</u>, 342 F.3d at 38; <u>Murphy</u>, 53 Mass. App. Ct. at 318; <u>Greene v. New England Deaconess Ass'n, Inc.</u>, 2002 WL 31677209 Mass.Super. Ct. Before he arrived in May 2000, Davin knew the Plaintiffs were among those who complained and, in Davin's words, it was a "shit storm." He conferred with Bulman about the Plaintiffs. French briefed Foley on it and Foley considered whether they "were a problem" as part of his decision to recommend the transfer. **P Facts 100.** Bulman and Davin regularly met with Foley where alleged issues were raised about the Plaintiffs and about the racial issues. **P Facts 100.**[8]

Also, the "retaliation" to which the Defendants refer (**Defts' Reply at 4**) does <u>not</u> relate

---

[8] For transfers of others a year earlier, Foley said Bulman and Davin had input. Superintendent Joyce says sergeants can recommend transfers and would be consulted. **P Facts 100.**

9

solely to the transfer. As discussed above and in their Opposition Memo and set forth in their Statement of Facts, the attitude of Bulman, Davin and the white officers, as the Plaintiffs directly observed, became hostile after they complained, they continued to suffer unit segregation in many ways. They became marked men. They were the first blacks in the YVSF to step forward to complain. Causation is easily, at a minimum, an issue of fact.

### 3. & 4. This matter is not appropriate for summary judgment.

Because the Plaintiffs have already addressed above and in their Opposition Memorandum, the further redundant arguments the Defendants make in their Reply at 5 and 6, the Plaintiffs will not respond specifically to them. Because of the many facts and law applicable to this matter, however, the Plaintiffs asks that the Court give them, as well as the Defendants, leave to further brief this matter before ruling on the Defendants' Motion for Summary Judgment if there is any aspect of the Plaintiffs' claims the Court wishes the parties to address.

WHEREFORE, based on the foregoing points and authorities, as well as the points and authorities set forth in the Plaintiffs' Opposition Memorandum and the Plaintiffs' Statement of Facts, the Plaintiffs respectfully request that the Defendants' Motion for Summary Judgment be denied.

November 26, 2006

PLAINTIFFS STEVEN HORNE AND
RONALD BROWN,
By their Attorney,

/s/ Stephen A. Roach
Stephen A. Roach, Esq.
ROACH & WISE, LLP
31 State Street
Boston, MA 02109-2705
(617) 723-2800

CERTIFICATE OF SERVICE

    I, Stephen A. Roach, Attorney for Plaintiff, hereby certify that on November 26, 2006, I served Defendants with the within document by causing a copy of the same to be mailed and faxed to their counsel of record and to be served electronically.

                                                   s/Stephen A. Roach
                                                   Stephen A. Roach