UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 04-10718-RGS

STEVEN HORNE and RONALD BROWN

v.

CITY OF BOSTON,
SERGEANT ERIC BULMAN, and
SERGEANT JOHN DAVIN

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

September 19, 2007

STEARNS, D.J.

Boston police officer Steven Horne and former Boston police officer Ronald Brown brought this lawsuit under the federal and state Civil Rights Acts, 42 U.S.C. § 1983, and Mass. Gen. Laws c. 12, § 11I.  Horne and Brown allege that they were treated in a racially discriminatory manner by Sergeants Eric Bulman and John Davin, their immediate supervisors in the Youth Violence Strike Force (YVSF), the anti-gang unit of the Boston Police Department (BPD).  Defendants Bulman and Davin move for summary judgment on all of plaintiffs' claims.  For reasons that will become apparent, the motion will be ALLOWED.  Judgment will also enter for the defendant City of Boston.

BACKGROUND

The facts are taken in the light most favorable to plaintiffs, supplemented where appropriate by additional facts offered by defendants that are not in dispute.  Steven Horne was hired by the BPD in March of 1996.  In August of 1999, he was assigned to the YVSF.  Twenty months later, in April of 2001, Horne was transferred back to patrol duties.  Ronald

Brown was hired by the BPD in June of 1997. Brown also joined the YVSF in August of 1999, and like Horne, in April of 2001, was reassigned as a patrolman. Brown was subsequently terminated by the BPD after being convicted of a felonious assault.[1]

Sgt. Eric Bulman initially supervised Horne and Brown in the day division of the YVSF. Lt. Gary French commanded the day division. In April of 2000, Sgt. John Davin replaced Bulman as Horne and Brown's direct supervisor.[2] In May of 2000, Lt. Kevin Foley replaced Lt. French. The day and night divisions were then combined under Lt. Foley's overall command.

Vacancies within the BPD are often "posted," that is, a notice is circulated inviting officers to apply for openings in units as they become available. There are no assurances that an officer will receive the assignment for which he or she applies. The Commissioner has the final say on the deployment of BPD officers. Still, it is a common practice for unit commanders to request the assignment of particular officers to their units.

Horne and Brown considered the YVSF to have "many advantages" – YVSF officers exercise more day-to-day discretion than do patrol officers; they are not required to respond to 911 calls; they have citywide jurisdiction; wear plain clothes; travel in unmarked cars; and act "more like detectives than uniformed officers."[3] In the summer of 1999,

---

[1]The incident that led to Brown's conviction occurred while he was off-duty.

[2]Bulman was promoted to the command staff of the night shift.

[3]On the other hand, patrol officers have greater opportunities to earn overtime pay. In districts C-6 and B-2, the districts to which Horne and Brown were transferred, officers who chose to work overtime clocked an average of 218.5 hours (C-6) and 284.9 hours (B-2) of overtime pay during the period from August 1, 1999, though June 1, 2001. In contrast, officers assigned to the YVSF recorded an average of only 83.4 overtime hours

several openings in the YVSF were "posted."  Both Horne and Brown applied and were

interviewed by Lt. French.  According to Lt. French, his ideal candidate was

> relatively easygoing but aggressive on the street, aggressive in the sense
> of searching out information, searching out community contacts, searching
> out informants.  I was looking for officers that weren't problematic, didn't
> have a history of internal affairs complaints . . . didn't have a reputation of
> being overly aggressive, . . . that were progressive in the sense of how they
> wanted to do policing, . . . that were familiar with the neighborhoods, . . . that
> had some experience . . . that would fit in with the group, fit in with the other
> [officers].

French Dep. at 30-31.  Lt. French forwarded a list of his ten preferred candidates to the

Commissioner.[4]  Five officers were selected by the Commissioner.  In addition to Horne

and Brown, they included Adolfo Brito (Cape Verdean male), Joseph McCarthy (white

male), and Mariso Langer (Hispanic male).

Brown and Horne maintain that from the beginning Bulman favored white over

minority officers.  Bulman repeatedly told Horne that he and Brown would have to "prove

themselves."  Brown found Bulman's approach to be

> demeaning, it was body language, his body language was harsh and hard,
> it wasn't the type of language that you would say, . . . somebody that was
> new in the unit, you come in friendly[.] . . . His body language was more of
> a hard type, you know, no smiles, just up and go.

Brown Dep. at 124.  According to Horne, Bulman expressed resentment at the fact that he

and Brown had been chosen for positions that Bulman felt should have gone to more

deserving (non-minority) candidates.  Horne does not recall when he heard Bulman give

---

during the same period.

> [4]Lt. French is relatively certain that Horne and Brown were included on his preferred
> list.

voice to this sentiment; it could have been "a few weeks in or maybe, it could have been a year or so" after he joined the YVSF.  Horne Dep. at 55–57.

The practice in the YVSF was for a team of three officers to work together as a squad.  Horne and Brown allege that YVSF squads were, for the most part, segregated by race.  According to Horne, when Michelle Williams, a newly assigned white officer, asked to partner with Horne and Brown, she was discouraged by an unidentified supervisor from doing so, and chose instead to work with two white officers.[5]

Bulman assigned Horne, Brown, and Brito to work as a squad.  According to Horne, Bulman gave them inconsequential case files to work on, files that Horne described as "minimal, you know, minor warrants of individuals to go seek out . . . we [were given] like one or two files [to investigate]."  According to Brown, he and Horne were not given any files at all, but were left instead to sit at headquarters with virtually nothing to do.  Brown Dep. at 126.  Brown testified that during his first two months at the YVSF, "I think we spent,

---

[5]Lt. Foley acknowledged that officers were generally permitted to select their own partners.   Lt. Foley testified that

> [m]y policy was that people could ride with whomever they requested to ride with.  Because if they were riding together with people they wanted to work with, their productivity would be greater.

Foley Dep. at 421.

> Lt. French explained in his deposition that

> [a] lot of times if officers sort of click together, we would let them work together.  If there was a conflict or they didn't like working together, we would let them work with who they wanted to work with.  So it was pretty much a self-selection process.

French Dep. at 87-88.

well, I spent a lot of time working with the school officers doing anticrime and school assignments before I started doing any kind of warrant apprehension, because we were not introduced to it, may I say, although there were officers performing warrant apprehensions, but we were not introduced to it."[6]  Brown Dep. at 45–46.

Horne and Brown believed that Bulman was neglecting their training in order to pay more attention to the training of white officers.

> The reason why we hadn't started immediately working on [warrant apprehensions] . . . [was] because we didn't know what to do . . . he just handed [the file] to us . . . . Lieutenant French let us know . . . the next room is where you can find all the information, but still, like I said, we didn't know what to do.

Horne Dep. at 40-41.  After an incident in which Brown and Brito attempted to serve a warrant on a suspect who was being sought by another squad, Bulman made "negative," "nonsupervision type statements" to Brown (the specifics of which Brown does not recall).

On one occasion, Bulman told Lt. French that Horne and Brown had refused to reveal information about a source they had developed who was providing information about a high profile fugitive.  "The flavor of the conversation that I had with Eric [Bulman] was the fact that Brown and Horne wouldn't share that information not only with Eric but with other members of the unit.  And we had a full court press on to arrest this guy and there was a high level of frustration in the unit regarding that."  French Dep. at 92-93. Brown testified that because the case was "hush hush," he had created a handwritten

---

[6]The day shift, to which Horne and Brown and the three other new officers were assigned, focused on gang intervention and the apprehension of fugitives. Horne and Brown had gained some experience in tracking and serving felony warrants when they worked as regular patrolmen – Brown had "served quite a few warrants" when assigned to District C-11.

"intelligence" report "in bits and pieces," which he "more than likely" shared with Bulman and to a lesser degree with an FBI agent hunting the same fugitive.[7] Bulman testified that the FBI agent came to him in frustration after Brown refused to identify his source by name. Bulman extracted the source's identity from Brown only "after a lot of teeth pulling." Bulman Dep. at 194.

Bulman also criticized Horne and Brown for using questionable tactics (as when they obtained a key to the apartment of a suspect's girlfriend, which they entered surreptitiously to listen to her voice-mail), and for using poor judgment in making off-duty arrests without the appropriate backup. Bulman "advised [Horne and Brown] that this was not a good practice." Id. at 193. Lt. French shared Bulman's view.

> You shouldn't be tracking a dangerous felon off-duty, . . . . And if you happen to cross a dangerous felon when you're off-duty, the very idea that he's a dangerous felon – and most of these guys like we discussed earlier are involved in violent crimes, shootings, homicides, et cetera – your best bet common sense dictates and this is one of the things we try when we bring an officer on to the unit is to ensure that they have a lot of common sense. Common sense would dictate you contact the local police department. You don't do anything until they arrive and you contact the department, your supervisor. Let them know where you are, what's going on and we get additional people out there to assist them. . . . If they are off duty and they observe a violent crime in progress or a crime in progress, . . . [t]here is not an issue with that. The issue is continuing an investigation . . . into one fugitive while they are off duty without anyone in the unit being aware of the fact they are tracking that person. That was the issue that was brought to my attention.

French Dep. at 72, 75-76.

---

[7]According to Brown, "Bulman kind of told us, . . . be careful what you say to [the agent], watch out what you say to him. . . . So I would pass most of the information to Sergeant Bulman . . . and not so much to [the agent] because the sergeant asked us not to say too much to him, although I guess it was his case." Brown Dep. at 334.

Lt. French did not seek to transfer Horne and Brown at the time because he believed that as they garnered experience their performance would improve. "[T]hey were relatively new in the unit. I think they may have worked for me for eight or nine months. . . . [T]here is a learning curve coming into the unit." Id. at 97-98. Bulman, for his part, nominated Horne and Brown for several commendations. When asked if these recommendations were consistent with Bulman's criticisms of Horne and Brown, Lt. French testified, "It can be. These were individual situations or operations that took place that involved Horne and Brown where they did exceptional work. And it's tempered by the concerns that Eric [Bulman] raised to me when I was a unit commander there." Id. at 253-254.

In August of 1999, Bulman was assigned to investigate a civilian's verbal abuse complaint against Brown. Bulman concluded that the charge against Brown was false, and recommended that the case be closed as "unfounded." Bulman never instituted a disciplinary proceeding against either plaintiff during their tenure in the YVSF. "I felt that writing anything down about what they did was a higher level of discipline and something that could be turned over to Internal Affairs, be on their record, and that wasn't my intention to try to hurt them. I was just trying to make sure they understood why we do things a certain way, for their safety and for the procedures that we had in place to safeguard everybody, both the officers and the suspects." Bulman Dep. at 197-198.

In February of 2000, a "spate" of violence erupted at Dorchester High School. Lt. French held a brainstorming session with YVSF officers to devise a containment strategy. Horne was present at the session. Brown was not. Lt. French told the officers that they

were being "redirected" to the schools, which led some of the officers present to object. One white officer questioned the effectiveness of the two black officers who were then assigned as public school liaisons.  Horne Dep. at 99.  Another white officer stated that he "wouldn't even send my dog to Dorchester High because it was so bad."  Id. at 100.  Horne was upset by the comments, and told Lt. French after the meeting that he thought the remarks were insensitive and inappropriate.  Horne spoke with other minority officers on the day shift, and ultimately, Horne, Brown and some of the other minority officers met with Bulman to discuss their concerns.  Bulman told Lt. French about the meeting.  Bulman also recalled hearing about other comments made by white officers to which black officers had taken offense – remarks about the cleanliness of black-owned homes ("nasty" and "full of roaches"), and derogatory comments about minority students in public schools ("animals, rapists and murderers").

Lt. French convened a meeting of the YVSF to discuss the issues raised by the minority officers.  He also reported the officers' concerns to his superior, Deputy Superintendent Thomas Dowd.  Lt. French told Superintendent Dowd that the senior command staff should be made aware of how racially charged the situation had become. Within two weeks, a meeting with YVSF officers was held at BPD headquarters.  The meeting was moderated by Joan Sweeney, a BPD management consultant.  After this meeting, several black officers, including Brown and Horne, met to share their perceptions

of racist attitudes that they believed were harbored by some white YVSF officers.[8]  Brown

Dep. at 209-210.

Lt. French next invited all YVSF officers to an off-site meeting.  Issues discussed

at the meeting included the opinion held by some minority officers that white officers were

overly aggressive or hostile in their interaction with minority youth; the segregation of

officers by race in squad assignments; the fact that "wanted" posters on the walls of YVSF

headquarters consisted only of black suspects; and the reluctance of some officers (mostly

white) to do gang intervention work.  Also discussed was the comment made earlier by one

officer that he would not send his dog to Dorchester High School; a T-shirt worn by another

officer belittling the Abner Diallo shooting; and the use of the word "nigger" by a white

officer in the presence of a black officer.

Horne recalls little of that meeting.  Brown, however, testified that "people

expressed their concerns about a lot of different things, a lot of racial tension . . . trying to

prevent further hostility and tensions from occurring if they could."  Brown particularly

remembers the discussion about the Diallo T-shirt.  "I don't know if [the officer] did it

directly at that meeting . . . but I heard that he had . . . apologized for [wearing] it."  Brown

further recalls that the commanders at the meeting "made certain statements that they

were trying to provide [a] certain amount of sensitivity training to officers, . . . and were

trying to voice more of a camaraderie within [the] unit, that we all kind of learn to get along

and associate with each other, kind of like we do in the districts."  Brown Dep. at 234-237.

---

[8]Horne testified that he believes that white officers in the YVSF resented the black
officers for raising issues that portrayed the YVSF as racist.  Horne Dep. at 162-163.
Horne does not identify any of these officers by name.  Id. at 164-165.

Shortly after the off-site meeting, Superintendent Dowd met with the YVSF sergeants to review the roster of officers assigned to the YVSF. A number of officers were identified for transfer out of the unit based on the judgment that they were not contributing to the unit's overall success, or because they had expressed a lack of interest in remaining. Nine officers were transferred out of the YVSF in March of 2000. Of the nine, one was black, one Asian, one Hispanic, and six were white males. Horne and Brown were not among the officers transferred. However, they allege that the white officers who were transferred were not among those who had "engaged in racist behavior."

In May of 2000, Lt. Foley replaced Lt. French as the commander of the YVSF. Lt. Foley was familiar with the Dorchester High controversy that had embroiled the YVSF in February and March, and had been present at the off-site reconciliation meeting. Shortly after assuming command, Lt. Foley convened another unit wide meeting at the Park Plaza Hotel. Members of the clergy and the community (including representatives of the Nation of Islam and the NAACP) were invited to attend. Lt. Foley informed those assembled that he would not tolerate racial divisions in the unit, and invited a sharing of any concerns. Horne said that he did not speak out at the meeting for "fear of reprisal." Brown testified that after this meeting, "things started to try to come together. I think that Lieutenant Foley probably became a little instrumental . . . to try and do things together as a unit, . . . to kind of get that camaraderie going to settle some of this hostility. . . . at least it was an attempt to get things, a solution to the problem . . . ." Brown Dep. at 261.

Sometime in the summer of 2000, Horne and Brown attempted to assist three white officers who had stopped a black suspect for questioning. The three white officers told

10

Horne and Brown that they "could handle it. Back off. This is ours." Horne and the white officers ended up exchanging profanities. Horne believed that this was an instance of racial harassment, and reported it to Lt. Foley. Horne also complained to Lt. Foley that the "wanted" board did not display any posters of fugitives who were white. Lt. Foley had revised the board to contain only murder suspects and responded that "if you look at the murder warrants that are outstanding, for whatever reason the majority of them are black individuals. So that's what would be out there. . . . It was not . . . intentional." Foley Dep. at 441-442.

Brown states that at some time between January and March of 2001, while tracking a fugitive on Homestead Street in Roxbury, a white officer accessed Criminal Offender Record Information (CORI) concerning a black woman for reasons that Brown considered unjustified and racially offensive. He complained to Lt. Foley, who stated that he would speak to the officer involved. Brown also alleges that Davin agreed to permit a wanted white suspect to surrender voluntarily, an accommodation that he felt Davin would not have made for a black suspect.

Davin became Horne and Brown's direct supervisor in April of 2000. Davin testified that as far as he knew, the racial tensions exposed during the Dorchester High School crisis meeting had been addressed and resolved prior to his arrival at the YVSF. Although Davin believed that Horne and Brown were performing well, he had concerns about their reluctance to share information about the tracking of fugitives.

> It's not always that they wouldn't tell me. It's when we get to the house – . .
> . as you pull up as a supervisor, you come out with the immediate questions
> that the guy — It was almost an understanding with the guys, okay, this is

what got us here, boom, boom, boom, so I can make my decision on whether to go through the door or not. . . . Sometimes their response would be, "An informant got us here," and I'd have to pry further, "Well, is it a carded informant?" "Is it not a carded informant?" "Well, it's not a carded informant, but it's a source." "Well, that source got us here." And then what would happen, instead of just getting the bang, bang probable cause that got us here, I'd have to ask more and more and more questions to pull out more and more information to hit the level that we're at to go into the house if we in fact can get into the house.

Davin Dep. at 205-207.  Davin also testified that Brown "in my opinion, was tactically lacking in training whether he came up there too soon as a police officer and hadn't learned just basic patrol procedures relative to standing in front of doors – I mean we all make mistakes along the way, but it was my opinion that Ron made more mistakes than most of us." Id. at 140.

In January of 2001, the supervisors of the YVSF met with the BPD command staff (including Commissioner Evans) to conduct a Personnel Analysis Meeting (PAM).  PAM was designed to be

an early warning mechanism to review all personnel in the department, not as a disciplinary tool, but a management tool to assess each officer and perhaps red flag any problems that we foresee in the future with these officers. . . . It was done department wide. . . . The procedure or process was that the team, which involved the commissioner, the chief, and the superintendent, chief in charge of Internal Affairs, would visit districts throughout the city and they would bring with them an assessment . . . of all the personnel . . . they would review every individual assigned to that district or unit. . . . [E]very officer under that particular command would be reviewed, and then there would be a discussion on each officer, usually involving the district or unit commander and the specific supervisor that supervised that individual on a day-to-day basis.

Foley Dep. at 315-316. Under the terms of the BPD's collective bargaining agreements, "the PAMS could be used for evaluative purposes but not for disciplinary purposes." Id. at 330. Brown and Horne assert that they were singled out unfairly for a PAM evaluation.[9]

At the PAM meeting, Davin reported that Horne was "an excellent fugitive officer, did a great job at finding where the bad guy was, but felt at times that he withheld information from me relative to the case, how they came about finding the guy or where they ended up or things of that nature."[10] Davin Dep. at 140. Davin met with both Brown and Horne after the PAM, and told them what he had reported to the command staff. Davin told Horne that he believed he "was an excellent fugitive investigator; that in my opinion, I felt sometimes he withholds information." Id. at 167. Davin told Brown that he "thought [Brown] was a good fugitive investigator, [but] that he lacked, in my opinion, the tactical skills, basic skills involved in serving a warrant." Id. at 173-174.

In April of 2001, Lt. Foley recommended to the command staff that Horne and Brown, together with five other officers, be transferred out of the unit. Of the seven officers Lt. Foley recommended for transfer, four were black (including Horne and Brown), and three were white. Lt. Foley testified that he based his decision regarding Horne and Brown

---

[9]Plaintiffs have filed affidavits from two other YVSF officers, Craig Jones and Kenneth Israel, stating that they had not been required to undergo PAM evaluations. Israel Aff. ¶ 6; Jones Aff. ¶ 8. Both Jones and Israel are African-Americans.

[10]Davin testified, "I was asked to go through my list of officers and give my opinion, good and bad, of how I felt their work ethic was and what they needed to work on, and that's what I did for every officer on the day shift." Id. at 150.

on their unsanctioned involvement in off-duty arrests;[11] their reluctance to share information; the unwillingness of other YVSF officers to work with them;[12] and with respect to Brown, because of accusations of sexual harassment made against him by Marisa Henderson, Lt. Foley's administrative clerk.[13]

---

[11]Horne claims that he made only two off-duty arrests. (BPD records show that Horne made off-duty arrests on March 29, 2000, on October 27, 2000, and on December 19, 2000. Brown testified that he made no off-duty arrests while working in the YVSF. Plaintiffs include in their exhibits a BPD commendation awarded to officer Brian Albert for demonstrating "great dedication to duty by choosing to pursue a wanted fugitive while off-duty." Pl. Ex.15.

[12]Subsequent to the PAM evaluation, officer Grant Callender, recently transferred into the YVSF, was assigned to work with the Horne and Brown. Callender asked Davin to remove him from their car. Callender told Davin that Horne and Brown "do fucked up shit, and it's going to jeopardize my career if I ride with them." Id. at 183. Specifically, Callender complained that Horne and Brown, after being informed to stay clear of an ongoing homicide investigation where issuance of an arrest warrant was imminent, went to the house where the suspect was believed to be hiding and "were showing photos to prostitutes up around . . . Blue Hill Ave., . . . to see if they could ID the suspect out of the photo array." Id. at 185.

[13]Henderson had complained repeatedly to Lt. Foley about being harassed by Brown. Lt. Foley found the relationship between Brown and Henderson, because of its volatility, disruptive to the unit.

> When it was on obviously there was [sic] no problems. When they were having an issue it became a problem and disruptive. . . . She sits right outside my office and she would come in on numerous occasions when there was a problem between the two of them . . . . She would come in late saying that something had happened, she would leave early because she was emotionally upset . . . [I] had to make a decision between Marisa or Ron Brown. My choice, my decision, and I kept Marisa and transferred Ron Brown.

Foley Dep. at 189, 193-194, 473.

Lt. Foley further explained his decision to recommend the transfer of plaintiffs as follows.

> There was never any question that they were good officers. The question was, were they a good fit for a specialized unit. . . . [In making the decision to recommend their transfer], I would have evaluated or discussed with other supervisors, reviewed a lot of different issues. As I mentioned, arrest was not the sole indicator that someone should stay or go. It was a collection of things. As I mentioned, in any small unit it was more than just being a good police officer. It was getting along with others, others getting along with you, esprit de corps, . . . it was . . . an assessment of their entire behavior or input or lack thereof, whether or not they were a problem or not to me or to others that I arrived at these decisions to transfer Steve, Ron, and others, I might add, out of the Gang Unit.

Foley Dep. at 366, 393-394.

Lt. Foley testified that he had recommended the transfer of four white officers for similar reasons.

> [Officers] Cellucci, Foundas, very uncommunicative . . . . [Officer] Cloran . . . [o]fficers didn't want to work with him, he contributed nothing to the unit as far as communicating with the other officers, he just didn't fit. He, however, did not make any off-duty arrests, so obviously that wasn't part of my decision-making process, but I just felt that he didn't fit in the Gang Unit. . . . Gary Ryan, . . . [h]e was unhappy with a command decision that I made and his – which was quite obvious in his behavior and demeanor, which I felt was unacceptable.

Id. at 460, 466-467.

Lt. Foley also transferred other black officers. "Larry Celester, a black officer, and actually an excellent police officer, but was told on numerous occasions that there was a place for joking and it wasn't at roll call. . . . He persisted in playing, if you will, at roll call and I transferred him." Id. at 463-464. Lt. Foley requested the transfer of Mark Buchanon because "[h]e was a community services officer, and we really had no need for a

15

community services officer." Id. at 138. During the time that Horne and Brown served in

the YVSF, a total of thirty-nine officers were transferred prior to plaintiffs' reassignment.[14]


DISCUSSION

On March 18, 2004, Horne and Brown initiated this action against Bulman, Davin,

and the City of Boston in Suffolk Superior Court.  The case was removed to this court on

April 9, 2004, on federal question grounds.  Bulman and Davin are named in all six counts

of the Complaint.  The City of Boston is named in Counts I, III, and IV, apparently on a

Monell theory.[15]  Count I alleges a violation of 42 U.S.C. § 1983 (retaliation for the

exercise of the right to free speech); Count II alleges a conspiracy to violate plaintiffs' civil

rights in violation of 42 U.S.C. § 1985; Count III alleges violations of 42 U.S.C. § 1981, and

Mass. Gen. Laws c. 93, § 102 (discriminatory interference with a contractual employment

relationship); Count IV alleges violations of 42 U.S.C. § 2000e and Mass. Gen. Laws c.

151B, § 4 (race discrimination); Count V alleges a violation of Mass. Gen. Laws c. 12, §11I

(interference with secured civil rights by means of threats, intimidation, and coercion); and

finally, Count VI alleges intentional interference with advantageous business relationships.

---

[14]Plaintiffs allege that upon being transferred, their positions were taken by Gregory Long and Frank McLaughlin, two white officers whom Bulman had reportedly complained should have been originally chosen over Horne and Brown.  Long was transferred into the YVSF on March 31, 2001; McLaughlin was transferred into the unit on January 4, 2002. Plaintiffs offer no evidence that either Bulman or Davin caused the transfers of Long or McLaughlin.

[15]See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  I say apparently as the theory of municipal liability is not articulated in any meaningful sense in the Complaint or in plaintiffs' brief.

Bulman and Davin seek summary judgment essentially on the ground that plaintiffs are unable to establish a causal relationship between anything that they said or did and plaintiffs' transfer out of the YVSF.[16]

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Gaskell v. Harvard Co-op Soc'y, 3 F.3d 495, 497 (1st Cir. 1993). "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." Rodriguez-Pinto v. Tirado-Delgado, 982 F.2d 34, 38 (1st Cir. 1993). To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position. Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). If the showing is made, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." Id. The nonmoving party "must adduce specific, provable facts which establish that there is a triable issue." Id. "There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986).

Count I - 42 U.S.C. § 1983

---

[16]Defendants also argue that plaintiffs' transfer did not amount to an adverse employment action and is therefore not actionable. They also claim qualified immunity as an affirmative defense. As the court agrees with defendants' primary argument, there is no need to address either of these alternative bases for judgment.

In Count I of the Complaint, Horne and Brown allege that Bulman and Davin caused their "transfer out of the YVSF . . . in retaliation for their exercise of free speech . . . object[ing] to racism by white officers and supervisors, . . . in the treatment and segregation of black officers like themselves, [and] also in the disparate treatment of black suspects and witnesses."  Complaint ¶ 42.  To establish a claim of retaliation, a plaintiff must show: (1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action; and (3) that there was a causal connection between the adverse action and the protected conduct.  See Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006); Lewis v. Gillette Co., 22 F.3d 22, 25 (1st Cir. 1994) (the showing of causation must be particularly strong where the protected conduct and the adverse action are widely separated in time).

To qualify as protected conduct, a public employee's speech must be on a matter of public concern; additionally, the employee's interest in unfettered expression must not be outweighed by the government's interest as an employer in promoting the efficient delivery of its services.[17]  Waters v. Churchill, 511 U.S. 661, 668 (1994).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."[18]

---

[17]This weighing of the employee's rights and the employer's interests is often referred to as the "Pickering balancing test," after Pickering v. Bd. of Educ. of Township High Sch. Dist., 391 U.S. 563, 568 (1968).

[18]Whether the speech at issue involved a matter of public concern and whether the employee's interest in speaking outweighed any legitimate governmental interest are typically legal determinations; whether speech was a motivating factor in the adverse employment action raises issues of fact which are ordinarily for the jury to resolve. Nethersole v. Bulger, 287 F.3d 15, 18-19 (1st Cir. 2002).

Connick v. Myers, 461 U.S. 138, 147-148 (1983).  When the speech at issue is incidental to an employee's official duties, or involves workplace grievances, or merely matters of personal interest, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech."  Garcetti v. Ceballos, __U.S. __, 126 S.Ct. 1951, 1958 (2006).  See also Connick, 461 U.S. at 149 ("[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."). In the retaliation context, while speech must involve a matter of public concern, it need not be "public" in the sense of being directed to an audience outside of the workplace.  Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 12 n.10 (1st Cir. 2003).  It is enough that the employee suffers adverse consequences for bringing the matter to the attention of his or her supervisor.

Many of the statements for which Horne and Brown claim First Amendment protection, such as those expressing dissatisfaction with the manner in which officers were assigned to specific squads, or the method used by Lt. Foley to select posters for the "most wanted" board, raise no issue of public concern.  They rather reflect plaintiffs' disgruntlement with workplace practices (no doubt exacerbated by the undeviating obedience demanded by a quasi-military organization of its rank-and-file).  Several subjects cited by plaintiffs, however, do raise matters that invite public concern.[19]  These include the racially insensitive statements made by one officer about the "criminal" student

---

[19] While Brown and Horne recite allegations that unidentified officers used racially abusive epithets, only anonymous hearsay sources are attributed.  A court will not consider inadmissible evidence in ruling on a motion for summary judgment. Casas Office Machines, Inc. v. Mita Copystar America, Inc., 42 F.3d 668, 683 (1st Cir. 1994).

body at Dorchester High School, and the wearing of a T-shirt by another officer mocking the death of Abner Diallo.[20]  Of even greater concern is the allegation that some white officers were infected with racist attitudes that influenced the manner in which they carried out their duties.

Plaintiffs cite three instances in which they made "protected" complaints to persons in authority.  After the contentious Dorchester High School meeting, Horne complained to Lt. French; he together with Brown and several other minority officers then met with Bulman to express their concerns.[21]  On another occasion, Horne told Lt. Foley that he had been "racially harassed" by a group of white officers whom he had attempted to assist in making an arrest; on a third occasion, Brown complained to Lt. Foley that a white officer had improperly accessed CORI information about a minority female.

What is missing is any evidence that Bulman and Davin had any determinative say in plaintiffs' transfer.  To establish a constitutional violation plaintiffs must show a causal link between the transfer and something that Bulman and Davin did to retaliate against plaintiffs' for their speech.[22]  Camilo-Robles v. Hoyos, 151 F.3d 1, 7-8 (1st Cir. 1998).  See

---

[20]As Horne and Brown acknowledge, both of the officers involved apologized and explained at a unit meeting convened by Lt. French that they had not intended their acts and comments to convey a racial message.  Brown testified that he felt the officers' apologies to be sincere at the time.  However, on a later occasion, Brown claims to have heard one of the same officers refer to black suspects as "monkeys."  Brown stated that he did not make a formal complaint about the remark because "Sergeant Bulman . . . was present when the [comment was] made."  Brown Dep. at 244-245.

[21]Lt. French, it will be recalled, took immediate and aggressive action to deal with the Dorchester High School incident.

[22]The court for present purposes will assume that the transfer, even though it involved no diminution of pay or responsibility, was "material," in the sense of amounting

also Figueroa v. Aponte-Roque, 864 F.2d 947, 953 (1st Cir. 1989) (a supervisor can be held liable only for his own acts or omissions, and not for the acts or omissions of others whose conduct the supervisor has neither condoned nor authorized).  Bulman and Davin, as sergeants in the YVSF, did not have the authority to hire, terminate, or transfer officers under their supervision.  Lt. Foley testified that the decision to transfer Horne and Brown out of the YVSF began with him and then "moved up the chain of command."  Cf. Carialia v. Hertz Equip. Rental Corp., 363 F.3d 77 (1st Cir. 2004) (where decision makers themselves are not motivated by a discriminatory animus, but where the decision itself is influenced by a lower-level employee who has a discriminatory motive, the employer may be found liable).  Lt. Foley testified that his decision was based on his disapproval of Horne's practice of making off-duty arrests (including one while in the company of his girlfriend); the disinclination of other officers to work with plaintiffs; the unwillingness of Horne and Brown to share information with other officers; and Brown's volatile and disruptive relationship with Marisa Henderson.[23]  Because there is no evidence that Lt. Foley's decision was prompted or dictated by anything Davin or Bulman did or said, plaintiffs' retaliation claim  necessarily fails.[24]

---

to a taking of something of consequence from the plaintiffs. See Blackie v. Maine, 75 F.3d 716, 725-726 (1st Cir. 1996). Cf. Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 24 (1st Cir. 2002) (a disadvantageous transfer may constitute an adverse employment action).

[23]Lt. Foley is not named in the Complaint as a defendant.

[24]While the Complaint makes a perfunctory reference to Article 16 of the Massachusetts Declaration of Rights, there is no allegation that plaintiffs' Article 16 rights (which are co-extensive with the First Amendment) were violated by means of "threats, intimidation and coercion," as the Massachusetts Civil Rights Act requires, nor is any meaningful attempt made in plaintiffs' brief to give content to the state constitutional claim.

Count II - Violation of 42 U.S.C. § 1985

In Count II of the Complaint, Bulman and Davin are alleged to have "combin[ed], conspir[ed] and agree[d] to violate the Plaintiffs' rights due to the Plaintiffs' race [and thereby] deprived [them] of property, hindered, [and] impeded them in the discharge of [their] duties as police officers, and deprived them of their equal protection under the laws and equal privileges and immunities under the law."  Complaint ¶ 55.  Under the deprivation clause of 42 U.S.C. §1985(3), a plaintiff must show: (1) a conspiracy; (2) motivated by racial or class-based animus; (3) aimed at interfering with rights that are protected against official encroachment. See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267-268 (1993).  This claim stumbles at the gate.  Plaintiffs have produced no evidence of a conspiratorial agreement between Bulman and Davin.  An illicit agreement is the essence of a conspiracy and without proof of such, there can be no viable cause of action.  See Attorney General v. Tufts, 239 Mass. 458, 493-494 (1921).

Bulman and Davin did not jointly supervise plaintiffs.  Bulman supervised plaintiffs as the commanding sergeant in the day division until August of 2000 when he was transferred to the night shift.  Davin became plaintiffs' immediate supervisor only after Bulman's transfer.  Plaintiffs offer a single, vague, and conclusory allegation hinting at concerted action: "Bulman and Davin began to make false statements to Lt. Foley, the new commander of the unit as of May 2000 about Horne and Brown, such as they were not 'team players,' were 'secretive,' did not share information, and made too many off-duty

22

arrests." Plaintiffs' Statement of Facts ¶ 78.[25]  In contradistinction, the court's review of the entire record, including the depositions of Bulman, Davin, and Lt. Foley, discloses no instance during which Bulman offered a negative comment about plaintiffs' job performance to Lt. Foley (as opposed to Lt. French).[26]  Bulman testified that while he may have been present at the PAM meeting when Horne and Brown were discussed, he did not offer an opinion because plaintiffs were not then under his supervision.  Bulman Dep. at 242-243.[27]  While Davin did offer critical comments about plaintiffs during the PAM evaluation, there can be no such thing as a conspiracy of one.

    Count III - Violation of 42 U.S.C. § 1981(b)

---

[25]There is some frustration on the court's part in being presented by plaintiffs with conclusory allegations of "fact" with either misleading or missing citations to the record. The necessity of combing a voluminous record to compensate for counsel's deficiencies in this regard has inordinately delayed this decision.  See Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 42 (1st Cir. 2006) (It is the parties' responsibility to direct the court to evidence in the record supporting their allegations.); Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.");  Richards v. Combined Ins. Co. of Am., 55 F.3d 247, 251 (7th Cir. 1995) ("It is not our task or that of the district court to scour the record in search of a genuine issue of triable fact.  We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.").

[26]Lt. Foley repeatedly told plaintiffs' counsel during the deposition that he had had no discussions with Bulman about plaintiffs.  When asked if he remembered talking to any supervisors other than Davin and Bulman about Horne and Brown, Lt. Foley responded, "I think I've said several times that I never had a conversation about Steven Horne or Ron Brown with Sergeant Bulman."  Foley Dep. at 310.  Lt. Foley testified that he did not speak to Bulman about plaintiffs because Bulman was not then their supervisor.  Id. at 310-311.

[27]As there is no evidence establishing a conspiracy between Bulman and Davin, the court need not discuss the second missing element of the claim, the lack of any evidence of a race-based animus on the part of Lt. Foley in transferring the plaintiffs.

In Count III, Horne and Brown allege that Bulman, Davin, and the City of Boston, "[b]y their actions in performing their obligations in a discriminatory manner with regard to the terms of the Plaintiffs' employment with the City, and by their actions in modifying the terms of the Plaintiffs' employment . . . denied [Horne and Brown] the enjoyment of all benefits, privileges, terms, and conditions of [their] contractual relationship [with the City] in violation of 42 U.S.C. §1981(b) and in violation of M.G.L. Chapter 93, §102." Complaint ¶ 59.  To state a claim under 42 U.S.C. § 1981, a plaintiff must show: (1) that he is a member of a racial minority; (2) that the defendant discriminated against him on the basis of his race; and (3) that the discrimination impacted one or more of the activities protected by the statute.  Garrett v. Tandy Corp., 295 F.3d 94, 98 (1st Cir. 2002).  These include "the ability either to make, perform, enforce, modify, or terminate a contract, or to enjoy the fruits of a contractual relationship, by reason of a race-based animus." Id. at 100-101. This claim fails for the simple reason that plaintiffs had no contractual right to be assigned to, or remain as, members of the YVSF.[28]

Count IV - Violation of 42 U.S.C. § 2000e and M.G.L. c. 151B, §4

In Count IV, Horne and Brown allege that Bulman and Davin and the City of Boston discriminated against them because of their race.  Horne and Brown assert that the negative PAM evaluations and criticisms of their performance have been thrown up as a

---

[28]The Complaint makes a cursory reference to Mass. Gen. Laws c. 93, § 102, a statute affirming state constitutional rights.  However, section 102 does not create a private cause of action where an exclusive remedy is provided by another statute specifically addressing the right affected, as does the state employment discrimination statute, Mass. Gen. Laws c. 151B.  See Agin v. Federal White Cement, Inc., 417 Mass. 669, 672 (1994); Charland v. Muzi Motors, Inc., 417 Mass. 580, 585 (1994).

smokescreen for defendants' retaliatory acts.  The discrimination claim is brought under both Title VII and M.G.L. c. 151B.  The test is the same under either statute.  Plaintiffs must demonstrate that they:  (1) are members of a protected class; (2) who performed their job duties acceptably; (3) who suffered an adverse job action; and (4) whose positions were filled by persons whose qualifications and skills were similar to their own.  If plaintiffs make out a prima facie case of race discrimination, the burden shifts to the employer to rebut any presumption of discrimination by articulating a legitimate nondiscriminatory reason for the adverse action.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973); see also Tardanico v. Aetna Life & Cas. Co., 41 Mass. App. Ct. 443, 448 (1996) ("The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext.").  If an acceptable rebuttal is offered, the plaintiff has the burden of showing that the reasons articulated by the employer are a pretext for discrimination.[29] The employer has only a burden of production; the burden of persuasion remains at all times with the employee.  Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999).[30]

---

[29]"No case of disparate treatment under G.L. c. 151B is complete without proof that the plaintiff's termination was a pretext for racial discrimination by showing that similarly situated employees were treated differently."  City of Boston v. MCAD, 47 Mass. App. Ct. 816, 821-822 (1999).

[30]The Massachusetts Supreme Judicial Court (SJC) has stated that summary judgment is "admittedly a disfavored remedy in discrimination cases based upon disparate treatment."  However, the SJC has upheld summary judgment in favor of defendants where "the plaintiff is unable to offer admissible evidence of the defendant's discriminatory intent, motive, or state of mind sufficient to carry the plaintiff's burdens and support a judgment in the plaintiff's favor."  Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127 (1997).

Plaintiffs argue that they were treated differently than other officers within the YVSF because of "voicing their complaints." As evidence of disparate treatment, Brown and Horne state that they were singled out for PAM reviews; that they had never been previously disciplined for poor performance, but had received several commendations for their work in the YVSF; and that after they were transferred, two white officers of similar qualifications, Gregory Long and Frank McLaughlin, took their place. Again – apart from the nondiscriminatory reasons articulated by Lt. Foley for plaintiffs' transfer out of the unit – plaintiffs have produced no evidence that Bulman or Davin either caused their transfer or played any determinative role in their selection for the PAM evaluations.[31] Consequently, this claim also fails.

Count V - Violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, §§11I

Count V of the Complaint alleges that Bulman and Davin violated rights secured to plaintiffs by the Massachusetts Civil Rights Act (MCRA). Bulman is specifically alleged to have subjected plaintiffs to a "scheme of harassment." The allegations against Davin are less clear, although he and Bulman are accused of making "false statements to the plaintiffs [sic] and to higher superior officers which effected an unwarranted transfer of the plaintiffs out of the YVSF." Complaint ¶ 72.

The purpose of the MCRA is to provide under state law a remedy "coextensive with 42 U.S.C. § 1983 except that the Federal statute requires State action whereas its State

---

[31]Lt. Foley testified that the PAM evaluation was performed by a team consisting of "the commissioner, the chief, the superintendent, chief in charge of Internal Affairs, would visit districts throughout the City . . . starting with A, going to Z, they would review every individual assigned to that district or unit." Foley Dep. at 315.

counterpart does not." Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-823 (1985). The MCRA is remedial in nature. It creates no substantive rights. Mouradian v. General Electric Co., 23 Mass. App. Ct. 538, 543 (1987). Thus, in order "to seek redress through [the MCRA as under its Federal analog, 42 U.S.C.] § 1983 . . . a plaintiff must assert the violation of a federal [or State] law." Perkins v. Commonwealth, 52 Mass. App. Ct. 175, 181 (2001), quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997). Moreover, in deference to a legislative concern that the MCRA not be interpreted to create "a vast constitutional tort," the Act is "explicitly limited" to situations "where the derogation of secured rights occurs by threats, intimidation or coercion" involving a specific threat of harm "directed toward a particular individual or class of persons." Bally v. Northeastern Univ., 403 Mass. 713, 718-719 (1989).

For purposes of the MCRA, "a '[t]hreat' . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. . . . 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . ['Coercion' involves] 'the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done.'" Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474 (1994). Although there may be circumstances in which a showing of economic coercion, standing alone, may be actionable under the MCRA, almost all of the reported cases involve an element of physical force or confrontation. Buster v. George W. Moore, Inc., 438 Mass. 635, 648 (2003). See also Haufler v. Zotos, 446 Mass. 489, 506-507 (2006) (confrontational

behavior); Planned Parenthood, 417 Mass. at 473 (physical invasion and blockade of private property); Bell v. Mazza, 394 Mass. 176, 183-184 (1985) (intimidating threats).

The allegations against Davin and Bulman fall well short of the types of coercive conduct found in cases that have sustained a violation of the MCRA. The most that is said is that defendants complained about aspects of plaintiffs' job performance. Even if the complaints were deliberately false (as alleged), this does not amount to "an attempt to force someone to do something the person is not lawfully required to do," as the MCRA requires. Freeman v. Planning Bd. of West Boylston, 419 Mass. 548, 565 (1995).

### Count VI - Intentional Interference with Advantageous Business Relationships

Count VI[32] of the Complaint alleges intentional interference by Bulman and Davin with plaintiffs' employment relationship with the City of Boston "[by] their discriminatory and unlawful acts," which "caused [plaintiffs] to be transferred out of the YVSF." Complaint ¶ 77. "[T]o make out a claim for interference with advantageous business relations, the plaintiff must prove that (1) he had a business relationship for economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive *or* means, and (4) the plaintiff's loss of advantage resulted directly from defendants' conduct." Kurker v. Hill, 44 Mass. App. Ct. 184, 191 (1998).[33] "[S]omething more than intentional interference is required" to make out the tort. United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816 (1990) (adopting Restatement

---

[32]Count VI is mistakenly captioned in the Complaint as a second Count V.

[33]A plaintiff need only prove improper means *or* motive, not both. G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 273 (1991).

(Second) of Torts, § 766, replacing the term "malicious" with "improper").[34] "The additional ingredient is improper conduct, which may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion)." <u>Schwanbeck v. Federal-Mogul Corp.</u>, 31 Mass. App. Ct. 390, 412 (1991), <u>rev'd on other grounds</u>, 412 Mass. 703 (1992).

The claim fails for at least two reasons. First, there was nothing improper about the means by which Bulman and Davin communicated their dissatisfaction with plaintiffs' job performance to their superiors. Making and reporting evaluations of the officers under their supervision was an integral part of defendants' duties as patrol sergeants. <u>See Jenkins v. DeTucci</u>, 41 Mass. App. Ct. 176, 182-183 (1996) (record demonstrated that in contacting board of directors with concerns about plaintiff's performance, defendants were fulfilling their duties in advancing DMR programs and protecting clients' health and well-being). Second, plaintiffs are unable to satisfy the necessary element of economic damage. The tort requires proof of pecuniary loss (not mere emotional stress or loss of non-pecuniary professional or social benefits). <u>See Ratner v. Noble</u>, 35 Mass. App. Ct. 137, 139 (1993); <u>Tech Plus, Inc. v. Ansel</u>, 59 Mass. App. Ct. 12, 18-19 (2003). It is

---

[34]Section 767 of the Restatement (Second) of Torts sets forth a number of factors that might be considered in determining whether a defendant's conduct in intentionally interfering with a contract (or a prospective contractual relation) is improper: "(a) the nature of the actor's conduct, (b) the actor's motive (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." Section 767 does not exhaust the list of possible factors. <u>See</u> <u>Id.</u> at comment b.

undisputed that plaintiffs' transfer out of the YVSF, whether or not "akin to a demotion" as plaintiffs allege, resulted in no diminution in their pay.

ORDER

For the foregoing reasons, defendants' motion for summary judgment on all counts of the Complaint is <u>ALLOWED</u>.  The case may now be closed.[35]

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[35]While plaintiffs on the opening page of their brief make the conclusory assertion that the entry of summary judgment for Bulman and Davin "would not . . . dispose of the independent claims against the Defendant City of Boston," that is simply an incorrect statement of the applicable law. <u>See</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) (per curiam); <u>Evans v. Avery</u>, 100 F.3d 1033, 1039-1040 (1st Cir. 1996).  There is no recovery under <u>Monell</u> on a theory of respondeat superior, as plaintiffs appear to assume.  <u>See</u> <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 122 (1992).